## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| _____ ) | |
| WABTEC CORPORATION, ) | |
| ) | |
| Plaintiff, ) | **Complaint** |
| ) | Court No. 23-00157 |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT

Plaintiff Wabtec Corporation ("Wabtec"), by and through its attorneys, alleges and states as follows:

1.     Wabtec contests the final affirmative injury determinations of the U.S. International Trade Commission ("ITC" or "Commission") in the antidumping and countervailing duty investigations of certain freight rail couplers and parts thereof from China.  *See Certain Freight Rail Couplers and Parts Thereof from China*, 88 Fed. Reg. 43,398–43,399 (Int'l Trade Comm'n, July 7, 2023).  The public version of the Views and Dissenting Views of the Commission are contained in *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) ("*Final Determination*").

## JURISDICTION

2.     Wabtec brings this challenge to the Commission's *Final Determination* pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i).  This Court therefore has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c).

**STANDING**

3.    Wabtec is a U.S. importer of freight rail couplers.  Wabtec is thus an interested party under 19 U.S.C. § 1677(9)(A).

4.    Wabtec participated in the proceedings before the Commission giving rise to this action and, therefore, is a "party to the proceeding in connection with which the matter arose."  28 U.S.C. § 2631(c); *see* 19 U.S.C. § 1516a(a)(2)(A).

**TIMELINESS OF THIS ACTION**

5.    After the Commission issued the *Final Determination*, the U.S. Department of Commerce ("Commerce") published notice of the countervailing duty and antidumping orders on July 14, 2023.  *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Countervailing Duty Order*, 88 Fed. Reg. 45,135–45,138 (Dep't of Commerce, July 14, 2023) ("*CVD Order*"); *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138–45,140 (Dep't of Commerce, July 14, 2023) ("*AD Order*").

6.    Wabtec commenced this action on August 14, 2023 by filing its Summons within the time period specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(II).  Dkt. 1.

7.    Wabtec has timely filed this Complaint within 30 days of the filing of its Summons, as required by 19 U.S.C. § 1516a(a)(2)(A) and U.S. Court of International Trade Rule 3(a)(2).

**STATEMENT OF FACTS**

**Procedural History**

8.    On September 29, 2021, the Coalition of Freight Coupler Producers ("Petitioner"), then-consisting of McConway and Torley, LLC ("M&T") and Amsted Rail Co., Inc. ("Amsted"), domestic producers of freight rail couplers ("FRCs"), filed a petition asking the Commission to reach an affirmative determination of material injury due to imports of FRCs from China

("*FRC I*").  *See generally* Petition, *Freight Rail Coupler Systems and Components Thereof from The People's Republic of China*, Inv. Nos. 701-TA-670 and 731-TA-1570 (Sept. 29, 2021). Shortly after filing the petition, Amsted withdrew from the petitioner coalition and the United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW") was added to the petition.

9.     The class or kind of merchandise subject to the petition was freight rail coupler systems and four major components thereof:  knuckles, coupler bodies, coupler yokes, and follower blocks ("Subject FRC I Imports").  *Id.*

10.     Even though the petition did not name Mexico as a subject country, Petitioner argued that imports from Mexico were evidence of material injury to the domestic industry on the theory that they were allegedly a direct result of the domestic industry's efforts to compete with Chinese imports.

11.     In March 2022, after affirmative preliminary determinations by Commerce and the Commission, provisional ADD/CVD were imposed on Subject FRC I Imports from China. *Freight Rail Coupler Systems and Components from China: Preliminary Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 12,662–12,664 (Dep't of Commerce, Mar. 7, 2022); *Freight Rail Coupler Systems and Components from China: Preliminary Affirmative Determination of Sales at Less-Than-Fair Value*, 87 Fed. Reg. 14,511–14,514 (Dep't of Commerce, Mar. 15, 2022).  A provisional CVD rate of 265.99 was imposed on March 7, 2022 and a provisional ADD rate of 116.70 percent was imposed on March 15, 2022, for a combined rate of 382.69 percent.  Importers were required to deposit estimated ADD/CVD on shipments entered on or after the effective dates of these provisional duties, and liquidation of entries was suspended.

12.    Subsequently, on July 5, 2022, the Commission issued a unanimous negative final injury determination. *Freight Rail Coupler Systems and Components From China: Determination,* 87 Fed. Reg. 41,144–41,145 (Int'l Trade Comm'n, July 11, 2022); *see also* Voting Sheet, F*reight Rail Coupler Systems and Components From China*, Inv. Nos. 701-TA-670 and 731-TA-1570 (Final) (Int'l Trade Comm'n, June 14, 2022).  The Commission's investigation focused on the period from 2019 to 2021 and found that "an industry in the United States is not materially injured or threatened with material injury by reason of subject imports from China" that are sold in the United States. *Id.*  The public version of the Views of the Commission are contained in *Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670 and 731-TA-1570 (Final), USITC Pub. 5331 (July 2022) ("*FRC I Determination*").

13.    In its *FRC I Determination*, the Commission found that the volume of subject imports from China was significant, *id.* at 21, that subject imports from China gained market share over the POI, *id.* at 20–21, and that "the domestic industry's output and financial performance declined considerably according to most measures during the POI." *Id.* at 32.  Nevertheless, the Commission found no material injury because there was no "causal nexus" between subject imports and the domestic industry's performance. *Id.*

14.    In particular, the Commission did "not find that the subject imports … had significant price effects on the domestic industry." *Id.* at 32.  The Commission found that "any overall market share shift was affected by different demand trends for new railcars and maintenance of FRCs, as well as differing concentrations of shipments in these market segments by U.S. producers and importers …." *Id.* at 25–26.  The Commission also found that, due to the dominant use of annual and long-term contracts, "domestic producers were not in a position to pivot as quickly to increase sales to the replacement market to avail themselves of the lesser decline

in demand in that market." *Id.* at 28.  "Thus, domestic producers' greater reliance on OEM sales

… at the beginning of the POI relative to subject imports contributed to domestic producers' …

market share loss to subject imports over the POI." *Id.*  In considering the impact of subject

imports, the Commission found that "other factors" unrelated to price "affected domestic prices."

*Id.* at 32 n. 162.  Those factors included "declines in demand," "changes in relative consumption

in the OEM and replacement market segment," and a number of other non-price-related factors.

*Id.* at 32–35 & n. 189.  The Commission further found that, for a meaningful portion of the market,

the use of Bedloe technology is a distinguishing factor as between domestic product and subject

imports.  *Id.* at 16–17 n. 76.

      15.     The Commission also reached a unanimous negative determination regarding threat

of material injury.  Its decision was based on multiple factors, including the following: (1) "while

the subject {Chinese} industry has the ability to increase its exports to the United States in the

imminent future, that ability also existed during the POI and did not materialize;" (2) "barriers to

enter the U.S. market limits the potential for additional subject imports, as Chinese foundries are

unable to sell FRCs to purchasers in the U.S. market without appropriate certification from the

AAR, which requires partnership with or sponsorship by an AAR member;" (3) "a licensing

agreement filed to the record contains provisions that restrain certain AAR-certified foundries in

China from selling outside of their home market and certain other markets, including North

America;" (4) "the record does not suggest that subject imports' pricing behavior was getting

increasingly aggressive toward the end of the POI such that they may imminently cause adverse

price effects on the domestic industry;  and (5) "the subject imports were not a material cause of

the industry's condition …."  *Id.* at 36, 38–40.

16.    The Commission published a notice of its final determination in the *Federal Register* on July 11, 2022.  *Freight Rail Coupler Systems and Components From China,* 87 Fed. Reg. 41,144–41,145 (Int'l Trade Comm'n, July 11, 2022).  The investigations in *FRC I* were terminated as a result.

17.    After the final determination was published, Commerce issued instructions to Customs and Border Protection advising that ADD/CVD were no longer required to be deposited on Subject FRC I imports, cash deposits on prior entries should be refunded to importers, and liquidation of entries no longer was suspended.  Liquidation Instructions - Termination, *Freight Rail Coupler Systems and Components from China,* Inv. C-570-144 (Dep't of Commerce, Aug. 9, 2022) (Barcode: 4272806-01); Liquidation Instructions - Termination, *Freight Rail Coupler Systems and Components from China,* Inv. A-570-143 (Dep't of Commerce, Aug. 5, 2022) (Barcode: 4271905-01).

18.    Petitioner did not appeal or seek judicial review of this unanimous ITC decision.

19.    Instead, on September 28, 2022, the same coalition led by M&T filed a new petition asserting materially identical allegations pressed and passed upon by the ITC in *FRC I*.  *See generally* Petition*, Certain Freight Rail Couplers and Parts Thereof from China and Mexico*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Sept. 28, 2022).  While Petitioner had argued that imports from Mexico were themselves evidence of material injury in *FRC I*, Petitioner formally named Mexico as a subject country in *FRC II*.  *Id.*

20.    The class or kind of merchandise subject to the *FRC II* petition were knuckles, coupler bodies, and combinations of knuckles and coupler blocks, known as "fits" or "assemblies" ("Subject FRC II Imports").  *Id.*  These products had been subject to the Commission's material injury investigation in *FRC I*.  *See* Petition, *Freight Rail Coupler Systems and Components Thereof*

*from The People's Republic of China*, Inv. Nos. 701-TA-670 and 731-TA-1570 (Sept. 29, 2021). The investigation in *FRC II* focused on the period from 2020 to 2022, which substantially overlapped with the period of investigation in *FRC I*.

21.     On September 29, 2022, the Commission published its notice of institution of the preliminary antidumping and countervailing duty investigations into certain freight rail couplers and parts thereof from China. *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China and Mexico: Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 87 Fed. Reg. 60,413–69, 414 (Int'l Trade Comm'n, Oct. 5, 2022).

22.     Interested parties argued that Section 751(b) of the Tariff Act barred the new investigations into imports from China as such investigations would entail an impermissible review of the Commission's negative determination in *FRC I*. Interested parties also argued that the Commission has the inherent authority in administering the Tariff Act to ensure the integrity and finality of its determinations, and that the Commission should exercise this authority to reach a negative determination in *FRC II*. Interested parties also argued that the Commission should not cumulate imports from China and Mexico, including because the exception to cumulation in Section 771(7)(G)(ii)(II) of the Tariff Act applied given the Commission's negative determination in *FRC I*.

23.     On November 15, 2022, the Commission made its preliminary determination, finding that "there is a reasonable indication that an industry in the United States is materially injured by reason of imports of certain freight rail couplers and parts thereof from China and Mexico." *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China and Mexico: Determinations*, 87 Fed. Reg. 69, 340 (Int'l Trade Comm'n, Nov. 18, 2022). The

public version of the Views of the Commission is contained in *Certain Freight Rail Couplers and Parts Thereof from China and Mexico*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Preliminary), USITC Pub. 5387 (Nov. 2022) ("*Preliminary Determination*").

24.    In the *Preliminary Determination*, the Commission excluded a domestic producer from the definition of the domestic industry on the ground that its primary interest appeared to be in importation and not domestic production and that the firm's inclusion would obscure the impact of injury due to subject imports.  *Id.* at 26–27.  The Commission also found that cumulation of imports from China and Mexico was appropriate, *id.* at 34 & n. 146, that Section 751(b) was inapplicable, and that the Commission lacked authority to reach a negative determination in *FRC II* based on its determination in *FRC I*, *id.* at 38–39.

25.    On March 3, 2023 (CVD) and March 13, 2023 (AD), Commerce published affirmative preliminary determinations of subsidization and dumping, resulting in provisional ADD/CVD being imposed on Subject FRC II Imports from China.  *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value and Preliminary Affirmative Critical Circumstances Determination,* 88 Fed. Reg. 15, 372– 15,374 (Dep't of Commerce, Mar. 13, 2023); *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Preliminary Affirmative Critical Circumstances Determination,,* 88 Fed. Reg. 13, 425–13,428 (Dep't of Commerce, Mar. 3, 2023). The provisional CVD rate was 265.99 percent and the provisional ADD rate was 169.90, for a combined rate of 435.89 percent.  Importers were required to deposit estimated ADD/CVD upon entry, and liquidation of entries was suspended.

26.     On March 9, 2023, the Commission commenced the final phase of these investigations.  *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China and Mexico:  Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 88 Fed. Reg. 16,031–16,033 (Int'l Trade Comm'n, Mar. 15, 2023).

27.     As in the preliminary phase, interested parties argued that Section 751(b) barred the Commission from reaching an affirmative determination with respect to FRCs from China and that the Commission also had the inherent authority to safeguard the integrity of its negative determination in *FRC I* by reaching a negative determination in *FRC II*.  Interested parties also continued to argue that the exception to cumulation in Section 771(7)(G)(ii)(II) of the Tariff Act applied and barred the Commission from cumulating imports from China and Mexico.

28.     On May 19, 2023, Commerce published notice in the *Federal Register* of its final affirmative determination in the countervailing duty investigation of certain freight rail couplers and parts thereof from China.  *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, In Part*, 88 Fed. Reg. 32,184–32,187 (Dep't of Commerce, May 19, 2023).  On May 30, 2023, Commerce published notice in the *Federal Register* of its final affirmative determination in the antidumping investigation of certain freight rail couplers and parts thereof from China.  *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value and Final Affirmative Determination of Critical Circumstances*, 88 Fed. Reg. 34,485–34,487 (Dep't of Commerce, May 30, 2023).

29.     On June 14, 2023, the Commission voted 3 to 1 that the domestic industry is materially injured by reason of subject imports from China.  *See Voting Sheet, Certain Freight*

*Rail Couplers and Parts Thereof From the People's Republic of China,* Inv. Nos. 701-TA-682 and 731-TA-1592 (Final) (Int'l Trade Comm'n, July 3, 2023).  The Commission published the notice of its final determinations in the *Federal Register* on July 7, 2023.  *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China,* 88 Fed. Reg. 43, 398–43,399 (Int'l Trade Comm'n, July 7, 2023).  The Views and Dissenting Views of the Commission are set forth in the *Final Determination*.

30.     In the Views, the majority (Commissioner Kearns, Commissioner Schmidtlein, and Commissioner Karpel) determined that the domestic industry is materially injured by reason of subject imports.  *Final Determination*, at 11.  In the Dissenting Views, Chair Johanson determined that the domestic industry is not materially injured or threatened with material injury by reason of subject imports.  *Id.* at 66.  In Separate Views, Chair Johanson and Commissioner Karpel dissented from the majority's decision not to exclude one domestic producer from the definition of the domestic industry in these investigations.  *Id.* at 65.  Commissioner Stayin did not participate in these investigations.  *Id.* at 3.

31.     Commerce published notice of countervailing duty and antidumping orders covering imports of FRCs from China on July 14, 2023.  *CVD Orders*, 88 Fed. Reg. 45,135–45,138 (Dep't of Commerce, July 14, 2023); *AD Orders*, 88 Fed. Reg. 45,138–45,140 (Dep't of Commerce, July 14, 2023).

### Procedural Issues

32.     The Commission issued its *Final Determination* notwithstanding its prior negative determination in *FRC I*.  In reaching this decision, the Commission did not address Section 751(b)'s limits on the ability of the Commission to review its prior negative determinations in

*FRC I.*  Nor did it acknowledge, much less exercise, its inherent authority to preserve the integrity of its decisions in *FRC I* by reaching a negative determination as to China in *FRC II.*

### Definition of Domestic Industry

33.    In defining the domestic industry, the Commission reversed its preliminary decision to exclude one domestic producer from the domestic industry for purposes of its material injury analysis and instead defined "a single domestic industry consisting of all U.S. producer{s} of FRCs" in its final determination.  *Final Determination*, at 22.

34.    The Commission reasoned that "even if a U.S. producer's current primary interest is not in domestic production, that alone is not dispositive in the Commission's related party analysis when the record shows the related party is not shielded from subject import competition and its exclusion from the industry would mask the effects of subject imports on the industry." *Id.* at 17.

35.    The Commission found both factors present here.  First, it found that the record did not indicate that the producer's "domestic production activities were shielded from competition with subject imports from China and Mexico during the POI, or otherwise benefited from *** subject imports from Mexico during the period." *Id.* at 22.  Second, contrary to what it found in its preliminary determination, the Commission concluded that "its exclusion from the domestic industry would mask declines in the industry's performance caused by subject import competition, including data relating to market share, employment, capacity utilization, and financial performance." *Id.*

36.    The Commission thus found "that appropriate circumstances do not exist to exclude" the firm "from the domestic industry as a related party." *Id.*

## Cumulation of Subject Imports

37.    The Commission also decided to "cumulate subject imports from China and Mexico for purposes of {its} material injury analysis." *Id.* at 27. The Commission found that "{t}he statutory threshold for cumulation is satisfied in these investigations because petitioners filed the antidumping and countervailing duty petitions with respect to both subject countries on the same day, September 28, 2022." *Id.* at 25. It also found "a reasonable overlap of competition between imports from both subject countries, and between subject imports from each source and the domestic like product." *Id.*

38.    In reaching these conclusions, the Commission rejected the argument that the exception to cumulation in Section 771(7)(G) of the Tariff Act applied because imports from China were subject to a prior negative determination in *FRC I*. *Id.* at 24. The Commission reasoned that "the current investigations are not the same investigations as those in FRC I" and "that a negative determination in a prior investigation is not the same as a termination in these investigations," such that the statutory exception to cumulation did not apply. *Id.* at 24 & n. 114.

39.    In reaching this decision, the Commission ignored language in the Statement of Administrative Action (SAA) to the Uruguay Round Agreements Act (URAA), which references whether the specific "imports" at issue "are the subject of terminated investigations," not simply whether the *current* investigation into the imports has been terminated. *See* H.R. Rep. No. 103316, Vol. I at 849 (1994).

## Material Injury Analysis

40.    The Commission found that "an industry in the United States is materially injured by reason of imports of FRCs from China that Commerce has found to be sold in the United States at less than fair value and subsidized by the government of China." *Final Determination*, at 27.

41.     In reaching this conclusion, the Commission found that the domestic industry improved by most measures over the POI.  The domestic industry's market share increased over the POI.  *Id.* at 48.  The domestic industry's practical production capacity, production quantity, capacity utilization, and U.S. shipments increased over the POI.  *Id.* at 47–48.  And the domestic industry's employment-related performance indicia, the industry's number of production workers, the industry's total hours worked and wages paid, and the industry's revenues, gross profits, and operating and net income all increased over the POI.  *Id.* at 48–49.  At the same time, U.S. shipments of cumulated subject imports declined and subject imports lost market share to the domestic industry over the POI.  *See id.* at 39 & n. 217, 48.

42.     Nevertheless, the Commission concluded that the domestic industry was materially injured by reason of subject imports.

43.     The Commission found that cumulated subject imports had significant adverse price effects during the POI.  *Id.* at 46.  The Commission reasoned that cumulated subject imports significantly undersold domestically produced FRCs, leading to a shift in market share from the domestic industry to cumulated subject imports in the overall market from 2020 to 2021, prior to the imposition of provisional duties on FRCs from China in *FRC I*, and in the replacement market from 2020 to 2022 largely attributable to FRCs from Mexico.  *Id.*  It also concluded that subject imports prevented price increases that would have otherwise occurred to a significant degree in 2020 and 2021.  *Id.*

44.     The Commission also found that cumulated subject imports had a significant adverse impact on the domestic industry.  *Id.* at 54.  The Commission reasoned that a significant volume of cumulated subject imports significantly undersold the domestic like product, leading to a shift in market share from the domestic industry to cumulated subject imports in the overall

market from 2020 to 2021, prior to the imposition of provisional duties on FRCs from China in *FRC I*, and in the replacement market from 2020 to 2022. *Id.* at 50. The Commission further found that subject imports prevented price increases that would have otherwise occurred to a significant degree in 2020 and 2021. *Id.*

45. The Commission discounted the evidence of the domestic industry's improvement by attributing it to the provisional duties imposed in *FRC I*. *See, e.g.*, *id.* at 42–47, 50, 51 n. 278, 53. The Commission also focused on trends within the replacement channel (as opposed to the OEM channel). Even though the domestic industry "made gains in the OEM market in 2022 that offset volume losses in the replacement market," the Commission treated the domestic industry's decline in market share in the replacement channel standing alone as evidence of material injury. *Id.* at 43 & n. 240.

46. The Commission also discounted the significance of its negative determinations in *FRC I*. It reasoned that the Commission is not bound by its prior determinations and that its decision in *FRC I* was based on a different record with a different scope, and only concerned imports of FRCs (and certain additional components) from China. *Id.* at 54.

47. Commissioner Karpel's affirmative determination differed from the Commission's affirmative determination insofar as Commissioner Karpel excluded one domestic producer from the domestic industry, as the Commission itself had done in its preliminary determination. *Id.* at 61–65. Commissioner Karpel reached an affirmative determination notwithstanding her conclusions that (i) subject imports did not depress domestic prices to a significant degree or prevent price increases that would have otherwise occurred to a significant degree; (ii) domestic prices generally increased during the POI; (iii) the domestic industry improved its COGS-to-net-

sales ratio over the POI; and (iv) there is no evidence that would indicate that domestic prices should have or could have been higher than they were. *Id.* at 46 n. 254.

## STATEMENT OF CLAIMS

48. The *Final Determination* is "unsupported by substantial evidence on the record, or otherwise not in accordance with law" as provided by 19 U.S.C. § 1516a(b)(1)(B)(i) for the following reasons:

## COUNT ONE

49. Paragraphs 1 through 48 are incorporated by reference.

50. The Commission's decision to reach an affirmative determination notwithstanding its negative determinations in *FRC I*, and the subsidiary findings and conclusions on which this decision rests, are unsupported by substantial evidence and otherwise not in accordance with law.

51. Section 751(b) of the Tariff Act provides that the Commission "may not review" a prior negative determination within 24 months of its publication absent "good cause." 19 U.S.C. § 1675(b)(4).

52. The Commission also has inherent authority in administering the Tariff Act to preserve the integrity of its prior decisions.

53. Among other errors, the Commission:

   a. failed to adequately address these arguments in its *Final Determination*;

   b. failed to conclude that a petitioner must show good cause for the Commission to review a negative determination within two years;

   c. failed to find that Petitioner was seeking a review of the Commission's prior determination in *FRC I*;

   d. failed to find that Petitioner did not and could not show good cause;

    e.   failed to find that Section 751(b) barred an affirmative determination against China in *FRC II*; and

    f.   failed to acknowledge or exercise its inherent authority in administering the Tariff Act to preserve the integrity of its own proceedings by reaching a negative determination with respect to China in *FRC II*.

## COUNT TWO

54.    Paragraphs 1 through 53 are incorporated by reference.

55.    The Commission's decision to reach an affirmative determination notwithstanding its negative determinations in *FRC I*, and the subsidiary findings and conclusions on which this decision rests, are unsupported by substantial evidence and otherwise not in accordance with law.

56.    Among other errors, the Commission:

    a.   failed to adequately explain why it was reaching an affirmative determination against China in *FRC II* notwithstanding its prior negative determination in *FRC I*;

    b.   failed to adequately explain why it was crediting evidence or findings that it had previously rejected in *FRC I*; and

    c.   inconsistently and without adequate explanation relied on differences between the investigations in *FRC I* and *FRC II* for some purposes, while ignoring such differences for other purposes.

## COUNT THREE

57.    Paragraphs 1 through 56 are incorporated by reference.

58.    The Commission's decision not to exclude one firm from the definition of the domestic industry, and the subsidiary findings and conclusions on which this decision rests, are unsupported by substantial evidence and otherwise not in accordance with law.

59.     Among other errors, the Commission:

    a.   applied the wrong legal standard in defining the domestic industry;

    b.   reversed its preliminary determination that one firm's primary interest is in importation and not domestic production given its ratio of imports to domestic production and its stated reasons for importation (lowering its costs and expanding sales for its largest customers) notwithstanding that no facts were introduced in the final phase investigation that detracted from the Commission's preliminary finding;

    c.   reversed without adequate factual basis or explanation its preliminary determination that inclusion of the related party would skew the data for the domestic industry;

    d.   improperly found that the firm was not shielded from competition with subject imports and did not benefit from subject imports from Mexico; and

    e.   failed to properly consider the facts that: (i) this party did not move production to Mexico during the POI or due to subject import competition; (ii) its exclusion would not mask injury or distort the data; and (iii) the party's primary interest with respect to FRCs appears to lie in importation, which is consistent with its capacity utilization (and resulting performance and financial indicators) and its ratio of subject imports to domestic production.

## **COUNT FOUR**

60.     Paragraphs 1 through 59 are incorporated by reference.

61. The Commission's decision to "cumulate subject imports from China and Mexico for purposes of {its} material injury analysis," and the subsidiary conclusions on which this decision rests, are unsupported by substantial evidence and otherwise not in accordance with law.

62. Among other errors, the Commission:

   a. improperly interpreted Section 771(7)(G) of the Tariff Act not to bar cumulation under the circumstances of these investigations;

   b. ignored relevant language from the SAA regarding the meaning and purpose of Section 771(7)(G); and

   c. erroneously determined that "the current investigations are not the same investigations as those in FRC I and that that a negative determination in a prior investigation is not the same as a termination in these investigations."

## COUNT FIVE

63. Paragraphs 1 through 62 are incorporated by reference.

64. The Commission's decision that cumulated subject imports had significant adverse price effects during the POI, and the subsidiary findings on which this conclusion rests, are unsupported by substantial evidence and otherwise not in accordance with law.

65. Among other errors, the Commission:

   a. erroneously concluded that underselling had significant adverse price effects;

   b. failed to recognize that despite underselling, subject imports lost market share to the domestic like product, not the other way around;

   c. improperly discounted the evidence of the domestic industry's improvement in 2022 because of the provisional duties imposed in *FRC I*;

18

d.  improperly focused on price and COGS-to-net-sales ratio trends from 2020 to 2021 while discounting trends between 2021 and 2022 because of the provisional duties from *FRC I*;

e.  improperly discounted evidence that certain sales on the confidential record should not be treated as examples of lost sales or as evidence of injury or price suppression;

f.  failed to adequately explain its reliance on contemporaneous business documents provided by Petitioner that it previously rejected in *FRC I*;

g.  failed to recognize that the decline in the domestic industry's share of the replacement market was attributable to the industry's strategic decisions to prioritize its OEM customers and that subject imports were pulled into the market by demand considerations;

h.  failed to properly consider the impact of trends within the OEM channel on the domestic industry;

i.  failed to reconcile its reasoning with its decision in *FRC I*, where the Commission found that subject imports from China in 2020 and 2021 did not cause injury and discounted claims that FRC production shifted to Mexico due to competition with Chinese imports;

j.  failed to properly consider record evidence showing that non-price factors such as availability and quality were more important than price in purchasing decisions; and

k.  failed to properly consider the fact that the domestic industry does not produce FRCs with Bedloe technology, which put it at a competitive disadvantage in competing for business.

## COUNT SIX

66.    Paragraphs 1 through 65 are incorporated by reference.

67.    The Commission's decision that cumulated subject imports had an adverse impact on the domestic industry during the POI, and the subsidiary findings on which this conclusion rests, are unsupported by substantial evidence and otherwise not in accordance with law.

68.    Among other errors, the Commission:

   a.    failed to properly consider the fact that domestic industry's condition improved during the POI by most measures of performance;

   b.    improperly discounted the evidence of the domestic industry's improvement in 2022 because of the provisional duties imposed in *FRC I*;

   c.    improperly focused on trends within the replacement channel, failing to recognize the domestic industry's lack of capacity and lack of interest in this market;

   d.    failed to reconcile its reasoning with its decision in *FRC I*, where the Commission found that subject imports from China in 2020 and 2021 did not cause injury;

   e.    failed to properly consider the impact of trends within the OEM channel on the domestic industry; and

   f.    failed to properly consider the fact that the domestic industry does not produce FRCs with Bedloe technology, which put it at a competitive disadvantage in competing for business.

## COUNT SEVEN

69.    Paragraphs 1 through 68 are incorporated by reference.

70.    Commissioner Karpel's decision that cumulated subject imports had adverse price effects and impact on the domestic industry during the POI, and the subsidiary findings on which

this conclusion rests, are unsupported by substantial evidence and otherwise not in accordance with law.

71.    Although Commissioner Karpel defined the domestic industry to exclude one company that the Commission Majority had included as a member of the domestic industry, Commissioner Karpel relied on the same basic factors as the Commission Majority in its price and impact analyses.

72.    The flaws in the Commission Majority analyses are also found in Commissioner Karpel's opinion.  In addition, Commissioner Karpel's exclusion of one domestic producer from the domestic industry changed the record in ways that undermined her ultimate finding of material injury.

73.    Among other errors, Commissioner Karpel improperly focused on trends within the replacement channel, failing to recognize that the domestic industry did not have the capacity or interest in serving this market due to its focus on the OEM market.

## **PRAYER FOR RELIEF**

For the reasons stated above, Wabtec respectfully requests that this Court:

1.    Hold that the Commission's *Final Determination* in the subject investigation is unsupported by substantial evidence on the record and otherwise not in accordance with law;

2.    Remand the investigation to the Commission for disposition consistent with any orders and opinions of this Court; and

3.    Grant such other relief as may be just and proper.

Respectfully submitted,

*/s/ David M. Morrell*

David M. Morrell
Ryan M. Proctor
Shelbie M. Rose
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3636
dmorrell@jonesday.com

*Counsel for Wabtec Corporation*

Dated:  September 13, 2023

**CERTIFICATE OF SERVICE**
*Wabtec v. United States,* Case No. 23-00157

I, Shelbie M. Rose, hereby certify that on September 13, 2023, I caused the attached Complaint to be served by certified mail or registered mail, return receipt requested, on the following parties and counsel:

| PARTY | REPRESENTATION |
|---|---|
| On Behalf of The United States | Attorney-In-Charge<br>International Trade Field Office<br>Commercial Litigation Branch<br>Civil Division<br>U.S. Department of Justice<br>26 Federal Plaza<br>Room 346, Third Floor<br>New York, NY 10278<br><br>Supervising Attorney<br>Commercial Litigation Branch<br>Civil Division<br>U.S. Department of Justice<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, DC 20044 |
| On Behalf of the International Trade Commission | The Honorable Lisa R. Barton<br>Secretary<br>U.S. International Trade Commission<br>500 E. Street, S.W.<br>Washington, DC 20436 |
| On Behalf of the Coalition of Freight Coupler Producers | Daniel Pickard, Esq.<br>Buchanan Ingersoll & Rooney PC<br>1700 K Street NW #300<br>Washington DC 20006<br> daniel.pickard@bipc.com |
| On Behalf of the Strato, Inc. | Andrew T. Schutz, Esq.<br>Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP<br>1201 New York Ave., NW, Suite 650<br>Washington, DC 20005<br>aschutz@gdlsk.com |
| On behalf of Amsted and ASF-K de Mexico S. de R.L. de C.V. ("ASF-K"). | Richard P. Ferrin<br>Faegre Drinker Biddle & Reath LLP<br>1500 K Street, N.W. #1100,<br>Washington, DC 20005<br>richard.ferrin@faegredrinker.com |

| On behalf of TTX Company | James Smith<br>Covington & Burling<br>One Center City<br>850 Tenth Street, NW<br>Washington, District of Columbia 20001-4956<br>jmsmith@cov.com |
|---|---|
| On behalf of Embassy of Mexico | Antonino Bertoni<br>Ministry of Economy of Mexico<br>Pachuca 189, Col. Condesa<br>C.P. 06140, Cuauhtemoc Mexico City<br>Tel. 011 52 55 57 299 100<br>antonino.bertoni@economia.gob.mx |
| On behalf of The Greenbrier Companies, Inc. | Stephen J. Orava<br>King & Spalding, LLP<br>1700 Pennsylvania Ave., NW #900<br>Washington, DC 20006<br>sorava@kslaw.com<br>tradeservice@kslaw.com |

*/s/ Shelbie M. Rose*
Shelbie M. Rose
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3652
srose@jonesday.com

*Counsel for Wabtec Corporation*