## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| ———————————————————— x | |
| WABTEC CORPORATION and STRATO INC., : | |
| : | |
| Plaintiff/Consolidated Plaintiff, : | |
| : | Consol. Court No. 23-00157 |
| : | |
| v. : | **PUBLIC VERSION** |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant, : | |
| and : | |
| : | |
| COALITION OF FREIGHT : | |
| COUPLER PRODUCERS, : | |
| : | |
| Defendant-Intervenor. : | |
| ———————————————————— x | |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs Wabtec Corporation ("Wabtec") and Strato, Inc. ("Strato"), respectfully move for judgment on the administrative record.  For the reasons set forth in the accompanying Memorandum of Law in support of its motion, Wabtec and Strato request that the Court determine that the final affirmative injury determinations of the U.S. International Trade Commission ("ITC" or "Commission") in the antidumping and countervailing duty investigations of certain freight rail couplers and parts thereof from China and the accompanying Views of the Commission are not supported by substantial evidence on the record and are otherwise not in accordance with law. *See Certain Freight Rail Couplers and Parts Thereof from China*, 88 Fed. Reg. 43,398–43,399 (Int'l Trade Comm'n, July 7, 2023); Views and Dissenting Views of the Commission; *Certain Freight Rail Couplers and Parts*

*Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) (collectively "Final Determination").

Dated:  August 19, 2024

Respectfully submitted,

*/s/ David M. Morrell*
David M. Morrell
Shelbie M. Rose
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
202.879.3636
dmorrell@jonesday.com

*Counsel for Wabtec Corporation*

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Ned H. Marshak
GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, D.C. 20005
202.783.6881
aschutz@gdlsk.com

*Counsel for Strato Inc.*

*/s/ James M. Smith*
James M. Smith
Sooan (Vivian) Choi
Paula Ortiz Cardona
Wanyu Zhang
COVINGTON & BURLING LLP
850 10th Street, NW
Washington, D.C. 20001
202.662.5550
jmsmith@cov.com

*Counsel for Strato Inc.*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| ——————————————————— x | |
| : | |
| WABTEC CORPORATION and STRATO INC., : | |
| : | |
| Plaintiff/Consolidated Plaintiff, : | |
| : | Consol. Court No. 23-00157 |
| : | |
| v. : | |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant, : | |
| and : | |
| : | |
| COALITION OF FREIGHT : | |
| COUPLER PRODUCERS, : | |
| : | |
| Defendant-Intervenor. : | |
| ——————————————————— x | |

### ORDER

Upon consideration of the Motion for Judgment on the Administrative Record filed by Plaintiffs Wabtec Corporation ("Wabtec") and Strato, Inc. ("Strato"), and upon all other papers and proceedings herein, the Court

ORDERS that Wabtec and Strato's Motion is granted; and further

FINDS that the contested results of the U.S. International Trade Commission ("ITC" or "Commission") in *Certain Freight Rail Couplers and Parts Thereof from China*, 88 Fed. Reg. 43,398–43,399 (Int'l Trade Comm'n, July 7, 2023) and Views and Dissenting Views of the Commission in *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) (collectively "Final Determination"), were not supported by substantial evidence on the record, and were otherwise not in accordance with law; and further

ORDERS that this matter is remanded to the Commission with instructions to issue a negative determination in accordance with the decision of this Court.

SO ORDERED.

_____
Gary S. Katzmann, Judge

Dated: _____, 2024
       New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

———————————————————————— x
:
WABTEC CORPORATION and STRATO INC.,            :
:
Plaintiff/Consolidated Plaintiff,    :
:        Consol. Court No. 23-00157
:
v.                          :        **PUBLIC VERSION**
:
UNITED STATES,                                 :
:        **Business Proprietary**
:        **Information Removed From**
Defendant,            :        **pages i, 2-3, 5, 8, 13-17, 24-34,**
and                            :        **36-41, 43-46, 48-53, and 56-58.**
:
COALITION OF FREIGHT                           :
COUPLER PRODUCERS,                             :
:
Defendant-Intervenor.       :
———————————————————————— x

## PLAINTIFF'S RULE 56.2 MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Andrew T. Schutz
Ned H. Marshak
GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave. NW #650
Washington, D.C. 20005
202.783.6881
aschutz@gdlsk.com

James M. Smith
Sooan (Vivian) Choi
Paula Ortiz Cardona
Wanyu Zhang
COVINGTON & BURLING LLP
850 10th Street, NW
Washington, D.C. 20001
202.662.5550
jmsmith@cov.com

David M. Morrell
Shelbie M. Rose
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
202.879.3636
dmorrell@jonesday.com

Dated: August 19, 2024    *Counsel for Wabtec Corporation*    *Counsel for Strato Inc.*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 7

      A.  Administrative Decision Under Appeal ................................................................ 7

      B.  Reasons for Contesting the Administrative Decision.................................... 7

      C.  Issues Presented and Summary of Argument ................................................. 7

STATEMENT OF FACTS ............................................................................................ 10

      A.  Petitioner Commences *FRC I*, in Which the Commission Issued a Unanimous
          Negative Determination and Thereby Terminated the Investigation................... 10

      B.  Petitioner Refiles Its Petition, Thereby Initiating *FRC II*........................... 12

      C.  The Commission Reaches an Affirmative Determination in *FRC II*. ........ 13

      D.  The Commission Refuses to Address the Attorney's Disabling Conflict of Interest. 17

STANDARD OF REVIEW .......................................................................................... 17

ARGUMENT .................................................................................................................. 18

I.     The Commission Erred by Allowing Petitioner to Relitigate the Final Determination in
       FRC I.......................................................................................................................... 18

      A.  The Commission's Refusal to Apply Section 751(b)(4) Was Contrary to Law......... 18

      B.  The Commission Erred in Refusing to Acknowledge and Exercise Its Inherent
         Authority. .............................................................................................................. 22

II.    The Commission Erred in Refusing to Exclude [      ] from the Domestic Industry. ....... 24

      A.  The Commission's Traditional Criteria Required Exclusion of [      ]. ................... 25

      B.  The Commission's Reasons for Including [      ] Are Legally and Factually Flawed.
         .................................................................................................................................. 26

III.   The Commission Improperly Cumulated Imports Subject to the Terminated Investigation
       in *FRC I*.................................................................................................................. 31

**PUBLIC VERSION**

IV.    The Commission's Finding of Material Injury by Reason of Subject Imports Is
       Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law....... 32

       A.   The Commission's Price Effects Analysis Is Unsupported by Substantial Evidence
            and Otherwise Not in Accordance with Law......................................................... 36

       B.   The Commission's Causation Analysis, Which Contradicted *FRC I* findings, Was
            Arbitrary, Unsupported by Substantial Evidence, and Otherwise Not in
            Accordance with Law. ........................................................................................... 41

V.     The Conflict of Interest Requires Remand of the Commission's Decision for Issuance of a
       Negative Injury Determination. ........................................................................................... 54

       A.   The Commission's Refusal to Address the Conflict of Interest Rests on a False
            Premise.................................................................................................................... 55

       B.   Regardless of the Commission's Authority, This Court Should Address the Conflict
            of Interest. .............................................................................................................. 56

CONCLUSION................................................................................................................................ 58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Airmark Corp. v. FAA,*
    758 F.2d 685 (D.C. Cir. 1985) ................................................................. 3

*Allied Mineral Prods. v. United States,*
    28 C.I.T. 1861 (2004) .......................................................................... 19

*Amsted Rail Co., Inc. v. United States Int'l Trade Comm'n,*
    600 F. Supp. 3d 1308, 1330-31 (CIT 2022) ............................................. 55

*Asociacion Colombiana de Exportadores de Flores v. United States,*
    704 F. Supp. 1068 (CIT 1988) ............................................................... 3

*Bonney Forge Corp. v. United States,*
    560 F. Supp. 1303 (CIT 2022) .............................................................. 22

*Borden v. United States,*
    593 U.S. 420 (2021) ............................................................................ 21

*Chemours Co. FC LLC v. United States,*
    393 F. Supp. 3d 1186 (C.I.T. 2019) ...................................................... 22

*City of Tacoma v. Taxpayers of Tacoma,*
    357 U.S. 320 (1958) ............................................................................ 20

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ............................................................................ 18

*CS Wind Vietnam Co. v. United States,*
    832 F.3d 1367 (Fed. Cir. 2016) ............................................................ 17

*Ctr. for Auto Safety v. Fed. Highway Admin.,*
    956 F.2d 309 (D.C. Cir. 1992) ............................................................. 46

*Elkem Metals Co. v. United States,*
    26 C.I.T. 234 (2002) ........................................................................... 12

*Fag Kugelfischer Georg Schafer AG v. United States,*
    332 F.3d 1370 (Fed. Cir. 2003) ............................................................. 8

*Gechter v. Davidson,*
    116 F.3d 1454 (Fed. Cir. 1997) ....................................................... 24, 56

*Gerald Metals, Inc. v. United States,*
    132 F.3d 716 (Fed. Cir. 1997) ............................................................. 41

*Henson v. Santander Consumer USA Inc.*,
    582 U.S. 79 (2017)........................................................................................19

*Humane Soc'y of the U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) .....................................................................27

*Hung Vuong Corp. v. United States*,
    483 F. Supp. 3d 1321 (CIT 2020)................................................................22

*Hynix Semiconductor, Inc. v. United States*,
    431 F. Supp. 2d 1302 (Ct. Int'l Trade 2006) ..........................................42

*Makita Corp. v. United States*,
    819 F. Supp. 1099 (CIT 1993).....................................................................57

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984)......................................................................18

*San Remo Hotel, L.P. v. City & Cnty. of San Francisco*,
    545 U.S. 323 (2005)......................................................................................23

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001)....................................................................24

*Tokyo Kikai Seisakusho, Ltd. v. United States*,
    529 F.3d 1352 (Fed. Cir. 2008)....................................................................22

*Touchcom, Inc. v. Bereskin & Parr*,
    299 F. App'x 953 (Fed. Cir. 2008) .............................................................56

*United States v. Morales*,
    807 F.3d 717 (5th Cir. 2015) .......................................................................21

*In re Vivint, Inc.*,
    14 F.4th 1342 (Fed. Cir. 2021) ..............................................................28, 56

*Wall v. Kholi*,
    562 U.S. 545 (2011)......................................................................................21

**Administrative Materials**

*Certain Freight Rail Coupler Systems and Components from China*,
    Inv. Nos. 701-TA-670 and 731-TA-1570 ...................................... *passim*

*Certain Freight Rail Couplers and Parts Thereof from China*,
    Inv. Nos. 701-TA-682 and 731-TA-1592...................................... *passim*

*Certain Electronic Imaging Devices*,
    Inv. No. 337-TA-726 ..........................................................................2, 6, 45

*Certain Network Interface Cards & Access Points,*
   Inv. Nos. 337-TA-455 ...........................................................................45, 46

*Freight Rail Coupler Systems and Components From China,*
   87 Fed. Reg. 41,144 (July 11, 2022) ...........................................................11

**Statutes**

19 U.S.C. §1671d(b)(1) ...........................................................................1, 23

19 U.S.C. § 1516a(a)(1)(D) ...........................................................................12

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................................17

19 U.S.C. § 1671d(c)(2) ...........................................................................1, 4, 8, 32

19 U.S.C. § 1671d(b)(1) ...........................................................................14

19 U.S.C. § 1671d(c)(2) ...........................................................................1, 4, 2, 23

19 U.S.C. § 1673b(a)(1) ...........................................................................22

19 U.S.C. § 1673d(b) ...........................................................................41

19 U.S.C. §1673d(b)(1) ...........................................................................1, 19, 23

19 U.S.C. § 1673d(c)(2) ...........................................................................1, 4, 8, 11, 32

19 U.S.C. § 1675(b) ...........................................................................18

19 U.S.C. §1675(b)(1)(A), (C) ...........................................................................19

19 U.S.C. § 1675(b)(4) ...........................................................................7, 18

19 U.S.C. § 1675(b)(4)(A)–(B) ...........................................................................7, 19

19 U.S.C. § 1677(4)(B) ...........................................................................8

19 U.S.C. §1677(7)(H) ...........................................................................31

19 U.S.C. § 1677(7)(G)(ii)(II) ...........................................................................4, 8, 31

19 U.S.C. § 4572(a) ...........................................................................23

**Regulations**

19 C.F.R. § 208.16(b) ...........................................................................23, 24

**Model Rules of Professional Conduct**

Rule 1.9, cmt. 3 ...........................................................................57

**PUBLIC VERSION**

## Other Authorities

Statement of Administrative Action to the Uruguay Round Agreements Act, H.R.
    Rep. No. 103316, Vol. I (1994) ........................................................................4, 8, 31, 42, 45

D.C. Bar Ethics Op. 309 (2001)........................................................................................57

Rule 201.15(a).....................................................................................................................54

Plaintiffs Wabtec Corporation ("Wabtec") and Strato, Inc. ("Strato"), U.S. importers of subject merchandise, submit this Memorandum of Law to support their Rule 56.2 Motion for Judgment on the Agency Record.

## INTRODUCTION

The Tariff Act of 1930, as amended ("Tariff Act"), makes the International Trade Commission ("the Commission") the ultimate arbiter of whether subject imports materially injure the domestic industry. Its determination is "final." 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). And when its determination is negative, "the investigation shall be terminated." *Id.* §§ 1671d(c)(2), 1673d(c)(2). Parties before the Commission have long understood and respected the obvious implication of this: the Commission's determination of injury with respect to particular merchandise in a particular country during a particular time period is not subject to question outside of the specific channels for review set forth in the Tariff Act. Indeed, to Plaintiffs' knowledge, for *at least* 13 years, no petitioner has filed a second petition involving the same merchandise from the same country within a year of a final negative determination by the Commission. That is, until the petition giving rise to this proceeding.

Petitioner first brought a petition to impose duties on freight rail couplers ("FRCs") from China in September 2021 ("*FRC I*"). After a comprehensive nine-month investigation, the Commission unanimously determined that subject imports neither caused nor threatened material injury to the domestic industry. Petitioner did not seek review of this decision in this Court, as was its right. Instead, just weeks after the Commission's 5-0 negative determination, and nearly one year to the day after its first filing, Petitioner refiled a nearly identical petition again seeking duties on FRCs from China ("*FRC II*"). In Petitioner's view, the Commission had to throw its previous determination—resting on 227 pages of detailed findings and data—into the trash and begin again as though the first proceeding had never happened at all.

Despite the  unprecedented nature of the filing, the Commission obliged, treating *FRC II* as an ordinarily filed case that should follow an ordinary investigative path.  The Commission's ho-hum attitude toward the extraordinary nature of the proceeding spawned all kinds of errors.  Nearly all of them flow from a fundamental conceit: that the Commission was at liberty to deny any connection between the cases for some purposes, while relying on the effects of *FRC I* for other purposes, all without harmonizing or explaining the disparate treatment of the investigations.  This basic approach is most evident in the Commission's decision to treat the two investigations and determinations as wholly distinct and based on separate records to evade procedural obstacles and inconvenient factual findings arising from *FRC I*, while elsewhere citing provisional duties from *FRC I* as *the* justification for its wholesale dismissal of the [          ] gains achieved by the domestic industry, by virtually every measure, over the period of investigation ("POI").  In its transparent attempt to reach a result, the Commission glossed over statutory provisions designed to prevent precisely the kind of do-over Petitioner achieved here and all the discrepancies its tends to create.  The Commission also refused to acknowledge, much less justify, the contradictions between specific factual findings in *FRC I* and *FRC II*.  Its defense of all of this?  "The Commission," so says the Commission, "is not bound by our prior determinations in FRC I."  Views of the Commission, *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final) (July 2023) ("Views"), PR190 at 54, CR178 at 58.

What may be true of kings is not true of administrative agencies.  The Commission cannot use the fact-specific nature of investigations as cover for arbitrary decision-making.  The world may continue to turn and new facts may arise, but saying that is no substitute for a reasoned explanation justifying why two obviously similar cases turned out differently.  As this Court has put it, the fact that an "administrative agency may make varying decisions based on the facts of

particular cases does not permit the agency to act arbitrarily." *Asociacion Colombiana de Exportadores de Flores v. United States*, 704 F. Supp. 1068, 1071 (CIT 1988).  Nor is "{d}eference to agency authority or expertise … a license to … treat like cases differently." *Airmark Corp. v. FAA*, 758 F.2d 685, 691 (D.C. Cir. 1985) (cleaned up).  Where a subsequent case brought by the same petitioner encompasses the same imports, from the same country, from the same years, the Commission must give reasons beyond the mere fact there is a new proceeding and a new record to justify revisiting prior determinations and reversing the findings on which they were based.  The Commission's basic failure to do this gives rise to several independent grounds to  remand its decision with instructions.

 ***First***, the Commission should never have reached the merits of *FRC II*.  Section 751(b) of the Tariff Act bars "reviews" of negative final determinations within two years absent "good cause," and the Commission has inherent authority to demand as much in controlling its proceedings.  Nevertheless, the Commission granted Petitioner's do-over request, brushing off the limits imposed by Section 751(b) and ignoring its inherent authority to prevent relitigation of its prior determinations.

 ***Second***, the Commission improperly defined the domestic industry by turning on its head the text and purpose of the related-party provision under Section 771(4)(B) of the Tariff Act.  The Commission has applied this provision to exclude domestic firms to avoid masking injury suffered by *other* domestic producers.  In this case, after initially excluding [  ] as a related party from the domestic industry in accordance with its longstanding practice, the Commission reversed course and included this firm in a way that masked the *lack* of injury to the rest of the domestic industry.  In effect, the Commission interpreted the related-party exclusion in a classic tails-I-win-heads-you-lose manner: The provision applies, or does not apply, based on whether it improves the injury story for petitioners.  That position is contrary to law and not supported by substantial

evidence.  (In fact, it is not even supported by a majority of the Commissioners, two of whom dissented from this two-Commissioner-only determination.)

*Third*, the Commission violated Section 771(7)(G)(ii)(II) of the Tariff Act by cumulating imports that were subject to its negative determination in *FRC I*.  That provision prohibits cumulating imports "from any country with respect to which the investigation has been terminated."  19 U.S.C. § 1677(7)(G)(ii)(II).  The purpose of this provision is to prevent cumulation of "imports that are the subject of terminated investigations."  *See* Statement of Administrative Action to the Uruguay Round Agreements Act, H.R. Rep. No. 103316, Vol. I at 179 (1994) ("SAA").  Here, the Commission's negative final determination in *FRC I* "terminated" the investigations.  19 U.S.C. §§ 1671d(c)(2), 1673d(c)(2).  Thus, the imports covered by *FRC I* were not subject to cumulation in *FRC II*.  The Commission flouted this principle by cumulating imports from *FRC I*.

*Fourth*, after gerrymandering the domestic industry and improperly cumulating imports from *FRC I*, and over a dissent from Chairman Johanson, the Commission found material injury based on analysis riddled with internal contradictions and discrepancies with *FRC I*.  In *FRC I*, the Commission had credited Respondents' account of the market—that the domestic industry has historically prioritized the OEM channel, which follows the business cycle of new railcar builds.  When  new railcar builds dropped to near-historic lows over the POI in *FRC I*, *see* PR190 at II-13, that had a disproportionate impact on domestic producers.  As the Commission explained: the domestic producers had "a relatively higher share of their shipments comprising complete FRCs as compared to subject importers," and "any overall market share shift was affected by different demand trends for new railcars and maintenance of FRCs, as well as differing concentrations of shipments in these market segments by U.S. producers and importers."  Views of the Commission, *Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670 and 731-TA-

1570 (Final) (July 2022) ("*FRC I* Views"), PR39 at 25-28, CR42 at 33-36.

What the Commission gleaned from the record in *FRC I* was prophetic in *FRC II*.  Between 2021 and 2022, as new railcar builds surged, the domestic industry's performance improved by virtually every measure: its market share increased by [    ] percentage points, and performance indicators relating to production (production quantity, U.S. shipments, capacity utilization), employment (number of production workers, hours worked, waged paid), and financial health (revenues, gross profits, operating and net income) all increased.  Views, PR190 at 47-50, CR178 at 50-52; Staff Report, PR190/CR163 at C-3.

But rather than credit Respondents' and the Commission's own previous account of the market in *FRC I*, the Commission contorted itself to credit a new theory of injury in *FRC II*.  That theory required using a two-part maneuver designed to engineer indicia of "injury."  First, the Commission disregarded any and all improvements in 2022 as being attributable to provisional duties levied on Chinese imports during the pendency of *FRC I*, even though it had previously deemed those very imports non-injurious, and focused instead only on the domestic industry's market-share loss and performance declines from 2020 to 2021, a time frame during which it had already determined that imports from China caused no injury.  Views, PR190 at 51, CR178 at 55.  Second, the Commission disregarded the domestic industry's [      ] overall market-share gains and other improvements resulting from the rebound in OEM channel demand, instead finding that the domestic industry's [      ] market share loss in 2022 in the replacement channel alone—the segment in which the Commission previously found the domestic industry was less concentrated—was evidence of price effects and adverse impact, and thus injury by reason of subject imports.  Views, PR190 at 43 n.240, CR178 at 45 n.240.  But these two pretexts for conjuring injury—provisional duties and distribution channels—were both squarely addressed in *FRC I*, whose relevant findings the Commission never acknowledged, let alone reconciled with its

new finding of injury in *FRC II*.  Moreover, even aside from the discrepancies between *FRC I* and *FRC II*, the Commission's price and impact analyses suffer from several independent flaws that bespeak a design to reach a result.

     ***Finally***, and all the while, the Commission refused to address a glaring conflict of interest that compromised the integrity of the investigations.[1]  As the Court knows from prior proceedings in *Amsted v. U.S. International Trade Commission*, No. 22-307, the Attorney representing Petitioner in *FRC II* previously represented Amsted Rail Company, Inc. in *FRC I*.  Because the matters are substantially related and Petitioner's interests are materially adverse to Amsted's, the Attorney has labored under a conflict-of-interest from the start.  The Commission refused to address the conflict of interest, disclaiming any authority to do so.  But that squarely contradicts the Commission's regular practice of adjudicating allegations of conflicts of interest as part of its "inherent authority to control proceedings."  *Certain Electronic Imaging Devices*, USITC Inv. No. 337-TA-726, 2010 WL 4786589, at *3 (Sept. 1, 2010).  The false premise of its refusal to do so here alone requires remand.  It also requires entry of a negative determination on remand because the conflict irrevocably tainted the proceedings and calls into question the integrity of the result.  Each of these errors, alone or combination, requires remand of the Commission's final determination with instructions.

---

[1] Wabtec did not raise the conflicts issue in its complaint and does not join the portions of the brief relating to that issue, whether legal or factual in nature.  *See infra*, at 17, 54-58.

## STATEMENT PURSUANT TO RULE 56.2

**A.    Administrative Decision Under Appeal**

Wabtec and Strato seek review of the Commission's final determination in the antidumping and countervailing duty investigations of FRCs from China, which is not supported by substantial evidence on the record and is otherwise not in accordance with law. *See* Notice of Determinations, PR189; Views, PR190, CR178 (collectively "Final Determination").

**B.    Reasons for Contesting the Administrative Decision**

The reasons for contesting the administrative decision are set forth in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

**C.    Issues Presented and Summary of Argument**

**1.   *Did the Commission err in reversing its prior determination in* FRC I*?***

**Yes.** Section 751(b)(4) of the Tariff Act requires that a petitioner show "good cause" before seeking "review" of any final determination by the Commission, if less than two years have elapsed. 19 U.S.C. § 1675(b)(4). This provision covers both final affirmative and final negative determinations. *See id.* § 1675(b)(4)(A)–(B). The Commission also has inherent authority to control its proceedings by demanding the same. Here, just weeks before the petition was filed in this case, the Commission reached a final determination in *FRC I* that FRCs from China do not cause or threaten material injury. Petitioner sought review of that determination in *FRC II* because success would necessarily entail nullifying the Commission's negative determination in *FRC I*. Indeed, the Commission could not reach an affirmative determination in *FRC II* without finding injurious *the very same imports* it found non-injurious in *FRC I*. Because the petition did not identify, and the Commission did not find, good cause to reexamine the Commission's previous findings, the Commission had no basis to review and upset its negative determination in *FRC I*. The Commission also erred in failing to acknowledge its inherent authority to preserve the integrity

of its prior final determination by demanding good cause before reviewing it.

### 2. *Did the Commission err in including a related party within the domestic industry?*

**Yes.**  Section 771(4)(B) of the Tariff Act authorizes the Commission to exclude related parties from the domestic industry.  19 U.S.C. § 1677(4)(B).  Congress granted this authority out of a concern that *including* a related party would mask injury to *other* domestic firms.  In reversing its preliminary determination on this issue, the Commission turned this provision on its head.  It included a related party, [        ], on the theory that [        ] own imports were injuring itself, which is incoherent and unsupported by the record.  And the forced inclusion of [        ] in the domestic industry had the effect of masking the *lack* of injury to the rest of the domestic industry, [                        ], which conflicts with the very purpose of the provision.  The Commission's decision is thus unsupported by substantial evidence and contrary to law.

### 3. *Did the Commission improperly cumulate subject imports from China and Mexico?*

**Yes.**  Section 771(7)(G)(ii)(II) of the Tariff Act prohibits cumulating imports "from any country with respect to which the investigation has been terminated."  19 U.S.C. § 1677(7)(G)(ii)(II).  Under this provision, the Commission may not cumulate "imports that are the subject of terminated investigations."  SAA at 179.  Here, after the Commission issued its negative final determination in *FRC I*, the investigations were "terminated."  19 U.S.C. §§ 1671d(c)(2), 1673d(c)(2).  As a result, none of the imports at issue in those investigations were subject to cumulation.  The Commission violated this statutory bar by cumulating imports from *FRC I* in reaching its determination in *FRC II*.  Its decision was contrary to law and must be remanded.

### 4. *Did the Commission err in reaching an affirmative material injury determination?*

**Yes.**  Most fundamentally, in reaching an affirmative determination in *FRC II*, the Commission effectively reversed its prior negative determination in *FRC I*, without addressing

contradictions between the two determinations or the central findings on which they were based. In many instances, the Commission did not even acknowledge the inconsistency. It was content to disclaim any obligation to reconcile its findings across investigations: "The Commission is not bound by our prior determinations in FRC I." Views, PR190 at 54, CR178 at 58. The Commission claimed the very kind of "license" to "treat like cases differently" that courts have roundly rejected notwithstanding the fact-bound nature of administrative proceedings. *See, e.g.*, *Airmark Corp.*, 758 F.2d at 691. In addition, even on the four corners of its decision, the Commission contradicted itself and ignored record evidence undermining central aspects of its final determination. For these reasons, its decision is contrary to law and unsupported by substantial evidence.

### 5. *Did the Commission err in refusing to address the Attorney's conflict of interest?*

**Yes.** Just as the Commission disclaimed any responsibility to reconcile its findings across *FRC I* and *FRC II*, the Commission also disclaimed any authority to address a disabling conflict of interest by Petitioner's counsel. Yet that assertion squarely contradicts the Commission's own extensive and long-standing practice. The Commission has repeatedly claimed and exercised the power to resolve conflicts of interest as part of its "inherent authority to control proceedings." *Certain Electronic Imaging Devices*, USITC Inv. No. 337-TA-726, 2010 WL 4786589, at *3 (Sept. 1, 2010). The flawed premise of its refusal to address the conflict of interest here alone requires remand. Moreover, regardless of the Commission's authority to address the issue, this Court undoubtedly has the ability to address the conflict. Because the conflict has tainted these proceedings and the final result, the Court should direct entry of a final negative determination on remand.

## STATEMENT OF FACTS

**A.      Petitioner Commences *FRC I*, in Which the Commission Issued a Unanimous Negative Determination and Thereby Terminated the Investigation.**

On September 29, 2021, Petitioner, the Coalition of Freight Coupler Producers, led by domestic manufacturer M&T, filed a petition seeking AD/CVD duties on imports of FRCs from China.  *See FRC I* Views, PR39 at 3, CR42 at 3.  FRCs are steel castings designed to connect freight cars together.  In filing its petition on FRCs, the Coalition originally included two members of the domestic industry—M&T and Amsted Rail Company—but Amsted withdrew from the Coalition shortly after the petition was filed.  *Id*.

In the ensuing investigation, the scope included four FRC components—knuckles, coupler bodies, yokes, and follower blocks.  *Id.*, PR at 5-7, CR at 7-8.  Petitioner argued that imports of Chinese FRCs had taken a significant share of the U.S. market by underselling their products and undercutting their rivals.  *Id.*, PR at 21-23, 29, CR at 27-29,37-38.  After over nine months of litigation, the Commission reached a unanimous 5-0 final negative determination, finding neither injury nor threat of injury from imports of Chinese FRCs.  *Id.* at 3; *Voting Sheet*, Document ID 773085, Inv Nos. 701-TA-670 and 731-TA-1570 (Final), June 14, 2022.

In its Views, the Commission found that the volume of subject imports from China was significant, that subject imports from China gained market share over the POI (2019-21), and that "the domestic industry's output and financial performance declined considerably according to most measures during the POI"—not a typical fact-pattern in a unanimous negative determination involving China. *FRC I* Views, PR39 at 32, CR42 at 42.  Nevertheless, the Commission found no material injury because there was no "causal nexus" between subject imports and the domestic industry's performance.  *Id.*  It found that Petitioner had "fail{ed} to show that subject imports had significant price depressing effects" or had "prevented price increases," failed to demonstrate that "low-priced subject imports" had "significantly undersold the domestic like product," and failed

to provide evidence that "lower offers by subject imports undercu{t} domestic producers' prices." *Id.*, PR at 30–31, CR at 39-41.  The Commission did "not find that the subject imports … had significant price effects on the domestic industry."  *Id.*, PR at 32, CR at 41.  In considering the impact of subject imports, the Commission found that "other factors" unrelated to price "affected domestic prices."  *Id.*, PR at 32 n.162, CR at 42 n.162.  Those factors included "declines in demand," changes in "relative consumption in the OEM and replacement market segment," "M&T's … most favored customer pricing clause in its long-term supply agreement with Trinity," and a number of other non-price-related factors, including the superior Bedloe technology available only in imports from China.  *Id.*, PR at 34–35 & n.189, CR at 45-46 & n.189.  The Commission also found that "any overall market share shift was affected by different demand trends for new railcars and maintenance of FRCs, as well as differing concentrations of shipments in these market segments by U.S. producers and importers."  *Id.*, PR at 25, CR at 33.

As to threat of material injury, the Commission found that Petitioner had not demonstrated a "likelihood of substantially increased subject imports in the imminent future" given the "declining volume of subject imports in the U.S. market during the POI, the subject industry's declining U.S. exports, the expected increase in demand for FRCs in China, as well as its neighboring countries and Europe{.}"  *Id.*, PR at 39, CR at 51.  And, in considering the possibility of future price effects, the Commission found that "pricing patterns are unlikely to change appreciably in the imminent future," meaning "th{e} lack of adverse effects will likely continue." *Id.*, PR at 39, CR at 52.

The Commission published a notice of its final determination in the Federal Register on July 11, 2022, thereby terminating the investigations.  *See* 19 U.S.C. § 1673d(c)(2); *Freight Rail Coupler Systems and Components From China*, 87 Fed. Reg. 41,144 (July 11, 2022).  Petitioner had until August 10, 2022, to seek judicial review of the Commission's negative determination.

*See* 19 U.S.C. § 1516a(a)(1)(D).  Petitioner did not seek judicial review of the decision.

**B.      Petitioner Refiles Its Petition, Thereby Initiating *FRC II*.**

On September 28, 2022, just weeks after the Commission's unanimous negative determination in *FRC I*, and notwithstanding the Commission's finding that "th{e} lack of adverse effects will likely continue," Petitioner refiled a nearly identical petition asserting the same allegations pressed and passed upon in the previous investigation.  *See generally* Petition PR1/CR1.

The Petition in *FRC II* slightly narrowed the scope (removing yokes and follower blocks) and added Mexico as a subject country.  *Id.* at Vol. I, 6-8.  Apart from this, Petitioner cited only one condition of competition that had changed—provisional duties from the very case Petitioner unanimously lost just weeks before.  The allegations were otherwise materially the same, including Petitioner's emphasis on Mexico.

In *FRC I*, Petitioner had urged the Commission to treat imports from Mexico as themselves evidence of material injury to the domestic industry—a novel argument expressly identified and rejected in the Commission's final determination.  *See FRC I* Views, PR39 at 29-30 n.149, CR42 at 38-29 n. 149 ("Petitioner contends that the increased presence of nonsubject imports in the U.S. market is itself a manifestation of injury caused by subject imports, inasmuch as low-priced subject import competition drove Amsted to outshore some of its FRC production operations to Mexico.").  In other words, even without naming Mexico as a subject country, Petitioner had made the role of Mexico a central feature of *FRC I*, both factually and legally.

As it also did in *FRC I*, the Petition in *FRC II* identified two channels of distribution for FRCs.  One is the replacement market, in which railcar owners and maintenance companies purchase FRCs to replace broken or worn FRCs on railcars already in service.  Petition, PR1/CR1 Vol. I at 18.  The other is the Original Equipment Manufacturer ("OEM") channel, in which new

railcar builders purchase FRCs (along with innumerable other railcar components) for incorporation into new railcars. *Id.* The OEMs then sell finished railcars to third parties, such as Class I railroads (*e.g.*, Union Pacific, BNSF, or CSX) and pooling or leasing companies (like TTX). *Id.*

Because of the Petition's timing, there was substantial overlap in the periods of investigation for each of the two investigations: *FRC I* covered imports from 2019 through 2021, while *FRC II* covered imports from 2020 through 2022. *See* Views, PR190 at 38 n.208, CR178 at 39 n.208.

**C.    The Commission Reaches an Affirmative Determination in *FRC II*.**

On June 14, 2023, over the dissent of Chair Johanson, the Commission reached a final affirmative determination, finding that the domestic industry was materially injured by reason of subject imports from China, with two Commissioners dissenting from the decision to include [    ] in the domestic industry. *Id.*, PR/CR at 1; *see also* Separate Views, PR190 at 61-66, CR180 at 1-6. The Commission published the notice of its final determinations in the Federal Register on July 7, 2023. Notice of Determinations, PR189. The Views and Dissenting Views of the Commission are set forth in USITC Publication 5438.

In both the preliminary and final phases, Respondents had raised issues arising from Petitioner's decision to seek a do-over of *FRC I*. First, they argued that, absent good cause, Section 751(b) barred the Commission from reaching an affirmative determination with respect to FRCs from China and, further, that the Commission had the inherent authority to safeguard the integrity of its negative determination in *FRC I* by demanding good cause before proceeding with *FRC II*. *See* PR56/CR60 at 23-36, PR59/CR61 at 13-28, PR132/CR142 at 53-54. In its preliminary determination, the Commission rejected the statutory argument on the ground that Section 751(b)(4) applies only to "affirmative," not "negative," final determinations as part of "a changed

circumstances review." Prelim. Views, PR102/CR96 at 39 n.167. It also found the provision inapplicable because *FRC II* involved a different scope and added a new subject country (Mexico). *Id.* The Commission did not return to the issue in its final determination, nor did it address (in its preliminary or final determinations) whether the Commission possesses inherent authority to prevent relitigation of its prior determinations absent good cause.

Second, Respondents argued that Section 771(7)(G)(ii)(II) of the Tariff Act barred the Commission from cumulating Chinese imports that were subject to the "terminated" investigation in *FRC I*. *See* PR56/CR60 at 23-36, PR59/CR61 at 13–28, PR132/CR142 at 53-54; PR153/CR157 at 6-7. The Commission rejected this argument on the ground that "the current investigations are not the same investigations as those in FRC I" and "that a negative determination in a prior investigation is not the same as a termination in these investigations." Views, PR190 at 24 n.114, CR178 at 25 n.114.

Third, the parties disputed the definition of the domestic industry. In the preliminary phase, Petitioner had insisted that the Commission should exclude [          ] from the domestic industry as a related party pursuant to Section 771(4)(B) of the Tariff Act. The Commission initially agreed with this request, reasoning that "[          ] primary interest appears to have been in importation of subject merchandise, given that its ratio of subject imports to domestic production was [               ] throughout the POI and its stated reasons for importing subject merchandise were lowering costs and expanding sales for its largest customers." Prelim. Views, PR102/CR96 at 26. The Commission also found that inclusion of "[          ] data may obscure the impact of dumped and subsidized imports on the domestic industry." *Id.* at 26-27. Petitioner continued to support this position in the final phase, but ultimately reversed course after one Commissioner floated the idea at the hearing. Hearing Tr., PR144 at 71-73. The basis for the change in position was not any change in facts, but its apparent impact on the ultimate question. As one

Commissioner implied, excluding [          ] would improve Petitioner's injury story, *see id.* at 73 (expressing "surprise{} that {Petitioner} argued for excluding the related party"), which proved [      ] since "[          ] reported [      ] financial results than [    ] for two of the three years of the POI{.}"  Views, PR190/CR178 at 17.

　　In the final phase, over the objection of Respondents and two Commissioners (Chair Johanson and Commissioner Karpel), the Commission reversed course and included [          ] in the domestic industry.  The Commission continued to find that [          ] was a related party and did not disturb its preliminary finding that [          ] primary interest appeared to be in importation, not domestic production.  *Id.* at 15.  Nevertheless, the Commission concluded this was not dispositive when the related party "is not shielded from subject import competition" and "its exclusion from the industry would mask the effects of subject imports on the industry."  *Id.*, PR at 17, CR at 18.  Under this formulation, the Commission found that [          ] was not shielded from competition with imports from Mexico—in effect, finding that [

                                                              ], despite [                    ] assertions to the contrary.  *Id.* at 17-19.  The Commission also found that [          ] was not shielded from competition with imports from China, but only by crediting testimony the Commission had explicitly rejected in *FRC I*—namely, that [

                                                                            ].  In *FRC I*, the Commission had rejected that same theory based on evidence that [

                                                    ].  The Commission did not acknowledge or even explain this contradiction, and inexplicably refused to credit [              ] testimony that [      ] imports from Mexico were not injuring, but actually complementing, [      ] domestic operations.

　　Based on this flawed definition of the domestic industry, the Commission reached an

affirmative material injury determination.  On its face, this was a surprising result given the volume, price, and impact data compiled by the Commission.  Over the POI, the volume of cumulated subject imports declined by [    ] percent.  Staff Report, PR190/CR163 at IV-2.  At the same time, the domestic industry [                ] improved by almost every measure: it gained [     ] percentage points of market share, increased production by [     ] percent, increased U.S. shipments by [     ] percent, improved capacity utilization by [     ] percentage points, decreased inventories by [     ] percent, and experienced overall increases in all employment-related performance indicia. *Id.* at Table C-1.  Its pricing also improved: the domestic industry's U.S. shipment average unit values ("AUVs") increased by [     ] percent, net sales AUVs increased by [     ] percent, and its COGs to net sales ratio fell by [     ] percentage points.  *Id.*

Nevertheless, the Commission found material injury through two flawed steps.  First, the Commission repeatedly discounted the overall improvements by the domestic industry based on the "presumption" that this was due to the provisional duties from *FRC I*.  Views, PR190 at 45-47, 51, CR178 at 47-48, 50, 55.  Second, the Commission noted that the domestic industry lost market share in the replacement channel over the POI.  *Id.*, PR at 43, CR at 45.  Not only were these points flawed (more on that later), but the Commission also failed to reconcile them with its own account of the market in *FRC I*.  There, the Commission had explained shifts in market share based on different demand trends within the OEM and replacement channels, as well as producers' different concentrations in these channels.  That account of the market offers a much more simple, straightforward explanation for the domestic industry's performance over the POI: between 2021 and 2022, a boom in new railcar production—deliveries increasing by 39.1 percent and orders increasing by 61.6 percent—drove the domestic industry's [        ] gains in the OEM channel. Staff Report, PR190/CR163 at II-12-15; Separate Views, PR190 at 69, CR179 at 6.  These gains [        ] the [        ] losses in the replacement channel, *id.*, which explains the domestic

industry's overall market-share increase of [    ] percentage points.  Views, PR190 at 47-48, CR178 at 50-51.  This simple, straightforward analysis explains the records in both *FRC I* and *FRC II*.  And the Commission's refusal to adopt it meant the Commission could only reach its desired outcome through the contortions and contradictions that defined its final determination.

## D.    The Commission Refuses to Address the Attorney's Disabling Conflict of Interest.

While the Commission wasted no time reaching and resolving the merits of *FRC II*, it avoided addressing the disabling conflict of interest arising from the Attorney's prior representation of Amsted.  On October 13, 2022, Amsted asked the Commission to disqualify the Attorney from participating as counsel for Petitioner in *FRC II*, because the Attorney had previously represented Amsted in *FRC I* and was now acting directly adverse to its interests in *FRC II*, which is substantially related to *FRC I*.  *See generally* PR36, CR31.  The Commission claimed that it would address the matter in the ordinary course, but ultimately punted on the merits and denied the request.  PR53.  In a letter dated October 21, 2022, the Commission claimed that it "does not adjudicate alleged violations of the Rules of Professional Conduct of a state Bar, nor does it determine whether conduct has violated the Model Rules of Professional Conduct of the American Bar Association."  *Id.* On this basis alone, the Commission determined that there was "not good cause" under Commission rules to disqualify the Attorney from participation in this investigation …."  *Id.*

## STANDARD OF REVIEW

The Court must hold unlawful any aspect of Commerce's decision-making that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. §  1516a(b)(1)(B)(i).  "To fulfill that obligation, {courts} insist that Commerce 'examine the record and articulate a satisfactory explanation for its action.'"  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016).  Substantial evidence is "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Decisions premised on errors of statutory interpretation are not in accordance with law. *Fag Kugelfischer Georg Schafer AG v. United States*, 332 F.3d 1370, 1372 (Fed. Cir. 2003).

## **ARGUMENT**

**I.    THE COMMISSION ERRED BY ALLOWING PETITIONER TO RELITIGATE THE FINAL DETERMINATION IN FRC I.**

Petitioners are not free to force an endless cycle of reinvestigation whenever they are displeased with a prior determination in an AD/CVD proceeding. On the contrary, Section 751(b)(4) requires petitioners to wait two years absent "good cause" justifying a reexamination of a prior determination. The Commission also has inherent authority to preserve the integrity of its proceedings by declining to reexamine prior determinations without adequate justification. Yet, here, the Commission erred in refusing to apply Section 751(b)(4) and in failing to acknowledge, much less exercise, its inherent authority to preserve the integrity of its proceedings. Each error independently requires remand of the Commission's affirmative determination.

**A.    The Commission's Refusal to Apply Section 751(b)(4) Was Contrary to Law.**

**1.    The Commission did not find good cause as required by Section 751(b)(4) to justify reexamining its final determination in *FRC I*.**

Section 751(b)(4) requires that a petitioner show "good cause" before seeking "review" of any final determination by the Commission, if less than two years have elapsed. 19 U.S.C. § 1675(b)(4). Yet, here, Petitioner did not offer—and the Commission did not find—"good cause." The Commission thus erred in reaching an affirmative determination in this investigation.

Section 751, subsection (b), of the Tariff Act addresses review of previous final determinations. *Id.* § 1675(b). The subsection comprises four paragraphs. Paragraph (1) authorizes review of previous *affirmative* determinations that resulted in AD/CVD orders based

on changed circumstances.  Paragraphs (2) and (3) lay out procedural rules for conducting the review authorized in paragraph (1).  By their terms, paragraphs (2) and (3) are limited to review "under this subsection" (*i.e.*, subsection (b)).  And paragraph (4) broadly provides that, "{i}n the absence of good cause," the Commission "may not review" any final injury determination within 24 months of its publication.  *Id.* § 1675(b)(4)(A)-(B).

Unlike paragraphs (2) and (3), however, paragraph (4) is not limited to review "under this subsection."  Rather, it applies to review of *any* "determination made under section 1671d(a) or 1673d(a)" (final Commerce determinations) and *any* "determination made under section 1671d(b) or 1673d(b)" (final Commission  determinations).  *Id.*  By their plain terms, these provisions include all final determinations, whether affirmative or negative, which necessarily includes the Commission's negative determination in *FRC I.*  *See id.* § 1673d(b)(1) ("The Commission shall make a final determination of whether an industry in the United States is materially injured, or is threatened with material injury … by reason of {subject} imports….").  Indeed, by cross-referencing the final-determination provisions without any language limiting them to final *affirmative* determinations, paragraph (4) stands in stark contrast to paragraph (1), which is limited to "final *affirmative* determination{s}."  *Id.* § 1675(b)(1)(A), (C) (emphasis added).  It is a bedrock presumption of statutory interpretation that "differences in language like this convey differences in meaning."  *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017).  Here, the "differences in language" mean that Petitioner, upon refiling a petition within 24 months of the Commission's previous determination, had to demonstrate "good cause" to justify review of this determination.

The Tariff Act's structure reinforces this conclusion.  The Act establishes an intricate remedial scheme of adjudicatory authority divided between two agencies, with each step of the process defined with specificity and subject to deadlines of unusual brevity.  At the conclusion of

that process, it offers only one route for review as of right: a judicial action in this Court.  19 U.S.C. § 1516a(a)(1).  The Act does not provide for rehearing, unlike the statutes governing many other agencies.  And the Act emphasizes that the agencies' determinations are "final."  *E.g.*, *id.* § 1673d(a)(1), (b)(1).  From this highly reticulated scheme, Congress has "prescribed the specific, complete and exclusive mode for … review of" the agencies' orders, such that review "must be made in the Court {of International Trade} or not at all."  *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958).  Section 751(b)(4) makes that inference explicit by directly forbidding review of any final determination (whether affirmative or negative) within two years absent a showing of "good cause."

For these reasons, Petitioner was required to establish—and the Commission was required to find—"good cause" before forcing another investigation into FRCs from China.  Indeed, Petitioner could demonstrate injury in *FRC II* only by reexamining—and upsetting—the Commission's final negative determination and subsidiary findings in *FRC I*, whose scope covered all the products at issue in *FRC II* and for a substantially overlapping POI (2019-2021 and 2020-2022, respectively).  Yet, the Commission did not find any "good cause" necessary to justify the review entailed by *FRC II*.  The Commission erred in reaching an affirmative determination in *FRC II*.

### 2.    The Commission's rationale for refusing to apply Section 751(b)(4) was flawed.

In its preliminary determination, the Commission did not discuss whether Petitioner established good cause or whether the investigations in *FRC II* would entail a "review" of determinations in *FRC I*.  Instead, the Commission assumed that Section 751(b) applies only to "changed circumstances reviews," which it defined as the procedure outlined in Section 751(b)(1) for obtaining review of a prior *affirmative* final determination based on "changed circumstances."  Prelim. Views, PR102/CR96 at 39.  But the Tariff Act never uses the phrase "changed

circumstances review." *See Borden v. United States*, 593 U.S. 420, 435 (2021) ("The first precondition of any term-of-art reading is that the term be present in the disputed statute." (plurality opinion)). Nor does it exclude reviews of prior final *negative* determinations. Unlike Section 751(b)(1), which is expressly limited to *affirmative* determinations, Section 751(b)(4) prohibits the Commission from reviewing *any* "determination made under section 1671d(b) or 1673d(b)," which unambiguously encompasses all final determinations, whether affirmative or negative. The Commission cannot wave away the clear import of this provision by invoking a phrase that is not used in the statute itself and that, in any event, easily encompasses Section 751(b)(4): changes in circumstances are the paradigmatic example of "good cause," *United States v. Morales*, 807 F.3d 717, 723-24 (5th Cir. 2015), such that a review of a recent prior determination pursuant to a showing of good cause would plainly qualify as a "changed circumstances review." *See Wall v. Kholi*, 562 U.S. 545, 553 (2011) (noting that in a legal context, "review" means "a judicial … reexamination of a judgment or claim").

The Commission further stated that *FRC II* is "based on new petitions with a different scope and different subject countries (China and Mexico versus China only)," compared with *FRC I*. Prelim. Views, PR102/CR96 at 39 n.167. The Commission did not explain why these observations were relevant, when the overlap is undeniable. In any event, they do not change that *FRC II* amounted to a "review" of the Commission's negative injury determination in *FRC I*. The scopes and POIs in both cases substantially overlap. Views, PR190 at 39 n.208, CR178 at 38 n.208. And while Mexico was added as a subject country in *FRC II*, the Commission still conducted distinct investigations and reached distinct final injury determinations for each country. As a result, in the investigation against China, the Commission could not reach an affirmative determination in *FRC II* without finding injurious the very same imports deemed *not* injurious in *FRC I*.

The Commission also assumed its hands were tied because it "has no authority to effectively stop the preliminary investigations" and instead has a "statutory obligation to proceed with its preliminary investigations."  Prelim. Views, PR102/CR96 at 38.  But Section 751(b)(4) is binding on the Commission in these proceedings.  And because Petitioner could not lawfully prevail before the Commission in *FRC II* without forcing the precise "review" forbidden by Section 751(b)(4), the Commission had not only the authority, but the duty, to reach a negative determination in *FRC II*.  19 U.S.C. § 1673b(a)(1).  Its decision to reach an affirmative determination in *FRC II* was thus contrary to law.

### B.      The Commission Erred in Refusing to Acknowledge and Exercise Its Inherent Authority.

In addition to the requirements of Section 751(b), the Commission also has the inherent authority to control of its proceedings by refusing to reexamine prior determinations without good cause.  That the Commission failed to acknowledge, much less address, this issue is alone "sufficient grounds for remand."  *Bonney Forge Corp. v. United States*, 560 F. Supp. 1303, 1312 (CIT 2022); *see Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1367 (CIT 2020).

All administrative agencies, including the Commission, have the inherent power to regulate and maintain the integrity of their own proceedings.  *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008).  For instance, the Commission can reopen its proceedings to address fraud, despite having no explicit statutory basis for that authority.  *Chemours Co. FC LLC v. United States*, 393 F. Supp. 3d 1186, 1194 (C.I.T. 2019); *Elkem Metals Co. v. United States*, 26 C.I.T. 234, 240 (2002).  The Commission's inherent power naturally extends to guaranteeing the finality of its decisions when they are attacked or manipulated.  Finality is not just a matter of convenience; it goes to the heart of the Commission's power to *authoritatively* resolve the questions within its jurisdiction.  The principle of finality "has found its way into every system of jurisprudence, not only from its obvious fitness and propriety, but because without it, an end could

never be put to litigation." *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 336–37 (2005) (quoting *Hopkins v. Lee*, 19 U.S. (6 Wheat.) 109, 114 (1821)). It "is demanded by the very object for which civil {tribunals} have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination." *Id.* (quoting *S. Pac. R. Co. v. United States*, 168 U.S. 1, 49 (1897)). If tribunals did not have some mechanism to guarantee the conclusiveness of their earlier decisions in later actions, their "aid would not be invoked for the vindication of rights of person and property." *Id.* (quoting *S. Pac. R. Co.*, 168 U.S. at 49). Thus, as a necessary corollary to its power to "make a *final* determination" on material injury, the Commission has the power to demand that losing parties present a valid justification before revisiting its prior determinations. 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1); *see City of Tacoma*, 357 U.S. at 336 (bar on collateral review of agency determination followed from the congressional directive "that its judgment 'shall be final,'" without any "need" to "be labeled res judicata, estoppel, collateral estoppel, waiver or the like either by Congress or the courts").

The Commission itself has recognized as much in issuing regulations under the USMCA Implementation Act. Similar to the Tariff Act, the USMCA Implementation Act provides that the Commission, upon receipt of a petition, "*shall* promptly initiate an investigation to determine" whether certain events are "causing or threaten{} to cause material harm to a United States long-haul trucking services industry." 19 U.S.C. § 4572(a) (emphasis added). Though the statute says "shall ... initiate," the Commission prohibits new investigations "with respect to the same subject matter as a previous investigation" within one year absent a showing of "good cause." 19 C.F.R. § 208.16(b); *see also* Implementing Rules for the United States-Mexico-Canada Agreement, 85 Fed. Reg. 41,355, 41,360 (July 10, 2020).

As this regulation shows, the Commission has already claimed the authority to demand petitioners to show cause before forcing a do-over investigation into the same "subject matter as a

previous investigation." 19 C.F.R. § 208.16(b). The Commission failed to address this point, much less justify the discrepancy in how it administers substantially similar provisions in the Tariff Act and the USMCA Implementation Act. Its decision was thus contrary to law. *See, e.g.*, *Gechter v. Davidson*, 116 F.3d 1454, 1459 (Fed. Cir. 1997) ("It is well established that agencies have a duty to provide reviewing courts with a sufficient explanation for their decisions so that those decisions may be judged against the relevant statutory standards, and that failure to provide such an explanation is grounds for striking down the action."); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[ ]n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently").

## II.   THE COMMISSION ERRED IN REFUSING TO EXCLUDE [          ] FROM THE DOMESTIC INDUSTRY.

The Commission also erred in including [          ] within the domestic industry. In its preliminary determination, the Commission excluded [          ] under Section 771(4)(B) of the Tariff Act, because its "primary interest" was in importation of subject merchandise. Prelim. Views, PR102/CR96 at 26. In the final determination, however, the Commission reversed itself, even though none of the relevant facts had changed. Indeed, the only apparent change was a new appreciation for the impact including [          ] would have on Petitioner's injury story. Because [                                        ] over the POI, a critical linchpin of the Commission's injury determination was including [          ] in the domestic industry. As the Commission itself put it, "[          ] domestic operations suffered [          ] trade and financial performance as subject imports from Mexico increased," such that excluding [          ] "from the domestic industry would mask declines in the industry's performance caused by subject import competition, including data relating to market share, employment, capacity utilization, and financial performance." *Id.*, PR at 21-22, CR at 22-23. But rather than reach this result through a neutral application of its traditional criteria, the Commission distorted the related-party framework beyond recognition. The

Commission adopted a new, ad hoc test that is unmoored from the text and purpose of the Act, credited theories it had rejected in *FRC I* (without acknowledging or justifying the contradictions), adopted findings that defy basic common sense (namely, that [       ] was injuring itself), and ignored key record evidence. For these reasons, its decision must be remanded with instructions to exclude.

### A.    The Commission's Traditional Criteria Required Exclusion of [       ].

Under Section 771(4)(B) of the Tariff Act, "{i}f a producer of the domestic like product and an exporter or importer of the subject merchandise are related parties, or if a producer of the domestic like product is also an importer of the subject merchandise, the producer may, in appropriate circumstances, be excluded from the industry." In administering this provision, the Commission has long applied, with this Court's blessing, five factors: (1) the percentage of domestic production attributable to the importing producer; (2) the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from the LTFV sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market); (3) whether inclusion or exclusion of the related party will skew the data for the rest of the industry; (4) the ratio of import shipments to U.S. production for the imported product; and (5) whether the primary interest of the importing producer lies in domestic production or importation. Views, PR190 at 14 n.54, CR178 at 14-15 n.54. On the Commission's own account of the facts, these factors all tilt decisively toward excluding [       ].

First, [       ] accounted for a [              ] proportion of domestic production, ranging from [    ] to [    ] percent over the POI. *Id.*, PR at 16, CR at 17.

Second, the Commission itself found that [        ] "stated reasons for importation were lowering its costs and expanding sales for its largest customers," a polite way of saying the firm benefits from the alleged LTFV sales. *Id.* at 15.

Third, excluding [        ] would not skew the data "for the rest of the industry," because [    ] performance [            ] by virtually every measure over the POI.  Separate Views, PR190 at 75, CR179 at 13.  If anything, the Commission's decision to include [        ] in the domestic industry masks the *lack* of injury "for the rest of the industry"—the precise opposite goal of the related-party provision.

Fourth, [        ] imports-to-U.S. production ratio was [            ], reaching [    ] percent in 2020, [      ] percent in 2021, and [      ] percent in 2022.  Views, PR190/CR178 at 17.

Finally, as the Commission itself determined in the preliminary phase and did not abandon in the final phase, [        ] "primary interest" is in importation rather than domestic production. *Id.* 15, 17-18.

Thus, under a straightforward application of the Commission's ordinary criteria, [        ] should have been excluded from the domestic industry.

**B.    The Commission's Reasons for Including [        ] Are Legally and Factually Flawed.**

In a pattern that should be familiar at this point, the Commission did not follow the path marked out by its traditional factors.  Instead, the Commission crafted an ad hoc test seemingly designed to reach a result.  The Commission explained that the traditional analysis was "not dispositive" where "the related party is not shielded from subject import competition and its exclusion from the industry would mask the effects of subject imports on the industry."  *Id.*, PR at 17, CR at 18.  By "the industry," the Commission meant [        ], not the "rest of the industry" as contemplated under the traditional framework.  Applying this new standard, the Commission found that [        ] was not shielded from competition with subject imports from Mexico and China and that its exclusion from the domestic industry would mask injury to itself.  On top of the

patent absurdity of concluding that a rational actor is actively injuring itself, the Commission's

analysis contradicts key findings from *FRC I* and suffers from several other legal and factual errors.

### 1. The Commission contradicted prior findings from *FRC I* without reasoned explanation.

Start with the contradictions.  A central premise of the Commission's analysis was that

[       ] was not shielded from competition with subject imports, including from China.  In

supporting this assertion, the Commission twice contradicted its findings in *FRC I*.

In *FRC I*, Petitioner argued that [



].  The Commission rejected that argument based on

evidence that [                                         ] *Id.*  In *FRC II*, the Commission reversed

itself on this precise issue, crediting testimony it previously rejected that "the need to compete

with subject imports from China was the reason that [         ] FRC production was shifted to

Mexico" over the POI.  Views, PR190 at 20, CR178 at 21.  The Commission did not acknowledge,

much less explain, the contradiction.

Similarly, in *FRC I*, the Commission found that imports from China, including coupler

bodies, did not injure the domestic industry from 2019 through 2021.  Yet, in *FRC II*, the

Commission treated those very same imports as injurious, noting that "{s}hipments of coupler

bodies from China took market share from [       ] in the component market (replacement

channel) in 2021."  Views, PR190/CR178 at 20.

Because these findings plainly contradict the Commission's prior findings in *FRC I*, its

failure to justify the contradictions is the very definition of arbitrary decision-making and alone

requires setting aside its decision.  *See, e.g.*, *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040,

1048-49 (9th Cir. 2010) (holding that agency action was arbitrary and capricious because the agency failed to adequately explain a factual finding that contradicted a previous factual finding).

### 2.    The Commission's analysis contains several legal errors.

In addition to the unacknowledged and unexplained contradictions between its findings in *FRC I* and *FRC II*, the Commission's analysis suffers from several other legal errors.

First, the Commission's formulation of the standard—focusing on whether the related party is generally "shielded" from import competition and whether "its exclusion from the industry would mask the effects of subject imports on the industry"—untethered the related-party inquiry from the traditional five factors described above.  The five factors make no reference to whether the related party is "shielded" from import competition.  And while they do reference "skewing" the data, the relevant frame of reference is "skew{ing} the data *for the rest of the industry*."  Views, PR190/CR178 at 14-15 n.54 (emphasis added).  As this suggests, this factor addresses whether including the related party would mask injury to other domestic producers.  If so, this favors the exclusion of the related party.  But here, the Commission reversed the inquiry, focusing instead on whether [        ] was injuring itself, without regard to the impact [        ] imports had on [    ], the [      ] domestic producer.  The result was the inclusion of a related party that masked the lack of injury to [    ].  The Commission's failure to adequately justify this inversion of its typical practice alone requires remand of its decision.  *See In re Vivint, Inc.*, 14 F.4th 1342, 1352 (Fed. Cir. 2021) ("Agency action that departs from established precedent without a reasoned explanation is arbitrary and capricious." (cleaned up)).

Second, and relatedly, the Commission's reframing of the inquiry also turns congressional intent on its head.  "Congress enacted the provision so that domestic producers whose interests in the imports were strong enough to cause them to act against the domestic industry would be excluded from the ITC's consideration and investigation into material injury or threat thereof."

*Allied Mineral Prods. v. United States*, 28 C.I.T. 1861 (2004). Yet, here, the Commission determined that [          ] primary interest was in importation and that [      ] actions were injuring the domestic industry, yet *included* [          ] in the domestic industry. This decision cannot be squared with this clear statement of congressional intent.

Third, the Commission's novel approach also rested on the non-sensical proposition that despite having a "primary *interest*" in importation, [          ] pursuit of that "interest" led to self-inflicted injury. The Commission cannot have it both ways. If [          ] "primary *interest*" was in importation, then importation by definition cannot have been *against* its interest. Its decision to credit two conflicting ideas is the very definition of irrational and arbitrary decision-making.

### 3.    The Commission's decision is unsupported by substantial evidence.

Finally, in addition to the foregoing legal problems, the Commission's decision founders on the record. A central premise of the Commission's related-party analysis is the fantastical proposition that [          ] injured itself. But the Commission ignored extensive record evidence, including from [                    ], belying that claim.

[        ] reported that it has not been materially injured by subject imports," Views, PR190 at 62, CR180 at 2, and that [


               ]. [          ] U.S. Producers QR, CR125 at 41-43, Separate Views, PR190 at 62, CR180 at 2. [


                         ]. Separate Views, PR190 at 62, CR180 at 2. Unlike [    ], [        ] competes based on its ability to bundle a suite of rail products, which means it cannot view FRC production in isolation. Rather, it optimizes production for the entire suite of railcar components across [                          ] facilities, taking

into account the location of its customers.  As a result, the workers at its Mexican facility are not in competition with the workers at [                    ] facility for the production of FRCs, but instead work in tandem to optimize the production and sale of bundles of rail products to its customers.  PR151/CR152 at 28.

Consistent with this evidence, [

], as new rail car builds surged.  Between 2021 and 2022, total production [                                        ] percent and total capacity utilization [

].  [        ] U.S. Producers QR, CR125 at 12.  Moreover, overall production [

].  PR151/CR152 at 28.  Thus, FRCs made by [        ] in Mexico complemented the multiple rail products made by [        ] in [                        ], to the mutual benefit of production workers in [            ] and [        ] overall domestic operations.  PR151/CR152 at 1-6.

Moreover, to the extent [        ] experienced [

].  [        ] U.S. Producers QR, CR125 at 10, 43. The company explained that it [

].  *Id.*  The Commission ignored this evidence entirely.

The Commission further erred in its findings regarding the reason [        ] moved production to Mexico.  As the Commission indicated in *FRC I*, [

].  Indeed, record evidence shows that "[

] Separate Views, PR190 at 65, CR180 at 5.  In other words, the Commission had it right in *FRC I*.  Contrary to the Commission's claim in *FRC II*, [        ] decision to produce FRCs in Mexico, rather than in the United States, was not caused by low priced, dumped imports.

For these reasons, the Commission's decision to include [      ] as a member of the domestic industry was not supported by substantial evidence and was contrary to law.

### III.   THE COMMISSION IMPROPERLY CUMULATED IMPORTS SUBJECT TO THE TERMINATED INVESTIGATION IN *FRC I*.

Section 771(7)(G)(i)(II) prohibits the Commission from cumulating imports from "any country with respect to which the investigation has been terminated."   19 U.S.C. § 1677(7)(G)(ii)(II); *see also id.* § 1677(7)(H).  The SAA makes clear that the relevant inquiry under this provision is whether the specific "imports" to be cumulated were "the subject of terminated investigations."  SAA at 849.  Here, all subject imports from China for the years 2020 and 2021 were the subject of the terminated investigation in *FRC I*.  *See generally* Petition, PR1/CR1.  Section 771(7)(G)(i)(II) thus barred cumulation of these imports in *FRC II*.

The Commission nevertheless cumulated imports from China and Mexico during those years on the ground that "the current investigations are not the same investigations as those in FRC I" and that "a negative determination in a prior investigation is not the same as a termination." Views, PR190 at 24, CR178 at 25.  The first point misses the mark because the relevant question is whether the *imports* to be cumulated were subject to a terminated investigation, which is indisputably the case here.  It is also non-sensical, since there will *always* be distinct investigations, one of which has been "terminated," when this cumulation provision applies.  And the second point is contradicted by the statute: where the Commission issues a negative determination, "the investigation shall be *terminated* upon the publication of notice of that negative determination{.}"

19 U.S.C. §§ 1671d(c)(2), 1673d(c)(2) (emphasis added).  Therefore, because the investigation in *FRC I* was "terminated," the Commission's decision to cumulate imports subject to *FRC I* was contrary to law.

**IV.  THE COMMISSION'S FINDING OF MATERIAL INJURY BY REASON OF SUBJECT IMPORTS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW.**

Turning to the injury determination itself, the Commission's finding of material injury is unsupported by substantial evidence and contrary to law, *even under the Commission's chosen parameters*—its dubious inclusion of [      ] in the domestic industry and its improper cumulation of imports from China and Mexico.  Even accepting those conditions, the record demonstrated that the domestic industry was *not* injured, much less injured by reason of subject imports.  Over the POI (2020-2022), the domestic industry improved by virtually every measure: its market share increased by [   ] percentage points, and performance indicators relating to production (production quantity, U.S. shipments, capacity utilization), employment (number of production workers, hours worked, waged paid), and financial health (revenues, gross profits, operating and net income) all increased.  Views, PR190 at 47-49, CR178 at 50-52; Staff Report, PR190/CR163 at C-3.

During the investigation, respondents provided a simple explanation for the absence of injury in the *FRC II* record: the domestic industry's [      ] improvements corresponded with a significant upturn in the new railcar market between 2021 and 2022, as domestic producers were heavily concentrated in the OEM channel.  Wabtec Posthearing Br., PR153/CR155 at 6-7; PR39 at 27-28 (emphasizing the "relatively higher share of {the domestic industry's} shipments comprising complete FRCs as compared to subject importers").  In its negative determination in *FRC I*, the Commission effectively predicted that whenever demand in the OEM channel recovered, the domestic industry's fortunes would do the same: it expressly found that the domestic

producers' concentration in the OEM channel caused them to be disproportionately affected by the greater decline in demand in the OEM channel relative to the decline in demand in the replacement channel during that POI (2019-2021).  *FRC I* Views, PR39 at 25-28, CR42 at 33-36.  As the Commission explained in *FRC I*: "{a}ny overall market share shift was affected by different demand trends for new railcars and maintenance of FRCs, as well as differing concentrations of shipments in these market segments by U.S. producers and importers."  *Id.*, PR at 25, CR at 33. Thus, in *FRC II*, the respondents reminded the Commission that the same conditions of competition were at work in both investigations: in *FRC I*, the domestic industry's performance declined as OEM channel declined; in *FRC II*, the domestic industry's performance improved as OEM demand increased.  Wabtec Posthearing Br., PR153/CR155 at 8; PR190 at 77.

The Commission, however, did an about-face in *FRC II*.  Ignoring respondents' arguments that its decision in *FRC I* had predicted the domestic industry's successes in *FRC II*, the Commission discarded its prior findings without explanation and contorted itself to reach an affirmative determination.  Specifically, the Commission orchestrated a two-part maneuver to engineer indicia of "injury."  First, the Commission disregarded any and all improvements in 2022 as being attributable to provisional duties levied on Chinese imports during the pendency of *FRC I*, which found those imports to be non-injurious, and focused instead only on the domestic industry's market share loss and performance declines from 2020 to 2021, a time frame during which it had already determined that imports from China caused no injury.  Views, PR190 at 51 & n.278, CR178 at 54-55 & n.278.  Second, the Commission disregarded the domestic industry's [          ] market share gains and other improvements resulting from the rebound in OEM channel demand, instead finding that the domestic industry's [          ] market share loss in 2022 in the replacement channel alone—the segment in which the Commission previously found the domestic industry was less

concentrated—was evidence of price effects and adverse impact, and thus injury by reason of subject imports. *Id.*, PR at 51-52, CR at 54-55.

Importantly, these two pretexts for conjuring injury—provisional duties and distribution channels—were both squarely addressed in *FRC I*, whose relevant findings the Commission never acknowledged, let alone reconciled with its new finding of injury, in *FRC II*. During the pendency of *FRC I*, imports from China declined while provisional duties were in place, until the Commission terminated cash deposits with its unanimous negative determination. As a matter of first principles, any decline in imports that were adjudicated to be non-injurious cannot be converted into evidence of injury. Moreover, as a matter of simple math, the decline in imports from China, which were more heavily concentrated in the replacement channel, PR190 at 26, cannot provide a plausible basis for discounting the domestic industry's [      ] gains in the OEM channel. If provisional duties could explain the domestic industry's improvement, then one would expect the domestic industry to have benefited in the replacement channel in 2022. Yet the Commission found that the domestic industry lost [            ] of market share in the replacement channel in 2022—a factual finding that directly contradicts its claim that provisional duties explain the domestic industry's improvement over the POI. Views, PR190 at 43, CR178 at 45.

As respondents explained to the Commission, the only plausible explanation for the domestic industry's improvements in 2022 is the increase in demand in the OEM channel, where domestic producers are more heavily concentrated. The domestic industry saw a [            ] percentage point increase in market share in the OEM channel from 2021 to 2022, gains that [            ] decline in share in the replacement channel during that period. Staff Report, PR190/CR163 at G-11, G-15. In brushing away the domestic industry's gains in the OEM channel, the Commission inexplicably departed from its conclusion in *FRC I* that market share shifts are

driven by differing demand trends in the OEM and replacement channels, and the differing concentrations in those segments for domestic versus foreign producers—not by subject imports. *FRC I* Views, PR39 at 25, CR42 at 33.

The Commission's failure to reconcile its reasoning in *FRC II* with its prior findings in *FRC I*, or with the transient effects of that investigation, permeates the entire injury analysis. Although it claimed that the two investigations are distinct when rejecting respondents' procedural arguments as to why *FRC II* was improper from the start, the Commission relied on several aspects of *FRC I* in *FRC II*—but only when supportive of reaching an affirmative determination. Among other things, the Commission took evidence it has previously rejected in *FRC I* and reached opposite conclusions in *FRC II*; reversed itself on findings of conditions of competition in *FRC I* that should have applied directly in *FRC II*; and invoked the pendency of *FRC I* as the reason for distrusting any data that could point to another negative determination. Moreover, by discounting the data from 2022 based on *FRC I*'s provisional duties, the Commission in finding injury in *FRC II* gave more weight to the 2020-2021 period—the period that overlaps exactly with the POI of *FRC I*. Although the Commission had already deemed couplers imported from China during 2020-2021 to be non-injurious in *FRC I*, it turned around and found those *exact same couplers* to be a cause of injury in *FRC II*. The Commission fails to explain how it could reach directly opposite conclusions as to the very same import shipments from China.

Even within the four corners of the *FRC II* opinion, the Commission dealt inconsistently with the fallout from *FRC I*. As discussed above, the Commission rejected respondents' argument that the domestic industry was not injured on the basis that "the improvements only occurred after the industry received trade relief." Views, PR190 at 51 & n.278, CR178 at 54 n.278. At the same time, however, the Commission separately found that "the withdrawal of subject imports from China after the imposition of provisional duties *inured wholly to subject imports from Mexico*."

*Id.*, PR at 43 n.240, CR at 45 n.240 (emphasis added).  The Commission cannot have it both ways: either the domestic industry's improvements in 2022 resulted from the provisional duties, or the domestic industry improved *despite* provisional duties "inur{ing} wholly" to Mexico—in which case the improvements cannot be discounted.

The basic contradictions in the Commission's analysis are telling.  In rejecting respondents' straightforward explanation for the absence of injury in this record, the Commission had to cobble together a patchwork of half-baked and often inconsistent findings in an attempt to support an affirmative determination.   Its attempt falls well short of what the APA requires.   The Commission's various contradictions and failures to address inconsistencies in its price effects and causation analyses are detailed in Parts IV.A and IV.B below, further demonstrating that the Commission's finding of material injury by reason of subject imports is unsupported by substantial evidence and otherwise not in accordance with law.

A.     **The Commission's Price Effects Analysis Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law.**

The Commission determined that cumulated subject imports caused adverse price effects, finding that the domestic industry lost market share to subject imports in select segments during select years, and that subject imports prevented price increases that would have otherwise occurred (*i.e.*, caused price suppression).   In so doing, the Commission failed to reconcile various inconsistencies with *FRC I* and ignored significant record evidence that undermined its price effects analysis.

1.     **The Commission erred in finding that underselling by subject imports caused the domestic industry to lose market share.**

In *FRC II*, the domestic industry's market share increased by [    ] percentage points over the POI.  Staff Report, PR190/CR163 at C-3.  Yet the Commission determined that the domestic industry *lost* market share due to subject import underselling on two grounds: (i) from 2020 to

2021, before provisional duties in *FRC I*, the domestic industry lost share in the overall market; and (ii) from 2021 to 2022, it lost share in the replacement segment. Views, PR190 at 42-43, CR178 at 44-45. In bifurcating its market share analysis this way, the Commission failed to explain inconsistencies with its prior findings in *FRC I*, as well as with other record evidence, respondents' arguments, and its own findings in *FRC II*.

First, the Commission improperly discounted the domestic industry's overall market share gain in 2022 by chalking it up to the effect of provisional duties. The Commission found that the domestic industry was able to regain market share "{o}nly after the imposition of provisional duties on FRCs from China in 2022." *Id.* However, if provisional duties were the reason for the domestic industry's overall market share gain in 2022, then one would expect the gain to have occurred in the replacement channel, where Chinese imports were heavily concentrated. *Id.*, PR at 26, CR at 27; *FRC I* Views, PR39 at 14, CR42 at 17. Yet record data showed that the domestic industry lost [   ] percentage points of market share in the replacement channel between 2021 and 2022, contradicting its position that any improvement was due to provisional duties. Staff Report, PR190/CR163 at G-15. Moreover, by choosing to ignore 2022 for the overall FRC market, the Commission focused on the years 2020 and 2021—but those are the precise years covered by the *FRC I* investigation, where the Commission found that the very same subject imports from China were *not* injurious and did not cause any loss in the domestic industry's market share. *FRC I* Views, PR39 at 26, 31-32, CR42 at 34, 41. In finding adverse price effects, the Commission did not attempt to reconcile these contradictions.

At the same time, the Commission erroneously disregarded the domestic industry's [          ] gains in the OEM channel, which the Commission had previously found to be the market segment prioritized by the domestic industry, PR39 at 27-28. In *FRC I*, the Commission found that any decline in the domestic industry's market share between 2020 and 2021 was due to

the decline in new railcar builds, since domestic producers historically prioritized the OEM channel over the replacement channel, and their long-term contracts with OEMs made it difficult for them to pivot sales to the replacement channel during a downturn in OEM demand.  *Id.*, PR at 27-28, 31, CR at 35-36, 41.  During the POI of *FRC II*, new railcar builds increased by 39.1 percent from 2021 to 2022, and the domestic industry's market share in the OEM channel increased from [    ] percent in 2021 to [    ] percent in 2022, resulting in an overall [    ] percentage point market share gain during the POI.  Staff Report, PR190/CR163 at C-3, II-12, G-11.  Thus, the domestic industry's overall market share was driven by demand trends in the OEM channel—just as the Commission predicted in *FRC I*.  *See FRC I* Views, PR39 at 25-28, CR42 at 33, 35-36.  By restricting its analysis to market share changes in the replacement market, the Commission failed to reconcile its underselling and price effects analysis in *FRC II* with its prior findings in *FRC I* regarding the impact of OEM demand on the domestic industry's performance.

**2.    The Commission erroneously concluded that subject imports suppressed domestic prices.**

In *FRC II*, the Commission found that "subject imports prevented price increases that would have otherwise occurred to a significant degree in 2020 and 2021."  Views, PR190 at 46, CR178 at 47.  In reaching this finding of price suppression, the Commission again discounted the domestic industry's improvement in 2022 and contradicted prior findings in *FRC I*.

By focusing on price suppression in 2020 and 2021, the Commission dismissed the fact that the domestic industry's COGS-to-net-sales ratio *declined* by [ ] percentage points over the POI.  Staff Report, PR190/CR163 at C-4.  Although the Commission acknowledged that the domestic industry's COGS-to-net-sales ratio declined between 2021 and 2022, it dismissed this improvement due to provisional duties in *FRC I*.  Views, PR190 at 45 & n.249, CR178 at 47 & n.249.  As explained above, discounting the data in 2022 on the account of *FRC I* is at odds with the market share shifts by segment and with the Commission's finding that the provisional duties

in 2022 "inured wholly to subject imports from Mexico." *See supra* Part IV.A.2.  Moreover, the Commission disregarded record evidence showing that prices for both domestic and imported FRCs *increased* throughout the POI—even in years *before* the imposition of provisional duties. The domestic industry's U.S. shipment AUVs increased every year of the POI, by [    ] percent between 2020 and 2021, and [    ] percent between 2021 and 2022.  Staff Report, PR190/CR163 at C-4.  Pricing-product data also showed that domestic prices of [      ] of the five pricing products were [      ] in Q4 2021 than in Q1 2020, suggesting that the domestic industry was able to [                                              ] even before provisional duties were imposed.  *Id.* at V-13, 15, 17.  The decrease in domestic prices for pricing products 1 and 2 (coupler assemblies sold in the OEM channel) between 2020 and 2021 was driven by the decline in demand in the OEM market during that period—which, as explained above, is attributable to the domestic industry's focus on the OEM market, not to subject imports.  *See Id.* at V-9-11; Prelim. Staff Report, PR127/CR141 at II-10.

The Commission also impermissibly relied on business documents that Petitioner initially submitted in *FRC I* to conclude that subject imports placed "pricing pressure" on the domestic industry in 2020 and 2021.  Views, PR190 at 45, CR178 at 48.  In *FRC I*, the Commission had previously reviewed these very same documents and rejected them as evidence of price effects, finding that they were "limited in scope and in several instances unclear or incomplete" and "vague without a specific reference to subject imports." *Id.*, PR at 45 n.252, CR at 48 n.252; *FRC I* Views, PR39 at 25 & n.125, CR42 at 32 & n.125.  Nevertheless, the Commission chose to rely on this evidence in *FRC II* because it was now "corroborated by the pricing data," Views, PR190 at 45 n.252, CR178 at 48 n.252—when, as explained above, record data on price does *not* show that subject imports placed pricing pressure on the domestic industry, even during the 2020-2021 period.  Moreover, the business documents relate to [                    ], *id.*, which the

Commission [                                                    ] in *FRC I*, *FRC I* Views, PR39 at 35,

CR42 at 46.  Accordingly, the Commission's finding of price suppression is unsupported by

substantial evidence and contrary to law.

> **3.    The Commission failed to consider record evidence showing that non-price factors such as availability and the predominant use of long-term contracts drive purchasing decisions.**

In *FRC II*, the Commission found that evidence of lost sales supported its finding that

subject imports caused adverse price effects.  Views, PR190 at 42, CR178 at 43.  However, the

Commission failed to address significant record evidence undermining its finding of lost sales, and

failed to reconcile this with contrary findings in *FRC I*.

To start, questionnaire responses demonstrated that price did not drive purchasing

decisions.  Of ten responding firms that purchased subject imports, eight firms (80%) indicated

that price was *not* the primary reason for purchasing subject imports, and seven firms (70%)

indicated that subject imports were *not* priced lower than domestic products.  Staff Report,

PR190/CR163 at V-25-26.  As reasons for purchasing subject imports, purchasers frequently

indicated that the [                                    ] of subject imports was superior

to domestic FRCs.  *Id.*

The largest "lost sale" was reported by [    ].  Respondent Amsted provided evidence

explaining that [    ] "made its purchases [              ] subject to a long-term contract that was

negotiated long before the beginning of the POI," such that "{this} business was not up for bid or

addressable by M&T during the POI."  Amsted Prehearing Br., PR 134/CR148 at 43.  The

Commission, however, found the fact "that subject imports were shipped during the POI pursuant

to long term contracts previously signed does not mean such imports were not injurious."  Views,

PR190 at 42 n.233, CR178 at 44 n.233.  This finding contradicts the Commission's finding in

*FRC I* that long-term contracts were indeed a non-price reason explaining why the domestic

industry "lost" sales to imports.  *FRC I* Views, PR39 at 16-17, CR42 at 21-22.  While the

Commission cited to other reasons for giving weight to this "lost sale," the Commission failed to

explain its departure from its contradictory conclusion in *FRC I*.

 Moreover, the Commission ignored other evidence that purchasers were forced to seek

imports [

              ].  Several purchasers, including

[            ], reported experiencing supply constraints

from domestic producers.  Staff Report, PR190/CR163 at II-8, V-25-26.  When [


  ], the purchaser had reason to believe that [


                 ].

Amsted Posthearing Br., PR151/CR152 at 4, Ex.4; *see also infra* Part IV.B.2.b.  Indeed, it cannot

be a coincidence that the domestic producer [

              ].  Thus, the

Commission failed to address evidence of domestic supply constraints or prioritization of the OEM

channel undermining its finding that the domestic industry "lost sales" due to subject imports.

 For all of these reasons, the Commission's finding that subject imports caused adverse price

effects is unsupported by substantial evidence and contrary to law.

 **B. The Commission's Causation Analysis, Which Contradicted *FRC I* findings, Was Arbitrary, Unsupported by Substantial Evidence, and Otherwise Not in Accordance with Law.**

 To find that material injury to the domestic industry is "by reason of" subject imports, the

Commission must ensure that subject imports are more than a minimal or tangential cause of injury

and that there is a sufficient causal, not merely temporal, nexus between subject imports  and

injury.  19 U.S.C. § 1673d(b); *see Gerald Metals, Inc. v. United States*, 132 F.3d 716, 719-20 (Fed.

Cir. 1997).  In its causation analysis, the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold.  *See* SAA at 851-52; *Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302, 1317 (Ct. Int'l Trade 2006) (requiring the Commission to "analyze compelling arguments that purport to demonstrate the comparatively marginal role of subject imports in causing that injury").

In *FRC II*, the Commission repeatedly failed to address compelling evidence demonstrating the "comparatively marginal role" of subject imports in causing injury.  The Commission also repeatedly failed to explain departures from findings in *FRC I* that were based on virtually the same factual record.

### 1.    The Commission improperly discounted the domestic industry's improved condition in 2022 by attributing it to provisional duties in *FRC I*.

The domestic industry improved by virtually every measure over the POI, but the Commission discounted the improvement by attributing it to provisional duties during *FRC I*. Views, PR190 at 51 & n.278, CR178 at 54-55 & n.278; *see* Wabtec Posthearing Br., PR153/CR155 at 6-7 (listing indicators of domestic producers' improved condition).  The Commission's decision to discount domestic producers' improved condition was unsupported by record evidence, inconsistent with the SAA, and (again) at odds with its own findings in *FRC I*.

### a.    The Commission's attribution of the domestic industry's improvement in 2022 to provisional duties was unsupported by record evidence.

The Commission found in *FRC II* that "{a}lthough the domestic industry's production, sales, and shipments increased over the POI, the improvements *only occurred after the industry received trade relief*."  Views, PR190 at 51 & n.278, CR178 at 54 n.278 (emphasis added).  "Trade relief" referred to provisional AD/CVD duties on Chinese imports from March to July 2022 as a

result of preliminary determinations in *FRC I*.  The prohibitively high cash deposit rates caused imports from China—which the Commission ultimately found non-injurious in *FRC I*—to temporarily exit the U.S. market.  Staff Report, PR190/CR163 at IV-20.  Despite claiming that *FRC I* and *FRC II* are distinct investigations with different scopes, the Commission relied on provisional duties from *FRC I* to discount industry data in *FRC II*.  *See* Views, PR190 at 51, 54, CR178 at 54-55, 58.  Record evidence in *FRC II* demonstrates that the Commission's discounting was improper, as domestic producers did not pick up a meaningful amount of sales from Chinese imports in 2022.

In *FRC I*, the Commission found "the steeper decline in consumption" in the OEM channel disproportionately affected domestic producers, because "the majority of {their} shipments in 2019 {were} directed to OEM purchasers and a relatively higher share of their shipments compris{ed} complete FRCs as compared to subject importers" who directed the majority of their shipments "to the maintenance/replacement segment{.}"  *FRC I* Views, PR39 at 14, 27-28, CR42 at 17, 35-36.  The Commission also found "domestic producers were not in a position to pivot as quickly {as subject importers} to increase sales to the replacement market" "due to the dominant use of annual and long-term contracts{.}"  *Id.*, PR at 28, CR at 36.  Consistent with *FRC I*, Chinese imports continued to concentrate in the replacement market in *FRC II*.  Views, PR190 at 26, CR178 at 27.  If provisional duties had caused purchasers to abandon Chinese imports for domestically produced FRCs, domestic producers should have picked up significant sales in the replacement channel where Chinese imports had been concentrated, but the domestic industry in fact lost market share in that channel in 2022, and failed to pick up a meaningful amount of the [

] pounds of sales that Chinese imports lost.  Staff Report, PR190/CR163 at G-15.

By contrast, in the OEM channel where Chinese imports were *not* concentrated, the domestic industry gained [     ] percentage points of market share from 2021 to 2022 while Chinese

imports declined by only [     ] percentage points. *Id.* at G-11.  In other words, domestic producers gained a net [     ] percentage points of OEM market share—the equivalent of [            ] additional pounds of FRCs—that cannot be explained by provisional duties.  *Id.*  Even the Commission itself recognized elsewhere that "the withdrawal of subject imports from China after the imposition of provisional duties inured wholly to subject imports from Mexico," meaning the domestic industry did not improve due to the withdrawal of Chinese imports.  Views, PR190 at 43 n.240, CR178 at 45 n.240.  That finding cannot be squared with the Commission's claim that provisional duties explained the domestic industry's improved performance in 2022.

That the Commission had to strain to place such weight on provisional duties is also apparent from other errors, including outright misreadings of the record.  For example, the Commission partially rested this finding on [        ] purportedly stating that provisional duties contributed to its increased purchases from domestic sources during 2022.  *Id.*, PR at 53 n.291, CR at 57 & n.291.  No such statement was in the record.  [        ]'s sole explanation for its increased domestic purchases was "[                                                                            ]."

[        ] Importers/Purchasers QR, CR113 at IV-2.  [

]. Views, PR190 at 44 n.243, CR178 at 46 n.243.

Lastly, if provisional duties could have explained the domestic industry's improvement, the domestic industry should have seen most improvement when the provisional duties were in place, but [     ] production [                                        ] from March to July 2022 when imports from China declined; its production [        ] from August to December 2022, *after* the Commission made its negative determination in *FRC I* and cash deposits were terminated.  *See* Staff Report, PR190/CR163 at III-8, IV-20.

      **b.  The Commission's decision to discount the domestic industry's improved performance in 2022 was inconsistent with both the SAA and *FRC I*.**

The Commission's decision to discount the domestic industry's improved performance is also at odds with the SAA, which it cited as support.  Views, PR190 at 42 n.236, CR178 at 44 n.236.  As explained in the SAA, where there is "a significant change in data" concerning the effects of imports subsequent to the imposition of provisional duties, the Commission may reduce the weight given to such data only "{i}n the absence of sufficient evidence ... establishing that such change is related to factors other than the pendency of the investigation."  SAA at 854.  Respondents explained that the domestic industry's improved performance in 2022 was driven not by the pendency of *FRC I* but rather a significant increase in demand in the OEM channel—the very same channel where the Commission previously found the domestic industry to be concentrated.  *See, e.g.*, Wabtec Posthearing Br., PR153/CR155 at 7-8.

The Commission's discounting of this improvement was also inconsistent with *FRC I* where it found that the domestic producers' concentration in the OEM channel caused them to be disproportionately affected by the greater decline in demand in the OEM channel relative to the replacement channel.  *FRC I* Views, PR39 at 25, 27-28, CR42 at 33.  As the Commission explained in *FRC I*: "{a}ny overall market share shift was affected by different demand trends for new railcars and maintenance of FRCs, as well as differing concentrations of shipments in these market segments by U.S. producers and importers."  *Id.*  In both investigations, the domestic industry's fortunes rose and fell with shifts in OEM demand.  In *FRC I*, the domestic industry's performance declined as OEM demand declined by [    ] percent, compared to a lesser [    ] percent decline in the replacement channel.  *Id.*, PR at 14 n.58, CR at 18 n.58.  In *FRC II*, demand in the OEM channel increased by [  ] percent—with a [    ] percent increase between 2021 and 2022 alone—while demand in the replacement channel remained almost flat over the POI.  Staff Report,

PR190/CR163 at G-11; PR190 at 77.  This increase in OEM demand directly corresponded to improvements in the domestic industry's performance indicators.  *See id., PR*190/CR at C-3, CR at IV-22 (showing domestic industry's U.S. shipments increased by [          ] pounds from 2021 to 2022 which coincided with the [          ] pound increase in U.S. demand).

       The Commission refused to apply the same logic that led to a negative determination in *FRC I*.  Instead it noted that "{a}pparent U.S. consumption increased by [     ] percent from 2021 to 2022, but the domestic industry's U.S. shipments increased by far more, [     ] percent," and then attributed the rest of the increase in the domestic industry's U.S. shipments to the decrease in subject imports from China.  Views, PR190 at 51, CR178 at 54-55.  The Commission ignored evidence that this [     ] percentage increase was a result of domestic producers' U.S. shipments [          ] in 2021, after FRC demand had declined continuously from 2019 to 2021.  *See FRC I* Views, PR39 at 14 & n.58, CR42 at 18 & n.58.  The decline was especially significant in the OEM segment where the Commission previously found that the domestic industry was concentrated.  *See id.*

       In sum, by throwing up a smokescreen about provisional duties, the Commission improperly discounted the obvious causes that drove real and significant improvements in the domestic industry's condition over the POI: the spike in OEM channel demand, PR190 at II-13, not a transient decline in imports from China.

       **2.**      **The Commission erroneously attributed to subject imports adverse effects in the replacement channel caused by the domestic industry's longstanding prioritization of OEM sales.**

       Even though the domestic industry gained over [   ] percentage points of market share overall and almost [   ] points in the OEM channel, Staff Report, PR190/CR163 at C-3, G-11, the Commission relied on the domestic industry's loss of share in the replacement channel in finding injury.  It found that "{a}lthough the industry made gains in the OEM market in 2022 that offset

volume losses in the replacement market, the replacement market is larger ... and represents a more steady source of demand and income for the domestic industry."  Views, PR190 at 43, CR178 at 45.  This finding contradicted *FRC I* and substantial record evidence.

> **a.  The Commission contradicted its *FRC I* finding that the domestic industry's decline in the replacement market was due to differing demand trends and producer concentrations in the replacement and OEM channels.**

In *FRC I*, the Commission concluded that "any overall market share shift was affected by different demand trends for new railcars and maintenance of FRCs, as well as differing concentrations of shipments in these market segments by U.S. producers and importers{.}" *FRC I* Views, PR39 at 25, CR42 at 33.  In reaching this conclusion, the Commission first observed that "the majority of domestic producers' shipments in 2019 {were} directed to OEM purchasers and a relatively higher share of their shipments compris{ed} complete FRCs as compared to subject importers."  *Id.*, PR at 27-28, CR at 35-36.  From 2019 to 2021, OEM demand declined more sharply than replacement demand.  *Id.*, PR at 14 & n.58, CR at 18 n.58.  This divergence in demand trends reflected the fact that demand in "the maintenance market is relatively constant while the new freight railcar market can have large swings from year to year."  *FRC I* Staff Report, PR39/CR40 at II-9.  The Commission also found that "domestic producers were not in a position to pivot as quickly to increase sales to the replacement market to avail themselves of the lesser decline" in the replacement market due to "the dominant use of annual and long-term contracts, including the long-term supply contract between M&T and Trinity{.}"  *FRC I* Views, PR39 at 28, CR42 at 36.  M&T acknowledged the company's strategy of prioritizing OEM customers despite business cycles.  Amsted Posthearing Br. Q&A, PR151/CR152 at 9 (citing *FRC I* Conf. Tr. at 46-47 (Mr. Mautino)) ("{A}s the new car builds would escalate, the percentage of new car would be much higher than the maintenance.  In ... a low car build year ... 60/40 OEM to maintenance.  In a high car build year, it could be as much as ... 75, 80 percent new car.").  The consequence of this

focus on OEM sales was felt by M&T's customer [

]."

*FRC I* Staff Report, PR39/CR40 at II-21-22.

Consistent with *FRC I*, Respondents explained that any loss of market share in the replacement channel by the domestic industry during *FRC II* was attributable to the industry's strategy to focus on the OEM market rather than from competition from subject imports. *See* Wabtec Posthearing Br., PR153/CR155 at 11. In dismissing Respondents' argument, the Commission did not acknowledge—much less distinguish—the relevant *FRC I* findings. The Commission also contradicted *FRC I* by finding for the first time in *FRC II* that the domestic industry's loss of share in the replacement channel was evidence of injury by reason of subject imports. Views, PR190 at 51, CR178 at 54-55.

> **b. The Commission mischaracterized *FRC II* record evidence, which showed that the domestic industry's loss of share in the replacement channel was almost entirely due to [**
> **].**

As Respondents explained, nearly [            ] decline in the domestic industry's replacement channel shipments from 2021 to 2022 resulted from [


]. *See* Amsted Posthearing Br. Q&A, PR151/CR152 at 37-38, 41. The Commission rejected this argument for three reasons, all of them contradicted by record evidence.

- The Commission said [

  ] Views, PR190 at 52 n.289, CR178 at 56 n.289. To the contrary, [

  ]." Amsted Posthearing Br., PR151/CR152 at Ex. 4 ¶ 22.

- Second, the Commission noted that the dispute "occurred in July 2021, before the capacity constraints that are alleged to have occurred." Views, PR190 at 52 n.289, CR178 at 56 n.289. In fact, [

48

[                     ], the very same channel where the Commission found in *FRC I* that [                                          ]. Amsted Posthearing Br., PR151/CR152 at 9.

- The Commission credited [

                                        ]. Views, PR190 at 52 n.289, CR178 at 56 n.289. In reality, [

                                        ]. Amsted Posthearing Br., PR151/CR152 at Ex. 4, Att. 1. The Commission completely failed to address [
                     ]. Views, PR190 at 52 n.289, CR178 at 56 n.289.

This episode [        ] was not some sideshow; instead, it confirmed the remarkable lengths to which the domestic industry was willing to go in prioritizing OEM channel sales as the business cycle for new car builds reversed. When OEM demand began to decline in 2019, [



                              ]. *See* Amsted Posthearing Br., PR151/CR152 at Ex. 4, Att. 5 ([



                                        ]). Yet when OEM demand began to spike in mid-2021, [


                              ]. [



                              ]. *See id.* Q&A at 2-3. [



                              ]. *See id.* at Ex. 4 ¶¶ 14-17, 19, 23 ([



                              ]). [



                                                                           ].

*See id.* at Ex. 4 ¶25; [   ] Importer/Purchaser QR, CR120 at IV-19.

Other record evidence confirmed [

                                                                    ].    For    example,

[                   ] stated that domestic suppliers [

                              ].  [                  ] Importer/Purchaser QR, CR 112 at III-20, IV-7.

Meanwhile, in the replacement channel, [



                                                            ].  *See* Amsted Posthearing

Br., PR151/CR152 at 9-10.  In both investigations, Mr. Mautino of M&T testified that the company

historically sought to "offset" downturns in the OEM channel with "more sales in the maintenance

channel," admitting that replacement sales were secondary to OEM sales for M&T.  Hearing Tr.,

PR 144 at 153 (Mr. Morrell quoting Mr. Mautino's *FRC I* Hearing testimony); Conf. Tr., PR 50 at

21 (Mr. Mautino).  The Commission did not address this evidence at all.

### c. The Commission ignored market trends and contradicted *FRC I* in giving weight to the fact that the domestic industry made [                              ] in 2020 and 2021 in the replacement market.

In dismissing Respondents' argument that M&T's focus on OEM customers explained its

[    ] of share in the replacement market in 2022, the Commission relied on the fact that the

domestic industry "made [                        ] during 2020 and 2021 in the replacement market

rather than the [    ] market," which, according to the Commission, showed the domestic industry

was "interested" in the replacement market.  Views, PR190 at 52, 71, CR178 at 55.

Respondents never argued that the domestic industry was not "interested" in the

replacement market.  Rather, the argument was that the domestic industry *prioritized* the OEM

market, both during the POI and historically.  *See, e.g.*, Wabtec Posthearing Br., PR153/CR155 at

11, 14.  This in part reflected Trinity's ownership of M&T until 2018, after which M&T had a

contractual obligation [

]. *FRC I* Views, PR39 at 15 n.64, CR42 at 19 n.64.

The Commission also ignored data showing that the domestic industry's sales were temporarily higher in the replacement market than in the OEM market only because demand in the OEM market during 2020 and 2021 was at a near-historic low—falling no less than [  ] percent from 2019 to 2021. *See id.*, PR at 14 n.58, CR at 18 n.58; PR190 at II-13. In fact, when OEM demand recovered, the domestic industry pivoted back to the OEM market as soon as it could, capturing [                    ] of the demand increase in this channel and increasing its market share in this channel by [    ] percentage points. Staff Report, PR190/CR163 at IV-22, G-11. In 2019, the domestic industry was allocating more than [  ] percent of their shipments to the OEM channel. *FRC I* Staff Report, PR39/CR40 at II-4. This ratio declined as OEM demand collapsed from 2019 to 2021, but it immediately [                ] percent when OEM demand recovered in 2022. *See id.*; Staff Report, PR190/CR163 at II-4. The Commission did not address this contrary record evidence.

In sum, the Commission's attribution of the domestic industry's loss of market share in the replacement channel to subject imports contradicted its *FRC I* findings and was unsupported by record evidence.

  **3. The Commission minimized the importance of Bedloe as a distinguishing factor between Chinese imports and domestic FRCs without providing a sufficient explanation.**

In *FRC II*, Respondents argued that a substantial portion of the FRC market was not available to the domestic industry because purchasers required Bedloe technology, which was available only from Chinese producers. *See* TTX Posthearing Br., PR 156/CR 156 at 5-10. The Commission agreed in part, finding that "Bedloe technology is an important purchasing factor for a portion of the market, in view of TTX's clear preference for Bedloe technology and that it is one

of the largest U.S. purchasers of FRCs." Views, PR190 at 34 n.182, CR178 at 35 n.182. Yet it

concluded that "although certain purchasers may prefer Bedloe FRCs over non-Bedloe FRCs, the

technology ... does not account for the significant volume of subject imports during the POI."

Views, PR190 at 54, CR178 at 58. The Commission failed to acknowledge that Bedloe FRCs—

accounting for [                                                    ]—remained a significant non-price

factor distinguishing domestic FRCs from Chinese imports, such that Chinese imports were not

injurious to the domestic industry. Staff Report, PR190/CR163 at IV-14.

      In *FRC I*, the Commission had found that for a meaningful portion of the market, the use

of Bedloe technology in Chinese-origin FRCs is a key distinguishing factor. *FRC I* Views, PR39

at 16 n.76, CR42 at 21 n.76. The Commission cited reasons such as the largest purchaser of FRCs

in 2021, TTX, identified Bedloe as a very important purchasing factor; TTX provided technical

evidence that certain Bedloe products had superior performance relative to other products; and

purchasers reported quality exceeding industry standards as a very important purchasing factor.

*Id.*

      These facts remained virtually the same in *FRC II*, but the Commission discounted TTX's

preference for Bedloe FRCs based on its claim that TTX purchased more [

      ] in 2022. Views, PR190 at 53-54, CR178 at 57-58 (citing [   ] Importer/Purchaser

QR, CR119 at IV-1). This claim is false, as the Commission did not account for TTX's corrected

purchase data after the Commission confirmed that importers should not report couplers attached

to new railcars built in Mexico and never entered for consumption. *Compare* [   ]

Importer/Purchaser QR, CR119 at IV-1 *with* TTX Posthearing Br. Q&A, PR156/CR156 at 15

(showing [

      ]). Contrary to the Commission's finding, corrected purchase data showed that Bedloe

accounted for [   ] of knuckles and [   ] of coupler bodies purchased by TTX in the maintenance

channel, which represented the vast majority of TTX's FRC purchases in 2022.  TTX Posthearing Br. Q&A, PR156/CR156 at 14.

The Commission also cited an [          ] in TTX's purchases of non-Bedloe FRCs in 2022 as evidence for "the substitutability of subject imports and the domestic like product, even by purchasers that view Bedloe technology as an important purchasing factor."  Views, PR190 at 34 n.182, CR178 at 36 n.182.  But as TTX emphasized, [



].  TTX Final Comments, PR176/CR 175 at 13.  TTX nevertheless maximized its purchases of Bedloe by [


].  TTX Posthearing Br. Q&A, PR156/CR156 at 13.  Even when faced with supply constrains from China, TTX [                    ] its purchase of domestically produced FRCs.  *Id.* at 15 (showing TTX [                                                    ]).  The Commission never acknowledged these points.

Furthermore, the Commission failed to square its findings on shifts in TTX purchases with its conclusions in *FRC I*.  The record in *FRC I* showed a similar [          ] in TTX's purchase of non-Bedloe products from 2020 to 2021, an [                                            ] from 2021 to 2022.  *Id.* at 11; *FRC I* Views, PR39 at 19 n.99, CR42 at 25 n.99.  The Commission nonetheless affirmed Bedloe's importance in *FRC I*, noting that [      ] additional purchases of non-Bedloe FRCs were due to supply constraints during the pendency of *FRC I* and its new railcar acquisitions from Mexico.  *FRC I* Views, PR39 at 19 n.99, CR42 at 25 n.99.  In *FRC II*, TTX provided the same reasons for its [              ] purchases from Mexico in 2022, *see* [    ]

Importer/Purchaser QR, CR119 at II-2, but the Commission drew the opposite conclusion without providing any explanation for its reversal.

For reasons stated above, the Commission's minimization of the importance of Bedloe as an important non-price factor distinguishing domestic FRCs from subject imports from China was arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law.

## V. THE CONFLICT OF INTEREST REQUIRES REMAND OF THE COMMISSION'S DECISION FOR ISSUANCE OF A NEGATIVE INJURY DETERMINATION.

While the Commission lost no time reaching the merits of *FRC II*, it refused to address a disabling conflict of interest that tainted the proceedings from the start.

In the underlying proceedings, Amsted asked the Commission to disqualify the Coalition's counsel (the "Attorney") and Law Firm from further participation in *FRC II* based on a conflict of interest. The Attorney had represented Amsted in *FRC I*, which the company helped commence as a member of the Coalition. Though Amsted later withdrew from the Coalition, the company had confided in the Attorney "its legal strategy for prosecuting FRC-related trade investigations, competitive decision-making processes, and extensive FRC-related business proprietary information relevant to establishing the scope of domestic like product, the domestic industry, and the conditions of competition." PR36, CR31 at Ex. 1 at 1-2. And since the Coalition's interests in *FRC II* were now adverse to Amsted's in a matter substantially related to *FRC I*, Amsted asked the Commission to disqualify the Attorney and Law Firm from further participation in these proceedings.

On October 21, 2022, the Commission denied this request, albeit without addressing the merits of the asserted conflict. Instead, the Commission claimed, without qualification, that it "does not adjudicate alleged violations of the Rules of Professional Conduct of a state Bar, nor does it determine whether conduct has violated the Model Rules of Professional Conduct of the American Bar Association ...." PR53. On this basis alone the Commission concluded that there

was "not good cause under Rule 201.15(a), at this time, to disqualify {the Firm} from participation in this investigation …." PR53; *see* Am. Compl. ¶ 81; ECF No. 41-14. Though this Court dismissed for lack of jurisdiction respondents' previous attempt to appeal this determination, the Court did so "without prejudice to refiling once a claim under 28 U.S.C. § 1581(c) is ripe." *Amsted Rail Co., Inc. v. United States Int'l Trade Comm'n*, 600 F. Supp. 3d 1308, 1330-31 (CIT 2022).

The issue is now ripe for judicial review. For the reasons that follow, the Commission's affirmative determination should be remanded with instructions to issue a negative injury determination in light of the Attorney's "direct, ongoing, and nonconsensual conflict of interest," which tainted the integrity of the Commission's investigation and severely prejudiced respondents.

### A.    The Commission's Refusal to Address the Conflict of Interest Rests on a False Premise.

The Commission's decision to punt on the conflicts issue rests on the unqualified assertion that the Commission "does not adjudicate alleged violations" of professional-conduct rules or "determine whether conduct has violated" Model Rules of Professional Conduct. These statements are false. The Commission has expressly claimed—and exercised—"the authority to disqualify an attorney or firm from practice before it based on its inherent authority to control proceedings." *Certain Electronic Imaging Devices*, USITC Inv. No. 337-TA-726, 2010 WL 4786589, at *3 (Sept. 1, 2010). And its long-standing practice when exercising this authority is to "look to the ABA Model Rules of Professional Conduct for guidance in determining whether to disqualify counsel." *Id.*; *see also, e.g.*, *Certain Network Interface Cards & Access Points*, USITC Inv. No. 337-TA-455, 2001 WL 893287, at *2 n.1 (Aug. 2, 2001) (stating that the Commission "has looked to the Model Rules for guidance in such matters"). Pursuant to this authority, the Commission has in fact disqualified counsel in Commission proceedings. *See, e.g.*, *id.*; *Certain Network Interface Cards & Access Points*, USITC Inv. No. 337-TA-455, Commission Op., 2001 WL 1646394 (Dec. 18, 2001) (affirming disqualification).

The premise of the Commission's refusal to address the conflict issue—that conflict issues are categorically beyond its purview—is thus patently false.  And even if it were true, its refusal to resolve the issue is insufficiently reasoned.  Either way, its decision cannot stand.  *See, e.g.*, *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992) ("An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence."); *Gechter v. Davidson*, 116 F.3d 1454, 1459 (Fed. Cir. 1997) ("agencies have a duty to provide reviewing courts with a sufficient explanation for their decisions so that those decisions may be judged against the relevant statutory standards, and that failure to provide such an explanation is grounds for striking down the action"); *In re Vivint, Inc.*, 14 F.4th 1342, 1352 (Fed. Cir. 2021) ("Agency action that departs from established precedent without a reasoned explanation is arbitrary and capricious." (cleaned up)).

## B.  Regardless of the Commission's Authority, This Court Should Address the Conflict of Interest.

Even if the Commission's handwashing were acceptable, the conflict remains and must be addressed.  Model Rule 1.9(a) "requires disqualification if four criteria are met: (1) the moving party and opposing counsel had a prior attorney-client relationship, (2) the interests of the opposing counsel's present client are adverse to the movant, (3) the matters involved in the present underlying lawsuit are substantially related to the matters for which the opposing counsel previously represented the moving party, and (4) the moving party does not consent." *Touchcom, Inc. v. Bereskin & Parr*, 299 F. App'x 953, 954 (Fed. Cir. 2008).  Each of these criteria is satisfied in this case.

First, it is undisputed that Amsted and the Attorney had an attorney-client relationship in *FRC I*.

Second, Amsted's interests in *FRC II* are materially adverse to the interests of the Attorney's client in this case, as evidenced by the fact that Amsted [

].  *See generally, e.g.*, PR134/CR144.

Third, the *FRC I* and *FRC II* investigations are "substantially related."  Among other things, they involved the same petitioner (the Coalition led by M&T), overlapping scopes and POIs, and extensive arguments and data specifically concerning the impact of imports from China and even Mexico on the domestic industry.  Indeed, in both *FRC I* and *FRC II*, the Coalition pressed arguments about the role of Mexico in the U.S. market and the reasons for [          ] shift of production to Mexico—and the Commission made express findings regarding the same.  *See* Views, PR190 at 20, CR178 at 21.  And it was on the precise topic of [

].  For example, the Attorney advised [




].  Given this exchange, there is, at minimum, "a substantial risk that [          ] confidential factual information as would normally have been obtained in the prior representation would materially advance the {Coalition's} position in the subsequent matter."  ABA Model Rule 1.9, cmt. 3.

Finally, Amsted did not consent to the Attorney's representation in *FRC II*.  While Amsted granted the Attorney an advance waiver, the waiver expressly excluded "matters that are substantially related to our work for you."  PR36/CR31 at 12.  Even without that exception, the waiver would be invalid.  *See, e.g.*, D.C. Bar Ethics Op. 309 (2001) ("an advance waiver of conflicts will not be valid where the two matters are substantially related to one another").

For these reasons, the Attorney should have been—and still must be—disqualified from further participation in this matter.  Whether or not the Commission has authority over the issue, this Court certainly does.  Where an attorney is a member of this Bar, this Court "has plenary authority and responsibility to supervise professional conduct," including conduct occurring in

AD/CVD proceedings before the Commission. *Makita Corp. v. United States*, 819 F. Supp. 1099, 1104 (CIT 1993). Indeed, after Commerce had similarly claimed it was powerless to act "to forestall a conflict of interest" in *Makita*, the Court intervened "to protect" the proceedings by issuing an injunction to prevent "irreparable harm" arising from the conflict of interest. *Id.*

In this case, the harm has already materialized and is irreparable. The Attorney successfully led an effort to obtain tariffs against Amsted and other respondents. And this effort was almost certainly informed by confidential information and insights gained pursuant to the Attorney's prior attorney-client relationship with Amsted. An example illustrates the point. In reaching its final affirmative determination, the Commission expressly found that [


] in *FRC I*. Even if the Attorney could contextualize these dealings [            ], the appearance of impropriety remains and taints the proceedings. This can only be addressed by remanding the Commission's final determination with instructions and requiring it to enter a negative determination, since the implications of the conflict of interest cannot be disentangled from the proceedings.

## <u>CONCLUSION</u>

For these reasons, the Court should remand the Commission's final determination and direct it to enter a final negative determination. At the very least, the Court should remand the Commission's final determination and direct the Commission to address the multiple legal and factual errors in its decision.

Dated: August 19, 2024                    Respectfully submitted,

                                          */s/ David M. Morrell*
                                          David M. Morrell
                                          Shelbie M. Rose
                                          JONES DAY
                                          51 Louisiana Avenue, N.W.
                                          Washington, D.C. 20001
                                          202.879.3636
                                          dmorrell@jonesday.com

                                          *Counsel for Wabtec Corporation*

                                          */s/ Andrew T. Schutz*
                                          Andrew T. Schutz
                                          Ned H. Marshak
                                          GRUNFELD, DESIDERIO, LEBOWITZ,
                                          SILVERMAN & KLESTADT LLP
                                          1201 New York Ave. NW #650
                                          Washington, D.C. 20005
                                          202.783.6881
                                          aschutz@gdlsk.com

                                          *Counsel for Strato Inc.*

                                          */s/ James M. Smith*
                                          James M. Smith
                                          Sooan (Vivian) Choi
                                          Paula Ortiz Cardona
                                          Wanyu Zhang
                                          COVINGTON & BURLING LLP
                                          850 10th Street, NW
                                          Washington, D.C. 20001
                                          202.662.5550
                                          jmsmith@cov.com

                                          *Counsel for Strato Inc.*

PUBLIC VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiffs' Memorandum of Law In Support of its 56.2 Motion, as computed by Jones Day's word processing system Microsoft Word 2013, is 18,848 words.  Wabtec and Strato filed a Motion for Excess Words/Pages, and the Court granted this Motion on August 14, 2024 ("the Order").  This Order stated that this brief shall not exceed 19,000 words.


*/s/ David M. Morrell*
David M. Morrell

Dated: August 19, 2024