*NONCONFIDENTIAL VERSION*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE GARY S. KATZMANN

Court No. 23-00157

**WABTEC CORPORATION,**

*Plaintiff*,

**and**

**STRATO, INC,**

*Consolidated Plaintiffs*,

**v.**

**UNITED STATES,**

*Defendant*,

**and**

**COALITION OF FREIGHT COUPLER PRODUCERS,**

*Defendant-Intervenors*.

## DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

GARRETT L. PETERSON
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone: (202) 205-3241
Facsimile: (202) 205-3111
garrett.peterson@usitc.gov

MICHAEL K. HALDENSTEIN
Attorney-Advisor
Office of the General Counsel
Telephone: (202) 205-3041
michael.haldenstein@usitc.gov

DOMINIC L. BIANCHI
General Counsel
Telephone:  (202) 205-3061
dominic.bianchi@usitc.gov

ANDREA C. CASSON
Assistant General Counsel for Litigation
Telephone: (202) 205-3105
andrea.casson@usitc.gov

JANE C. DEMSPEY
Attorney-Advisor
Office of General Counsel
Telephone: (202) 205-3142
jane.dempsey@usitc.gov

**DATED:  December 19, 2024**

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES....................................................................................v

I.    STATEMENT PURSUANT TO RULE 56.2...................................................1

    A.    Administrative Determinations Sought to be Reviewed..................1

    B.    Questions Presented .........................................................................2

        i.    Did the Commission act in accordance with law by proceeding with these investigations? ..........................2

        ii.    Was the Commission's decision not to exclude [ ███████ ] from the domestic industry supported by substantial evidence and in accordance with law?.........................3

        iii.    Was the Commission's cumulation of subject imports from China and Mexico in accordance with law? .................4

        iv.    Was the Commission's finding of significant adverse price effects supported by substantial evidence and in accordance with law?........................................................6

        v.    Was the Commission's finding that subject imports had a significant impact on the domestic industry supported by substantial evidence and in accordance with law?...................7

        vi.    Was the Commission's decision not to disqualify the Attorney and his Firm supported by substantial evidence and in accordance with law? .......................................8

II.    STATEMENT OF FACTS .............................................................................9

    A.    Procedural History.............................................................................9

    B.    The *FRC II* Investigations ...............................................................10

        i.    Domestic Like Product ..........................................................10

        ii.    Domestic Industry ................................................................11

        iii.    Cumulation .........................................................................13

        iv.    Conditions of Competition ....................................................14

        v.    Volume ................................................................................16

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

### TABLE OF CONTENTS (cont'd)

|  |  |  |  |
|---|---|---|---|
| | vi. | Price Effects | 16 |
| | vii. | Impact | 19 |
| **III.** | **STANDARD OF REVIEW** | | **19** |
| **IV.** | **ARGUMENT** | | **21** |
| | **A.** | **The Commission Acted in Accordance with Law by Proceeding with the *FRC II* Investigations** | **21** |
| | **B.** | **The Commission's Inclusion of [ ▇▇▇ ] in the Domestic Industry Definition Is Supported by Substantial Evidence and in Accordance with Law** | **24** |
| | | i. The Commission's Related Parties Analysis Was Consistent with Its Statutory Authority | 24 |
| | | ii. A Related Company's Primary Interest Is Not Dispositive in the Commission's Related Parties Analysis | 28 |
| | | iii. The Commission's Finding that the Related Company Was Not Shielded from the Effects of Subject Imports Is Supported by Substantial Evidence | 29 |
| | | iv. Plaintiffs' Challenges to the Commission's Findings Are Unavailing | 31 |
| | **C.** | **The Commission Was Not Barred from Cumulating Subject Imports from China and Mexico** | **34** |
| | **D.** | **The Commission's Price Effects Finding Is Supported by Substantial Evidence and in Accordance with Law** | **35** |
| | | i. The Commission Reasonably Considered the Evidence of Lost Sales | 35 |
| | | ii. The Commission Reasonably Found that Underselling by Subject Imports Caused the Domestic Industry to Lose Market Share | 37 |
| | | iii. The Commission Reasonably Determined that Subject Imports Suppressed the Domestic Like Product Prices | 39 |

**TABLE OF CONTENTS (cont'd)**

    1.  The Commission's Price Suppression Analysis
        Should Be Sustained ........................................39

    2.  Plaintiffs' Challenges to the Commission's Price
        Suppression Findings Are Unavailing ...........................40

**E.  The Commission's Impact Finding Is Supported by Substantial
Evidence and in Accordance with Law ..............................42**

    i.      The Commission's Impact Analysis Should Be Sustained ......................42

    ii.     The Commission's Decision to Attribute the Domestic
         Industry's Improved Performance in 2022 to the *FRC I*
         Provisional Duties Was Supported by Substantial Evidence ...................44

    iii.    The Commission's Causation Analysis Was Supported by
         Substantial Evidence and In Accordance with Law ..................46

    iv.    The Commission's Consideration of Bedloe Technology
         Was Supported by Substantial Evidence ......................48

**F.  Wabtec and Strato Are Not Entitled to Relief from the
Commission's Decision Not to Disqualify the Attorney and
Firm ..............................................................50**

    i.      Background ........................................50

    ii.     Wabtec and Strato Lack Standing to Bring a Conflict of
         Interest Claim ........................................51

    iii.    The Commission's Determination that Good Cause Did Not
         Exist to Disqualify the Attorney and Law Firm is Supported
         by Substantial Evidence and Otherwise in Accordance with
         Law ..............................................56

    iv.    The Court Should Not Entertain Plaintiffs' Request for the
         Court to Address the Alleged Conflict of Interest ....................58

    v.     Wabtec and Strato Are Not Entitled to Their Requested
         Relief ..............................................59

**V.  CONCLUSION ..........................................61**

# TABLE OF AUTHORITIES

**Cases**                                                                                                                          **Page(s)**

*Algoma Steel Corp. v. United States,*
    865 F.2d 240 (Fed. Cir. 1989)................................................................59

*Allen v. Wright,*
    468 U.S. 737 (1984)................................................................52

*Allgenesis Biotherapeutics Inc. v. Cloudbreak Therapeutics,* LLC,
    85 F.4th 1377 (Fed. Cir. 2023) ................................................51, 52

*Allied Mineral Prods., Inc. v. United States,*
    28 CIT 1861 (2004) ................................................................26, 28

*Altx, Inc. v. Am. Extruded Prod. Corp.,*
    370 F.3d 1108 (Fed. Cir. 2004)................................................................60

*In re Am. Airlines, Inc.,*
    972 F.2d 605 (5th Cir. 1992) ................................................................53

*Amsted Rail Co., Inc. v. U.S. Int'l Trade Comm'n,*
    600 F. Supp. 3d 1308 (Ct. Int'l Trade 2022) ................................................10, 60

*In re Appeal of Infotech., Inc.,*
    582 A.2d 215 (Del. 1990) ................................................................55, 56

*Budd Co. Railway Div. v. United States,*
    1 CIT 67, 507 F. Supp. 997 (1980)................................................................58

*Changzhou Trina Solar Energy Co. v. USITC,*
    100 F. Supp. 3d 1314 (Ct. Int'l Trade 2015) ................................................25

*Colyer v. Smith,*
    50 F. Supp. 2d 966 (C.D. Cal. 1999) ................................................52, 53, 55

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966)................................................................20

*In re Dresser Indus.,*
    972 F.2d 540 (5th Cir. 1992) ................................................................53

*Elkem Metals Co. v. United States,*
    26 CIT 234, 193 F. Supp. 2d 1314 (2002)................................................................60

*Empire Plow Co. v. United States,*
    11 CIT 847, 675 F. Supp. 1348 (1987)................................................................24, 25

v

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                          **Page(s)**

*Gen. Motors Corp. v. United States,*
　17 CIT 697, 827 F. Supp. 774 (1993) ................................................................33

*Goldsmith v. U.S. Bd. of Tax Appeals,*
　270 U.S. 117 (1926) ...........................................................................................57

*Imperial Sugar Co. v. United States,*
　181 F. Supp. 3d 1284 (Ct. Int'l Trade 2016), *appeal dismissed*, No. 17-1320
　(Fed. Cir. 2017) .................................................................................................20

*INS v. Ventura,*
　537 U.S. 12 (2002) ..............................................................................................59

*ITG Voma Corp. v. U.S. Int'l Trade Comm'n,*
　253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed.
　Cir. 2019) ..........................................................................................................20

*Koyo Seiko Co., Ltd. v. United States,*
　13 CIT 461, 715 F. Supp. 1097 (1989) ..............................................................60

*LG Elecs., Inc. v. U.S. Int'l Trade Comm'n,*
　38 CIT 1562, 26 F. Supp. 3d 1338 (2014) ...........................................25, 27, 31

*Loper Bright Enters. v. Raimondo,*
　603 U.S. ___, 144 S. Ct. 2244 (June 28, 2024) ............................................20, 21

*Lujan v. Defs. of Wildlife,*
　504 U.S. 555 (1992) ...........................................................................51, 52, 53

*Makita Corp. v. United States,*
　17 CIT 240, 819 F. Supp. 1099 (1993) ..............................................................59

*N.M. Garlic Growers Coal. v. United States,*
　352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) .....................................................58

*Nippon Steel Corp. v. United States,*
　458 F.3d 1345 (Fed. Cir. 2006) ...................................................................20, 60

*NLRB v. Food Store Emp. Union,*
　417 U.S. 1 (1973) ...............................................................................................60

*Optyl Eyewear Fashion Int'l v. Style Co.,*
　760 F.2d 1045 (9th Cir. 1985) ...........................................................................55

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Cases (cont'd)**                                                                                          **Page(s)**

*Royal Brush Mfg., Inc. v. United States,*
   75 F.4th 1250 (Fed. Cir. 2023) ........................................................................59

*Sandvik AB v. United States,*
   13 CIT 738, 721 F. Supp. 1322 (1989), *aff'd without opinion*, 904 F.2d 46
   (Fed. Cir. 1990).........................................................................................25, 28

*Shakeproof Indus. Prods. Div. of Ill. Tool Works, Inc. v. United States,*
   104 F.3d 1309 (Fed. Cir. 1997)........................................................................57

*In re Shared Memory Graphics LLC,*
   659 F.3d 1336 (Fed. Cir. 2011)........................................................................54

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944)........................................................................................21

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016)...................................................................................51, 52

*Timex V.I., Inc. v. United States,*
   157 F.3d 879 (Fed. Cir. 1998)..........................................................................20

*Tokyo Kikai Seisakusho, Ltd. v. United States,*
   529 F.3d 1352 (Fed. Cir. 2008)........................................................................23

*Torrington Co. v. United States,*
   16 CIT 220, 790 F. Supp. 1161 (1992), *aff'd without opinion*, 991 F.2d 809
   (Fed. Cir. 1993)...........................................................................................25, 26

*U.S. Steel Grp. v. United States,*
   96 F.3d 1352 (Fed. Cir. 1996)..........................................................................20

*Unified Sewage Agency of Wash. Cty. v. Jelco Inc.,*
   646 F.2d 1339 (9th Cir. 1981) .........................................................................53

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951)........................................................................................20

*Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.,*
   435 U.S. 519 (1978)........................................................................................57

*In re Yarn Processing Patent Validity Litig.,*
   530 F.2d 83 (5th Cir. 1976) ..................................................................52, 53, 55

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                                          **Page(s)**

*Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*,
   217 F. Supp. 3d 1363 (Ct. Int'l Trade 2017) ........................................................................20

**Statutes**

19 U.S.C. § 1516a ...........................................................................................................59, 60

19 U.S.C. § 1516a(b) .............................................................................................................58

19 U.S.C. § 1516a(b)(1)(B)(i) ...............................................................................................19

19 U.S.C. § 1516a(b)(2) .........................................................................................................58

19 U.S.C. § 1671a(c) ...............................................................................................................2

19 U.S.C. § 1671a(c)(2) .........................................................................................................23

19 U.S.C. § 1671b(a) .........................................................................................................2, 23

19 U.S.C. § 1671c ............................................................................................................22, 35

19 U.S.C. § 1671c(a)(1)(A) ...................................................................................................35

19 U.S.C. § 1671d(b)(1) ........................................................................................................56

19 U.S.C. § 1673a(c) ...............................................................................................................2

19 U.S.C. § 1673a(c)(2) .........................................................................................................23

19 U.S.C. § 1673b(a) .........................................................................................................2, 23

19 U.S.C. § 1673c ..................................................................................................................22

19 U.S.C. § 1673c(a)(1)(A) ...................................................................................................35

19 U.S.C. § 1673d(b)(1) ...................................................................................................22, 56

19 U.S.C. § 1675(b)(1) .....................................................................................................2, 22, 23

19 U.S.C. § 1675(b)(4)(A) ................................................................................................2, 22

19 U.S.C. § 1677(4)(A) ..........................................................................................................26

19 U.S.C. § 1677(4)(B) .....................................................................................................24, 26

19 U.S.C. § 1677(4)(D) ..........................................................................................................33

**<u>TABLE OF AUTHORITIES (cont'd)</u>**

**Statutes (cont'd)**                                                                    **Page(s)**

19 U.S.C. § 1677(7)(G)(i) ........................................................................5, 34, 35

19 U.S.C. § 1677(7)(G)(ii)(II) ....................................................................5, 13, 34

19 U.S.C. § 4574(d)(2)(D) ................................................................................24

28 U.S.C. § 2639(a)(1) .....................................................................................19

**Regulatory Authorities**

19 C.F.R. § 201.15 ...............................................................................50, 56, 59

86 Fed. Reg. 58,864 (Dep't of Comm. Oct. 25, 2021) ..........................................23

86 Fed. Reg. 58,878 (Dep't of Comm. Oct. 25, 2021) ..........................................23

87 Fed. Reg. 64,440 (Dep't of Comm. Oct. 25, 2022) ..........................................23

87 Fed. Reg. 64,444 (Dep't of Comm. Oct. 25, 2022) ..........................................23

**Legislative Authorities**

H.R. Rep. 103-316, vol. 1 (1994) ................................................................ *passim*

S. Rep. No. 96-249 (1979) ...........................................................................24, 59

Defendant U.S. International Trade Commission opposes the motion for judgement upon the agency record filed by Wabtec Corp. and Strato, Inc. ("Plaintiffs").  The Commission's affirmative determinations regarding *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (*"FRC II"*) are supported by substantial evidence and otherwise fully in accordance with law.  We respectfully request this Court to affirm those determinations.

## I.    STATEMENT PURSUANT TO RULE 56.2

### A.  Administrative Determinations Sought to be Reviewed

Plaintiffs seek review of the Commission's final affirmative antidumping and countervailing duty determinations concerning China in the Commission's *FRC II* investigations.[1]  The Commission's Views are contained in USITC Pub. 5438 (Jul. 2023) (PR190).[2]  Notice of the Commission's determinations was published at 88 Fed. Reg. 43,398 (July 7, 2023) (PR189).

---

[1] Although the petitions in these investigations were filed on the same day, the Commission made staggered determinations.  The "leading" determinations, challenged in this appeal, cover the AD and CVD investigations of FRCs from China.  The investigation schedules became staggered when the U.S. Department of Commerce ("Commerce") did not postpone its final determinations for the AD and CVD China investigations, but did postpone its final determination for the Mexico AD investigation.  *See* Views at 3-4 & n.4.  The Mexican respondents have separately appealed the Commission's determination concerning the affirmative order on Mexican imports.  *Amsted v. United States*, Consol. Court No. 23-268.

[2] Citations to the public record are indicated by "PR," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CR," referring to list number 2 on the index of the administrative record.  Accordingly, citations to the Commission's confidential Views ("Views") are to CR178 and citations to the confidential Staff Report ("SR") are to CR163.

### B.  Questions Presented

#### i.  Did the Commission act in accordance with law by proceeding with these investigations?

Yes.  Upon the filing of a petition, the Department of Commerce is charged with determining whether to initiate an investigation.  19 U.S.C. § 1671a(c); 19 U.S.C. § 1673a(c). Given that Commerce determined to initiate these investigations, the Commission was statutorily required to conduct its injury investigations of whether a domestic industry in the United States was materially injured by the allegedly dumped and subsidized FRC imports within the scope of Commerce's initiation notice.  Once Commerce initiated its investigations, the Commission's preliminary determinations were required within 45 days of the petitions.  19 U.S.C. § 1671b(a); 19 U.S.C. § 1673b(a).  Accordingly, contrary to Plaintiffs' view that the Commission had inherent authority to not institute the *FRC II* investigations without good cause shown by the petitioners, Plaintiffs' Brief ("PlBr.") at 22, declining to institute the *FRC II* investigations would have been in direct conflict with the Commission's statutory obligations.  Thus, the Commission properly proceeded with these investigations as required under the statute.

Nor was the Commission barred from proceeding with these investigations by 19 U.S.C. § 1675(b)(4) in light of the Commission's negative determinations in *Freight Rail Coupler Systems and Components from China,* Inv. Nos. 701-TA-670 and 731-TA-1570 (Final), USITC Pub. 5331 (July 2022) (CR42) ("*FRC I*" and *"FRC I* Views*")*, as Plaintiffs claim.  PlBr. at 18-20. While that provision bars, in the absence of good cause shown, a *changed circumstances review* of a determination less than 24 months after publication of the determination in question, the *FRC II* investigations were initiated by Commerce as new investigations.

Moreover, the changed circumstances provision could not be applied to the *negative FRC I* determinations because there is no order to be reviewed.  *See* 19 U.S.C. § 1675(b)(1) (explicitly

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

stating that the changed circumstances provisions apply only to final affirmative determinations or suspension agreements).  Furthermore, there is no statutory provision like the changed circumstances provision that bars the filing of a new AD or CVD petition following a negative final determination.

> **ii.  Was the Commission's decision not to exclude [ ███ ] from the domestic industry supported by substantial evidence and in accordance with law?**

Yes.  The statute defines the domestic industry as the industry as a whole and provides that the Commission "may" in appropriate circumstances exclude a domestic producer as a related party.  19 U.S.C. § 1677(4).  In line with the Commission's practice, Congress confirmed that the reason for excluding related parties from the domestic industry under this provision is "to reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports."  Statement of Administrative Action ("SAA") for the Uruguay Round Agreements Act ("URAA"), H.R. Rep. 103-316, vol. 1 (1994) at 858.  The statute gives the Commission the discretion to exclude such producers, which reviewing courts have upheld, as long as the factors considered are reasonable, and the Commission's factual conclusions are supported by substantial evidence.  Here, using its primary factors, as well as other available information on the record, the Commission found that [ ███ ] was not shielded from the effects of competition with subject import and that its exclusion would have masked injury to the domestic industry.  Views at 19-22.  Accordingly, the Commission's related parties analysis was consistent with legislative history and case law.

Plaintiffs distort the Commission's actual findings in its final determinations by claiming that the Commission found that [ ███ ] "primary interest" was in importation.  PlBr. at 29. The record in the final phase of the investigations was mixed regarding whether [ ███ ]

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

primary interest was in importation or domestic production – including a last minute change in stance by the very company involved – and the Commission explained that even if a U.S. producer's current primary interest lies in importation, that factor alone is not dispositive in the Commission's related parties analysis. Views at 18. Plaintiffs' argument that [ ████ ] did not face import competition is belied by the record. PlBr. at 29-30. As the Commission explained, [ ██████████████████████████████████████████████████████████████ ████ ]. Views at 17-23. Plaintiffs also wrongly assert that the negative *FRC I* determinations precluded the Commission from finding competition between domestically produced FRCs and subject imports from China. PlBr. at 27. Not only were *FRC I* and *FRC II* separate investigations with different periods of investigation ("POI") and subject merchandise, but the Commission's findings in the two investigations were not inconsistent as Plaintiffs suggest. In *FRC I*, the Commission found that the offshoring of domestic production that occurred decades earlier was not evidence of injurious competition by subject imports from China during the POI of *FRC I*. *FRC I* Views at 38-39 n.149. Whereas in *FRC II*, production shifted from the United States to Mexico during the POI to produce lower-priced FRCs that were increasingly substituted for the domestic like product. Views at 19-20. Regardless, the Commission did not conclude in *FRC I* that the domestic industry was not competing with imports from China or Mexico.

### iii. Was the Commission's cumulation of subject imports from China and Mexico in accordance with law?

Yes. The statutory threshold for cumulation was satisfied because the petitions with respect to both subject countries were filed on the same day and none of the statutory exceptions to cumulation applied. Views at 26. The Commission also found a reasonable overlap of competition between the domestic like product and imports from each subject country and between imports from each subject country. Views at 26-28.

In another twist on their theme that the *FRC I* investigations barred the *FRC II* investigations, Plaintiffs contend that 19 U.S.C. § 1677(7)(G)(ii)(II) – which prohibits cumulation of imports from "any country with respect to which the investigation has been terminated" – precludes the cumulation of subject imports from China with those from Mexico in the *FRC II* investigations because some of the imports from China were included in the negative *FRC I* determinations.  PlBr. at 31-32.  That exception, however, has nothing to do with the treatment of imports that were examined in a different prior investigation.  Plaintiffs misunderstand that the term "terminated" in section 1677(7)(G)(ii)(II) refers to a Commission decision to "terminate" an investigation because it finds that imports from a particular country fall below the statutory negligibility threshold, and not to imports examined in a completely different investigation.  *See* SAA at 847-849 (explaining that section 1677(7)(G)(ii)(II) implements the URAA provision concerning negligible imports.).  Further, the cumulation provision directs the Commission to assess whether there is a reasonable overlap of competition between subject countries involved in investigations that are the subject of petitions filed on the same day.  19 U.S.C. § 1677(7)(G)(i); *see also* SAA at 848.  The petitions for the *FRC II* investigations, covering FRC imports from both China and Mexico were filed on the same day, September 28, 2022; hence the Commission properly compared those imports in its cumulation analysis.  The petitions commencing the *FRC I* investigations, on the other hand, were filed a year earlier, on September 29, 2021, and therefore the imports addressed in that investigation were not relevant for the purposes of determining negligibility or whether to cumulate imports in *FRC II*.

### iv. Was the Commission's finding of significant adverse price effects supported by substantial evidence and in accordance with law?

Yes.  The Commission reasonably found that significant underselling caused the domestic industry to lose market share to subject imports in the overall market from 2020 to 2021 and in the replacement market throughout the POI.  Views at 44-45.  Also reasonable was the Commission's finding that subject imports suppressed the domestic like product prices to a significant degree in 2020 and 2021.  Views at 47-48.

Plaintiffs' emphasis on the fact that some responding purchasers did not corroborate lost sales does not detract from the two firms that did.  Views at 43.  Nor are Plaintiffs' other challenges to the Commission's price effects findings availing.  While the domestic industry was able to increase its sales in the Original Equipment Manufacturers ("OEM") market in 2022, the *FRC I* provisional duties reduced the presence of, and sales by, FRC imports from China in the overall market that year.  Views at 45 n.240; SR at Tables G-9, G-12.  On the other hand, in questioning why the domestic industry was not able to pick up sales in the replacement market with the *FRC I* provisional duties in place, PlBr. at 37-38, Plaintiffs ignore that the volume of lower-priced subject imports from Mexico increased in that market segment in 2022.  Views at 43, 45 n.240.  Likewise, in challenging the Commission's discounting of the domestic industry's COGS-to-net-sales ratio in 2022, PlBr. at 38-39, Plaintiffs overlook that the *FRC I* provisional duties increased prices for subject imports from China that year, which allowed the domestic industry to increase its prices as well.  Views at 44-45, 48; SR at Tables V-3-7.

Also unavailing are Plaintiffs' arguments based on alleged inconsistencies between *FRC I* and *FRC II*. PlBr. at 37-40.  Plaintiffs do not account for the differences between the two investigations, including POIs, countries covered, and market conditions.  While the domestic industry's long-term contracts may have explained market share losses in the market conditions

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

of *FRC I*, they do not explain why the domestic industry was unable to retain sales in the replacement market in *FRC II* when it had [████████████████] and the total shipments to that market [███████████████].  Views at 55; SR at Table G-12.  Long-term contracts also do not undermine evidence corroborating lost sales, and especially not when the contract in question was renegotiated during the POI.  Views at 43 n.233.

> **v.  Was the Commission's finding that subject imports had a significant impact on the domestic industry supported by substantial evidence and in accordance with law?**

Yes.  The domestic industry suffered declines in its production, sales, shipments, and revenues from 2020 to 2021 while subject imports were capturing market share through significant underselling and preventing the domestic industry from increasing prices that otherwise would have occurred.  Views at 53-54.  Although the domestic industry's performance subsequently increased by most measures from 2021 to 2022, this improvement coincided with, and was accounted for by, the *FRC I* provisional duties.  Views at 54.

Plaintiffs make several unavailing attempts to undermine the evidence indicating that the *FRC I* provisional duties played a role in the domestic industry's improved performance in 2022.  PlBr. at 43-44.  Contrary to Plaintiffs' claims, the record showed that the *FRC I* provisional duties reduced the presence of subject imports from China in the overall market in 2022, which contributed to the domestic industry's market share gain that year.  Views at 40, 44-45.  The provisional duties also drove up the prices of subject imports from China in 2022, which allowed the domestic industry to raise its prices as well that year.  Views at 43-45, 48.

Plaintiffs overlook record information in claiming that the domestic industry's focus on OEM market explained its market share losses in the replacement market because it didn't have the capacity for both.  PlBr. at 48-50.  Both domestic producers reported [████████████]

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

████████████ ] during the POI, including in 2022 when the domestic industry increased its

U.S. shipments to the OEM market, that could have been used to increase shipments to the

replacement market.  Views at 55.

Plaintiffs' also overstate the importance of Bedloe technology, which they claim was a

factor that distinguished subject imports from China and domestically produced FRCs.  PlBr. at

51-53.  The Commission acknowledged that the preference of certain purchasers for Bedloe

FRCs somewhat limited substitutability between subject imports and domestically produced

FRCs.  Views at 35 n.182, 57.  But, as the Commission also found, the record showed that

Bedloe FRCs did not account for a significant volume of subject imports during the POI and that

a [ ███ ] purchaser with a preference for Bedloe FRCs [ ████████████████████████

████████████████ ].  Views at 57-58.

### vi.  Was the Commission's decision not to disqualify the Attorney and his Firm supported by substantial evidence and in accordance with law?

As an initial matter, Plaintiffs lack standing to challenge the Commission's decision not

to disqualify [ ████████████████ ] (Attorney) and Firm.  Neither Wabtec nor Strato have

ever retained the Attorney or Firm to represent them before the Commission, and their sole

reliance upon Amsted's former attorney-client relationship to challenge the Commission's *FRC*

*II* determination on imports from China should be rejected.  Indeed, they fail to meet their burden

in demonstrating the requisite injury that is fairly traceable to the alleged ethical breach.  In any

event, their conflict of interest claim lacks merit because the Commission's determination that

good cause did not exist to disqualify the Attorney and Firm is supported by substantial evidence

and otherwise in accordance with law.  Plaintiffs' contrary arguments center around their

misunderstanding of the applicable statute, regulations, and Commission practice in antidumping

and countervailing duty investigations.

## II.    STATEMENT OF FACTS

### A.  Procedural History

*FRC I Investigations*.  On September 29, 2021, the Coalition of Freight Coupler Producers (the "Coalition") filed petitions concerning imports of freight rail coupler systems and certain components thereof from China.  *FRC I* Views at 3.  The scope of these investigations included knuckles, coupler bodies, coupler yokes, and follower blocks.  *FRC I Views* at 7-8.  In July 2022, the Commission determined that an industry in the United States was not materially injured or threatened with material injury by reason of imports of the subject merchandise from China that were found by Commerce to be sold in the United States at less than fair value ("LTFV") and subsidized by the government of China.  *FRC I* Views at 3.

*FRC II Investigations*.  On September 28, 2022, the Coalition filed petitions concerning imports of certain freight rail couplers and parts thereof ("FRCs") from China and Mexico. Views at 3.  The scope of these investigations included knuckles and coupler bodies, but not coupler yokes or follower blocks, making it narrower than the scope of the *FRC I* investigations. Views at 7-9 n.21.  The petitions regarding FRCs from China and Mexico were filed on the same day, but the Commission's investigation schedules, including its determinations, became staggered when Commerce postponed only its final determination regarding FRCs from Mexico (but not regarding FRCs from China).  Views at 3.  In July 2023, the Commission determined that an industry in the United States was materially injured by reason of LTFV and subsidized FRCs from China, and in November 2023, applying the same analysis, determined that an industry in the United States was materially injured by reason of LTFV FRCs from Mexico. USITC Pub. 5470 (Nov. 2023) at 3.[3]

---

[3] Then-Chairman Johanson dissented in both the leading and trailing investigations, and reached negative final determinations.  *See* CR179.

*Prior Proceedings at the Court of International Trade and U.S. Court of Appeals for the Federal Circuit.*  On October 14, 2022, while the preliminary phase of the Commission's *FRC II* investigations was ongoing, Amsted, Wabtec, Strato, and another U.S. importer TTX commenced an action in this Court seeking declaratory and injunctive relief to block the Commission from disclosing business proprietary information ("BPI") to the Attorney and Firm and disqualify the Attorney and Firm from representing the Coalition based upon an alleged conflict of interest. *Amsted Rail Co., Inc. v. U.S. Int'l Trade Comm'n*, Ct. Int'l Trade No. 22-307 (ECF 14).

On November 15, 2022, following briefing and oral argument, the Court dismissed the case for lack of subject matter jurisdiction.  *Amsted Rail Co., Inc. v. U.S. Int'l Trade Comm'n*, 600 F. Supp. 3d 1308 (Ct. Int'l Trade 2022).

Amsted, Strato and TTX subsequently appealed the Court's dismissal decision to the U.S. Court of Appeals for the Federal Circuit.  After the parties completed briefing, Amsted filed a Joint Stipulation of Voluntary Dismissal, and the Federal Circuit dismissed the appeal on July 5, 2023.  *Amsted Rail Co., Inc. v. U.S. Int'l Trade Comm'n*, Fed. Cir. No. 23-1355 (ECF 90).

### B.  The *FRC II* Investigations

#### i.  Domestic Like Product

FRCs connect two freight cars together by automatically interlocking the knuckles of two FRCs when the freight cars are pushed together, as well as reducing shocks when freight cars are in transit or braking.  Views at 9.  FRCs consist of two main metal components, (1) knuckles and (2) coupler bodies, in addition to ancillary parts (*e.g.*, coupler locks, coupler lock lifters, knuckle pins, knuckle throwers, and rotors).  Views at 9.

The Commission found that the record supported defining all in-scope FRCs as a single domestic like product.  Views at 10-13.  Consequently, and in the absence of any contrary

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

argument, the Commission defined a single domestic like product, coextensive with the scope. Views at 13-14.

### ii. Domestic Industry

The records of the preliminary and final phases of the subject investigations established that [ ███ ] was a related party due to its importation of subject merchandise and ownership of [ ███ ], a subject producer and exporter of subject merchandise in Mexico. *Certain Freight Rail Couplers and Parts Thereof from China and Mexico*, Inv. Nos. 701-TA-682 and 731-TA-1592-1593 (Prelim.), USITC Pub. 5387 (Nov. 2022) (CR96) ("Prelim. Views") at 24; Views at 15-16.

In the preliminary phase of the investigations, notwithstanding [ ███ ] insistence that its primary interest was in domestic production, the Commission found that, based on information available in the preliminary record, appropriate circumstances existed to exclude it from the domestic industry definition. Prelim. Views at 25-27.

Additional evidence and argument on the related parties issue was presented during the final phase of the investigations. Based on its review of the updated and complete record, the Commission found that appropriate circumstances did not exist to exclude [ ███ ] from the domestic industry definition.[4] Views at 17-23. The Commission explained that [ ███ ] share of U.S. production of FRCs during the POI doubled from [ ███ ] percent to [ ███ ] percent during the POI, and [ ███ ] again reported capital expenditures, totaling $[ ███ ]. Views at 17. Its ratio of subject imports to domestic production was again [ ███ ] but

---

[4] Then-Chairman Johanson and Commissioner Karpel dissented from the majority finding on related parties. They found appropriate circumstances to exclude [ ███ ] from the domestic industry as a related party, and conducted their injury analyses in relation to a domestic industry consisting of [ ███ ]. *See* CR180. Then-Chairman Johanson went on to reach negative determinations (CR179), while Commissioner Karpel joined the majority in reaching affirmative determinations.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

declined overall.  Views at 17-18.  While [ ███████ ], toward the end of the investigation,

reversed its earlier position to state that its primary interest was in importation, the Commission

explained that [ ███████ ] primary interest alone was not dispositive in its related party analysis.

Views at 17-18.

The record indicated that [ ███████ ] domestic production was not shielded from

competition with subject imports during the POI.  Views at 19-21, 23.  [ ███████ ] U.S.

shipments of domestically produced FRCs and U.S. shipments of subject imports from Mexico

had an inverse relationship across multiple pricing products during the POI, with overall U.S.

shipments of [ ███████ ] domestically produced FRCs decreasing by [ ███ ] percent and U.S.

shipments of subject imports from Mexico increasing by [ ███ ] percent.  Views at 20.  The

average unit values ("AUVs") of subject imports from Mexico for coupler fit/assembly and

coupler bodies were consistently [ ███ ] than the AUVs of [ ███████ ] domestically produced

coupler fit/assembly and coupler bodies.  Views at 20.  [ ████████████████████

████████████████████████████████ ] that could have been used to produce FRCs at its

facility in the United States.  Views at 19.  [ ███████ ] also lost market share to subject imports

from China in the replacement market from 2020 to 2021 before the *FRC I* provisional duties

were in place.  Views at 20-21.

The Commission also found that [ ███████ ] domestic FRC production operations did

not benefit from its imports of FRCs from Mexico.  Views at 21-22.  Rather, the record indicated

that [ ███████ ] exclusion from the domestic industry would mask declines in the domestic

industry's market share, financial performance, and employment, as well as the domestic

industry's available capacity.  Views at 23.  [ ███████ ] U.S. shipments and market share

declined overall during the POI, with it notably losing market share to subject imports from

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Mexico from 2020 to 2021. Views at 22. Its operating income-to-net sales ratio and COGS-to-net-sales ratio worsened over the POI, with its COGS-to-net-sales ratio reaching [ ███ ] percent in 2022. Views at 22. Increasing subject imports from Mexico also coincided with a reduction in [ ██████ ] production related workers from 2020 to 2021. Views at 23. Finally, [ ██████ ] capacity utilization was [ ███████ ] throughout the POI, reaching a high of [ ███ ] percent in 2022, which was [ █████████ ] than the only other domestic producer. Views at 21-22.

### iii. Cumulation

The Commission explained that the statutory threshold for cumulation was satisfied because the petitions with respect to both subject countries were filed on the same day, September 28, 2022, and none of the statutory exceptions to cumulation applied. Views at 26. It then found that there was a reasonable overlap of competition between the domestic like product and imports from each subject country and between imports from each subject country.[5] Views at 26-28. Consequently, the Commission cumulated subject imports from China and Mexico for purposes of its material injury analysis. Views at 28.

The Commission rejected Plaintiffs' argument that 19 U.S.C § 1677(7)(G)(ii)(II) barred the Commission from cumulating subject imports from China and Mexico. Prelim. Views at 34 n.146; Views at 25 n.114. The Commission explained that the cumulation exception cited by Plaintiffs only applied to investigated imports that met the initial statutory date-of-filing criteria for cumulation and then had their investigation terminated. Views at 25, n.114. While all three *FRC II* investigations met the statutory criteria for cumulation with their petitions being filed on

---

[5] Plaintiffs have not appealed the Commission's finding of a reasonable overlap of competition between the domestic like product and imports from each subject country and between imports from each subject country.

the same day, not only were the *FRC I* investigations not filed on the same day, their petitions were filed a year earlier and those investigations ended before the *FRC II* investigations were even filed.  Views at 25, n.114.

### iv.  Conditions of Competition

The Commission considered the pertinent conditions of competition in its analysis.  First, the Commission found that demand for FRCs was driven by the production of new freight railcars (OEM market), as well as the replacement of FRCs on freight railcars already in service (replacement market).  Views at 31-32.  The parties generally agreed that U.S. demand for new freight railcars follows an eight-to-ten-year business cycle, whereas U.S. demand for replacement FRCs is steadier and less tied to the business cycle since it is driven by the average useful life of FRCs.  Views at 32.  Apparent U.S. consumption declined from [          ] pounds in 2020 to [          ] pounds in 2021, and then increased to [          ] pounds in 2022.  Views at 32.

The Commission found that the U.S. market was exclusively supplied by the domestic industry and subject imports from China and Mexico.  Views at 33.  The domestic industry's share of apparent U.S. consumption decreased from [    ] percent in 2020 to [    ] percent in 2021, and then increased to [    ] percent in 2022.  Its practical FRCs capacity decreased from [          ] pounds in 2020 to [          ] pounds in 2021, and then increased to [          ] pounds in 2022.  Its capacity utilization decreased from [    ] percent in 2020 to [    ] percent in 2021, and then increased to [    ] percent in 2022.  Views at 33.

Subject imports' share of apparent U.S. consumption increased from [    ] percent in 2020 to [    ] percent in 2021, and then decreased to [    ] percent in 2022.  Views at 34.

The Commission found a moderately high to high degree of substitutability between domestically produced FRCs and subject imports.  Views at 35.  [          ] and



14

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

most responding importer/purchasers reported that the domestic like product and subject imports from China and Mexico were always or frequently interchangeable in all comparisons between the three sources.  Views at 36.  Furthermore, all in-scope FRCs, regardless of source, were subject to the same manufacturing and safety standards set by the Association of American Railroads.  Views at 36.

The Commission found that price was an important factor in purchasing decisions for FRCs.  Views at 36.  Purchasers ranked price as among the three most important factors in their purchasing decisions.  Views at 36 & n.185.  Most importer/purchasers reported that price was very important, and the rest reported it as being somewhat important.  Views at 36.  Of the 15 responding importer/purchasers, seven reported usually, and eight reported sometimes purchasing the lowest-priced FRCs.  Views at 36.

The Commission found that domestically produced FRCs were sold in the OEM and replacement markets, with the majority of domestic producers' U.S. shipments going to the replacement market in 2020 and 2021 and to the OEM market in 2022.  Views at 37.  The domestic industry's share of the OEM market increased from [ ▮ ] percent in 2020 to [ ▮ ] percent in 2021 and [ ▮ ] percent in 2022, while its share of the replacement market decreased from [ ▮ ] percent in 2020 to [ ▮ ] percent in 2021 and [ ▮ ] percent in 2022.  Views at 37 n.192.  Subject imports were also sold in both market segments.  Views at 37.  Subject imports from Mexico had a larger presence than subject imports from China in the OEM market but were predominantly and increasingly sold to the replacement market during the POI.  As a whole, more subject imports were sold in the replacement market than in the OEM market, and subject imports' presence in the replacement market increased over the POI.  Views at 37.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

The parties generally agreed that the *FRC I* provisional duties reduced the presence of subject imports from China in the U.S. market for some time in 2022. Views at 40. The *FRC I* and *FRC II* investigations had overlapping POIs, and the subject imports from China in the *FRC II* investigations had been included in the scope of the *FRC I* investigations. Views at 39-40. Thus, after Commerce issued affirmative preliminary determinations in the *FRC I* investigations in March 2022, the subject imports from China in the *FRC II* investigations were subjected to duties until July 2022. Views at 39-40.

### v.  Volume

The Commission found that the volume of subject imports was significant in absolute terms and relative to both consumption and production in the United States.[6] Views at 41.

### vi.  Price Effects

The Commission analyzed price effects in the context of its findings of a moderately high to high degree of substitutability as well as its finding that price is an important purchasing factor. Views at 41. It found that subject imports caused significant adverse price effects to the domestic industry by significantly underselling and suppressing domestic like product prices. Views at 42-49.

The quarterly pricing data collected by the Commission showed that subject imports pervasively undersold the domestic like product during the POI. Views at 42-43. It also showed that while subject imports from Mexico undersold the domestic like product throughout the POI, the underselling by subject imports from China was less prevalent in 2022 than in 2020 and 2021. Views at 43. The Commission rejected the argument that [ ██████████████████

██████████████████████████████████████████████████████

---

[6] Plaintiffs have not appealed the Commission's volume finding.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

█████████████████████████████████████████ ].  Views at 43 n.229.  As the

Commission explained, the discount [ ███ ] received was appropriately included in Strato's

reported prices, as the questionnaires stated that all prices were to be reported net of discounts

and rebates.  Views at 43 n.229.

The Commission also cited to evidence of lost sales due to price.  Views at 43.

Approximately [ ███ ] ([ █████ ] of responding importers/purchasers reported that they had

purchased lower priced subject imports over domestic product since 2020.  Two of these

importer/purchasers reported purchasing [ ██████ ] pounds of lower-priced subject imports

instead of the domestic like product, with price being their primary reason for the purchases.

The Commission observed that this quantity of lost sales was the equivalent to [ ███ ] percent of

total shipments of subject imports and [ ███ ] percent of apparent U.S. consumption during the

POI.  Views at 43.  The Commission rejected an argument not to consider one of the

importer/purchaser's purchases as lost sales because that purchaser/importer had a preexisting

long-term contract with the [ ████████████ ] from which it imported/purchased the FRCs.

Views at 43 n.233.  The Commission explained that although subject imports shipped during the

POI may be pursuant to an agreement that predated the POI, it did not prevent those subject

imports from being injurious.  Views at 43-44 n.233.  Moreover, the contractual agreement that

covered the sales was renegotiated during the POI in 2021, allowing for [ █████████ ] sourcing

of FRCs from other producers.  Views at 43-44 n.233.

The Commission next explained that the significant underselling by subject imports

resulted in the domestic industry losing market share to subject imports.[7]  Views at 44.  In the

---

[7] The domestic industry did not lose market share to subject imports in the OEM market during
the POI.  SR at Table G-9.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

overall market, the domestic industry lost [ ■ ] percentage points of market share to subject imports from 2020 to 2021. Views at 44. Although the domestic industry did gain overall market share in 2022, the Commission afforded less weight to that data because the *FRC I* provisional duties significantly reduced U.S. shipments of subject imports in the overall market that year. Views at 45 n.240. In the replacement market, the domestic industry lost [ ■ ] percentage points of market share to subject imports over the POI. U.S. shipments of subject imports from China declined in the replacement market in 2022 as a result of the *FRC I* provisional duties but those shipments wholly inured to subject imports from Mexico, so the Commission determined not to discount the replacement market shares for 2022. Views at 45 n.240. The Commission acknowledged that the domestic industry made gains in the OEM market in 2022 that offset volume losses in the replacement market, but it observed that the replacement market is "larger than the OEM market and represents a more steady source of demand and income for the domestic industry." Views at 45.[8]

Regarding price suppression, the Commission observed that the domestic industry's COGS-to-net-sales ratio was high throughout the POI and increased from 2020 to 2021. Views at 47. The Commission found that cumulated subject imports materially contributed to the increase in the industry's already high COGS-to-net-sales ratio from 2020 to 2021, as they undersold the domestic like product, although the [ ■ ] percent decline in apparent U.S. consumption during that period may have also contributed. Views at 47-48. This finding was corroborated by contemporaneous business documents showing that low-priced subject imports placed pricing pressure on the domestic industry in 2020 and 2021. Views at 48 & n.252. Thus,

---

[8] The Commission examined the available data on price trends but made no conclusion as to whether subject imports depressed the domestic like product prices. Views at 46-47.

the Commission found that subject imports prevented price increases that would have occurred

to a significant degree in 2020 and 2021. Views at 48. The Commission afforded less weight to

the domestic industry's improved COGS-to-net-sales ratio in 2022 because it was largely driven

by increased sales values that coincided with the *FRC I* provisional duties on FRCs from China.

Views at 47 n.249.

### vii.  Impact

The Commission observed that domestic industry began the POI in a weakened condition

that worsened from 2020 to 2021. Views at 50. Then, while cumulated subject imports were

capturing market share through significant underselling and preventing the domestic industry

from increasing prices that otherwise would have occurred in 2020 and 2021, the domestic

industry suffered declines in its production, sales, shipments, and revenues. Views at 53-54. The

domestic industry's performance increased by most measures from 2021 to 2022, but the

improvement coincided with the *FRC I* provisional duties that caused subject imports from

China to recede from the U.S. market and oversell the domestic like product. Views at 54. The

domestic industry as a whole, [ ███████████████████████████████ ], remained

unprofitable in 2022, even with an [ ████ ] percent increase in apparent U.S. consumption that

year. The domestic industry also lost market share in the replacement market in each year of the

POI. Views at 54.

## III.    STANDARD OF REVIEW

Under the Tariff Act of 1930, as amended, this Court reviews the Commission's final

determinations by assessing whether they are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The

Commission's determinations are presumed to be correct and the burden is on the party

challenging the determination to demonstrate otherwise. 28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal citation omitted).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 253 F. Supp. 3d 1339, 1347 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019); *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 217 F. Supp. 3d 1363, 1367 (Ct. Int'l Trade 2017); *Imperial Sugar Co. v. United States*, 181 F. Supp. 3d 1284, 1294 (Ct. Int'l Trade 2016).  Under the substantial evidence standard, the reviewing courts defer to the Commission's reasoned fact-finding and analysis in injury investigations.  *See, e.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1354-55 (Fed. Cir. 2006); *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996).

Plaintiffs misinterpret several statutory provisions in arguing that the Commission was barred from proceeding with these investigations, and from cumulating subject imports from China with subject imports from Mexico.  In their opening brief, however, they did not actually address the proper statutory construction or this Court's standard of review for statutory construction.  Nonetheless, we note that the Supreme Court has stated that "courts use every tool at their disposal to determine the best reading of the statute and resolve {any} ambiguity." *Loper Bright Enters v. Raimondo*, 603 U.S. ___, ___, 144 S. Ct. 2244, 2251 (June 28, 2024).  Beyond the statute's text, the tools of statutory construction to ascertain Congress's purpose and intent include the statute's legislative history, the statute's structure, and the canons of statutory construction.  *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998).  Furthermore,

the Supreme Court continues to recognize that courts should be informed by agencies' expertise, interpretation and experience with statutes that Congress entrusted them to administer. *Loper Bright*, 603 U.S. at ___, 144 S. Ct. at 2263, 2267 (citing, *e.g.*, *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)).

## IV.    ARGUMENT

An overarching theme in Plaintiffs' arguments is the mistaken belief that the *FRC I* and *FRC II* investigations involved were identical. The Commission explained that this was not the case, as the investigations were based on different petitions that were initiated by Commerce as new investigations. Prelim. Views at 39 n.167; Views at 24-25 n.114. It also explained that the "{*FRC I*} investigations involved different subject merchandise, different domestic like product and domestic industry definitions, and different subject countries than the {FRC II} investigations . . ., and these differences will also result in different volume, price, and impact analyses{.}" Prelim. Views at 39-40. Whereas, in *FRC I*, nonsubject imports (*i.e.*, imports from Mexico) accounted for the majority of the market share lost by the domestic industry, were lower-priced than the subject imports (from China) and the domestic like product, and had a stronger correlation than subject imports to domestic like product price declines. Views at 35 & n.133, 38. There were no nonsubject imports in *FRC II*, and cumulated subject imports (*i.e.*, cumulated imports from China and Mexico) represented the largest source of supply to the U.S. market during the POI. Views at 43.

### A.  The Commission Acted in Accordance with Law by Proceeding with the *FRC II* Investigations

Based on the faulty premise that the *FRC II* investigations were simply a "review" of the *FRC I* determinations, Plaintiffs proceed to argue that *FRC II* investigations should not have been initiated because the petitioners failed to show good cause for filing the new petitions

within 24 months of the Commission's negative final determinations in *FRC I*.  Nothing in the

statute, however, bars a petitioner from filing a new petition at any time subsequent to a negative

Commission determination.  Plaintiffs' reliance on section 751(b)(4) of the Tariff Act to argue

otherwise is unavailing.[9]  PlBr. at 18-20.

As the Commission explained in its preliminary *FRC II* determinations, the changed

circumstances provision was not applicable because it does not apply to final negative

determinations, as there is no order for review in such a scenario, and the *FRC I* and *FRC II*

investigations were based on different petitions, involving different subject merchandise and

subject countries, that were initiated by Commerce as new investigations.  Prelim. Views at 39

n.167.

Plaintiffs go to great lengths to argue that section 751(b) is not limited to changed

circumstances reviews concerning existing orders, going so far as to proclaim that "the Tariff Act

never uses the phrase "'changed circumstances review.'"  PlBr at 20-21.  It is unclear whether

Plaintiffs failed to read the chapeau to the statutory provision, or whether they believe the

caption "Reviews based on changed circumstances" inexplicably has a different meaning from

"changed circumstances review."  Either way, the structure of this statutory section plainly limits

its application to review of one of the three types of measures set out in subsection 1675(b)(1): a

final affirmative antidumping or countervailing duty determination that resulted in an

---

[9] Subsection 751(b)(4)(A) provides,

> In the absence of good cause shown, the Commission may not review a
> determination made under section 1671d(b) or 1673d(b) of this title, or an
> investigation suspended under section 1671c or 1673c of this title . . . less than 24
> months after the data of the publication of notice of that determination or
> suspension.

19 U.S.C. § 1675(b)(4)(A).

antidumping or countervailing duty order; a suspension agreement; or a final affirmative determination resulting from an investigation continued after suspension.  Likewise, the SAA states that section 1675(b) applies to "three categories:  affirmative determinations resulting in an antidumping or countervailing duty order or an antidumping finding (as pre-1980 order were termed), determinations regarding suspension agreements, and final affirmative determinations at resulting from an investigation continued following the entry into a suspension agreement." SAA at 878.

Nor is there merit to Plaintiffs' view that the Commission could have used its "inherent authority" to refuse to proceed with the *FRC II* investigations.  PlBr. at 22.  Commerce, not the Commission, has the statutory authority to determine whether a petitioning firm has alleged the elements necessary for initiating investigations.  *See* 19 U.S.C. §§ 1671a(c)(2), 1673a(c)(2).  And if Commerce initiates an investigation, the Commission has a statutory obligation to conduct its material injury investigation.  *See* 19 U.S.C. §§ 1671b(a), 1673b(a) (requiring the Commission to make its preliminary determinations within 45 days of the filing of a petition unless Commerce dismisses the petition).  Here, the *FRC I* and *FRC II* investigations were based on different petitions that Commerce initiated as new investigations.[10]  Thus, the Commission had an incontrovertible statutory obligation to undertake its injury investigations and had no "inherent authority" to refuse to proceed with the *FRC II* investigations.  *See Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1361 (Fed. Cir. 2008) ("An agency cannot . . . exercise its inherent authority in a manner that is contrary to statute.").

---

[10] *Compare* PR171 (87 Fed. Reg. 64,440 (Oct. 25, 2022); 87 Fed. Reg. 64,444 (Oct. 25, 2022)) *with* 86 Fed. Reg. 58,864 (Oct 25, 2021); 86 Fed. Reg. 58,878 (Oct. 25, 2021).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Finally, Plaintiffs miss the mark by trying to analogize their position here with the provisions of the Commission's regulations governing USMCA long-haul trucking investigations.  PlBr. at 23-24.  They overlook that the long-haul trucking regulation in question implements an explicit statutory provision, expressly barring the Commission from conducting a USMCA long-haul trucking investigation (absent good cause) "if . . . less than one year has elapsed since the Commission made its report to the President of the results of {the} previous investigation."  19 U.S.C. § 4574(d)(2)(D)(i)-(ii).

> **B.  The Commission's Inclusion of [ ▮▮▮▮ ] in the Domestic Industry Definition Is Supported by Substantial Evidence and in Accordance with Law**
>
> > **i.  The Commission's Related Parties Analysis Was Consistent with Its Statutory Authority**

Under the statute, the Commission is given the discretion to exclude producers of the like product from the domestic industry that import subject merchandise or are related to exporters or importers of subject merchandise, but it may only exclude such producers if it determines that "appropriate circumstances exist."  *See* 19 U.S.C. § 1677(4)(B).  In adding section 1677(4)(B) to the Trade Agreements Act of 1979, Congress provided an example of a circumstance that would warrant exclusion:  "where a U.S. producer is related to a foreign exporter and the foreign exporter directs his exports to the United States *so as not to compete* with his related U.S producers to, this should be a case where the ITC would not consider the related U.S. producer to be a part of the domestic industry."  S. Rep. No. 96-249 (1979) at 83 (emphasis added).  *See Empire Plow Co. v. United States*, 11 CIT 847, 853, 675 F. Supp. 1348,1353-54 (1987) ("The {U.S. Senate report for the Trade Agreements Act of 1979} displays an intent to exclude from the industry headcount domestic producers which, due to a relationship with the foreign producer, benefit from the foreign exporter" and "{t}he ITC is also concerned about excluding

companies which account for a significant share of the domestic production and which exclusion would result in impairing the accuracy of the ITC determination").

In amending the statute during the implementation of the URAA, Congress endorsed the approach that had been (and continues to be) utilized by the Commission, *viz*, "to reduce any distortion in industry data caused by the inclusion in the domestic industry of *a related producer who is being shielded from the effects of the subject imports*." SAA at 858 (emphasis added). *See, e.g.*, *LG Elecs., Inc. v. U.S. Int'l Trade Comm'n*, 38 CIT 1562, 1567-70, 26 F. Supp. 3d at 1345-47 (2014) (the Commission reasonably found that appropriate circumstances did not exist to exclude Electrolux from the domestic industry where Electrolux was not shielded from subject import competition and its exclusion would distort the data).

As the courts have explained, exclusion is within the Commission's discretion and based on the record. *See Torrington Co. v. United States*, 16 CIT 220, 224-25, 790 F. Supp. 1161, 1168 (1992), *aff'd without opinion*, 991 F.2d 809 (Fed. Cir. 1993); *Sandvik AB v. United States*, 13 CIT 738, 747-49, 721 F. Supp. 1322, 1331-32 (1989), *aff'd without opinion*, 904 F.2d 46 (Fed. Cir. 1990); *Empire Plow*, 11 CIT at 851, 675 F. Supp. at 1352. To this end, the Commission has traditionally looked at five primary factors: (1) the percentage of domestic production attributable to the importing producer; (2) the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from the LTFV sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market); (3) whether inclusion or exclusion of the related party will skew the data for the rest of the industry; (4) the ratio of import shipments to U.S. production for the imported product; and (5) whether the primary interest of the importing producer lies in domestic production or importation. *Changzhou Trina Solar Energy Co. v. USITC*, 100 F. Supp. 3d 1314,

25

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

1326-31 (Ct. Int'l. Trade 2015); *see also Torrington Co.,* 16 CIT at 224-25, 790 F. Supp. at

1168.  As the Commission's appropriate circumstances analysis is specific to the facts of each

case, its determination may be based on some or all of these enumerated factors or even non-

enumerated factors.  *See Allied Mineral Prods., Inc. v. United States*, 28 CIT 1861, 1865-1867

(2004) (acknowledging the Commission's primary factors and finding it within the

Commission's direction under section 1677(4)(b)(i) to consider other factors as well); *see e.g.*,

*Softwood Lumber Products from Canada*, Inv. Nos. 701-TA-566. 731-TA-1342 (Final), USITC

Pub. 4749 at 18-19 (Dec. 2017) (the Commission examined production trends and level of

capital investment).

Thus, contrary to Plaintiff's characterization, PlBr. at 25, the evaluation undertaken by

the Commission is anything but "unmoored" from the statutory text and purpose, but in fact was

perfectly consistent with the statute, legislative history, and caselaw.

Further, Plaintiffs' claim that the Commission should not have included [ ▮▮▮ ] in the

domestic industry because its inclusion masked the "lack of injury" to the domestic industry,

PlBr. at 28, runs afoul of the statutory purpose to assess whether dumped or subsidized imports

are causing material injury to the domestic industry, defined as "producers *as a whole* of a

domestic like product."  19 U.S.C. § 1677(4)(A) (emphasis added).  This statutory definition

means that the starting point in the Commission's analysis is that all domestic producers are

included in the domestic industry.  Thus, absent appropriate circumstances to exclude a producer,

it is to be included in the definition of the domestic industry.  Nothing in the statute supports

Plaintiffs' claim that the Commission is obligated to exclude a firm because it performed worse

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

than other members of the industry and could mask "noninjury."[11]  To the contrary, as the Commission found was the case here and in other cases, the exclusion of a related party not shielded from the effects of subject imports can mask the effects of those imports on the domestic industry.  Views at 23; *Aluminum Lithographic Printing Plates from China and Japan* (Inv. Nos. 701-TA-694 and 731-TA-1641-1642 (Final), USITC Pub. 5559 at 12 (Nov. 2024); *Gas-Powered Pressure Washers from Vietnam*, Inv. Nos. 731-TA-1598 (Final), USITC Pub. 5465 at 16-19 (Oct. 2023); *Portable Electric Typewriters from Singapore*, Inv. No. 731-TA-515 (Final), USITC Pub. No. 2681, at 10 (Sept. 1993).  This Court has also recognized that excluding a related party not shielded from the effects of competition with subject imports can distort the industry data.  *See LG Elecs.*, 38 CIT at 1569 n.9, 26 F. Supp. 3d at 1346 n.9 (distorting the industry data can mean excluding a domestic producer that competed with subject imports, as well as including a domestic producer that was shielded from the effects of subject imports).

The legislative history and caselaw therefore both indicate that exclusion of a related party from the definition of the domestic industry is appropriate when the related party's trade and financial data do not reflect competition with subject imports because the related party is shielded from competition with subject imports or benefitting from the imports.  In such instances, that party's inclusion in the domestic industry can mask the injury from subject imports.

---

[11] Moreover, the premise of Plaintiffs' claim is questionable, given that Commissioner Karpel, who determined to exclude [ ▮▮▮▮ ] from the domestic industry, joined the majority in reaching affirmative determinations.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

### ii.    A Related Company's Primary Interest Is Not Dispositive in the Commission's Related Parties Analysis

In arguing that importation was not against [          ] interest, Plaintiffs claim that the Commission found that [          ] primary interest was in importation, PlBr. at 29, but this is not true.  While the Commission made that finding in the preliminary stage of the investigations, it made no such finding in the final phase of the investigations, when it examined a complete and updated record, including data for a more current POI.  Prelim. Views at 26; Views at 17-18.

Tellingly, [          ] changed its story over the course of the investigations.  During the preliminary phase of the investigation through the hearing in the final phase of the investigation, [          ] claimed that, based on its capital expenditures, its primary interests was in **domestic production**, and that its exclusion would skew the domestic industry data.  Views at 17 n.74.  This included testimony at the Commission hearing on May 18, 2023, where [          ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ ].  Hearing Tr., PR160 at 162-63.  Then, near the end of the investigations, in its posthearing brief, [          ] reversed course and argued, based on the relative size of its FRC production to its production of other products, that its primary interest was actually in importation.  Views at 18 & n.77.  Given the mixed record, including [          ] own confusion as to where its primary interest lied, the Commission made no finding on that point in the final phase of the investigations.  Nor was it required to makes such a finding.  *See Allied Mineral Prods., Inc.,* 28 CIT at 1865 ("The Commission is not required to make findings as to each specific factor.") (*citing Sandvik*, 13 CIT at 748, 721 F. Supp. at 1332).  Rather, as the reviewing courts have found, noted above, the Commission weighs its self-prescribed factors under the facts and circumstances of each

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

investigation, and it has the discretion to weigh the importance of each factor and determine

whether the circumstances particular to that investigation warrant exclusion of a related party.

### iii. The Commission's Finding that the Related Company Was Not Shielded from the Effects of Subject Imports Is Supported by Substantial Evidence

The record showed that [ █████ ] domestically produced FRCs were not shielded from

competition with its imports from Mexico, notwithstanding that the latter far outweighed its

domestic production. Views at 19. Rather, the record evinced direct competition between those

products. For example, when [ █████ ] could have used raw materials located in the United

States for the production of FRCs in the United States, those raw materials [ █████████ ]

[ ██████████████████████████████████████ ].

Views at 19. [ █████ ] then imported these products into the United States where they

competed for sales with, and undersold [ ██████ ] domestically produced FRCs. Views at 20-

21 & n.92. This resulted in [ ██████████████████████ ] being

increasingly substituted for its domestically produced FRCs during the POI, as evidenced by the

corollary [ ████████████ ] in U.S. shipments of coupler bodies and knuckles produced in

Mexico as [ ██████ ] U.S. shipments of domestically produced coupler bodies and knuckles

[ ██████████████ ]. Views at 19-20.

Additionally, rather than benefitting from its [ ████████████ ], the record

indicated that [ ████████ ] domestic FRC operations performance suffered as the volume of

[ ████████ ] subject imports from Mexico increased in the U.S. market. Views at 21-22. Its

capacity utilization figures were [ ████████████ ] throughout the POI, and even when its

capacity utilization increased in 2022, it was [ ████████████ ] than other domestic

producer's utilization. Views at 21-22. [ ██████ ] sales and market share declined and its

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

operating-income-to-net-sales and COGS-to-net-sales ratios both worsened over the POI.  Views
at 22.  An amended supply agreement in 2022 that [    ] had with [    ] served as
further evidence that [    ] U.S. operations did not benefit from subject imports from
Mexico, as the majority of the knuckles ordered under that agreement were supplied with subject
imports from Mexico.  Views at 22.

      Moreover, the record supports the Commission's finding that [    ] also competed
with, and was not shielded from the effects of, subject imports from China.  Particularly,
domestically produced FRCs lost market share to subject imports from China in the replacement
market in 2021.  Views at 20-21. This competition was further corroborated by [    ]
reported [    ] to subject imports from China and testimony from the head of the
UAW during the *FRC I* conference that [    ] informed its U.S. workers in October 2021
that FRC production shifted to Mexico due to competition from subject imports from China.
Views at 21.

      Given its competition with subject imports, [    ] exclusion from the domestic
industry would have skewed the domestic industry data, as it was one of two domestic producers
that doubled its share of total U.S. production over the POI, reaching [    ] percent in 2022.
Views at 19, 23.  Particularly, [    ] exclusion would have skewed the domestic industry's
capacity utilization figures, market shares, financial data, and employment figures, which
declined when subject imports increased from 2020 to 2021.  Views at 23.

      In sum, substantial evidence supports the Commission's conclusion that the record did
not indicate that [    ] domestic production activities were shielded from competition with
subject imports from China and Mexico, or that [    ] otherwise benefitted from its
importation of subject imports from Mexico.  Views at 23.  To the contrary, [    ]

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

domestic production suffered substantially when the company decided to increasingly replace domestically produced product with imports from Mexico.  Accordingly, the Commission's decision not to exclude [ ███ ] from the domestic industry was a reasonable exercise of its discretion, much like the Commission's related parties analysis upheld in *LG Elecs.*, 38 CIT at 1569, 26 F. Supp. 3d at 1346 (finding a similar analysis to be reasonable and sustaining the Commission's finding that "excluding Electrolux would distort the data because it would mask declines in domestic capacity and employment during the POI").

### iv.  Plaintiffs' Challenges to the Commission's Findings Are Unavailing

While Plaintiffs do not dispute the factual predicates for the Commission's findings, they claim that the Commission's analysis of whether [ ███ ] was shielded from the effects of subject imports rests on the "central premise . . . that [ ███ ] injured itself."  PlBr. at 29.[12]

The Commission evaluated the facts that Plaintiffs point to in making its assertion, but it found that the record as a whole indicated that [ ███ ] competed with subject imports from both China and Mexico, and that its domestic FRC operations did not benefit from (and were in fact *harmed* by) subject imports from Mexico.  Views at 17-23.

Plaintiffs claim that the Commission's consideration of these factors was inconsistent with its *FRC I* determinations.  PlBr. at 27.  Again, Plaintiffs fail to recognize that the *FRC I* and *FRC II* investigations had different subject merchandise and POIs.  In particular, with respect to

---

[12] Plaintiffs overlook that the same could often be said of a related party analysis undertaken by the Commission.  By the very nature of the inquiry, in related party analyses the Commission generally examines whether a company that either has a corporate relationship with a subject exporter or importer, or derives some benefit from engaging in importation of the subject products, is shielded from the effects of the imports so as to make it appropriate to exclude that company from the domestic industry.  So, in many cases, parties could claim that any Commission finding that the related company was not shielded from the effects of the imports and was injured by the imports, amounted to what Plaintiffs describe as a premise that the related company is injuring itself.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

the examination of competition between [ ████ ] and subject imports, the domestic industry gained market share in the replacement market in *FRC I,* but lost market share in the replacement market in *FRC II.  Compare FRC I* Staff Report, CR40 at Table II-2 *with* SR at Table G-12.

Plaintiffs' argument is additionally unavailing on the details.  Plaintiffs highlight that in *FRC I* the Commission rejected the argument that the increased presence of nonsubject imports (imports from Mexico) was caused by subject imports from China in part because [ ████ ] decision to outshore production to Mexico occurred decades earlier.  *FRC I* Views at 38-39 n.149.  Contrary to Plaintiffs' contention, this finding is not inconsistent with the Commission's citation to the afore-cited testimony from the UAW representative about [ ████ ] shifted production to Mexico in October 2021 due to competition from subject imports from China. PlBr. at 27, 30-31.  First, the Commission in *FRC I* did not indicate that the domestic industry does not compete with subject imports from China or Mexico as Plaintiffs suggest.  Rather, the Commission rejected the petitioners' theory that the market share gains made by imports from Mexico were necessarily tied to subject imports from China.  *FRC I* Views at 38 & n.148.

Moreover, Plaintiffs are not comparing apples-to-apples.  In the quoted *FRC I* discussion, the Commission was evaluating whether the domestic industry was materially injured by reason of subject imports (from China alone in that investigation).  In the related parties analysis at issue, the question is whether the Commission properly declined to exercise its discretion to exclude a producer from the domestic industry.  The underlying finding challenged by Plaintiffs here is not about a causal link, but rather whether the producer in question was shielded from competition from subject imports.  In any event, the Commission's finding that [ ████ ] reason for [ █████████████ ] was not indicative of injury caused by the *FRC I* subject imports – which were only from China – bears little if any relevance to the

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

implications of a production shift from the United States to Mexico during the POI in *FRC II* or

to the relationship between [     ] and subject imports that include those from Mexico.

      That [    ] was not shielded from the effects of the imports in *FRC II* was

demonstrated by record data showing that [    ] performance suffered as the volume of

subject imports from Mexico increased.  [    ] capacity utilization, which reached its

highest level during the POI in 2022, at [  ] percent, was [       

   ] capacity utilization.  Views at 21-22.  Its operating-income-to-net-sales ratio was

negative and worsened throughout the POI, and its COGS-to-net-sales ratio increased overall

from [  ] percent in 2020 to [  ] percent in 2022.  Views at 22.  It also suffered overall

declines in its U.S. shipments and market share during the POI, notably losing market share to

subject imports from Mexico in 2020 and 2021.  Views at 22.  Furthermore, when [    ]

was presented with the opportunity to supply roughly [    ] pounds of knuckles to

[   ] from either its United States or Mexico facilities, the available data indicated that the

majority of the knuckles came from its [    ].  Views at 22 & n.104.

      Plaintiffs also claim that [    ] production and capacity utilization for other

products [         ], as new rail car builds surged.  PlBr. at 30.

Presumably referring to out-of-scope products, Plaintiffs ignore that the focus of the

Commission's injury analysis is solely on the U.S. production of the domestic like product.  As

the statute states:  "the effect of dumped imports . . . shall be assessed in relation to the United

States production of a domestic like product."  19 U.S.C. § 1677(4)(D); *see also General Motors

Corp. v. United States*, 17 CIT 697, 701, 827 F. Supp. 774, 780 (1993) (the statute "clearly

provides" that effects of dumped imports be assessed to production of the like product, in that

case minivans, not other types of vehicles produced by the corporations comprising the U.S.

minivan industry). The Commission therefore does not consider the domestic industry's other product lines or operations abroad when considering the condition of the domestic industry or the effects of subject imports.[13]

### C. The Commission Was Not Barred from Cumulating Subject Imports from China and Mexico

Plaintiffs wrongly claim that section 771(7)(G)(ii)(II), a statutory exemption to cumulation, barred the cumulation of subject imports from China in the *FRC II* investigations since subject imports from China for the years 2020 and 2021 were included in the negative *FRC I* determinations. PlBr. at 31-32. This subsection states that "{t}he Commission shall not cumulatively assess the volume and effect of imports . . . from any country with respect to which the investigation has been terminated." 19 U.S.C. § 1677(7)(G)(ii)(II). The Commission considered and dismissed this argument on the basis that, within the context of the *FRC II* investigations, the negative *FRC I* determinations did not amount to a terminated investigation as described in section 1677(7)(G)(ii)(II) because *FRC I* and *FRC II* were separate investigations. Prelim. Views at 34 n.146; Views at 25 n.114.

The statute provides that "the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which petitions were filed under section 1671a(b) or 1673a(b) of this title *on the same day* . . . ." 19 U.S.C. § 1677(7)(G)(i) (emphasis added); *see also* SAA at 848 (the "requirement of simultaneous filing will promote certainty in antidumping and countervailing duty investigations, by defining, at the

---

[13] Plaintiffs also claim that [ ████████ ] declining [ ████████████████ ████████████ ], with support being alleged statement from [ ████████ █ ] saying that it [ ████ ████████████████████████████████████ ]. PlBr. at 30. The alleged statement is not found in the citation provided by Plaintiffs. *See* CR125 at 10 & 43.

time of filing, the countries potentially subject to cumulative analysis."). Accordingly, the statute and legislative history are unambiguous in limiting cumulation to imports subject to investigations commenced on the same day, which is predicated on the simultaneous filing of their petitions. As the *FRC I* petitions were filed a year earlier than the *FRC II* petitions, they did not meet the statutory criterion for cumulation of being filed on the same day for purposes of cumulation in the *FRC II* investigations. Since the *FRC I* investigations therefore were not, and could not be considered as candidates for cumulation in the *FRC II* investigations under the general rule for cumulation, it follows that they could not possibly be subject to an exception to a nonapplicable rule.

Moreover, as explained in the SAA, the exception to cumulation for terminated investigations "implements the requirement of the {WTO} Agreements that negligible or de minimis imports not be cumulated."). SAA at 849. It does not apply to imports that were subject to other terminated investigations (such as *FRC I*) that are not otherwise subject to cumulation under section 1677(7)(G)(i).[14]

### D. The Commission's Price Effects Finding Is Supported by Substantial Evidence and in Accordance with Law

#### i. The Commission Reasonably Considered the Evidence of Lost Sales

Two firms, [▮▮▮▮▮▮▮▮], indicated that price was their primary reason for

purchasing [▮▮▮▮▮] pounds of subject imports instead of domestically produced FRCs



---

[14] By analogy, the exception to cumulation likewise does not apply where a petitioner has withdrawn and then re-filed a petition. Under the Tariff Act, the Commission may terminate an investigation upon the withdrawal of the petition by the petitioner. 19 U.S.C §§. 1671c(a)(1)(A) and 1673c(a)(1)(A). The petitioner is then permitted to refile a petition including imports in the terminated investigation along with imports from additional countries, and the imports from all countries subject to the refiled petitions will be eligible for cumulation under the statute. *See* 19 U.S.C. § 1671c; 19 U.S.C. § 1673c; SAA at 849 ("Cumulation Involving Refiled Petitions").

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

during the POI.  Views at 43; SR at Table V-13.  This was equivalent to [ █████ ] percent of total

shipments of subject imports and [ ███ ] percent of apparent U.S. consumption during that period.

Views at 43.  Plaintiffs fault the Commission for failing to address questionnaire responses of

other purchasers who reported domestic supply constraints, as well as purchaser and importer

responses indicating that subject imports were not lower-priced than domestically produced

FRCs and not purchased instead of domestically produced FRCs on the basis of price.  PlBr. at

40-41.  The information highlighted by Plaintiffs, such as the responses of purchasers

[ █████████████████████████████ ], does not concern the purchasers that

corroborated the domestic producers' reports of lost sales.  Thus, the record information

highlighted by Plaintiffs does not detract from the Commission's consideration of the purchaser

reports that reported purchasing subject imports instead of the domestic like product on the basis

of price.

   Equally unavailing is Plaintiffs' claim that long-term contracts were a non-price factor

explaining why the domestic industry lost sales to subject imports.  PlBr. at 40-41.  This

argument misrelies on *FRC I*.  The problem with Plaintiffs' efforts to graft the facts of *FRC I*

onto the *FRC II* investigations is apparent in Plaintiffs' efforts to discredit the largest lost sale,

concerning purchases by [ ████ ].  PlBr. at 40-41.  As the Commission noted in *FRC II*, the

contract between [ ████ ] and [ ██████████████ ] was renegotiated in 2021, during the

*FRC II* POI, and permitted [ ████ ] to purchase [ ██ ] percent of its FRC requirements from

other sources.  Views, at 43-44 n.233.  The Commission further explained that shipments made

during the POI were properly considered as POI sales and should be considered as subject import

sales and shipments for purposes of the Commission's injury analysis, irrespective of whether the

purchaser and seller had a pre-existing contract.  Views, at 43-44 n.233.  Plaintiffs' efforts to

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

undermine this reasonable Commission finding amount to another attempt to revert to the *FRC I* findings that did not include subject imports from Mexico.

### ii.   The Commission Reasonably Found that Underselling by Subject Imports Caused the Domestic Industry to Lose Market Share

The Commission reasonably discounted the domestic industry's market share gain in 2022 because this gain coincided with the *FRC I* provisional duties.  Views at 44-45 & n.240. Subject imports gained [ ▮ ] percentage points of overall market share at the direct expense of the domestic industry from 2020 to 2021 through significant underselling.  Views at 44.  While the domestic industry did gain overall market share in 2022, its market share gain coincided with the *FRC I* provisional duties, which caused subject imports from China to decline and primarily oversell the domestic like product.  Views at 44-45.  U.S. shipments of subject imports from China decreased in both market segments, with the largest decline, at [ ▮▮▮ ] pounds, occurring in the [ ▮▮▮▮▮ ].  SR at Tables G-9, G-12.  U.S. shipments of subject imports from Mexico also declined in the OEM market from 2021 to 2022, decreasing by [ ▮ ▮▮ ] pounds, but increased by [ ▮▮▮ ] pounds in the replacement market during that period.  SR at Tables G-9, G-12.  And as the Commission explained, it properly presumed that changes in the volume of imports related to provisional duties and reduce the weight accorded to the affected data.  Views at 44 n.236 (citing SAA at 854).  Given that it was only after the imposition of the *FRC I* provisional duties and the subsequent decline in subject imports that the domestic industry was able to gain market share, the Commission reasonably gave reduced weight to the domestic industry's market share gain in the overall market from 2021 to 2022. Views at 44-45 & n.240.

The significant underselling by subject imports also led them to gain [ ▮ ] percentage points of market share in the replacement market over the full POI.  Views at 45.  Contrary to

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Plaintiffs' claim, PlBr. at 37-38, the Commission recognized that the domestic industry made gains in the OEM market that offset its losses in the replacement market; but the Commission noted that the replacement market was larger and represented a steadier source of demand and income.  Views at 40, 44-45.  Further, as the Commission explained, the *FRC I* provisional duties did not have the same effect on the replacement market as they did on the overall market because the benefit from subject imports from China withdrawing from the replacement market inured wholly to subject imports from Mexico.  Views at 45 n.240.  The Commission therefore did not give reduced weight to the replacement market share data in 2022.  Views at 45 n.240.

Plaintiffs argue that if the U.S. market was truly affected by the *FRC I* provisional duties in 2022, the domestic industry would have gained market share in the replacement market that year.  PlBr. at 37.  But as the Commission explained, lower-priced subject imports from Mexico – which were not subject to *FRC I* provisional duties – took advantage of the gap left by the exiting imports from China in that market and prevented the domestic industry from gaining any share of that market in 2022.  Views at 43 & 45 n.240.

Aside from again mis-relying on *FRC I*, Plaintiffs are mistaken as a factual matter in claiming that the Commission's finding that the domestic industry lost market share to subject imports from 2020 to 2021 is inconsistent with its *FRC I* determinations.  PlBr. at 37-38. The Commission's *FRC I* finding that long-term contracts affected the domestic industry's ability to obtain sales, *FRC I* Views at 36, does not explain how the domestic industry was unable to retains sales in *FRC II*.  The domestic industry's U.S. shipments to the replacement market declined from 2020 to 2021 when the industry had [ ███████████ ] and the total U.S. shipments to that market segment [ █████████ ] (a trend which continued into 2022), Views at 55; SR at Table G-12.

### iii.   The Commission Reasonably Determined that Subject Imports Suppressed the Domestic Like Product Prices

#### 1.   The Commission's Price Suppression Analysis Should Be Sustained

The Commission reasonably found that subject imports prevented prices increases that would have otherwise occurred to a significant degree in 2020 and 2021.  Views at 48.  The domestic industry's COGS-to-net-sales ratio was high throughout the POI, increasing from [ ███ ] percent in 2020 to [ ███ ] percent in 2021, and then declining to [ ███ ] percent in 2022.  Views at 47.  While declining apparent U.S. consumption between 2020 and 2021 may have also contributed to the [ ██ ] percentage point increase in the domestic industry's already high COGS-to-net-sales ratio from 2020 to 2021, the Commission found that subject imports materially contributed to the increase, as they significantly undersold the domestic like product and increased their market share during that period.  Views at 47-48.  The petitioners also provided contemporaneous business documents showing that subject imports exerted pricing pressure on the domestic industry in 2020 and 2021.  Views at 48.

Although the domestic industry's COGS-to-net-sales ratio declined from 2021 to 2022, resulting in an overall decline in the ratio over the POI, the Commission observed that the decrease was largely driven by increasing sales values in 2022 that coincided with the *FRC I* provisional duties and subsequent price increases for subject imports from China.  Views at 43-45, 47.  Accordingly, the Commission found that the *FRC I* provisional duties, as well as increased apparent U.S. consumption, contributed to the domestic industry's improved, but still high, COGS-to-net-sales ratio in 2022.  Views at 48.  As a result, the Commission reasonably afforded reduced weight to the domestic industry's COGS-to-net-sales ratio in 2022.  Views at 47 n.249.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**2. Plaintiffs' Challenges to the Commission's Price Suppression Findings Are Unavailing**

In challenging the Commission's focus on price suppression during 2020 and 2021, Plaintiffs' claim that the Commission's reasoning is "at odds with" the segmented market shifts and the Commission's statements about the 2022 replacement of Chinese imports by Mexican imports in the replacement market. PlBr. at 38-39. Plaintiffs appear to conflate the Commission's discussion of replacement market specific findings with its discussion of the price suppressing effects of subject imports in the domestic market as whole. Nowhere in the Commission's Views did it find that <u>all</u> the subject imports from China that left the market in 2022 were replaced by subject imports from Mexico. Rather, in the quotation cited by Plaintiffs, the Commission was discussing only the replacement market, noting that the imposition of provisional duties on imports from China resulted in imports from Mexico, and not domestic product, increasing shipments and share in that market segment. *See* Views at 45 n.240. Thus, the replacement market was relatively unaffected by the *FRC I* provisional duties in 2022.

Plaintiffs argue that the Commission disregarded evidence that the domestic industry was able to [ ████████████████████████ ]. PlBr. at 39. If the domestic industry's increased prices, which the Plaintiffs claim is reflected in the domestic industry's AUVs, allowed the domestic industry to [ ████████████████ ] that would be reflected in the COGS-to-net-sales ratio. The domestic industry's COGS-to-net-sales ratio, however, was high and increased from [ ████ ] percent in 2020 to [ ████ ] percent in 2021. Views at 47. Accordingly, the data do not support Plaintiffs' claim that the domestic industry was able to [ ████████████ ] with its increased prices in 2020 or 2021.

Nor did the Commission "impermissibly" rely on business documents provided by the petitioners that showed subject imports put pricing pressure on the domestic industry. The

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Commission explained that it "previously considered some of the same documents in *FRC I* but found that the evidence of pricing pressure was inconsistent with the pricing data collected by the Commission and that the evidence was otherwise vague without a specific reference to subject imports." Views at 48 n.252. It also explained that the documents were corroborated by the pricing data in the *FRC II* record, which showed pervasive underselling by subject imports (including imports from Mexico) during the POI. Views at 42-43, 48 n.252.

While some of the same documents were presented by the petitioners in both investigations, they were not all the same documents, as Plaintiffs infer. PlBr. at 39-40. Rather, some new documents were included in *FRC II*, such as Attachment E in the petitioners' prehearing brief ([ ███████████████████████████████████████ ]). Pet'r's Prehearing Br., CR143 at Ex. 2. Furthermore, and contrary to what Plaintiffs have claimed, it is not clear that all the documents provided by the petitioners regarded competition from [ ████ ████████████████ ]. For example, [ ████████████████████████████ ████████████████████████████████████████ ]. Pet'r's Prehearing Br., CR143 at Ex. 2; [ ████████████████████████████████████ ]. Finally, the two investigations had different pricing data, which showed majority overselling by subject imports in *FRC I* and pervasive underselling by subject imports in *FRC II*. *FRC I* Views at 29; Views at 42-43, 58 n.299. Consequently, the Commission's finding that that the documentary evidence provided by the petitioners did not corroborate the pricing data in the *FRC I* investigations does not undermine the Commission finding that the materials, including additional documentation, corroborated the pricing data in the *FRC II* investigations.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**E.  The Commission's Impact Finding Is Supported by Substantial Evidence and in Accordance with Law**

**i.  The Commission's Impact Analysis Should Be Sustained**

The Commission reasonably found that subject imports had a significant adverse impact on the domestic industry.  Views at 54.  As the Commission explained, the domestic industry began the POI in a weakened condition that worsened from 2020 to 2021 and then improved by most measures in 2022 after the *FRC I* provisional duties were imposed, although it continued to experience financial losses. Views at 50.  The Commission observed that the domestic industry's declining production, sales, shipments, and revenues from 2020 to 2021 exceeded the decline in apparent U.S. consumption and corresponded with subject import underselling, market share gains, and price suppression.  Views at 54.  Then, the domestic industry's improved performance from 2021 to 2022 corresponded with the *FRC I* provisional duties, and the industry still reported operating and net losses and continued to lose market share to subject imports in the replacement market in 2022.  Views at 54.

The Commission rejected Plaintiffs' argument that the domestic industry was not injured because its production, capacity utilization, shipments, and profitability all improved over the POI.  Views at 54 n.278.  It explained that those improvements occurred only after the imposition of the *FRC I* provisional duties and that prior to those duties, all the indicators cited by Plaintiffs declined.  Views at 54 n.278.

Plaintiffs argued that any [ ▮ ] of market share in the replacement market segment by the domestic industry was attributable to the industry's decision to [ ▮▮▮▮▮▮▮▮▮▮ ], but the record did not support this argument.  Views at 55.  The domestic industry made [ ▮▮▮ ] in the replacement market in 2020 and 2021 and [ ▮ ] market share to subject imports during that period.  Views at 55.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

The Commission was unpersuaded by Plaintiffs' argument that the domestic industry did not have the available production capacity to increase sales during the POI.  Views at 55.  Both domestic producers reported [ ███████████████████████ ] during the POI.  Views at 55.  And even when there was a [ ███████ ] increase in the domestic industry's production and shipments in 2022, both U.S. producers' capacity utilization rate remained below [ ██ ] percent for the most part, with only [ █████ ] surpassing that figure in [ ██ ] of the [ ███ ] months that year.  Views at 55-56.

The Commission disagreed with respondents that a contract dispute that resulted in [ █████ ] no longer supplying [ █████████ ] proved that [ █████ ] was operating at [ ████ ████████ ] during the POI.  Views at 56 n.289.  The evidence supported the Commission's finding that the parties involved described the dispute as concerning price increases, not capacity.  As the Commission also noted, the dispute occurred in July 2021, before the alleged domestic industry capacity constraints in 2022.  Views at 56 n.289.

Addressing respondents' contention that a substantial portion of the FRC market was unavailable to the domestic industry because purchasers required FRCs with Bedloe technology, the Commission noted that the majority of subject imports during the POI were non-Bedloe FRCs.  Views at 57.  And while certain [ █████ ] purchasers, such as [ █████ ], preferred FRCs with Bedloe technology, most responding purchasers did not view the technology as important.  Views at 57.  [ █████ ] also increased its purchases of non-Bedloe FRCs during the POI when the *FRC I* provisional duties reduced the availability of Bedloe FRCs.  Views at 57-58.

Finally, the Commission examined the trends in apparent U.S. consumption and nonsubject imports and found that neither could explain the domestic industry's performance during the POI.  Views at 54-55, 58.  It found that the increase in apparent U.S. consumption

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

from 2021 to 2022 could not fully explain the domestic industry's improved performance in 2022 because the domestic industry's U.S. shipments, bolstered by the *FRC I* provisional duties, increased by far more than apparent U.S. consumption over that period.  Views at 54-55, 58.

  **ii. The Commission's Decision to Attribute the Domestic Industry's Improved Performance in 2022 to the *FRC I* Provisional Duties Was Supported by Substantial Evidence**

  Plaintiffs argue that the *FRC I* provisional duties could not have contributed to the domestic industry's improved performance in 2022 because the domestic industry did not pick up a "meaningful" amount of the sales left behind by the subject imports from China that withdrew from the market that year.  PlBr. at 43-44.  As discussed above, U.S. shipments of subject imports from China declined in the OEM and replacement markets, with the largest decline occurring in the replacement market where the withdrawal of such imports inured wholly to subject imports from Mexico.  Further, the increased presence of subject imports from Mexico in the replacement market corresponded with their decreased presence in the OEM market.  Thus, although the domestic industry did not directly pick up a significant portion of the sales left behind by the withdrawn subject imports from China, the *FRC I* provisional duties reduced the presence of subject imports in the OEM market, where the domestic industry was able to increase its sales and gain market share.

  Plaintiffs also claim that if the domestic industry's improvement was due to the *FRC I* duties then the domestic industry's performance should have improved most when the duties were in place.  PlBr. at 44.  As support for their position, Plaintiffs note that the domestic industry's production [ ████████ ] while the duties were in place and then [ ███ ] after the Commission issued its final determinations in the *FRC I* investigations, which terminated the cash deposits.  PlBr. at 44.  The Commission took all factors, including

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

production data into account in reaching its conclusion, and it found that the domestic industry's declining performance coincided with a significant volume of lower-priced subject imports that adversely affected domestic like product prices.  Views at 50-54.  Moreover, it is undisputed that the *FRC I* provisional duties reduced the sales and increased the prices of subject imports from China in 2022, which according to record information, remained the case even after the duties were lifted.  SR at Tables V-3-7, IV-10, C-1 & Fig. IV-7.  This allowed the domestic industry to increase its prices and U.S. shipments throughout the remainder of 2022.  SR at Tables V-3-7.

The Commission did not, as Plaintiffs argue, PlBr. at 44, misread the record regarding [ ██████ ] statements about the *FRC I* provisional duties.  The Commission highlighted [ ██████ ] questionnaire responses that explained that the [ ████████████████████ ████████████████████████ ] and showed that [ ██████ ] reduced its shipments of subject imports from China in 2022.  Views at 57 n.291.  [ ██████ ] also answered "yes" when asked if "the {*FRC I* provisional duties} result{ed} in changes {to its} supply chain arrangements, importations, employment, and shipments relating to freight rail couplers." [ ██████ ] Revised U.S. Importer/Purchaser Questionnaire Response, CR113 at II-4c.  In addition, its questionnaire response showed that it increased its purchases of domestically produced FRCs from 2021 to 2022, while its purchasers of both subject imports from China and Mexico declined over that period.  [ ██████ ] Revised U.S. Importer/Purchaser Questionnaire Response, CR113 at II-4c.  Based on these questionnaire responses, the Commission reasonably concluded that the *FRC I* provisional duties contributed, at least in part, to [ ████████████ ] purchases of domestically produced FRCs in 2022.  Views at 57.

Nor does Plaintiffs' reliance on the increased demand undermine the Commission's finding that the *FRC I* provisional duties contributed to the domestic industry's improved

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

performance in 2022.  PlBr. at 45.  Contrary to the arguments respondents made to the
Commission, the increase in apparent consumption alone did not account for the industry's
improved performance in 2022.  Views at 54.  As the Commission explained, and the evidence
shows, the increased consumption (in the OEM market) did not fully explain the domestic
industry's improved performance, as the domestic industry's U.S shipments increased by far
more than the increase in apparent U.S. consumption in 2022.  Views at 54-55 n.280 & 58.

### iii.   The Commission's Causation Analysis Was Supported by Substantial Evidence and In Accordance with Law

Plaintiffs suggest that the Commission's material injury finding is based solely on market
share losses in the replacement market.  PlBr. at 46-47.  While the record did show that the
domestic industry lost market share to subject imports in the replacement market throughout the
POI, the record also showed that the overall volume of cumulated subject imports was significant
and that cumulated subject imports had significant adverse price effects, including significant
price suppression, during the POI.  Views at 41-49.  The effects to the domestic industry's
performance were that its production, shipments, and revenues declined from 2020 to 2021, in
excess of the decline in apparent U.S. consumption.  Views at 54.  The domestic industry also
remained unprofitable in 2022 despite the increase in apparent U.S. consumption from 2021 to
2022.  Views at 54.

The record does not support Plaintiffs' claim that the domestic industry's loss of market
share was attributable to its focus on the OEM market rather than from subject import
competition.  PlBr. at 48.  As the Commission explained, the record belied respondents' claim
that the domestic industry was not interested in making sales in the replacement market.  Views
at 55. Although the domestic industry – primarily [ ███ ] given its long-term contract with
[ █████ ] – may have been pulled to the OEM market, that does not mean that the domestic

industry was not interested or able to increase sales to the replacement market during the POI. Both domestic producers reported [ ] during the POI that they could have used to increase shipments to the replacement market. Views at 55. This includes 2022, when the domestic industry increased production and sales to the OEM market, as [ ]. *Id* at 55-56.

Plaintiffs' effort to distinguish between "interest" and "prioritization" does not detract from the reasonableness of the Commission's findings. PlBr. at 50. Irrespective of the characterization, the record amply supports the Commission's findings that the domestic industry was able to and did sell to both the OEM and replacement markets throughout the POI, with the available capacity and ability to increase sales in either market without yielding sales in the other. Views at 37, 55.

In arguing that the domestic industry did not have available capacity for sales in the replacement market in 2022, Plaintiffs ignore the domestic industry's capacity utilization figures. PlBr. at 48-50. These data show that the domestic industry had [ ] throughout the POI, as its capacity utilization rate was [ ] percent in 2020, [ ] percent in 2021, and [ ] percent in 2022. Views at 33 & 55. Further, as discussed above, Plaintiffs' reliance on the contract between [ ] and [ ] is misplaced because the [ ] concerning the contract, only discussed [ ], not capacity constraints. Views at 56 n.289. Indeed, the purchaser specifically described [ ]. Views at 56, n.289, citing SR at II-18.

Plaintiffs also point to other importer/purchaser responses to claim that [ ██ ] did not have sufficient capacity for additional sales in 2022. PlBr. at 50. The Commission reasonably credited the verified questionnaire data provided by the domestic producers themselves over such anecdotal reports. These data indicated that both domestic producers had [ ████████ ████ ] throughout the POI, even in 2022. Views at 55-56.

### iv. The Commission's Consideration of Bedloe Technology Was Supported by Substantial Evidence

Plaintiffs rely yet again on the facts of the *FRC I* investigations to argue that the Commission failed to acknowledge that Bedloe technology was a significant price factor that distinguished subject imports from China from domestically produced FRCs. PlBr. at 51-53. In *FRC II*, however, no party (including Plaintiffs) argued that there was not a reasonable overlap of competition between subject imports from China and domestically produced FRCs (or subject imports from Mexico). And given the cumulation of subject imports in the *FRC II* investigations, Bedloe FRCs represented a significantly smaller volume of subject imports in the *FRC II* investigations than in the *FRC I* investigations. Indeed, as the Commission explained in its *FRC II* determinations, the majority of subject imports during the POI were non-Bedloe FRCs. Views at 57. Most purchasers also did not find the technology to be an important purchasing factor, but because certain [ ██ ] purchasers preferred Bedloe FRCs, mainly [ ██ ], the Commission found that there was a moderately high to high degree of substitutability between subject imports and domestically produced FRCs. Views at 35 n.182 &57. However, the record indicated that even [ ██ ] found non-Bedloe and Bedloe FRCs to be substitutable at least to some degree, given that [ ████████████ ████ ] during the POI. Views at 57-58. [ ██ ] also increased its non-Bedloe purchases in 2022, when it purchased more [ ████████████ ]. Views at 57.

Plaintiffs dispute that [                                                      ] is indicative of substitutability, claiming that the upward tick in non-Bedloe purchases was due to the constraints in acquiring Bedloe FRCs from China because of the *FRC I* provisional duties. PlBr. at 53.  Even if this were so, the reason for [          ] purchases does not change the reasonableness of the Commission's finding that purchasers such as [        ], at least to some degree, viewed non-Bedloe FRCs as substitutable with Bedloe FRCs.  Nor is the Commission's substitutability finding undermined by Plaintiffs' pointing to evidence showing that [          ] its purchases of domestically produced FRCs in the face of the supply constraints, but instead imported FRCs from Mexico.  PlBr. at 53.  Irrespective of whether [        ] switched to the domestic product or to subject imports from Mexico, neither of these products were Bedloe FRCs.  Views at 35 n.182.

Plaintiffs also dispute the Commission's statement that [        ] purchased more [        ] in 2022.  PlBr. at 52.  They claim that corrected purchase data was included in [        ] posthearing brief and showed that [                     ].  PlBr. at 52.  Here again, the Commission made this point to show that even [        ] considered there to be some degree of substitutability between Bedloe and non-Bedloe FRCs, as well as that a significant volume of subject imports during the POI were not Bedloe FRCs.  Views at 57-58.  So, even if the figures reported in [        ] posthearing briefs represent [        ] actual purchases in 2022, they do not detract from the Commission's finding, as Bedloe FRCs still did not account for a significant

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

volume of subject imports during the POI and [███████████████████████████

████████ ].[15]

### F.  Wabtec and Strato Are Not Entitled to Relief from the Commission's Decision Not to Disqualify the Attorney and Firm

#### i.  Background

On October 14, 2022, almost two weeks into the preliminary phase of the underlying

*FRC II* investigations, Amsted and its Mexican affiliate, ASF-K de Mexico S. de R.L. de C.V.

("ASF-K"), filed a request with the Commission to disqualify the Attorney and Firm from further

participation as counsel for the petitioning Coalition.  *See* Amsted's Action Request to

Disqualify, CR31.  They alleged that a conflict of interest existed based upon the Attorney's

former representation of Amsted in the prior *FRC I* investigations ("disqualification request").

CR31.  According to Amsted and ASF-K, the Attorney, by representing the Coalition in *FRC II*,

violated Rule 1.9(a) of the American Bar Association's Model Rules of Professional Conduct and

its analogue, Rule 1.9(a) of the District of Columbia Rules of Professional Conduct.  *See* CR31.

On October 18, 2022, the Attorney responded to the disqualification request on behalf of

the Coalition.  CR56.  In the response, the Attorney maintained that no conflict existed, and that

in any event, Amsted had expressly waived any conflict with respect to any subsequent trade

investigations.  *See* CR56.

On October 21, 2022, the Commission responded to the disqualification request, stating

that "there {wa}s not good cause under Rule 201.15(a), at this time, to disqualify {the Attorney

---

[15] The Commission's finding regarding the importance of Bedloe technology was not, as
Plaintiffs allege a "reversal" of any finding it made in *FRC I*.  PlBr. at 53.  The footnote upon
which Plaintiffs rely addressed [ █████ ] reduced purchases of imports from China, and
increased purchases of imports from Mexico, in the face of post-(*FRC I*)-petition supply
constraints.  The footnote does not opine about the relative importance of Bedloe technology.

and Firm} from participation" in *FRC II* based on the ethical issues Amsted raised.  PR53.  The

Commission explained that it "does not adjudicate alleged violations of the Rules of Professional

Conduct of a state Bar, nor does it determine whether conduct has violated the Model Rules of

Professional Conduct of the American Bar Association, such as those described in {its} request."

PR53.  The Commission further explained that such determinations fell within the purview of the

relevant state bar association and noted that no such determination had been made.  *See* PR53.

To this day, Amsted has not submitted any evidence of a filed Bar complaint, let alone a

final determination from the relevant Bar authority regarding the alleged conflict of interest.

### ii.  Wabtec and Strato Lack Standing to Bring a Conflict of Interest Claim

As an initial matter, Wabtec and Strato lack standing to bring a conflict of interest claim

stemming from the Attorney's representation of the Coalition in the underlying *FRC II*

investigations because neither firm has a current or former attorney-client relationship with the

Attorney.  Wabtec and Strato instead rely solely upon the Attorney's former representation of

Amsted, an entirely separate firm, in the prior *FRC I* investigations as the basis for their conflict

of interest claim.  Their attempt to piggyback upon Amsted's former attorney-client relationship

to challenge the Commission's *FRC II* determination on imports from China should be rejected.

They fail to meet their burden in demonstrating the requisite injury that is fairly traceable to the

alleged ethical breach.

"To establish a case or controversy, a party invoking federal jurisdiction must meet the

'irreducible constitutional minimum of standing.'"  *Allgenesis Biotherapeutics Inc. v.*

*Cloudbreak Therapeutics, LLC*, 85 F.4th 1377, 1380 (Fed. Cir. 2023) (quoting *Lujan v. Defs. of*

*Wildlife*, 504 U.S. 555, 560 (1992)).  Specifically, a plaintiff must show that it has "'(1) suffered

an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3)

that is likely to be redressed by a favorable judicial decision.'" *Allgenesis Biotherapeutics Inc.*, 85 F.4th at 1380 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 578 U.S. at 338.

The standing doctrine "embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights. . . ." *Allen v. Wright*, 468 U.S. 737, 751 (1984). While the U.S. Court of Appeals for the Federal Circuit has not addressed the specific question of standing to bring a conflict claim by a non-client, the U.S. District Court for the Central District of California discussed in *Colyer v. Smith*, 50 F. Supp. 2d 966, 969 (C.D. Cal. 1999), that the majority view amongst the courts on this issue is that "only a current or former client of an attorney has standing to complain of that attorney's representation of interests adverse to that current client." The *Colyer* court cited *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83 (5th Cir. 1976), as the leading case representing this majority view. *Colyer*, 50 F. Supp. 2d at 969.[16]

In *Yarn Processing*, the U.S. Court of Appeals for the Fifth Circuit held that only a former client could move for disqualification, stating that "{t}o allow an unauthorized surrogate to champion the rights of the former client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist." 530 F.2d at 90. While the Fifth Circuit acknowledged the possibility of non-client standing, it did so for only limited

---

[16] The *Colyer* court explained that the minority view on this issue included a general "rules-based" standing for attorneys based upon their duty to report ethical violations. 50 F. Supp. 2d at 970. This minority approach, however, fails to account for the Constitutional standing requirement of demonstrating a concrete and particularized injury in fact. *See Lujan*, 504 U.S. at 561 (stating that the standing elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, {and} each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof").

circumstances where an "unethical change of sides was manifest and glaring" or an ethical

violation was "open and obvious," confronting the court with a "plain duty to act."  530 F.2d at

89; *see also Colyer*, 50 F. Supp. 2d at 972 (stating that the *Yarn Processing* court "undoubtedly"

had in mind an ethical breach so severe that it "obstructs the orderly administration of justice").

In other words, for standing to exist, the ethical breach must rise to the level of "infect{ing} the

proceedings" such that it invades a "legally protected interest which is (a) concrete and

particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Colyer*, 50 F. Supp.

2d at 973 (quoting *Lujan*, 504 U.S. at 560).

Assuming that this Court rejects a categorical rule denying standing to all non-client

litigants (which would include Wabtec and Strato), Wabtec and Strato still fail to establish the

necessary elements to meet the limited circumstances discussed in *Yarn Processing* for non-client

standing.  In particular, they fail to show that the alleged conflict was so "manifest and glaring"

or "open and obvious" that it "infected the proceedings."  *Yarn Processing*, 530 F.2d at 89;

*Colyer*, 50 F. Supp. 2d at 973.  Indeed, the Attorney did not represent adverse clients at the same

time as is normally the case where courts have found clear impropriety by counsel.  *See, e.g.*, *In

re Dresser Indus.,* 972 F.2d 540 (5th Cir. 1992) (law firm sued its own client, which it

concurrently represented in other matters); *In re Am. Airlines, Inc.*, 972 F.2d 605 (5th Cir. 1992)

(overlapping representation of directly adverse parties in the same case); *Unified Sewage Agency

of Wash. Cnty. v. Jelco Inc.*, 646 F.2d 1339 (9th Cir. 1981) (attorney undertook representation

adverse to a present client).  Nor did the Attorney switch clients in the *FRC I* and *FRC II*

investigations.  To the contrary, the Attorney was consistent in the representation of the Coalition

of domestic producer(s) and union workers across both investigations.

Plaintiffs point out that while Amsted was once a part of the petitioning Coalition in *FRC I*, Amsted's interests became adverse to the Coalition in *FRC II*.  PlBr. at 56-57.  But even then, rather than being "manifest and glaring" or "open and obvious," the alleged conflict remains questionable.  Specifically, it is not clear-cut whether the *FRC II* investigations meet the strict definition of being "substantially related" to the *FRC I* investigations, a purported requirement in establishing a conflict of interest.  PlBr. at 36 (citing the ABA Model Rules of Professional Conduct and D.C. Rules of Professional Conduct).  Indeed, as noted throughout this brief, *FRC I* and *FRC II* are separate investigative proceedings with distinct investigation numbers and different scopes, subject countries, and periods of investigation.  In any event, as Plaintiffs even acknowledge, Amsted had executed an advance conflicts waiver covering future conflicts with the Attorney that could bar Amsted from seeking disqualification under the relevant conflict rules.  PlBr. at 57; *In re Shared Memory Graphics LLC*, 659 F.3d 1336, 1340-42 (Fed. Cir. 2011) (finding that an advance conflicts waiver was intended to bar client from seeking disqualification of counsel).

Plaintiffs also fail to demonstrate how the alleged conflict "infected the proceedings." They speculate that the proceedings were "tainted" because the Attorney obtained confidential information from the prior representation of Amsted, which they allege "almost certainly informed" the Attorney's efforts in obtaining tariffs against Amsted and other respondents.  PlBr. at 58.  But the "confidential information" that Wabtec and Strato claim the Attorney used to prove the Coalition's case in *FRC II* – that Amsted moved production to Mexico due to competition with Chinese imports – was not even confidential.  Rather, this information was openly and publicly discussed in the prior *FRC I* investigations as well as the underlying *FRC II* investigations.  *FRC I* Views at 38-39 n.149 (noting petitioner's argument that the increased

presence of nonsubject imports was a manifestation of injury caused by subject imports, inasmuch as low-priced subject imports from China drove Amsted to outshore some of its FRC production operations to Mexico);  Views at 19-20 n.86 (citing conference testimony regarding how Amsted moved much of their production to Mexico to compete with Chinese imports). Plaintiffs not only fail to identify any confidential information for the basis of their conflict claim, but they also fail to point to any such information that would not otherwise be available under the APO or how that information tainted or infected the proceedings.  *See Colyer*, 50 F. Supp. 2d at 973 (that counsel may have learned confidential information from a former client which it will use to plaintiff's disadvantage is not a "legally cognizable" interest of plaintiff because the only injury that results from the breach of confidentiality is personal to the former client and "only intrudes upon {the former client}'s expectation of confidentiality").

In sum, Plaintiffs Wabtec and Strato lack standing and should be precluded from exploiting Amsted's former attorney-client relationship with the Attorney for their own strategic benefit in seeking to overturn the Commission's substantially supported affirmative material injury determination.  *See Yarn Processing*, 530 F.2d at 90 (allowing an unauthorized surrogate to champion the rights of the former client "would place in the hands of the unauthorized surrogate power presumptions which are inappropriate in his hands"); *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*, 760 F.2d 1045, 1050 (9th Cir. 1985) ("The cost and inconvenience to clients and the judicial system from misuse of the rules for tactical purposes is significant. Because of this potential for abuse, disqualification motions should be subjected to 'particularly strict judicial scrutiny.'") (quotation omitted); *In re Appeal of Infotechnology, Inc.*, 582 A.2d 215, 221 (Del. 1990) ("Infotechnology cannot enforce an alleged technical violation of the Rules especially where it has become apparent that it was seeking to use disqualification as a litigation

tactic."). The Court should therefore dismiss Wabtec's and Strato's conflict of interest claim for lack of standing.

### iii. The Commission's Determination that Good Cause Did Not Exist to Disqualify the Attorney and Law Firm is Supported by Substantial Evidence and Otherwise in Accordance with Law

Even if the Court finds that Wabtec and Strato possess standing to bring a non-client conflict of interest claim, their claim lacks merit because the Commission's determination that good cause did not exist to disqualify the Attorney and Firm is supported by substantial evidence and otherwise in accordance with law.

The Commission's regulations provide that any attorney or agent practicing before the Commission may "be suspended or barred from practicing before the Commission, or have imposed on him such lesser sanctions as the Commission deems appropriate" but only for "good cause shown." 19 C.F.R. § 201.15. Here, there was no conclusive determination of a proven conflict of interest on the record, and good cause therefore did not exist to disqualify the Attorney from representing the Coalition in the *FRC II* investigations. Plaintiffs' arguments to the contrary center around their mistaken belief that the Commission was required by law to adjudicate Amsted's conflict of interest claim. PlBr. at 55-56. But no such requirement exists.

The Commission's statutory mandate is to determine whether the imported merchandise in question either materially injures or threatens to materially injure a domestic industry within its statutory deadlines. 19 U.S.C. §§ 1671d(b)(1) & 1673d(b)(1). There is no statutory requirement within this complex scheme for the Commission to sit in the place of the relevant state Bar and adjudicate claims of violation of the Rules of Professional Responsibility and conduct an assessment as to whether the Attorney violated the Model Rules of Professional Conduct. Nor is there a regulatory requirement to do so. The Commission therefore reasonably

declined to adjudicate Amsted's conflict of interest claim during the underlying *FRC II*

investigations. *See Shakeproof Indus. Prods. Div. of Ill. Tool Works, Inc. v. United States*, 104

F.3d 1309, 1313-14 (Fed. Cir. 1997) (finding no legal error in Commerce's refusal to apply the

D.C. Rules of Professional Conduct to the question of whether a firm should have been

disqualified based upon an alleged conflict of interest); *see also Vt. Yankee Nuclear Power Corp.*

*v. NRDC*, 435 U.S. 519, 543 (1978) ("{A}dministrative agencies should be free to fashion their

own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge

their multitudinous duties.") (quotation omitted); *Goldsmith v. U.S. Bd. of Tax Appeals*, 270 U.S.

117, 121-22 (1926) (an agency has the authority to set general rules governing hearings before it

and the power to create and enforce rules limiting who can practice and appear before the

agency).

Likewise, there is no Commission practice of adjudicating disqualification claims in its

antidumping and countervailing duty ("Title VII") investigations. Plaintiffs' insistence otherwise

is based upon its mistaken reliance upon procedures in the Commission's investigations under 19

U.S.C. § 1337 ("section 337"). PlBr. at 55-56 (claiming that the Commission has a "long-

standing" practice in looking to "the ABA Model Rules of Professional Conduct for guidance in

determining whether to disqualify counsel"). Section 337 cases, however, are entirely different

from Title VII proceedings. Specifically, in section 337 cases, administrative law judges preside

over formal adjudications conducted pursuant to section 554 of the Administrative Procedures

Act, 5 U.S.C. § 554. These proceedings bear similarity to trials in that they involve notice,

cross-examination, presentation of evidence, objection, motion, argument, and other rights, and

apply procedural rules that are similar in many respects to the Federal Rules of Civil Procedure.

In contrast, Title VII proceedings are investigatory in nature, without any involvement by ALJs,

and do not have such procedural structures.  Accordingly, the Commission in such investigations

has declined to rule upon ethical violations under the Model Rules of Professional Conduct.  *See*

*Budd Co. Ry. Div. v. United States*, 1 CIT 67, 72, 507 F. Supp. 997, 1001 (1980) ("Congress has

recognized that the administrative proceedings under Title VII of the Tariff Act of 1930 are

investigatory, not adjudicatory.").  Because Commission rulings from one area are not in any way

informative of, much less binding precedent on the other, Plaintiffs fail to show that the

Commission departed from any established practice.

### iv.    The Court Should Not Entertain Plaintiffs' Request for the Court to Address the Alleged Conflict of Interest

Plaintiff's alternative argument that the Court must address the alleged conflict of interest

claim also lacks merit.  PlBr. at 56-58.

The Court's role is to review the Commission's final determination to determine whether

it is lawful and supported by substantial evidence in the record.  19 U.S.C. § 1516a(b); *see also*

*N.M. Garlic Growers Coal. v. United States*, 352 F. Supp. 3d 1281, 1307 & n.38 (Ct. Int'l Trade

2018) (finding that its task was to determine whether substantial evidence supported Commerce's

decision and that it "need not resolve its ethical concerns with {the attorney's} conduct prior to

rendering a decision").  In doing so, the Court considers the record evidence that was before the

Commission in its administrative proceedings.  19 U.S.C. § 1516a(b)(2).  In other words, the

Court must determine whether the Commission's decision not to disqualify the Attorney was

lawful and supported by substantial evidence in the record.  As explained above, in the absence

of a proven conflict of interest, the Commission's determination on this issue meets this standard.

While the Court "has plenary authority and responsibility to supervise professional

conduct" as Plaintiffs argue (PlBr. at 57), this authority applies to judicial proceedings before the

Court and does not extend to regulation of conduct of attorneys appearing before the

58

Commission. The Federal Circuit has recognized that just as the Court has the inherent authority to adopt procedures to manage their own affairs, "so do administrative agencies." *Cf. Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1261 (Fed. Cir. 2023). Here, the Commission enacted a rule requiring that "good cause" must exist for an Attorney to "be suspended or barred from practicing before the Commission, or have imposed on him such lesser sanctions as the Commission deems appropriate." 19 C.F.R. § 201.15(a). The Court should review the Commission's determination within the context of the agency's regulatory procedures and decline to engage in *de novo* review of the conflict claim under state and model ethics rules.[17]

### v. Wabtec and Strato Are Not Entitled to Their Requested Relief

All other inadequacies aside, Plaintiffs do not and, in fact, cannot show that they are entitled to their requested relief for an order for the Commission to "enter a negative determination." PlBr. at 58.

The statute does not permit the Court to reverse a determination of the Commission, either directly or indirectly. 19 U.S.C. § 1516a; S. Rep. No. 96-249 at 242 ("Section 516A would make it clear that traditional administrative law principles are to be applied in reviewing antidumping and countervailing duty decisions where by law Congress has entrusted the decision-making authority in a specialized, complex economic situation to administrative agencies"); *INS v. Ventura*, 537 U.S. 12, 16-17 (2002) (emphasizing that a court reviewing agency action should, except in exceptional circumstances, remand improper determinations to

---

[17] Plaintiffs' reliance on *Makita Corp. v. United States*, 17 CIT 240, 245, 819 F. Supp. 1099 (1993) is misplaced. PlBr. at 57. Aside from the factual distinctions in that case and this one, and putting aside that prior decisions by this Court are not binding, *Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989), *Makita* involved judicial action outside of review of the agency's merits determination. Unlike the instant case, *Makita* did not involve the Court's record review of an agency's determination (which in this case includes the decision not to disqualify) under 28 U.S.C. 1581(c) and 19 U.S.C. § 1516a.

the agency involved for additional investigation or explanation); *Altx, Inc. v. Am. Extruded Prod. Corp.*, 370 F.3d 1108, 1111 n.2 (Fed. Cir. 2004) ("Section 1516a limits the Court of International Trade to affirmances and remand orders; an outright reversal without a remand does not appear to be contemplated by the statute.").

While there may well be exceptional situations where "the trade court may be faced with a Commission determination that is unsupported by substantial evidence, and for which a remand {for further consideration or explanation} would be futile," that is not the case here. *Nippon Steel*, 458 F.3d at 1359; *see also NLRB v. Food Store Emp. Union*, 417 U.S. 1, 8 (1973). To the contrary, if the Court were to find merit to Plaintiffs' argument that the Attorney should have been disqualified from participating in the underlying *FRC II* investigations, the Commission has the ability to rectify any "taint" caused by the Attorney's conduct. *See*, *e.g.*, *Koyo Seiko Co., Ltd. v. United States*, 13 CIT 461, 464, 715 F. Supp. 1097, 1099 (1989) (discussing the Commission's statutory mandate of reconsideration that is "free of the accretions of any private interests, expectations or equities" in considering an issue anew) (quotation omitted); *Elkem Metals Co. v. United States*, 26 CIT 234, 240, 193 F. Supp. 2d 1314, 1321 (2002) (finding that the Commission had the inherent power to reconsider its final determinations to account for fraudulent information with respect to pricing that had been provided during the original investigations).[18]

---

[18] Even if the Court finds the Commission's actions regarding this issue to be unreasonable, the appropriate remedy is to remand to the Commission for further consideration, rather than direct the Commission to enter a negative determination, as Plaintiffs request. *See Amsted*, 600 F. Supp. 3d at 1308, 1324 ("{I}f the court finds the Commission's actions to be unreasonable, it may remand the matter for further investigation as appropriate").

## V.    CONCLUSION

For all the foregoing reasons, this Court should affirm the Commission's affirmative determinations for FRCs from China.  Because the Commission reasonably considered all the evidence and explained its findings, the Commission's determinations are supported by substantial evidence and in accordance with law.

Respectfully submitted,

Dominic L. Bianchi
General Counsel

Andrea C. Casson
Assistant General Counsel for Litigation

*/s/      Garrett L. Peterson*
Garrett L. Peterson
Jane C. Dempsey
Michael K. Haldenstein
Attorney-Advisors
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3241
garrett.peterson@usitc.gov

*Attorneys for Defendant United States International Trade Commission*

Dated: December 19, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S**

**NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE**

**56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD** contains 18,692 words,

according to the word-count function of the word processing system used to prepare this brief

(Microsoft Word 2010).


Dated: December 19, 2024          */s/ Garrett L. Peterson*
                                  Garrett L. Peterson
                                  Attorney-Advisor
                                  Office of the General Counsel
                                  U.S. International Trade Commission
                                  500 E Street, SW
                                  Washington, DC 20436
                                  Telephone: (202) 205-3241
                                  Facsimile: (202) 205-3111
                                  garrett.peterson@usitc.gov