# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| WABTEC CORPORATION and STRATO, INC., | |
| Plaintiff/Consolidated Plaintiff, | |
| v. | Consol. Court No. 23-00157 |
| UNITED STATES, | **NON-CONFIDENTIAL VERSION** |
| Defendant, and | |
| COALITION OF FREIGHT COUPLER PRODUCERS, | |
| Defendant-Intervenor. | |

## **PLAINTIFF'S MOTION FOR REMAND TO AGENCY FOR RECONSIDERATION**

Plaintiff Strato, Inc. ("Strato") respectfully moves the court to remand the final affirmative injury determinations of the U.S. International Trade Commission ("ITC" or "Commission") in the antidumping and countervailing duty ("AD/CVD") investigations of certain freight rail couplers ("FRCs") and parts thereof from China ("FRC II"), *Certain Freight Rail Couplers and Parts Thereof from China*, 88 Fed. Reg. 43,398 (July 7, 2023); *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682, 731-TA-1592, USITC Pub. 5438 (July 2023) (Final) ("Views"), for the agency to reconsider its affirmative injury determination in light of newly emerged evidence of fraud perpetrated by the domestic industry during the course of underlying investigation. This fraud had a material impact on the ITC's injury determination and compels reconsideration.

1

Case 1:23-cv-00157-GSK     Document 52     Filed 02/01/25     Page 2 of 14

Consol. Ct. No. 23-00157                              Business Proprietary Information Has Been Deleted

As articulated by the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"), a remand to the agency for reconsideration is necessary where there is clear and convincing new evidence that the agency proceeding under review was tainted by material fraud. *See Home Products Int'l v. United States*, 633 F.3d 1369, 1381 (Fed. Cir. 2011). Evidence that emerged after the Commission issued its affirmative injury determination demonstrates that domestic producers were producing and selling knuckles and complete coupler assemblies or fits (comprising coupler body and knuckle) that deviated significantly from specifications approved by the Association of American Railroads ("AAR") during the Period of Investigation ("POI"), despite repeated statements from domestic producers that their sales of knuckles and coupler assemblies throughout the POI were all AAR-approved. In reality, from at least the beginning of 2021 onward, a time frame spanning more than two-thirds of the POI, virtually *none* were.

To protect the freight rail network, the AAR commenced investigations in late 2023 [         ] and took prompt action in response: specifically, it declared that the new knuckle design never obtained AAR approval and directed the domestic industry to stop making and selling knuckles and fits with the non-approved design. The domestic industry sold these new knuckles throughout the POI, and these non-AAR-approved products accounted for the majority of their complete coupler assembly and standalone knuckle shipments (*e.g.*, Pricing Products 1, 2, *and* 3). The domestic industry withheld material information about these design changes both from the AAR and from the Commission, and repeatedly certified to the Commission that their knuckles enjoyed AAR approval—statements that now have been proven false. Their material fraud and failure to disclose material information during the *FRC II* investigations led the Commission to conclude that domestically produced knuckles were

manufactured to AAR specifications and were therefore interoperable and interchangeable with subject imports.

As detailed in **Appendix A (Request for Agency Reconsideration From TTX Company and Strato, Inc.)** and summarized below, the domestic industry's material fraud and omission of material facts tainted the ITC's analyses of domestic like product, cumulation, conditions of competition, and price effects, and undermined all data collected on price, capacity, production, shipments, and inventory during the POI—all of which the ITC expressly relied upon in its final determination. Newly emerged evidence about knuckles and coupler assemblies produced and sold in the United States during the POI therefore warrants an immediate remand for agency reconsideration. Plaintiff respectfully requests that this Court issue a remand for the ITC to reconsider its prior affirmative injury determination, staying this appeal pending the ITC's decision. *See Home Products Int'l v. United States*, 633 F.3d 1369, 1378 (Fed. Cir. 2011).

Strato consulted with Counsel for Plaintiff Wabtec, Defendant the United States, and Defendant-Intervenor the Coalition of Freight Coupler Producers regarding this motion, and received email responses on January 31, 2025. Counsel for Plaintiff Wabtec supports this motion. Counsel for Defendant-Intervenor opposes the motion and intends to file papers in opposition. Counsel for Defendant takes no position on the motion until it has the chance to review the motion and attached documentation more closely, and to consider the opposition that Defendant-Intervenor intends to file, and also requests that its response to this motion be due after Defendant-Intervenor files its opposition—a request that Strato does not oppose.

**I.      In November 2023 the AAR Concluded that Knuckles Produced Domestically during the POI Never Obtained AAR Approval After Discovering that the Domestic Industry Had Been Making and Selling Knuckles and Coupler Assemblies that Significantly Deviated from AAR Specifications.**

The AAR is a standard-setting organization and trade association representing the domestic freight rail industry. Its Castings Committee oversees the development and implementation of manufacturing standards for FRCs used in the United States and throughout North America. All knuckles and coupler bodies used in the United States must be manufactured to the AAR's M-211 or M-215 specifications to ensure that they are interoperable, meaning they can work together on railcars regardless of manufacturer.

[                              ] after the Commission closed the record to new factual information in the *FRC II* investigations—the AAR for the first time learned of a new knuckle design patented by McConway & Torley LLC ("M&T") that was sold in significant quantities during the POI. [                                      ], the AAR discovered that M&T had started producing and selling the new knuckles [                    ] it filed a petition against freight rail couplers from China in the first FRC case, in September 2021. A second domestic producer, Amsted Rail Company, Inc., started producing this new knuckle design [                                   ]. The domestic industry concealed its use of a new patented design from the AAR and from purchasers, [

                                        ]. Throughout the entire POI, the domestic industry continued to market its new knuckles as AAR-approved, using the exact same catalogue code for their new, non-AAR-approved knuckles as for the standard AAR-approved knuckles that the domestic industry secretly stopped producing.

The domestic producers did not just implement minor changes to the knuckles when they implemented M&T's patent after 2019. They started manufacturing a whole new product that

4

deviated significantly from AAR specifications. Deviations such as those summarized below led the AAR to formally announce in November 2023 that knuckles produced to M&T's patented new design were not AAR-approved:

- As highlighted in M&T's patent (which includes new designs for both a knuckle and a complementary coupler body), M&T significantly altered the angle of the top and bottom knuckle pulling lugs, *i.e.*, the rectangular blocks located on the tail of a knuckle. In an AAR-approved knuckle, the pulling lugs would have a nearly vertical draft angle of two to six degrees from ninety degrees, but the M&T design modifies that draft angle to about thirty degrees from a right angle.

- [

  ].

- M&T made other geometrical changes to the knuckle, including (i) increasing the thickness of the tail section near the lower knuckle pulling lug, (ii) increasing the thickness of the knuckle section between the throat and the backside of the knuckle, and (iii) increasing the diameter of the knuckle pin hole.

In November 2023, the AAR also directed domestic producers to return immediately to producing AAR-approved knuckles. [

]. Despite the AAR's insistence on a prompt transition back to the production of approved components, [

]. The only reasonable explanation [         ] is that the design changes were so significant that M&T had likely altered or even discarded the original physical toolings used to form the cavity in the metal casting mold for AAR-approved knuckles.

Based on information collected in September 2023, [

].

## II. The Non-AAR-Approved Knuckles [ ].

Since the beginning of 2024, the relevant AAR committee [

] differences between the non-AAR-approved knuckles designed by M&T and AAR-approved knuckles:

- Non-AAR-approved knuckles cause premature failures in other FRC components. Notably, they have caused considerable damage to coupler bodies with which they were sold as a fit or paired as a replacement knuckle. Studies show that the pulling lugs on a coupler body used with non-AAR-approved knuckles appear to wear three times as fast. The failure rate of coupler bodies used with non-AAR-approved knuckles could be over **30 times higher** than the failure rate of coupler bodies used with AAR-approved knuckles. The service life of a coupler body is typically four times longer than that of an AAR-approved knuckle, but on some cars equipped with non-AAR-approved knuckles, TTX has replaced 2.5 times more coupler bodies than non-AAR-approved knuckles.

- As M&T emphasized in its testimony to the Commission, the industry designed the knuckle to be the "fuse" of the FRC system—the component that is intended "to fail before everything else." *See FRC II* Staff Conf. Tr., PR61 at 47 (Mr. Mautino for M&T). This is because broken knuckles are easier to replace on line of road. M&T's design, however, shifted the loading of stress from the knuckle to the coupler body, making it the new fuse of any FRC system using non-AAR-approved knuckles. [
    ]
  because broken coupler bodies—which are heavier and more expensive than knuckles—can only be replaced by sending a mechanical road truck or by taking the railcar out of service.

- M&T's design creates additional longitudinal motion, which increases slack in the FRC system. [
    ].

- To improve coupler body reconditioning, performance, and safety, the industry developed a gauge for reconditioners to measure the wear on a coupler body and determine if it is too worn to return to service. The industry used the coupler body

6

wear patterns typically caused by AAR-approved knuckles to develop this gauge. M&T's knuckle design changed the wear pattern on coupler bodies and made the newly developed gauge ineffective for use with couplers that have been paired with non-AAR-approved knuckles. [

].

- M&T's new knuckle design loads the nose of the opposing knuckle, not the pulling face—the surface that is designed to be load-bearing. This shift in loading patterns away from the pulling face causes damage to the nose of AAR-approved knuckles when they are used together with a non-approved M&T knuckle.

[



]. Due to the lack of necessary information, the industry [



].

## III. The Domestic Industry's Material Fraud and Misstatements During the *FRC II* Investigations Require a Remand by this Court for the ITC to Reconsider its Prior Determination.

In July 2023, the Commission issued an affirmative injury determination in *FRC II*. Since then, the AAR has discovered new evidence establishing that the ITC's *FRC II* proceeding was tainted by material fraud and the omission of material facts by the domestic industry regarding the knuckles and coupler assemblies that it produced and sold throughout the POI. The ITC must have an opportunity to reconsider its *FRC II* determination, pursuant to its inherent authority to reconsider determinations for the integrity of its proceedings. Before it can do so, this Court must stay the pending appeal and remand the determination back to the ITC for the agency to resume jurisdiction over the matter.

### A.  The Commission Has the Authority to Reconsider its Affirmative Injury Determination.

Courts have long held that administrative agencies have the inherent authority to reconsider their prior decisions. The D.C. Circuit has explained that "{i}t is well settled that, even where Congress has provided no explicit mechanism for agency reconsideration, statutes that authorize agencies to act are also presumed to empower those agencies to reconsider their actions." *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 93 (D.C. Cir. 2014). Indeed, "{t}he power to reconsider is inherent in the power to decide." *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950). The power to reconsider "does not depend on statutory authority." *Prieto v. United States*, 655 F. Supp. 1187, 1191 (D.D.C. 1987).

The Commission has recognized that this inherent authority applies to its ability to reconsider its own prior material injury determinations. *Ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela*, Inv. Nos. 303-TA-23, 731-TA-566-570, 731-TA-641, USITC Pub. 3218 (Aug. 1999) (Reconsideration), at 6-7 ("*Ferrosilicon* Reconsideration Determination"). The Commission can, under "extraordinary circumstances," reconsider its original determinations. *Id.* at 8. This Court expressly held that the Commission's AD/CVD investigations are within the scope of this reconsideration authority, determining "that the ITC renders its final determinations in a quasi-adjudicative manner." *Elkem Metals Co. v. United States*, 193 F. Supp. 2d 1314, 1320 (Ct. Int'l Trade 2002). This Court has since reiterated that the Commission has the inherent authority to reconsider its own determinations. *Consolidated Fibers, Inc. v. United States*, 465 F. Supp. 2d 1338, 1343 (Ct. Int'l Trade 2006).

### B. Before the Commission Can Reopen its Proceedings for Potential Reconsideration, the Court Must First Remand the Investigation.

When an agency decision is on appeal, the Court must first remand the case back to the agency for the agency to decide whether reconsideration is proper. Although there is "no reason why" the pendency of an appeal would impact an agency's ability to reconsider its prior determination upon a discovery of fraud, the case must be remanded for the agency to assume jurisdiction over it. *Home Products Int'l, Inc. v. United States*, 633 F.3d 1369, 1377 (Fed. Cir. 2011); *see also Pirelli Tyre Co. v. United States*, 539 F. Supp. 3d 1257, 1261-62 (Ct. Int'l Trade 2021). The Federal Circuit has explained that there is "no reason why parties other than the administrative agency cannot also request reopening or a remand for the consideration of new and material evidence." *Home Products Int'l, Inc. v. United States*, 633 F.3d 1369, 1378 (Fed. Cir. 2011).

Strato is an interested party that has appealed the Commission's underlying material injury determination. In light of the new evidence that emerged following the Commission's determination, Strato now requests that the Court remand the investigation back to the Commission for it to analyze how the new and material evidence regarding the domestic industry's fraudulent representations of the interoperability and AAR-approved status of their knuckles and fits impact the affirmative injury determination. A remand is imperative for the Commission to consider the new evidence that TTX Company and Strato have compiled in **Appendix A** and to reconsider its affirmative injury determination.

### C. Clear and Convincing Evidence Demonstrates that the Domestic Industry Tainted the Underlying Investigation Through Material Fraud.

The Federal Circuit has provided a clear standard for the CIT to use when considering whether to remand an AD/CVD investigation for reconsideration. In *Home Products Int'l v.*

*United States*, the Federal Circuit considered the CIT's decision not to remand a decision back to the Department of Commerce ("Commerce") for reconsideration when new evidence came to light of material fraud that had tainted the underlying administrative review. 633 F.3d 1369 (Fed. Cir. 2011). In *Home Products*, the third administrative review proceeded during the pendency of an appeal to the CIT of Commerce's decision from the second administrative review. In the third administrative review, new evidence was uncovered that suggested that the respondent in the underlying investigation "had submitted falsified documents to Commerce during the third administrative review." *Id.* at 1372. Commerce concluded that certificates of origin bearing similar irregularities had also been submitted during the second administrative review that was under appeal. *Id.* at 1374-75. The Federal Circuit reversed the CIT's holding that it could not remand based on evidence outside of the administrative record under review, concluding that in instances of "new evidence indicating that the original record was tainted by fraud, reopening {the record} may be appropriate." *Id.* at 1379. When a party submits "clear and convincing new evidence sufficient to make a prima facie case that the agency proceedings under review were tainted by material fraud," then the CIT abuses its discretion if it does not order a remand for the agency to reconsider its decision in light of the new evidence. *Id.* at 1378. This Court has since applied this standard in cases where the underlying agency investigation may have been tainted by fraud. *Pirelli Tyre Co. v. United States*, 539 F. Supp. 3d 1257, 1261-62 (Ct. Int'l Trade 2021).

There is clear and convincing new evidence here that the Commission's affirmative injury determination in *FRC II* was tainted by material fraud. Domestic producers withheld the material fact that they were producing and selling newly designed, non-AAR-approved knuckles prior to and throughout the POI. Moreover, M&T repeatedly misrepresented to the Commission that its knuckles and fits were made to AAR specifications and therefore were interchangeable

10

with subject imports. *See, e.g.*, Hearing Tr., PR144 at 27-28 (Mr. Lefevre) ("These products are all interchangeable. They're built to be that way . . . . **{I}n the end the relevant standard is whether it meets AAR specifications**.") (emphasis added); *id.*, PR144 at 14, 19 (Mr. Mautino) ("It is my understanding that the Commission fully understands how freight rail couplers are made, and that **all rail couplers sold in the United States are produced to AAR standards**, and are designed to be interchangeable so that any coupler can be attached to any rail car . . . . **The finished product has to meet the AAR standards** regardless of how their mold is made. **All AAR certified couplers are interoperable, interchangeable, and substitutable**.") (emphases added); *see also* Petition Vol. I, PR1 at 9-10; M&T Prehearing Br., PR136 at 15, 28-30, 37, Ex. 17 ¶ 9; M&T Posthearing Br., PR155, Ex. 1 at 57-58, Ex. 4 ¶ 2; M&T Final Comments, PR181 at 5.

In reaching the affirmative injury determination, the Commission repeatedly relied on a false premise that all FRCs sold in the United States over the POI were made to AAR specifications and thus were interchangeable. This false premise tainted the Commission's analyses of domestic like product, cumulation, substitutability, and price effects:

- **Domestic Like Product**: The Commission found a single domestic like product consisting of all FRCs within the scope, *i.e.*, FRCs that meet or exceed AAR M-211 or M-215 specifications. Views, PR190 at 7, 11. The Commission included domestically produced knuckles and complete coupler assemblies in the domestic like product because the Petitioner misrepresented that the domestically produced knuckles and complete fits meet all AAR specifications.

- **Cumulation**: The Commission cumulated subject imports from China and Mexico after finding that subject imports from these countries are generally fungible with the domestic like product and each other. The Commission relied on the falsity that "{a}ll FRCs from subject and domestic sources are manufactured in accordance with AAR standards to ensure FRCs in the United States are interoperable." Views, PR190 at 25.

- **Conditions of Competition—Substitutability**: The Commission found "a moderately high to high degree of substitutability between domestically produced

11

FRCs and subject imports." Views, PR190 at 33. This conclusion rested on the falsity that "all FRCs and in-scope components are subject to manufacturing and safety standards set by the AAR, regardless of source." *Id.*, PR190 at 35. If M&T's non-AAR-approved design and related performance issues had been disclosed, the record on substitutability and the decisions of purchasers during the POI would have looked very different. The Commission also discounted the importance of the Bedloe technology, which Respondents argued was an important non-price purchase factor, citing no differences between Bedloe and non-Bedloe FRCs in terms of "AAR certification." *Id.*, PR190 at 34, n.182.

- **Price Effects**: In finding significant price effects during the POI, the Commission noted that "{o}ver half of the underselling by volume" consisted of pricing product 3, *i.e.*, E50 knuckles produced to AAR M-211 or M-215 standards. *Id.*, PR190 at 41, n.227. This means the Commission found significant underselling by comparing prices of imported pricing product 3 with prices of domestically produced knuckles that for at least two-thirds of the POI did not qualify as pricing product 3 because they were not produced to AAR standards. Data on pricing products 1 and 2, complete assemblies with both coupler body and knuckle, suffer from the same fatal flaw.

- **Other Findings Based on Data from Domestic Producers**: The Commission collected capacity, production, shipments, and inventory data from domestic producers, *see generally* U.S. Producers' Questionnaire, PR105, all of which should have been limited to FRCs that meet AAR specifications, **as required in the scope of the investigations**, *id.*, PR105 at 2. The fact that the domestic industry did *not* manufacture knuckles or complete assemblies to AAR specifications across the POI renders unreliable all findings of the Commission that were based on data collected from the domestic industry and from purchasers unaware that they had purchased non-AAR-approved knuckles or complete assemblies from the domestic industry.

Because Plaintiff has presented clear and convincing new evidence sufficient to establish a prima facie case that the Commission's affirmative injury determination in *FRC II* was tainted by material fraud, the Court must—pursuant to the Federal Circuit's standard in Home Products—remand the matter to the agency for the Commission to reconsider its prior determination in light of this new evidence.

Dated:  January 31, 2025

           Respectfully submitted,

           */s/ James M. Smith*

           James M. Smith
           Shara L. Aranoff
           Sooan (Vivian) Choi
           Wanyu Zhang
           John Catalfamo
           COVINGTON & BURLING LLP
           850 10th Street, NW
           Washington, D.C. 20001
           202.662.5550
           jmsmith@cov.com

           *Counsel for Strato Inc.*

           */s/ Andrew T. Schutz*
           Andrew T. Schutz
           Ned H. Marshak
           GRUNFELD, DESIDERIO, LEBOWITZ
           SILVERMAN & KLESTADT LLP
           1201 New York Ave., NW, Suite 650
           Washington, D.C. 20005
           202.783.6881
           aschutz@gdlsk.com

           *Counsel for Strato Inc.*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |  |
|---|---|---|
| WABTEC CORPORATION and STRATO INC., | : | |
| Plaintiff/Consolidated Plaintiff, | : | Consol. Court No. 23-00157 |
| v. | : | |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| COALITION OF FREIGHT COUPLER PRODUCERS, | : | |
| Defendant-Intervenor. | : | |

## ORDER

Upon consideration of the Motion for Remand to Agency for Reconsideration filed by Strato, Inc. ("Strato"), and upon all other papers and proceedings herein, the Court

ORDERS that Strato's Motion is granted; and further

ORDERS that this matter is remanded to the U.S. International Trade Commission for it to reconsider its affirmative injury determination in *Certain Freight Rail Couplers and Parts Thereof from China*, 88 Fed. Reg. 43,398 (July 7, 2023).

SO ORDERED.

_____
Gary S. Katzmann, Judge

Dated: _____, 2025
New York, New York