**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

WABTEC CORPORATION and STRATO INC.,

        **Plaintiff/Consolidated Plaintiff**

   v.

UNITED STATES,

        **Defendant,**

   **and,**

COALITION OF FREIGHT COUPLER PRODUCERS,

        **Defendant-Intervenor.**

**Before: Hon. Gary S. Katzmann, Judge**

**Court No. 23-00157**

---

**RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD AND OPPOSITION TO MOTION FOR REMAND**

Daniel B. Pickard, Esq.
Claire M. Webster, Esq.

Buchanan Ingersoll & Rooney PC
1700 K Street, NW, Suite 300
Washington, DC 20006
(202) 452-7000

*Counsel to Coalition of Freight Coupler Producers*

Dated: March 17, 2025

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD ...................... 1

I. RULE 56.2 STATEMENT ................................................................................................. 1

  A.  Administrative Decision Under Review ......................................................................... 1

  B.  Issues Presented and Summary of Argument ................................................................. 1

II. STATEMENT OF FACTS ................................................................................................. 4

III. STANDARD OF REVIEW .............................................................................................. 5

IV. ARGUMENT ..................................................................................................................... 6

  A.  The Commission Was Obligated to Proceed with an Investigation Initiated by the
Department of Commerce ..................................................................................................... 6

    1.    The Commission Does Not Have Discretion Regarding Whether to Initiate an
Investigation ......................................................................................................................... 6

    2.    The Underlying Investigation Was a New Case, Factually Distinct from the
Investigation Into Coupler Systems ..................................................................................... 7

    3.    Section 751(b)(4) Does Not Apply to Original Investigations ...................................... 9

  B.  The Commission's Decision to Include  [          ] in the Domestic Industry Was
Supported by Substantial Evidence and in Accordance with the Law ................................. 15

    1.    The Commission's Determination to Include  [          ] in the Domestic Industry
Was Supported by Substantial Evidence ............................................................................. 15

    2.    The Underlying Investigation and the Coupler Systems Investigation Are Distinct and
Were Accorded Separate and Appropriate Treatment by the Commission .......................... 21

  C.  The Commission Properly Cumulated Imports from China and Mexico in the Underlying
Investigation ......................................................................................................................... 23

  D.  The Commission's Finding of Material Injury by Reason of Subject Imports Is Supported
by Substantial Evidence and in Accordance with the Law ................................................... 24

    1.    The Commission's Price Effects Analysis Is Supported by Substantial Evidence and in
Accordance with the Law ..................................................................................................... 24

2.  The Commission's Causation Analysis Was Supported by Substantial Evidence and in Accordance with the Law ................................................................................. 29

E.  Plaintiffs Do Not Have Standing to Raise the Issue of an Alleged Conflict of Interest ... 36

OPPOSITION TO MOTION FOR REMAND ........................................................................ 40

I. THE FRAUD ALLEGATION SHOULD BE VIEWED IN THE CONTEXT OF THE PREVIOUS MULTIPLE MISCONDUCT ALLEGATIONS BY RESPONDENTS THAT HAVE BEEN PROVEN TO BE MERITLESS .................................................................... 40

II. THE FRAUD ALLEGATION IS NOT PROPERLY BEFORE THE COURT ................. 47

A.  Jurisdiction of the Court of International Trade ................................................ 47

B.  The Issue of Alleged Fraud in the Investigation Could Have Properly Been Raised in this Proceeding with Amendment of Plaintiffs' Complaint .......................................... 48

C.  The Matter Is Not Ripe for the Court's Review ................................................ 49

D.  The Matter Is Not Proper for a Remand ........................................................ 50

III. NO FRAUD HAS OCCURRED ............................................................................. 52

A.  The Design Modification of the E-Type Knuckle Was Known to Both Petitioner and Respondents in the Commission's Investigation ................................................... 53

B.  Contemporaneous Evidence Shows AAR Had Knowledge and Approved of McConway's E-Type Knuckles as Meeting Relevant Standards ............................................... 53

C.  Plaintiffs' Motion for Remand Fails to Meet the Clear and Convincing Evidence Standard Required to Send this Issue to the ITC ............................................................... 66

CONCLUSION .................................................................................................... 69

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)............................................................ 49, 50

*Aspects Furniture Int'l, Inc. v. United States*, 510 F. Supp. 3d 1353 (C.I.T. 2021) .................... 39

*Borden v. United States*, 593 U.S. 420 (2021)............................................................................ 13

*Buildex Inc. v. Kason Industries, Inc.,* 849 F.2d 1461 (Fed.Cir.1988) ......................................... 68

*Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319 (Fed. Cir. 2008) ................. 37

*Changzhou Trina Solar Energy v. U.S. International Trade Commission*, 100 F. Supp. 3d 1314,
(C.I.T. 2015) ............................................................................................................................ 17

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...................................................................... 37

*Colorado v. New Mexico*, 467 U.S. 310 (1984)...................................................................... 67, 68

*Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Fed. Cir. 2002) ........................................... 7

*Elkem Metals Co. v. United States*, 193 F. Supp. 2d 1314, 26 C.I.T. 234 (2002) ....................... 51

*FAA v. Cooper*, 566 U.S. 284 (2012)......................................................................................... 13

*Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019)...................................... 14

*Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409 (Fed.Cir.1997) ............................ 39

*George v. McDonough*, 596 U.S. 740 (2022) ............................................................................. 12

*Georgetown Steel Corp. v. United States*, 801 F.2d 1308 (Fed. Cir. 1986)................................. 49

*Hall CA-NV, LLC v. Ladera Dev., LLC*, No. 318CV00124RCJWGC, 2020 WL 1033560 (D.
Nev. Mar. 2, 2020)................................................................................................................... 45

*Home Prods. Int'l, Inc. v. United States*, 633 F.3d 1369 (Fed. Cir. 2011) ................................. 67

*Humane Society of the United States v. Locke*, 626 F.3d 1040 (9th Cir. 2010)............................ 21

*LG Electronics, Inc. v. U.S. International Trade Commission*, 26 F. Supp. 3d 1338 (C.I.T. 2014)
.............................................................................................................................................. 17, 25

*Los Angeles Biomedical Research Inst. at Harbor–UCLA Med. Ctr. v. Eli Lilly and Co.*, 849 F.3d
1049 (Fed. Cir. 2017)............................................................................................................... 39

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................ 37, 38

*Marbury v. Madison*, 1 Cranch 137 (1803) ............................................................ 37

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003) ................................................ 50

*National Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) .............................. 12

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ........................................... 6

*Novolipetsk Steel Public Joint Stock Company v. United States*, 503 F. Supp. 3d 1329 (C.I.T. 2021) ............................................................................................................................. 38

*Perfectus Aluminum, Inc. v. United States*, 391 F. Supp. 3d 1341 (C.I.T. 2019) ......................... 40

*Pirelli Tyre Co., Ltd. v. United States*, 539 F. Supp. 3d 1257 (C.I.T. 2021) ............................... 48

*RZBC Group Shareholding Co., Ltd. v. United States*, 100 F. Supp. 3d 1288 (CIT 2015) ............ 7

*Thermacote Welco Co. v. United States*, 27 C.I.T. 32, 246 F. Supp. 2d 1327 (2003) ................. 49

*Timken Company v. United States*, 28 C.I.T. 277, 321 F. Supp. 2d 1361, 1372 (2004) ......... 21, 28

*Titanium Metals Corp. v. United States*, 155 F. Supp. 2d 750, 25 C.I.T. 648 (2001) ................. 14

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) ........ 11

*United States v. Borneo, Inc.*, 971 F.2d 244 (9th Cir.1992) .......................................................... 39

*United States v. New-Form Mfg. Co.*, 27 C.I.T. 905, 277 F. Supp. 2d 1313 (2003) .............. 39, 40

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................... 5

*Usinor v. United States*, 26 C.I.T. 767 (2002) ......................................................................... 21, 28

*Usinor v. United States*, 28 C.I.T. 1107, 342 F. Supp. 2d 1267 (2004) .......................................... 6

*Vicentin S.A.I.C. v. United States*, 42 F.4th 1372 (Fed. Cir. 2022) ............................................... 7

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................................... 37, 38

*XYZ Corporation v. United States*, 253 F. Supp. 3d 1257 (C.I.T. 2017) ...................................... 49

*Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d 1314 (C.I.T. 2017) ................. 48

**Statutes**

19 U.S.C. § 1335 ............................................................................................................................. 14

19 U.S.C. § 1516a(b)(1)(B)(i) ......................................................................................................... 5

19 U.S.C. § 1675(b) .................................................................................................... 11

19 U.S.C. § 1675(b)(1)(A)–(B) ..................................................................................... 9

19 U.S.C. § 1675(b)(2) ................................................................................................ 10

19 U.S.C. § 1677(4)(B)(i) ........................................................................................... 15

19 U.S.C. § 1677(7)(C)(iii) .......................................................................................... 32

19 U.S.C. § 1677(7)(G)(i) ............................................................................................ 23

19 U.S.C. § 1677(7)(G)(ii) ........................................................................................... 23

19 U.S.C. § 1677(7)(I) ................................................................................................. 25

19 U.S.C. §§ 1671, 1673 ............................................................................................... 7

19 U.S.C. §§ 1671c, 1673c ............................................................................................ 7

28 U.S.C. § 2639(a)(1) ................................................................................................... 5

28 U.S.C. §§ 1581 – 1585 ........................................................................................... 47

## Regulations

19 C.F.R. § 207.45 ....................................................................................................... 12

## Rules

Fed. R. Evid. 201(b) .................................................................................................... 39

## Administrative Determinations

*Certain Crystalline Silicon Photovoltaic Products from Taiwan: Notice of Preliminary Results of Antidumping Duty Changed Circumstances Review*, 84 Fed. Reg. 26,816 (Dep't Commerce June 10, 2019) ....................................................................................................... 10

*Certain Freight Rail Couplers and Parts Thereof from China*, 88 Fed. Reg. 43,398 (July 7, 2023) ...................................................................................................................................... 1

*Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682, 731-TA-1592, USITC Pub. 5438 (July 2023) (Final) ............................................................... 22

*Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138 (July 14, 2024) ................................ 8, 22

*Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 87 Fed. Reg. 64,440 (Oct. 25, 2022) ............................. 5

*Certain Pasta from Italy: Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 82 Fed. Reg. 26,777 (Dep't Commerce June 9, 2017) ................................................ 10

*Certain Tissue Paper from China*, Inv. No. 731-TA-1070B (Final), USITC Pub. 3758 (Mar. 2005) ............................................................................................................................ 16

*Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 86 Fed. Reg. 58,878 (Oct. 25, 2021).. 4

*Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 58,864 (Oct. 25, 2021) ................................................................................................................................ 9, 23

*Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670 and 731-TA-1570, Pub. 5331 (July 2022) (Final) ...................................................................... 29

*Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670, 731-TA-1570, USITC Pub. 5331 (July 2022) (Final) ................................................................ 8, 22

*Large Residential Washers from Korea and Mexico*, Inv. Nos. 701-TA-488 and 731-TA-1199-1200 (Final), USITC Pub. 4378 (Feb. 2013) .......................................................... 16

*Polytetrafluoroethylene Resin from China and India*, USITC Inv. Nos. 701-TA-588 and 731-TA-1392-1393, Pub. 4801 (Final) .............................................................................. 20

*Procedures for the Conduct of Investigations of Whether Injury to Domestic Industries Results from Imports Sold at Less Than Fair Value or From Subsidized Exports to the United States*, 44 Fed. Reg. 76,458 (Dec. 26, 1979) ........................................................................ 14

**Constitutional Provisions**

U.S. Const. art. III, § 2, cl. 1 ....................................................................................... 37

**Legislative Matierals**

S. Rep. No. 96-249 (1979) ..................................................................................... 16, 17

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-826, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773 ............................ 16, 24, 25, 31

**Treatises**

Jerry Cohen & Matthew McCullough, International Trade Practice § 28:6 (Aug. 2024) ........... 12

**Other Authorities**

Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> (2012) ........ ...............................................................................................................................11, 13

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527 (1947). 13

Timothy Meyer, A New Era at the Court of International Trade: Endemic, Executive Orders, and Enforcement, 56 Vand. J. Transnat'l L. 983 (2023) ................................................................ 47

U.S. International Trade Commission, *Glossary: Changed Circumstances Reviews*, https://www.usitc.gov/glossary ................................................................................................ 12

## INTRODUCTION

On behalf of Defendant-Intervenor, the Coalition of Freight Coupler Producers, we hereby submit the following response to the August 16, 2024, brief in support of the motion for judgment on the agency record filed by plaintiff Wabtec Corporation and consolidated plaintiff Strato Inc., respectively (collectively, Plaintiffs). Pls.' Br. in Supp. of Pls.' Mot. for J. on the Agency R. (Aug. 16, 2024), ECF Nos. 44, 45, 46 (Pls. Br.), and opposition to Plaintiffs' motion for remand, ECF Nos. 51, 52 (Mot. for Remand). For the reasons discussed in this brief, in conjunction with those presented by Defendant United States, Defendant-Intervenor respectfully requests that this court reject the arguments raised by Plaintiff and Consolidated Plaintiff and affirm the final determination of the U.S. International Trade Commission (the Commission) in its investigation on *Freight Rail Couplers and Parts Thereof from the People's Republic of China*, and that this court dismiss Plaintiffs' motion for remand to the Commission.

## RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD

### I.    RULE 56.2 STATEMENT

#### A.    Administrative Decision Under Review

The administrative determination challenged in this appeal is U.S. International Trade Commission's Final Determination in the investigation into *FRCs from China*. *Certain Freight Rail Couplers and Parts Thereof from China*, 88 Fed. Reg. 43,398 (July 7, 2023) (Final Determination); *see* PR 189, PR 190, CR 178.

#### B.    Issues Presented and Summary of Argument

##### 1.    Did the Commission conduct an antidumping and countervailing duty investigation pursuant to a lawful initiation decision by the Department of Commerce?

Yes. The Commission conducted an antidumping and countervailing duty investigation following the Department of Commerce's initiation determination. Plaintiffs have asserted that the

Commission should have taken some measure of "control" over this proceeding to "preserve the integrity" of the proceeding. *See*. Pls. Br. at 18. However, the Commission does not decide whether an investigation is initiated, and it does not have unilateral authority to terminate an investigation. Plaintiffs further assert that the underlying investigation was improper on the grounds that it was a changed circumstances review of the prior Coupler Systems investigation. However, section 751 of the Tariff Act (the "Act") provides that changed circumstances reviews are a type of administrative review following an affirmative antidumping or countervailing duty investigation. The decision on appeal was a result of a new and distinct investigation and was not a result of a changed circumstances review.

### 2.    Did the Commission err in including a related party within the domestic industry?

No. The Commission's determination to include [          ] in the domestic industry was supported by substantial evidence and in accordance with the law. The Commission's Views tracked the five-factor test that it uses to determine whether to exclude a related party from the domestic industry. First, [          ] was the [          ] producer of the domestic like product. Second, [          ] was importing subject merchandise from Mexico in order to compete with other subject imports from China. Third, exclusion of [          ] would have skewed the data for the rest of the industry. Fourth, [          ] ratio of import shipments to U.S. production decreased throughout the POI. Fifth, [          ] primary interest, on its own admission, is in domestic production. Additionally, that the Commission's determination in this regard was not required to be consistent with its determination in the Coupler Systems investigation, as each Commission determination is *sui generis*.

    **3.**      **Did the Commission improperly cumulate subject imports from China and Mexico?**

No. The Commission was required to cumulate subject imports from China and Mexico because the petitions for each were filed on the same day, and the evidence demonstrated a reasonable overlap of competition. The exception for a terminated investigation does not apply, as no segment of the underlying investigation was terminated.

    **4.**      **Did the Commission err in reaching an affirmative material injury determination?**

No. The Commission's affirmative material injury determination was supported by substantial evidence and is in accordance with the law. Plaintiffs' arguments are based on the faulty assumption that the Coupler Systems investigation was binding precedent, combined with a disagreement as to the probative value of evidence that they wish the Commission relied on. There is substantial record evidence of both underselling and price suppression. There was substantial record evidence of causation, including that, while the condition of the domestic industry improved marginally at the end of the POI due in part to provisional duties from the Coupler Systems investigation, several key trade and financial indicators still showed that the domestic industry was in an injured state. Finally, as to Bedloe technology, most purchasers did not cite to it as an important purchasing factor, and Bedloe imports accounted for [            ] of total subject imports during the POI.

    **5.**      **Did the Commission err in refusing to address the Attorney's conflict of interest?**

No. Plaintiffs do not have standing to raise the issue of an alleged conflict of interest, as the plaintiff alleging a claim must have suffered an injury in fact as to that claim, and Plaintiffs acknowledge that <u>Amsted</u> asked the Commission to disqualify the Attorney but provide no nexus between themselves and any harm as a result of an alleged conflict of interest. Amsted has

dismissed all claims as to the existence of any conflict or any disqualification request. Indeed, the record demonstrated that Amsted had waived conflicts and agreed in writing to not request disqualification.

> **6.    Should the Court remand to the Commission on the grounds of alleged fraud in the underlying investigation?**

No. The matter is not properly before the Court, as the Court has jurisdiction only over appeals of agency action, and no agency action has yet been taken on this issue. The intent of a remand is for an agency to reconsider the record that was already before it, and the facts regarding this issue are not on the record. While the Commission does have the authority to reopen investigations due to fraud, there was no fraud relating to the issue of McConway & Torley selling allegedly unapproved knuckles. The Association of American Railroads ("AAR") approved McConway's knuckles annually throughout the years in which they were sold, and was aware of the design modification that McConway and other North American FRC producers had made. A commercial dispute that arose after the Commission's investigation is not fraud.  Nor has clear and convincing evidence been submitted of any fraud – because no fraud has occurred.

## II.    <u>STATEMENT OF FACTS</u>

To err on the side of clarity, and for the Court's benefit, Defendant-Intervenor provides the following additional facts that may be relevant to the Court in this case. *See* CIT R. 81(k).

The antidumping and countervailing duty petitions on Freight Rail Coupler Systems (coupler systems) from China were filed on September 29, 2021. *Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 86 Fed. Reg. 58,878 (Oct. 25, 2021). Commerce initiated its countervailing duty investigation into coupler systems from China on October 19, 2021. *Id.* The period of Commerce's investigation was January 1, 2020, through December 31, 2020. *Id.* at

58,879. That investigation covered freight rail coupler systems and certain components thereof, including knuckles, coupler bodies, *coupler yokes*, and *follower blocks*. *Id.* at 58,882 (emphasis added).

The antidumping and countervailing duty petitions on Certain Freight Rail Couplers and Parts Thereof (freight rail couplers or FRCs) from China and the antidumping duty petition on FRCs from Mexico were filed on September 28, 2022. *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 87 Fed. Reg. 64,440 (Oct. 25, 2022). Commerce initiated its countervailing duty investigation into FRCs from China on October 18, 2022. *Id.* at 64,441. The period of Commerce's investigation was January 1, 2021, through December 31, 2021. *Id.* That investigation covered certain freight railcar couplers, including knuckles and coupler bodies. *Id.* at 64,444. To avoid any uncertainty, while the previous case covered coupler systems, as well as subcomponents including yokes and follower blocks, the current investigation before this court did not include coupler systems, nor did it include yokes or follower blocks. Accordingly, to be more precise in the description of the different cases, this brief will refer to the previous case as "Coupler Systems," while the underlying investigation in this matter will be referred to as "FRCs."

## III.    <u>STANDARD OF REVIEW</u>

The court reviews the Commission's decisions to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla . . . {it is} such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). The Commission's decision is presumed to be correct, and the burden of proof rests on the party challenging the decision. 28 U.S.C. § 2639(a)(1). The court will defer to the Commission as long as there is an "adequate basis in support of the

Commission's choice of evidentiary weight." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006).

A plaintiff cannot ask the court to re-weigh the evidence on record. *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004). Factual findings by the Commission are afforded considerable deference. *See, e.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1354-55 (Fed. Cir. 2006).

## IV.   ARGUMENT

### A.   The Commission Was Obligated to Proceed with an Investigation Initiated by the Department of Commerce

#### 1.   The Commission Does Not Have Discretion Regarding Whether to Initiate an Investigation

The Department of Commerce, not the Commission, is the sole agency tasked with initiation of an investigation under the statute. Plaintiffs argue that the Commission failed to exercise its alleged "inherent authority to preserve the integrity of its proceedings." Pls. Br. at 18. Plaintiffs' brief is unclear on what action they would have had the Commission take to "control" this proceeding. They note that the Commission can reopen proceedings to address fraud and assert that this "inherent power naturally extends to guaranteeing the finality of its decisions when they are attacked or manipulated." Pls. Br. at 22.[1] Notwithstanding that there was no attack on the final determination in the Coupler Systems investigation, but rather a wholly new case filed for the Commission's prima facie consideration, Plaintiffs do not cite to any Commission authority to decline to initiate an investigation, nor any authority that would allow the Commission to unilaterally terminate an investigation once initiated.

---

[1] Defendant-Intervenor is aware that Plaintiffs have separately filed a motion for remand to the Commission due to alleged fraud in the underlying investigation. ECF Nos. 50, 51. Defendant-Intervenor will address those arguments below in its response to that motion.

The Commission does not have discretion regarding whether to initiate an investigation. That responsibility lies solely with the Department of Commerce. A petition functions like a civil complaint. *RZBC Group Shareholding Co., Ltd. v. United States*, 100 F. Supp. 3d 1288, 1296 (CIT 2015). Its purpose is to "propose an investigation." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002). The Department of Commerce determines whether to initiate an investigation based on the contents of the petition and subsequent pre-initiation questionnaires, and its involvement in an injury determination in an antidumping or countervailing duty investigation is limited to determining whether the Petitioner has alleged information regarding injury to a domestic industry sufficient to initiate an investigation. After the sufficiency threshold is met and an investigation is initiated, it is Commerce's province to determine whether subject merchandise is being sold at less than fair value in the United States and/or whether a foreign government has subsidized the production of subject merchandise that is sold in the United States, and the Commission's province to determine whether a domestic industry is injured as a result of subject imports. 19 U.S.C. §§ 1671, 1673; *see also, e.g.*, *Vicentin S.A.I.C. v. United States*, 42 F.4th 1372, 1375 (Fed. Cir. 2022). Additionally, the Tariff Act is clear that an investigation can be terminated only upon withdrawal of a petition by the petitioner. 19 U.S.C. §§ 1671c, 1673c. Accordingly, not only did Plaintiffs not cite any authority that would have allowed the Commission to "control" whether this investigation proceeded, but there is no such statutory authority for the Commission to exercise such "control." In short, Plaintiffs challenge the wrong agency as to the initiation decision and, for this reason, their argument must fail.

**2.    The Underlying Investigation Was a New Case, Factually Distinct from the Investigation Into Coupler Systems**

Defendant-Intervenor's petitions seeking relief from dumped and subsidized imports of FRCs from China and Mexico were neither an administrative nor a judicial review of a prior

antidumping or countervailing duty order, but instead were separate, new petitions, properly filed under 19 U.S.C. §§ 1671a(b) and 1673a(b). *See* PR1, CR1. The Commission's conduct of the investigations following Commerce's initiation was supported by substantial evidence and in accordance with the law.

The underlying Commission investigation on FRCs had a different POI and covered distinct products from the investigation on coupler systems. The Commission's investigation on FRCs from China <u>and</u> Mexico covered a POI of calendar years 2020, 2021, and 2022. *See, e.g.*, Final Staff Report, PR174, CR163 at C-3. This investigation covered FRCs, which were defined as certain freight railcar couplers and parts thereof. The Commission defined the domestic like product to be coextensive with the scope of the investigation. PR 190 at 11. According to the scope as initiated, and unchanged in Commerce's final scope determination, "{FRCs} are composed of two main parts: knuckles and coupler bodies but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors)." *See, e.g.*, *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138, 45,139 (Dep't Commerce July 14, 2024). In contrast, the Commission's investigation on coupler systems covered a POI of calendar years 2019, 2020, and 2021. *See Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670, 731-TA-1570, USITC Pub. 5331 (July 2022) (Final) at C-3. In that case the Commission also defined the domestic like product to be coextensive with the scope of the investigation. *Id.* at 8. The scope as initiated in the coupler systems investigation covered coupler systems, which are composed of, "at minimum, four main components (knuckles, coupler bodies, coupler yokes, and follower blocks . . .) but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors)." *See, e.g.*, *Freight Rail Coupler Systems and Certain Components Thereof*

*From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 58,864, 58,869 (Oct. 25, 2021). Accordingly, the FRCs investigation and the coupler systems investigation covered different POIs and different products. As there was different coverage of products, this also necessarily resulted in different U.S. production, market share, pricing analysis, and financial data reported in the FRCs investigation.

Plaintiffs' claim that the "sought review" of the Commission's decision regarding coupler systems is demonstrably false. *See* Pls. Br. at 7. Plaintiffs also do not point to any language indicating a request made by the Petitioner for Commerce or the Commission to review the prior determination. Indeed, the petition itself demonstrates that it was alleging distinct facts from the case on coupler systems: "Petitioner {previously} filed for antidumping and countervailing duty relief on imports of FRCs *systems* from China . . . ." PR1, CR1 at 5. Plaintiffs assert that "success {on the FRCs petitions} would necessarily entail nullifying the Commission's negative determination." Pls. Br. at 7. This is also contradicted by the language of the petition: "The current petition involves a modified scope as discussed below and the addition of Mexico as a subject country." PR1, CR1 at 6.

### 3.    Section 751(b)(4) Does Not Apply to Original Investigations

Plaintiffs essentially argue that this was a changed circumstances review of a negative Commission determination, which was prevented by 19 U.S.C. § 1675(b)(4). Pls. Br. at 20-22. Changed circumstances reviews are separate administrative proceedings filed at Commerce and the Commission after an antidumping or countervailing duty order has been imposed. Under the statute, Commerce and the Commission have the authority to review a *final affirmative antidumping or countervailing duty determination* when they receive information concerning changed circumstances sufficient to review such a determination. 19 U.S.C. § 1675(b)(1)(A)–(B) (emphasis added). The quintessential example of a changed circumstances review involves

Commerce's successor-in-interest analysis: whether a company that has acquired another company excluded from an existing order is subject to that order. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from Taiwan: Notice of Preliminary Results of Antidumping Duty Changed Circumstances Review*, 84 Fed. Reg. 26,816 (Dep't Commerce June 10, 2019); Issues and Decision Memorandum accompanying *Certain Pasta from Italy: Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 82 Fed. Reg. 26,777 (Dep't Commerce June 9, 2017).

The types of Commission decisions that are subject to a changed circumstances review are provided for in 19 U.S.C. § 1675(b)(2), which states:

> In conducting a review under this subsection, the Commission shall—
>
> (A) *in the case of a countervailing duty order or antidumping duty order* or finding, determine whether revocation of the order or finding is likely to lead to continuation or recurrence of material injury,
>
> (B) in the case of a determination made pursuant to section 1671c(h)(2) or 1673c(h)(2) of this title, determine whether the suspension agreement continues to eliminate completely the injurious effects of imports of the subject merchandise, and
>
> (C) *in the case of an affirmative determination* resulting from an investigation continued under section 1671c(g) or 1673c(g) of this title, determine whether termination of the suspended investigation is likely to lead to continuation or recurrence of material injury.

19 U.S.C. § 1675(b)(2) (emphases added). The plain text of the statute confirms that the Commission may conduct reviews as to antidumping orders, suspension agreements, and affirmative determinations, none of which were present here.[2] As Plaintiffs concede, there was no affirmative determination of injury in the investigation they claim that the underlying petition

---

[2] If the petition was a request to review a Commission determination, the Commission's regulations would have required the Petitioner to file its review request only at the Commission. *See* 19 U.S.C. § 1675(b)(2).

sought to review. *See* Pls. Br. at 10. Nonetheless, they claim that, because paragraph (4) is not limited to review "under this subsection," it applies to any determination, including the Commission's negative injury determination in the Freight Coupler Systems investigation. *Id.* at 19. The Supreme Court has found that statutory construction is a "holistic endeavor." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). Plaintiffs appear to have fallen into a common pitfall of statutory interpretation. "Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 167 (2012).

Accordingly, section 751 of the Tariff Act should be read as a whole. The title of the subsection (b) of that statute is "Reviews Based on Changed Circumstances." 19 U.S.C. § 1675(b). Each subheading under subsection (b) relates back to the title "Reviews Based on Changed Circumstances." Subheading (1) is "In General," subheading (2) involves "Commission Review," subheading (3) involves the "Burden of Persuasion," and subheading (4) provides a "Limitation on Period for Review." *Id.* This "limitation of period for review" refers, then, to "reviews based on changed circumstances."

"Changed circumstances" is a term of art in Commerce and Commission practice, referring to these "changed circumstances reviews" and associated administrative procedures. The term of art is defined in the Commission's own glossary of terms: "Changed circumstances reviews are made by the U.S. Department of Commerce and/or the {Commission} with respect to final affirmative determinations that resulted in a countervailing duty order or antidumping duty order." U.S. International Trade Commission, *Glossary: Changed Circumstances Reviews*,

https://www.usitc.gov/glossary. The Commission's regulations provide procedures for investigations of changed circumstances reviews, which reiterate that such reviews are only made of outstanding, or previous affirmative, determinations. *See* 19 C.F.R. § 207.45. This is supported by the treatise on International Trade Practice:

> Parties may request the International Trade Commission . . . to conduct a changed circumstance review of an antidumping or countervailing duty order whenever they believe that circumstances have changed such that the injury, or threat of injury, which underlay the original antidumping or countervailing duty order, no longer exists.

Jerry Cohen & Matthew McCullough, International Trade Practice § 28:6 (Aug. 2024). Here Plaintiffs' argument is that this was in fact an impermissible changed circumstance review of a previous negative Commission determination, however neither the statute, nor Commerce's regulations, nor the Commission's regulations provide for a review of a negative Commission determination.

While the title of a statute may not "override" the plain meaning of the statute's text, plain meaning should be construed within the meaning of the terms of art that a statute contains. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *National Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007). Here, Plaintiffs understate the treatment of the term of art, "changed circumstances," encouraging this Court to adopt a meaning of the term that is contrary to the context of how it is used in practice and the language of the statute. Pls. Br. at 17. Indeed, it is a longstanding principle in American jurisprudence that, where Congress employs a term of art obviously transplanted from another legal source, it "brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746-47 (2022). In *George*, the Supreme Court quoted from a lecture delivered by Justice Frankfurter in 1947, in which he stated: "The peculiar idiom of

business or of administrative {practice} often modifies the meaning that ordinary speech assigns to language. And if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).

> This principle has held true since Justice Frankfurter's oration:

> Every field of serious endeavor develops its own nomenclature – sometimes referred to as *terms of art*. Where the text is addressing a scientific or technical subject, a specialized meaning is to be expected . . . . And when the law is the subject, ordinary legal meaning is to be expected, which often differs from common meaning.

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 73 (2012). That is, the usage of a term itself suffices to adopt the cluster of ideas that were attached to each borrowed word in the absence of indication to the contrary. *See FAA v. Cooper*, 566 U.S. 284, 292 (2012). Here, the meaning of "changed circumstances" before the Department of Commerce and the International Trade Commission is consistent with "changed circumstances reviews," which have their own purpose and administrative procedures.

Plaintiffs rely on *Borden v. United States* for the proposition that terms of art must appear in a governing statute to be valid. *See* Pls. Br. at 20-21; *see also Borden v. United States*, 593 U.S. 420, 435 (2021). The Supreme Court's discussion in *Borden* is not as broad as Plaintiffs would have this Court believe. In *Borden*, the Supreme Court plurality discussed the dissent's finding of a term of art in a disputed statute, in which it found that the dissent "plucked out three words . . . appended them to a statutory phrase . . . with which they are not often associated {and} put the combination into a substantive criminal statute – all to signify . . . a term of art indifferent to *mens rea* {the issue at bar}." *Id.* at 436. In discussing the issue, the Supreme Court noted that the term

of art to which the dissent was pointing, "cannot have a traditional or commonplace meaning in statutes specifying criminal conduct: It does not appear in them in the first place." *Id.*

The Supreme Court's opinion also cites to *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019), in which the Court struck down a reading of a "rearrange{ment}" of a statute to create a term of art. *Id.* at 438. However, in neither *Borden* nor *Food Marketing* were there also administrative agency regulations interpreting the relevant statutes at issue in understanding the alleged terms of art. In contrast, here, the "Commission is authorized to adopt such reasonable procedures and rules and regulations as it deems necessary to carry out its functions and duties." 19 U.S.C. § 1335. The Commission did so and promulgated 19 C.F.R. section 207.45 to "implement{} section 751 of the Act which provides for the Commission to review a determination concerning an agreement to suspend an investigation or a determination concerning injury to a domestic industry upon the receipt of information showing changed circumstances." *Procedures for the Conduct of Investigations of Whether Injury to Domestic Industries Results from Imports Sold at Less Than Fair Value or From Subsidized Exports to the United States*, 44 Fed. Reg. 76,458, 76,467 (Dec. 26, 1979).

Furthermore, this Court has used the term "changed circumstances review" in numerous opinions, and in none of those cases was there a changed circumstances review of a negative ITC determination. *See, e.g.*, *Titanium Metals Corp. v. United States*, 155 F. Supp. 2d 750, 753, 25 C.I.T. 648 (2001) (appeal of the Commission's determination to revoke antidumping and countervailing duty orders pursuant to a changed circumstances review). Nor have Plaintiffs cited to any case of this Court or the Court of Appeals for the Federal Circuit ("Court of Appeals" or "CAFC") that supports its novel and unfounded interpretation.

Put simply, this matter involved a subsequent petition for initiation of a new antidumping investigation covering different products and a different POI. While Plaintiffs alleged that this was really a request for a changed circumstances review of previous negative Commission determination, this could not be the case as the statute does not even provide for a review of Commission negative determinations.

**B.      The Commission's Decision to Include  [              ] in the Domestic Industry Was Supported by Substantial Evidence and in Accordance with the Law**

**1.      The Commission's Determination to Include  [              ] in the Domestic Industry Was Supported by Substantial Evidence**

The Commission's practice is typically to define the domestic industry as all producers of the domestic like product. *See* PR 187 at 17. However, Section 771(4)(B)(i) of the Tariff Act provides that:

> If a producer of a domestic like product or an exporter or importer of the subject merchandise are related parties, or if a producer of the domestic like product is also an importer of the subject merchandise, the producer may, in appropriate circumstances, be excluded from the industry.

19 U.S.C. § 1677(4)(B)(i). A producer and an exporter or importer are considered related parties if:

(i)      the producer directly or indirectly controls the exporter or importer,
(ii)     the exporter or importer directly or indirectly controls the producer,
(iii)    a third party directly or indirectly controls the producer and the exporter or importer, or
(iv)     the producer and the exporter or importer directly or indirectly control a third party and there is reason to believe that the relationship causes the producer to act differently than a nonrelated producer.

*Id.* § 1677(4)(B)(ii). The legislative history of the "related party" provision, as well as Commission practice, are instructive in understanding the purpose of exclusion or inclusion of a related party from the domestic industry. The legislative history of the Trade Agreements Act of 1979 states that, "{w}here a U.S. producer is related to a foreign exporter and the foreign exporter directs his

exports to the United States so as not to compete with his related U.S. producer, this should be a case where the ITC would not consider the related U.S. producer to be a part of the domestic industry." S. Rep. No. 96-249 at 83 (1979). Furthermore, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act makes clear that the Commission uses this statutory provision to "reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-826, vol. 1 at 858 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 4190 ("SAA").

The Commission has previously found – and this Court has affirmed – that a related party should not necessarily be excluded only on the grounds that it is a significant importer of subject merchandise or became a significant importer during the POI. In *Certain Tissue Paper from China*, the Commission found that:

> {E}xclusion may not be warranted simply because a large producer (that was also a related party) has shifted to become a substantial importer of such merchandise during the period of investigation. A significant factor is whether the firm's domestic production operations significantly benefitted financially from its relationship to subject imports or from its import activities. Such benefits create the sort of data distorting effect that the exercise of discretion to exclude under the related party provision seeks to overcome.

*Certain Tissue Paper from China*, Inv. No. 731-TA-1070B (Final), USITC Pub. 3758 (Mar. 2005) at 11-12. Similarly, in *Large Residential Washers from Korea and Mexico*, the Commission found that a firm's "current interest is not in domestic production is an insufficient basis by itself to warrant exclusion as a related party in these investigations." *Large Residential Washers from Korea and Mexico*, Inv. Nos. 701-TA-488 and 731-TA-1199-1200 (Final), USITC Pub. 4378 (Feb. 2013) at 12-13. The Court affirmed the Commission's determination in *Large Residential Washers*, finding that to exclude a domestic producer would mask declines in the domestic industry

during the POI. *LG Electronics, Inc. v. U.S. International Trade Commission*, 26 F. Supp. 3d 1338,

1344-47 (C.I.T. 2014).

The Commission typically applies a five-factor test to determine whether to exclude a

domestic producer from the domestic industry:

> (1) the percentage of domestic production attributable to the importing
> producer;
>
> (2) the reason the U.S. producer has decided to import the product subject to
> investigation;
>
> (3) whether the inclusion or exclusion of the importing producer will skew the
> data for the rest of the industry;
>
> (4) the ratio of import shipments to U.S. production for the importing producer;
> and
>
> (5) whether the primary interest of the importing producer lies in domestic
> production or importation.

*See Changzhou Trina Solar Energy v. U.S. International Trade Commission*, 100 F. Supp. 3d 1314,

1329 (C.I.T. 2015). The Commission is not required to make findings as to each factor. *Id.*

Plaintiffs claim that the Commission misconstrued the related party legal standard and that

its final determination focused on whether the "related party is generally 'shielded' from import

competition" and claimed that it applied a "new, ad hoc test" in determining whether to exclude

[        ] from the domestic industry. Pls. Br. at 25, 28. Indeed, the Commission's review of

the relevant record data tracked its longstanding five-factor test to determine whether the exclusion

or inclusion of [        ] would distort the data for the domestic industry. *See* Views, PR190 at

21-22, CR178 at 23. The legislative history explains that, "where a U.S. producer is related to a

foreign exporter and the foreign exporter directs his exports to the United States so as not to

compete with his related U.S. producer, this should be a case where the ITC would not consider

the related U.S. producer to be part of the domestic industry." S. Rep. No. 96-249 at 83 (1979).

17

Effectively, when a foreign exporter intentionally exports to the United States to protect – or shield – its related U.S. company from injury, in that instance the Commission may exclude that U.S. producer from the U.S. industry. However, pursuant to the Commission's five-factor test, that is not the instance here.

First, [          ] was a significant producer of the domestic like product during the POI. It was the [              ] U.S. producer of FRCs, PR187, CR174 at VI-2, representing [          ] percent of domestic production in 2021, [          ] percent in 2022, and [          ] percent in 2023. *Compare* PR187, CR174 at C-4 *with id.* at C-6. This was consistent with arguments [              ] made in its own post-conference brief before the Commission. In that brief, it noted that it represented between [          ] and [          ] percent of domestic production during the preliminary POI, and that this weighed in favor of <u>inclusion</u> in the domestic industry. *See* PR57, CR59 at 10-11.

Second, [          ] made the reason for its importation of FRCs from Mexico clear to its workers: so it could compete with Chinese imports. Views, PR190 at 19, CR178 at 20. Contrary to Plaintiffs' arguments that the Commission's statement that [          ] reasons for importation were "a polite way of saying the firm benefits from the alleged LTFV sales," Pls. Br. at 25, the record included substantial evidence that [          ] domestic production suffered during the POI at a time when its Mexican sales were flourishing. Specifically, "the record indicates that, rather than complementing its domestic production with subject imports from Mexico, [          ] was increasingly substituting [          ] from Mexico for its domestic production of the same FRC products." Views, PR190 at 19, CR178 at 20. Importantly, the Commission's Views also noted that, [          ] used its Mexican facility as a lower priced alternative to U.S. production. According to a supply agreement [

18

]. *See* Views, PR190 at 21, CR178 at 22; PR187, CR174 at F-5.

Third, exclusion of [          ] would have skewed the data for the rest of the domestic industry. [          ] trade and production data demonstrated that its domestic operations were experiencing injury alongside the rest of the domestic industry. Its "domestic operations . . . suffered an overall decline in its shipments and market share during the POI, and notably lost share to subject imports from Mexico from 2020 to 2021." Views, PR190 at 21, CR178 at 22. The Commission's Final Staff Report shows that domestic industry data with [          ] excluded masks injury to the domestic industry. For example, [          ] unit values for its Mexican imports were consistently lower than those of its sales of the domestic like product. *Id.*, PR190 at 20 n.92, CR178 at 21. Additionally, [          ] operating income to net sales ratio, cost of goods sold to net sales ratio, and domestic market share all declined over the POI. *Id.*, PR190 at 20-21, CR178 at 22.

Plaintiffs claim that Commission's determination was unsupported by substantial evidence in part because "[          ] reported that it has not been materially injured by subject imports." Pls. Br. at 29. However, [          ] trade and financial indicators betray this position. [          ] key financial indicators demonstrated the impact of subject imports on its domestic production. [          ] domestic operating income to net sales ratio decreased from [          ] percent in 2020 to [          ] percent in 2021 and [          ] percent in 2022. [          ] Revised Response to U.S. Producers' Questionnaire, CR122 at VI-8. Its cost of goods sold ("COGS") as a percentage of net sales ratio increased from [          ] percent in 2020, to [          ] percent in 2021, and to [          ] percent in 2022. *Id.* at VI-3.

19

While [          ] claimed that its facilities in the United States and Mexico "work in tandem to optimize the production and sale of bundles of rail products to its customers," Pls. Br. at 30, PR151, CR152 at 28, the record also shows direct competition between [          ] Mexican exports and its domestic production. The Commission noted in its Views that "[


] in the United States. Views, PR190 at 18-19, CR178 at 19. This is further consistent with the experience of the United Steelworkers, a co-petitioner in the underlying investigation, who have seen jobs at [          ] move from the United States to Mexico. *See* Tr., PR160 at 32. "[


]." Views, PR190 at 19, CR178 at 19-20 n.86. This job loss was not "to the mutual benefit of production workers in [          ] and [          ] overall domestic operations. *See* Pls. Br. at 30.

Fourth, the ratio of [          ] imports from Mexico to its U.S. production [

]. Final Staff Report, PR174, CR163 at III-14. In similar cases, the Commission has found that, when a related party imports an increasing volume of subject imports but its ratio of subject imports to domestic production decreases, that weighs in favor of including that producer in the domestic industry. *See Polytetrafluoroethylene Resin from China and India*, USITC Inv. Nos. 701-TA-588 and 731-TA-1392-1393, Pub. 4801 (Final) at 16 (discussing related party Freudenberg). While this ratio remained [          ] throughout the period

of investigation, as  [                    ] argued in its post-conference brief before the Commission,

this factor is not dispositive for the Commission's analysis. *See* PR57, CR59 at 14.

Finally, [            ] clearly stated in the Commission's final phase hearing that its primary

interest was in domestic production.  [




]." PR160 at 162. Contrary to Plaintiffs' argument, the Commission directly

addressed this in its Views, stating that [            ] is a major U.S. producer with a primary interest

in domestic production. Views PR190, CR178 at 17.

### 2.    The Underlying Investigation and the Coupler Systems Investigation Are Distinct and Were Accorded Separate and Appropriate Treatment by the Commission

Plaintiffs claim that the Commission's lack of justification for the "contradictions" between

its determination in the Coupler Systems investigation and the underlying FRCs investigation is

"the very definition of arbitrary decision-making and alone requires setting aside its decision." Pls.

Br. at 27. In support, they cite *Humane Society of the United States v. Locke*, 626 F.3d 1040 (9th

Cir. 2010), which addressed an appeal of an agency action taken by the National Marine Fisheries

Service, and in which the court found that an action of that agency was arbitrary and capricious

because it was inconsistent with a prior action. *Id.* at 1048-49. However, each of the Commission's

determinations is nonprecedential for subsequent determinations. "The Commission must

independently consider each subject import and the circumstances of each investigation as *sui*

*generis*." *See, e.g.*, *Timken Company v. United States*, 28 C.I.T. 277, 321 F. Supp. 2d 1361, 1372

(2004). The only exception to this rule is for general market dynamics that "do not depend on the

specific products at issue." *Usinor v. United States*, 26 C.I.T. 767, 792 (2002).

Plaintiffs point to no fundamental market conditions, distinct from the products at issue, that would cause the Commission to view the Coupler Systems investigation as precedential to the FRCs investigation. Accordingly, the Commission was under no obligation to explain differences between its determination in the Coupler Systems investigation and its determination in the underlying FRCs investigation.

The underlying Commission investigation on FRCs had a different POI and covered distinct products from the investigation on coupler systems. The Commission's investigation on FRCs from China <u>and</u> Mexico covered a POI of calendar years 2020, 2021, and 2022. *See, e.g.*, *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682, 731-TA-1592, USITC Pub. 5438 (July 2023) (Final) at C-3, PR 190; Final Staff Report at C-3, CR 163. This investigation covered FRCs, which were defined as certain freight railcar couplers and parts thereof. The Commission defined the domestic like product to be coextensive with the scope of the investigation. PR 190 at 11. According to the scope as initiated, and unchanged in Commerce's final scope determination, "{FRCs} are composed of two main parts: knuckles and coupler bodies but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors)." *See, e.g.*, *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138, 45,139 (July 14, 2024). In contrast, the Commission's investigation on coupler systems covered a POI of calendar years 2019, 2020, and 2021. *See Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670, 731-TA-1570, USITC Pub. 5331 (July 2022) (Final) at C-3. In that case the Commission also defined the domestic like product to be coextensive with the scope of the investigation. *Id.* at 8. The scope as initiated in the coupler systems investigation covered coupler systems, which are composed of, "at minimum, four main components (knuckles, coupler bodies,

coupler yokes, and follower blocks . . .) but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors)." *See, e.g.*, *Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 58,864, 58,869 (Oct. 25, 2021). Accordingly, the FRCs investigation and the coupler systems investigation covered different POIs and different products, and, as noted above, resulted in different import volumes, pricing data, and financial performance indicators for the Commission's analysis.

### C.    The Commission Properly Cumulated Imports from China and Mexico in the Underlying Investigation

The Commission's determination to cumulate imports from China and Mexico was supported by substantial evidence and in accordance with the law. The statute provides that: "{T}he Commission shall cumulatively assess the volume and effects of imports of the subject merchandise from all countries with respect to which . . . petitions were filed . . . on the same day . . . if such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(G)(i). Plaintiffs claim that an exception to this provision applies here: that the Commission "shall not cumulatively assess the volume and effective of imports . . . from any country with respect to which the investigation has been terminated." *Id.* § 1677(7)(G)(ii). Cumulation for purposes of material injury applies only to petitions filed on the same day. *Id.* § 1677(7)(G)(i). "Termination" in this context refers to termination of a country in the investigation at issue, not a previous negative decision in another case. Plaintiffs raise this argument despite the fact that none of the underlying investigations were terminated. Indeed, Plaintiffs appear to misunderstand the statute. The list of exceptions that Plaintiffs refer to is clear that "The Commission shall not cumulatively assess the volume and effect of imports under clause (i) . . . " under certain circumstances. *Id.* § 1677(7)(G)(ii). That is, the exceptions only refer back

to investigations for which petitions were filed on the same day. The legislative history accompanying the Uruguay Round Agreements Act clarifies that, "The requirement of simultaneous filing will promote certainty in antidumping and countervailing duty investigations by defining, at the time of filing, the countries potentially subject to cumulative analysis." SAA at 75. To say that Chinese imports should not be cumulated with Mexican imports because the prior coupler systems investigation was terminated ignores the statutory requirement that the exception for terminated investigations refers only to investigations that were filed on the same day.

**D.    The Commission's Finding of Material Injury by Reason of Subject Imports Is Supported by Substantial Evidence and in Accordance with the Law**

The Commission's finding of material injury by reason of subject imports is supported by substantial evidence and in accordance with the law. Plaintiffs' arguments are based on the faulty assumption that the Coupler Systems investigation was binding precedent, combined with a disagreement as to the probative value of evidence that they wished the Commission relied on. Neither is grounds for a remand.

**1.    The Commission's Price Effects Analysis Is Supported by Substantial Evidence and in Accordance with the Law**

The Commission's price effects analysis is supported by substantial evidence and in accordance with the law. The alleged inconsistencies with the Coupler Systems investigation have no bearing on the underlying investigation on FRCs, and significant record evidence in this underlying investigation supports the Commission's determination.

As an initial matter, Plaintiffs claim that the "Commission improperly discounted the domestic industry's overall market share gain in 2022 by chalking it up to the effect of provisional duties." Pls. Br. at 37. It is common for there to be increase in market share at the end of a POI following the institution of provisional duties, and the Commission has the authority to presume that this is because of the provisional duties. Section 771(7)(I) of the Act provides that:

24

> The Commission shall consider whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition in an investigation . . . is related to the pendency of the investigation and, if so, the Commission may reduce the weight accorded to the data for the period after the filing of the petition in makings its determination of material injury . . . .

19 U.S.C. § 1677(7)(I). This is further elucidated by the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act:

> When the Commission finds evidence on the record of a significant change in data concerning the imports or their effects subsequent to the filing of the petition or the imposition of provisional duties, the Commission may presume that such change is related to the pendency of the investigation. In the absence of sufficient evidence rebutting the presumption and establishing that such change is related to factors other than the pendency of the investigation, the Commission may reduce the weight to be accorded to the affected data.

SAA at 854. The Commission has made this presumption in prior investigations, which the Court has upheld. *See LG Electronics, Inc. v. U.S. International Trade Commission*, 26 F. Supp. 3d 1338, 1354 (C.I.T. 2014).

　　　　　　　　a.　　The Commission's Underselling Analysis Is Supported by Substantial Evidence and in Accordance with the Law

Despite Plaintiffs' protests, there is substantial record evidence supporting the price effects of subject imports in this investigation. Cumulated subject imports undersold the domestic like product in 75 of 110 quarterly comparisons, or [　　　] percent of the time. Final Staff Report, PR174, CR163 at V-20. This amounted to [　　　] percent underselling by volume. *Id.* Plaintiffs argue that the domestic industry's price increase in [　　　] of the five pricing products indicates that the domestic industry was "able to [　　　　　　　　　　　]." Pls. Br. at 39. However, an increase in absolute prices does not necessarily demonstrate a lack of injury. The Commission's price effects analysis compares import prices and the domestic like product to determine whether underselling has occurred. Imports undersold the domestic like product for each of those [　　　] pricing products. Final Staff Report, PR174, CR163 at V-20. [

NON-CONFIDENTIAL VERSION

]. *See id.* The Commission's Views acknowledged the significance of this underselling, noting that the pricing product data showed "pervasive underselling by cumulated subject imports." Views, PR190 at 40, CR178 at 42. Furthermore, the Commission found that there was a moderate to high degree of substitutability of the domestic like product and subject imports. Views, PR190 at 33, CR178 at 35. [

] and most importer/purchasers reported that the domestic like product and subject imports were always or frequently interchangeable. *Id.*, PR190 at 35, CR178 at 36. The Commission also found that price was an important factor in purchasing decisions, based on the majority of importer/purchasers' responses. *Id.*, PR190 at 35, CR178 at 36 n.185. That price was an important purchasing factor and that imports and the domestic like product were substitutable underscores the probative value of the underselling data: domestic producers were competing on a like-to-like basis with imports in a market where price was paramount.

The Commission also reviewed and weighed evidence of lost sales on the record and found that the record included significant evidence of such lost sales. The Views of the Commission included that ten of 15 responding purchasers reported that they had purchased subject imports instead of the domestic like product during the POI, and that seven of ten importer/purchasers were lower than prices of the domestic like product. Views, PR190 at 41, CR178 at 43. Two of the seven reported that price was a primary reason for purchasing subject FRCs rather than the domestic like product. *Id.* Plaintiffs claim that the Commission "ignored" evidence that the domestic industry " [

]." Pls.

Br. at 41. Indeed, the Commission's determination did include review and analysis of the domestic industry's alleged supply constraints during the POI in discussing supply of FRCs to the U.S. market. Specifically, the Views stated that, "{w}hen asked if they had experienced any supply constraints between January 1, 2020, and September 28, 2022, [                    ] reported that they had not, but two of three responding importers and six of eight responding importer/purchasers reported that they had." Views, PR190 at 33, CR178 at 34. That is, the record included differing opinions from various interested parties regarding whether there were domestic supply constraints during the POI. Even if there had been domestic supply constraints during the POI, that would not have precluded the fact that the domestic industry lost sales and lost revenues due to subject imports. Here, Plaintiffs are essentially asking the Court to re-weigh this evidence.

> b.    The Commission's Price Suppression Analysis is Supported by Substantial Evidence and In Accordance with the Law

Contrary to Plaintiffs' arguments, the domestic industry's cost of goods sold ("COGS") as a percentage of net sales, an indicator that the Commission typically looks to as evidence of price suppression – inability to increase prices to cover increases in costs – was [                    ] throughout the entire period of investigation. COGS as a percentage of net sales was [         ] percent in 2020, [        ] percent in 2021, and [        ] percent in 2023. Final Staff Report, PR174, CR163 at C-4 (Table C-2). While this figure leveled off slightly by the end of the POI, COGS as a percentage of net sales nearing or exceeding [        ] percent is not an indicator of a healthy domestic industry. The Commission found that subject imports "prevented price increases that would have otherwise occurred to a significant degree . . . ." Views, PR190 at 45, CR178 at 48.

Here, the provisional duties in question included duties from the Coupler Systems investigation that covered similar, but not identical, merchandise to the FRCs investigation.

Plaintiffs further attempt to discount the domestic industry's loss of market share in the replacement channel by the end of the POI on the grounds that this contradicts the presumption of the effect of the provisional duties. *See* Pls. Br. at 37. Indeed, the domestic industry's loss of market share even when provisional duties were placed, in part, on subject imports underscores the injury to the domestic industry.

While the conditions of competition in the market for FRCs may have been influenced by the provisional duties from the Coupler Systems investigation, each of the Commission's determinations is nonprecedential for subsequent determinations. "The Commission must independently consider each subject import and the circumstances of each investigation as *sui generis*." *See, e.g.*, *Timken Company v. United States*, 28 C.I.T. 277, 321 F. Supp. 2d 1361, 1372 (2004). The only exception to this rule is for general market dynamics that "do not depend on the specific products at issue." *Usinor v. United States*, 26 C.I.T. 767, 792 (2002). In *Usinor*, the Court found that the Commission failed to explain why it came to a different determination regarding the effect of the existence of the European Union on market conditions in the underlying investigation on certain carbon steel products, when it had previously found that a producer's primary market focus being the European market was significant in cases on stainless steel plate and pressure sensitive tape. *Id.* at 791.

Plaintiffs point to no fundamental market conditions, distinct from the products at issue, that would cause the Commission to view the Coupler Systems investigation as precedential to the FRCs investigation. Accordingly, the Commission was under no obligation to explain differences between its determination in the Coupler Systems investigation and its determination in the underlying FRCs investigation. Indeed, the two different investigations had two different factual records and, importantly, in the FRCs investigation Mexican imports were subject merchandise.

28

It remains true that the Commission was not bound to replicate its determination from the Coupler Systems investigation in this investigation. However, even if the Commission were bound by its own prior investigations, the same contemporaneous business documentation provided in one investigation, which covers one set of products over one time period, may have different probative value than in another investigation that covers a similar set of products over a different time period. Moreover, in the Coupler Systems determination, the Commission described this documentary evidence as "limited in scope and in several instances unclear or incomplete." *Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670 and 731-TA-1570, Pub. 5331 (July 2022) (Final) ("Pub. 5331") at 25. In its Views in the underlying investigation, the Commission acknowledged that the evidence was "inconsistent with the pricing data collected by the Commission and that the evidence was otherwise vague without a specific reference to subject imports. . . . In these investigations, however this evidence of pricing pressure is corroborated by the pricing data demonstrating significant underselling and there is no concern about nonsubject imports." Views, PR190 at 45, CR178 at 48 n.252.

### 2. The Commission's Causation Analysis Was Supported by Substantial Evidence and in Accordance with the Law

The Commission's causation analysis was supported by substantial evidence and in accordance with the law. Contrary to Plaintiffs' argument, the domestic industry's condition did not "improve{} by virtually every measure over the POI." *See* Pls. Br. at 42.

### a. The Commission's Consideration of Provisional Duties from the Coupler Systems Investigation Was Supported by Substantial Evidence and In Accordance with the Law

The Commission's recognition of the domestic industry's improvement due to provisional duties was supported by substantial evidence and in accordance with the law. Plaintiffs claim that the Commission's determination in these investigations differed from its determination in the

Coupler Systems investigation and therefore was unsupported by substantial evidence. *See* Pls. Br. at 42-44. Indeed, the Commission's final determination specified the substantial evidence it relied on in making its determination.

In its Views, the Commission found that, "{T}he significant volume of cumulated subject imports significantly undersold the domestic like product, leading to a shift in market share from the domestic industry to cumulated subject imports in the overall market from 2020 to 2021, prior to the imposition of provisional duties on FRCs from China in FRC I, and in the replacement market from 2020 to 2022." Views, PR190 at 50, CR178 at 54. The Commission also acknowledged that "the imposition of provisional duties on FRCs from China in FRC I contributed to the domestic industry's improved performance in 2022." *Id.*, PR190 at 51, CR178 at 55.

Plaintiffs further allege that the Commission's alleged "discounting" of the domestic industry's improved performance is inconsistent with the SAA. Pls. Br. at 45. "As explained in the SAA, where there is 'a significant change in data' concerning the effects of imports subsequent to the imposition of provisional duties, the Commission may reduce the weight given to such data only '{i}n the absence of sufficient evidence . . . establishing that such change is related to factors other than the pendency of the investigation." Pls. Br. at 45 *quoting* SAA at 854. The full quote from the SAA is relevant to this case:

> {W}hen the Commission finds evidence on the record of a significant change in data concerning the imports or their effects subsequent to the filing of the petition or the imposition of provisional duties, the Commission may presume that such change is related to the pendency of the investigation. In the absence of sufficient evidence rebutting that presumption and establishing that such change is related to factors other than the pendency of the investigation, the Commission may reduce the weight to be accorded to the affected data.

SAA at 854. As explained further below, the Commission did not discount the domestic industry's improvement in 2022, but instead explained it as a condition of competition and gave weight to

additional evidence that the domestic industry was still injured in 2022, despite the provisional duties from the Coupler Systems investigation. Plaintiffs claim that the evidence rebutting the presumption that the improvement came from provisional duties was that there was a "significant increase in demand in the OEM channel." Pls. Br. at 45. However, demand in the OEM channel increased by [      ] percent from 2021 to 2022. *See* Final Staff Report, PR174, CR163 at G-11. Domestic shipments increased by [      ] percent over the same period. *See id.* at C-4. As the Commission explained in its Views and again in its response brief, this increased consumption did not fully explain the domestic industry's improved performance. *See* Views PR190 at 51 n.280, CR178 at 54-55; Comm'n Br. to Mot. for J. on Agency R. ("Comm'n Br.") at 46.

This brief has previously addressed that each of the Commission's determinations is *sui generis*. The Commission was not obligated to ensure that its determination in the underlying investigation was consistent with its determination in the Coupler Systems investigation. Plaintiffs identify an alleged contradiction in the Commission's determination: that it relied on evidence presented in the Coupler Systems investigation, as well as the provisional duties imposed in that investigation, but reached a different conclusion in the underlying investigation than in the Coupler Systems investigation. *See* Pls. Br. at 42-43. The Commission addressed this alleged contradiction in its Views. It recognized the existence of provisional duties from the Coupler Systems investigation as a condition of competition in the market that affected supply conditions during the POI. *See* Views, PR190 at 33, CR178 at 34. All relevant factors to a Commission determination are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). Moreover, the Commission did not rely on provisional duties from the Coupler Systems investigation to "discount" industry data in the FRCs investigation, Pls. Br. at 43, but instead to explain it as a relevant condition of

competition. The existence of an investigation into similar merchandise as is covered under the underlying investigation during this POI is a relevant condition of competition for the Commission to consider, but the results of that investigation are not dispositive here, as each Commission investigation is *sui generis*.

Plaintiffs further argue that, "if provisional duties had caused purchasers to abandon Chinese imports for domestically produced FRCs, domestic producers should have picked up significant sales in the replacement channel where Chinese imports had been concentrated, but the domestic industry in fact lost market share in that channel in 2022," as well as that the domestic industry did not see the kind of improvement Plaintiffs would have expected when the provisional duties were in place. Pls. Br. at 43-44. These allegations rest on the faulty premise that the FRCs investigation only involved China, when it in fact covered two subject countries: China and Mexico. While the provisional duties on China did contribute to the domestic industry's improved performance in 2022, those duties did not cure the domestic industry of all injury due to subject imports. While Chinese import quantities decreased by [        ] percent from 2021 to 2022, Mexican import quantities increased by [      ] percent over the same period. Final Staff Report, PR174, CR163 at C-3. The existence of provisional duties on imports from China for a brief part of the POI did not insulate the domestic industry from subject import competition. This is borne out in key financial and operational indicators for the domestic industry. As the Commission stated in its Views, "{m}onthly capacity and production figures for 2022 show that [

        ]. Views, PR190 at 52, CR178 at 55-56.

Furthermore, while the domestic industry's operating income increased from 2021 to 2022, this increase was from [                    ] to [                    ]. Final Staff Report,

PR174, CR163 at C-4. An increase from an [                    ] to a  [

] is still an  [                ].

      Contrary to Plaintiffs' arguments, the Commission did not "strain" to examine the probative value of provisional duties in the underlying investigation. *See* Pls. Br. at 44. Plaintiffs call out [          ]'s "purported" statement that provisional duties contributed to its increased purchases from the domestic industry in 2022. As the Commission explained in its response brief, [          ] stated on the record that the provisional duties from the Coupler Systems investigation did lead to changes in its "supply chain arrangements, importations, employment, and shipments relating to freight rail couplers." [                ] Revised U.S. Importer/Purchaser Questionnaire Response CR113 at II-4c; *see also* Comm'n Br. at 45. This statement, coupled with its increase in purchases of domestically produced FRCs from 2021 to 2022, [                ] Revised U.S. Importer/Purchaser Questionnaire Response CR113 at II-4c, indicates that provisional duties from the Coupler Systems investigation contributed to  [            ] increased purchases of domestic FRCs in 2022.

      b.    <u>The Commission's Causation Analysis Was Supported by Substantial Evidence and In Accordance with Law</u>

      The Commission's causation analysis was supported by substantial evidence and in accordance with the law. Putting aside that the Commission was not required to acknowledge or distinguish the "relevant" findings from the Coupler Systems investigation, the record in the FRCs investigation demonstrated a loss of market share in the replacement channel due to subject imports, not an alleged unwillingness of the domestic industry to supply the replacement channel. *See* Pls. Br. at 47-48. In the FRCs investigation, which included both Mexico and China and subject countries, subject imports' share of the replacement market increased by [      ] percentage points, from  [      ] percent in 2020 to  [        ] percent in 2022. *See* Final Staff Report, PR174, CR163

at G-15. This came at the direct expense of the domestic industry due to [

        ]. *See id.* While [                              ], particularly [                              ],

may have impacted the domestic industry's decision to sell more to the OEM market than the

replacement market, the domestic industry had [                              ] that could

have been used to service the replacement market had it been able to compete with low-priced

subject imports.

    The domestic industry's loss of market share in the replacement channel was not caused

by McConway & Torley's ("M&T") "[

        ]." Pls. Br. at 48. The Commission fully addressed the record evidence

surrounding the dispute between [                              ]. In the underlying investigation,

both the U.S. Freight Coupler Producers Coalition and Amsted presented evidence regarding this

dispute. [

                              ]." *See* Views,

PR190 at 52, CR178 at 56 n.289. When [

                              ]. *Id.* When [

                              ]. *Id.* This was

corroborated by information submitted by Amsted, confirming that "the dispute concerned M&T's

requests for price increases based on increased raw material prices." *Id.* Contrary to Plaintiffs'

claims, the Commission did "address [                              ]." *See* Pls. Br. at 49.

    Additional record evidence further demonstrated that [

                              ]. In  fact,  [

].

The [

]. *See* Petitioner's Prehearing Brief,

PR136, CR143 at Exhibit 2. [

]. *Id.* Contemporaneous business documentation on the

record [

]. *Id.* at Exhibit 2, Attachment B. According to [

]." [                              ] U.S. Importers' and/or

Purchasers' Questionnaire Response at III-20. Accordingly, the Commission had record evidence

from multiple parties that [

].

        c.      <u>The Commission's Consideration of Bedloe Technology Was Supported by Substantial Evidence and In Accordance with the Law</u>

Plaintiffs also claim that the Commission understated the importance of Bedloe technology

as a differentiating factor between subject imports and the domestic like product. Pls. Br. at 51-52.

Plaintiffs emphasize that FRCs with Bedloe technology accounted for [      ] percent of Chinese

imports during the POI. *See* Final Staff Report at IV-14; *see also* Pls. Br. at 52. Plaintiffs' argument

focuses on the behavior of one purchaser, TTX. TTX's alleged preferences are not indicative of

the entire industry's preferences. The Commission's Final Staff Report shows that, based on an

aggregation of data from importer/purchasers, nine reported price as a "very important" purchasing

factor, five reported price as a "somewhat important" purchasing factor, and none reported price as a "not important" purchasing factor. Final Staff Report, PR174, CR163 at II-21. In contrast, only two purchasers reported Bedloe technology as a "very important" purchasing factor, one reported Bedloe as a "somewhat important" purchasing factor, and 12 reported Bedloe as a "not important" purchasing factor. *Id.* Additionally, while FRCs with Bedloe technology accounted for [      ] percent of Chinese imports during the POI, such imports accounted for only [      ] percent of subject imports. Final Staff Report at IV-14. Accordingly, that Bedloe technology may have been important to one importer and that Bedloe imports accounted for [      ] of total subject imports during the POI, was sufficient evidence for the Commission to find that it was not an important distinguishing factor between subject imports and the domestic like product.

### E. Plaintiffs Do Not Have Standing to Raise the Issue of an Alleged Conflict of Interest

Plaintiffs' opening brief claims that the Commission failed to address Amsted's conflict-of-interest claim in the underlying investigation. Indeed, Plaintiffs do not have standing to raise this claim before this Court. Amsted, the party that did have standing to raise this claim, has voluntarily dismissed its companion appeal of the Commission's final determination as to Mexico and has amended its complaint in its appeal of Commerce's final determination as to Mexico to strike this issue from that appeal. *See* CIT Ct. No. 23-00242, Stipulation of Dismissal, ECF No. 57; CIT Ct. No 23-00268, Consent Motion to Amend Complaint, ECF No. 51. We respectfully request that the Court take judicial notice of the dismissal of these claims.

The Constitution dictates that, "{t}he judicial Power shall extend to all Cases . . . {and} Controversies. . . ." U.S. Const. art. III, § 2, cl. 1; *see also Marbury v. Madison*, 1 Cranch 137, 170 (1803). For constitutional standing to exist, a plaintiff must satisfy three elements. First, they must have already suffered or be imminently threatened with a concrete, particularized injury, that,

second, is fairly traceable to the challenged conduct, and that, third, is likely to be redressed by a favorable court ruling. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1331 (Fed. Cir. 2008).

That is, constitutional standing requires first that the <u>plaintiff</u> have suffered an injury in fact. *Lujan*, 504 U.S. at 560-61. Injury in fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560. (internal citations omitted). The Supreme Court has articulated that:

> As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify the exercise of the court's remedial powers on his behalf. The Art. III judicial power exists only to redress or otherwise protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action . . . .

*Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (internal quotes and citations omitted). The plaintiff bears the burden of proof that it has standing for each type of relief sought. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983).

The federal courts have consistently barred plaintiffs from adjudicating claims for which they do not have standing. In the seminal case, *Warth v. Seldin*, plaintiffs, a group of low-income individuals, alleged that a municipality's zoning ordinance had the purpose and effect of excluding those of low and moderate incomes from residing in the town. 422 U.S. at 503-04. The Supreme Court found, however, that the plaintiffs did not have standing because they could not point to how this zoning ordinance aggrieved them specifically. *Id.* at 505. Similarly, in *Lujan*, the Supreme Court famously found that plaintiffs did not have standing to challenge the Department of the Interior's interpretation of the critical habitat of endangered or threatened species under the Endangered Species Act. 504 U.S. at 564. Plaintiffs alleged that their general interest in visiting

endangered species constituted harm; the Supreme Court disagreed, finding that plaintiffs' lack of concrete plans to return to Sri Lanka to see the Asian elephants did not support the finding of actual or imminent injury that Article III cases require. *Id.*

This Court, too, has dismissed claims due to lack of standing. For example, in an appeal of a final determination of a Department of Commerce administrative review of the antidumping duty order on hot-rolled flat-rolled carbon-quality steel products from Russia, this Court found that NLMK, a foreign company that was not assigned a company-specific rate in that administrative review, did not have standing with respect to five counts of its complaint because the administrative review that was conducted had no impact on NLMK's assessment rate and cash deposit requirements. *Novolipetsk Steel Public Joint Stock Company v. United States*, 503 F. Supp. 3d 1329, 1343-43 (C.I.T. 2021).

Here, the plaintiffs have not suffered an injury in fact as to this claim. Plaintiffs acknowledge that Amsted asked the Commission to disqualify the Attorney but provide no nexus between themselves and any harm as a result of an alleged conflict of interest. They state, "since the Coalition's interests in FRC II were now adverse to Amsted's in a matter substantially related to FRC I, Amsted asked the Commission to disqualify the Attorney and Law Firm from further participation in these proceedings." Pls. Br. at 54. Indeed, in describing the alleged harm, Plaintiffs do not refer to themselves at all. They state only that, "{t}he Attorney successfully led an effort to obtain tariffs against Amsted and other respondents. And this effort was almost certainly informed by confidential information and insights gained pursuant to the Attorney's prior attorney-client relationship with Amsted." *Id.* at 58. That is, Plaintiffs allege harm to Amsted, but not to themselves. This is a paradigmatic example of not having standing to raise this claim.

Furthermore, as Amsted has dismissed its claims regarding this issue, under Rule 201(b) of the Federal Rules of Evidence an adjudicative fact may be judicially noticed where the fact is not reasonably subject to dispute because it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b); *see also* 28 U.S.C. § 2641 (stating that the Federal Rules of Evidence apply to all civil actions, with certain exceptions not relevant here, in the U.S. Court of International Trade).

Judicial notice of documents filed in separate litigation for purposes of recognizing an adjudicative fact is permissible. *Aspects Furniture Int'l, Inc. v. United States*, 510 F. Supp. 3d 1353, 1357 (C.I.T. 2021), *aff'd*, 42 F.4th 1366 (Fed. Cir. 2022); *see also, e.g., Los Angeles Biomedical Research Inst. at Harbor–UCLA Med. Ctr. v. Eli Lilly and Co.*, 849 F.3d 1049, 1062 n.6 (Fed. Cir. 2017) (observing that the court "can properly take judicial notice of the records of related court proceedings"); *United States v. New-Form Mfg. Co.*, 27 C.I.T. 905, 917 n.14, 277 F. Supp. 2d 1313, 1325 n.14 (2003). As the Court of Appeals has recognized, "{T}he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records." *Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1417 n.7 (Fed.Cir.1997) (citing *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir.1989), quoting 21 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5106, at 505 (1977)); *see also United States v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992) (noting that court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.") (citations omitted). As such, judicial notice of a court's records and proceedings may be taken for the purpose of recognizing a judicial act. *United States v. New-Form Mfg. Co.*, 27 C.I.T. at 917 n. 14; *see e.g., Perfectus Aluminum, Inc. v. United States*, 391 F. Supp.

3d 1341, 1349 (C.I.T. 2019), *aff'd*, 836 F. App'x 883 (Fed. Cir. 2020) (taking notice of a complaint filed in a separate district court case only to the extent that the United States made the allegations and other statements contained within and filed them in district court).

Here, Amsted has dismissed all of its conflict-of-interest allegations, which was the only party with standing to assert such an allegation.

## OPPOSITION TO MOTION FOR REMAND

I.    **THE FRAUD ALLEGATION SHOULD BE VIEWED IN THE CONTEXT OF THE PREVIOUS MULTIPLE MISCONDUCT ALLEGATIONS BY RESPONDENTS THAT HAVE BEEN PROVEN TO BE MERITLESS**

Defendant-Intervenor respectfully submits that the current meritless fraud allegation should be viewed in the context of the repeated and concerted efforts by Respondents in making baseless ethical allegations in order to defeat the domestic industry's petition for relief against injurious imports.

As the Court is aware, Respondents made repeated and serious allegations of violations of protective orders, which are devoid of any basis in fact, and which were ultimately abandoned. On October 12, 2022, counsel to Amsted made an entirely unfounded and public Administrative Protective Order ("APO") breach allegation that was filed on the Commission's EDIS document system and was titled *Action Request to Disqualify and Exclude Petitioner's Counsel from the APO. See* CIT Ct. No. 22-00307, Defendant's Response to Plaintiffs' Motion for a Preliminary Injunction, ECF 42 at Exhibit 8, Declaration of U.S. International Trade Commission Acting Secretary Katherine Hiner (ECF 42-9). The Commission deemed these letters to not be properly filed on EDIS (as APO violations are not to be made on the public record), removed them from EDIS, and so informed the parties that the Commission had taken that action. *Id.* Subsequently, on October 14, 2022, Amsted emailed the APO breach allegation to Ms. Katherine Hiner, who was the Acting Director of the U.S. International Trade Commission. *Id.*

40

In a declaration submitted in CIT Ct. No. 22-00307 (the case is discussed below), Acting Secretary Katherine Hiner confirmed that she had a call with Amsted's counsel regarding the October 12, 2022, APO breach allegations. *Id*. During that call, Acting Secretary Hiner asked for specific details to support Amsted's APO breach allegation, and Amsted admitted that they had no evidence of an actual violation of the protective order, but rather the fact that there were additional applicants to the APO late in the proceeding, in their opinion, 'smelled untoward.'" *Id.* The Commission followed its internal procedure to investigate the alleged APO breach and concluded that there was no evidence of a breach.

Also on October 14, 2022, Amsted and ASF-K de Mexico S. de R.L. de C.V. (hereinafter "ASF-K") were joined by Strato, Wabtec, and TTX and filed a motion for a temporary restraining order based on those same allegations with the U.S. Court of International Trade, asking that [                              ] be denied access to business proprietary information under the Commission's APO in the underlying investigation. *See Amsted Rail Co., Inc., et. al. v. U.S. Int'l Trade Comm'n*, CIT Ct. No. 22-00307, Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 15. Based on the submissions by those parties, this Court issued an Order staying the release of business proprietary information to [                    ] and eventually entered a temporary restraining order, which prevented [                    ] from receiving business proprietary information under the Commission's APO during an important period in the preliminary phase of the underlying investigation. *See* CIT Ct. No. 22-00307, Amended Order, ECF 22; CIT Ct. No. 22-307, Temporary Restraining Order, ECF No. 28. It bears emphasizing that Amsted's baseless APO allegations were used to interfere with [              ] ability to participate in the preliminary phase of the Commission's investigation and resulted in [                  ] being temporarily denied access to business confidential information during that phase. These same APO allegations

were ultimately dismissed by the Commission after it became clear that there was literally no evidence in support of any breach (and indeed there was no breach). Through bringing wholly unfounded allegations of a breach of the protective order, the Plaintiffs in this case, in cooperation with Amsted and TTX, attempted to obtain an advantage in the proceeding below.

Amsted, Strato, Wabtec, and TTX also filed their Initial Complaint in CIT Ct. No. 22-00307 on October 14, 2022. *See* CIT Ct. No. 22-00307, Complaint, ECF 14. Their eventual Amended Complaint included an appeal of the Commission's decisions and actions regarding the APO violation allegations and conflict-of-interest claims that were raised against [

         ] at the Commission. CIT Ct. No. 0022-307, Amended Verified Complaint, ECF 44. This Court dismissed the Amended Complaint on jurisdictional grounds, and Amsted, Strato, and TTX appealed the dismissal of the conflict-of-interest claims to the Court of Appeals – notably, in their appeal, these parties dropped their challenge of the Commission's determination on the non-meritorious APO violation claims. *Amsted Rail Co., Inc. v. United States Int'l Trade Comm'n,* 600 F. Supp. 3d 1308, 1330 (C.I.T. 2022) (dismissing the complaint); *see* CAFC Ct. No. 23-1355, Plaintiffs-Appellants' Corrected Opening Brief, ECF 31. All claims of a breach of the Commission's APO have since been abandoned.

Amsted also pursued its equally frivolous allegations that Petitioner's counsel violated the U.S. Department of Commerce (Commerce) APO of *Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China*. Commerce, on October 18, 2022, notified Amsted that it had referred the APO claims for investigation. *See Amsted Rail Company, Inc. et. al. v. U.S. Dep't of* Commerce, CIT Ct. No. 22-00316, Defendant-Intervenor's Motion to Dismiss, ECF 42, Exhibit 4 (ECF 42-4). Commerce, like the Commission, eventually also determined that there had not been an APO violation as no evidence in support of such an

allegation was submitted. In other words, a second allegation of ethical misconduct was made without any basis in fact. Subsequently, Amsted and ASF-K filed an interlocutory appeal of Commerce's preliminary treatment of the APO allegation before U.S. Court of International Trade in *Amsted Rail Company, Inc. et. al. v. U.S. Dep't of Commerce*, CIT Case No. 22-00316. Their Amended Complaint of November 18, 2022, requested the Court to, among other things, direct Commerce to disqualify Petitioner's counsel from the underlying investigations and to timely rescind Petitioner's counsel access to business proprietary information under the underlying investigations' APO. *See* CIT Ct. No. 22-00316, Verified Complaint or, in the Alternative, Petition for Writ of Mandamus, ECF 5; CIT Ct. No. 0022-316, Amended Verified Complaint, or in the Alternative, Petition for Writ of Mandamus, ECF 36.

In July 2023, following the voluntary dismissal by the Court of Appeals of Case Ct. No. 23-1355, Amsted and ASF-K filed a notice of voluntary dismissal without prejudice of CIT Ct. No. 22-00316, thus ending their interlocutory appeal of Commerce's conflict-of-interest and APO related decisions in the underlying investigations but reserving their right to raise those claims in an appeal of Commerce's final determination. *See* CIT Ct. No. 22-00316, Plaintiffs' Notice of Voluntary Dismissal Without Prejudice, ECF 60, ECF 61 (so ordered).  The claim of a breach of Commerce's protective order has also now been abandoned.

Respondents also made meritless arguments regarding conflicts-of-interest and requests to disqualify counsel to the domestic industry. This occurred despite the fact that the relevant company had signed a waiver of conflicts and an explicit agreement not to seek disqualification in a subsequent antidumping and/or countervailing duty investigation. Specifically, Strato and Amsted continued to make submissions on the conflict-of-interest issue in their appeals of the Commission's and Commerce's final determinations in *Certain Freight Rail Couplers and Parts*

*Thereof from the People's Republic of China* and *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of Mexico. See Amsted Rail Company et. al. v. United States* (Commerce), CIT Ct. No. 23-00242, Complaint at Count I, ECF 16; CIT Ct. No. 23-00242, Amsted's Br. in Supp. of Amsted's Mot. for J. on the Agency R. at 8-27, ECF 37; *Amsted Rail Company et. al. v. United States* (Commission) CIT Ct. No. 23-00268, Complaint at Count I, ECF 29; CIT Ct. No. 23-00268, Amsted's Br. in Supp. of Amsted's Mot. for J. on the Agency R. at 36-50, ECF 48; *Strato, Inc. v. United States* (Commission), CIT Ct. No. 23-00158, Complaint at Count 8, ECF 22.  Although Wabtec did not raise the conflict-of-interest issue in its Complaints on appeal, it submitted a Joint Motion for Judgment on the Agency Record in this case consolidating its Complaint in CIT Ct. No. 23-00157 with Strato's Complaint in CIT Ct. No. 23-00158 in which the conflict-of-interest issue was addressed. Pls. Br. at 54-58.

As the Court is aware, the engagement agreement between Amsted and counsel contained

[

].[3] *Action Request to Disqualify Petitioner's Counsel,* PR36, CR31 at Exhibit 2. Moreover, D.C. Bar Ethics Opinion 317 confirms that, when a client's waiver of his lawyer's conflict of interest has been relied upon by another client or the lawyer, the client's subsequent change of heart as to the waiver will not restore those involved to the *status quo ante. Response to ARC's Action Request Regarding Disqualification of Petitioner's Counsel,* PR44,

---

[3] It should be noted that, consistent with ABA Formal Opinion Op 21-497, ". . . even if the current and prior matters are 'substantially related'" and there is materially adverseness, a written waiver is enforceable.  *See Response to ARC's Action Request Regarding Disqualification of Petitioner's Counsel,* PR 44, CR 56 at Exhibit 4.

CR56 at 8, Exhibit 5 (D.C. Bar Ethics Opinion 317 at 1-2). Accordingly, there was a waiver of conflicts, an agreement not to seek disqualification, and a reliance by both counsel and the Petitioner in this matter as to those waivers.

But there were several other reasons why these claims were meritless including, but not limited to: (1) there was never a conflict with a former client (the mandatory respondent in the antidumping investigation (ASF-K) was never a client); (2) the nature of the joint representation between Amsted and McConway implicated a sharing of confidential information as between co-clients that precludes a finding of a conflict-of-interest. *See Response to Amsted's Action Request Regarding Disqualification of Petitioner's Counsel*, PR44, CR56 at 3, 5; *see also Hall CA-NV, LLC v. Ladera Dev., LLC*, No. 318CV00124RCJWGC, 2020 WL 1033560, at *2 (D. Nev. Mar. 2, 2020) (indicating that the Restatement (Third) of the Law Governing Lawyers § 75 in comment c-d states that "{i}n a subsequent proceeding in which former co-clients are adverse, one of them may not invoke the attorney-client privilege against the other with respect to communications involving either of them during the co-client relationship").

Amsted, the allegedly aggrieved party, has now dismissed all of its conflict of interest/disqualification claims. *See* CIT Ct. No. 23-00242, Stipulation of Dismissal, ECF No. 57, 58 (so ordered); CIT Ct. No. 23-00268, Consent Motion to Amend Complaint, ECF No. 51. Plaintiffs, who do not have standing to raise conflict-of-interest claims before this Court, have attempted to do so nonetheless. It is unknown at this time if they intend to pursue such frivolous claims in light of the fact that Amsted has now dismissed all of its appeals as to this issue.

Plaintiffs in this case now make a claim of fraud upon the Commission arising from a subsequent dispute that arose after the Commission concluded its injury investigation. To be clear, no fraud occurred. As described further below, Plaintiffs claims are highly misleading and are

factually incorrect. In a declaration submitted to this Court, [


]. *See* **Exhibit 1**. Plaintiffs'

allegation is procedurally infirm as it has not been submitted to the Commission yet. But more

importantly, the allegation is contradicted by the facts. The allegation affected not just the

Petitioner's production but also that of companies that were in opposition to the case (and who

similarly did not raise this issue because all producers (including the Mexican respondent

producer) had the good faith belief that the knuckles met all AAR specifications). Plaintiffs are

reckless in their factual statements, including the incorrect representation that the knuckles affected

were "the only knuckles manufactured domestically throughout at least two-thirds of the POI."

(The issue affected E-Type knuckles, but not F-Type knuckles which were also within the scope

and were also produced throughout the POI). And while Plaintiffs repeatedly claim that the issue

was concealed from AAR, this is blatantly contradicted by the evidence included in this

submission. Indeed, buried in a footnote in Exhibit A, page 14, FN 5 even Plaintiffs concede that

[


]."[4] Notice

was not limited to just [                    ], but rather occurred through multiple AAR inspections,

testing, certifications, and communications as detailed further below.  Despite the fact that these

---

[4] Plaintiffs represent to the Court that June 2023 "was the first time that the AAR heard about M&T's new knuckle design."  Plaintiff's Motion at Appendix A at 9.  But this is directly contradicted by their own submissions.  *See e.g.*, [
                    ]. Additional contemporaneous business documentation is provided with this submission demonstrating that Plaintiff's representation is, at best, highly misleading.  It is respectfully submitted that the representation is false.

numerous ethical violation allegations are untrue, they do have real world negative consequences, including reputations damage, for those targeted by these scandalous tactics. Simply put, there were no APO breaches, there was no improper conflict of interest, and there was no fraud.

## II.    THE FRAUD ALLEGATION IS NOT PROPERLY BEFORE THE COURT

### A.    Jurisdiction of the Court of International Trade

The U.S. Customs Court Act of 1980 established the jurisdiction of the U.S. Court of International Trade and provided for original jurisdiction over certain civil actions against the United States and certain civil actions commenced by the United States. *See generally* 28 U.S.C. §§ 1581 – 1585. The Court has exclusive jurisdiction over a broad range of trade matters, and that jurisdiction exclusively covers appeals of agency action when the appeal is brought on behalf of an entity other than the United States. Included within the Court's jurisdiction are antidumping and countervailing duty investigations, administrative reviews, sunset reviews, and other administrative proceedings undertaken by the Department of Commerce and the International Trade Commission under sections 516, 516a, and 517 of the Act, *id.* § 1581(b) – (c). Scholars have described the court as "a specialized Article III court of first instance with exclusive jurisdiction over a set of international trade issues that usually involve agencies of the United States as the defendant." Timothy Meyer, A New Era at the Court of International Trade: Endemic, Executive Orders, and Enforcement, 56 Vand. J. Transnat'l L. 983, 985 (2023). That is, the Court fundamentally exercises appellate jurisdiction over matters that have already factually been decided by an administrative agency, including the U.S. International Trade Commission. For the reasons discussed further below, the Court should not now exercise subject matter jurisdiction over the alleged fraud raised in the motion for remand, as it was not raised in the complaint and has not been submitted to the agency for consideration.

**B.    The Issue of Alleged Fraud in the Investigation Could Have Properly Been Raised in this Proceeding with Amendment of Plaintiffs' Complaint**

"The scope of any litigation is confined to the issues raised in a plaintiff's complaint." *Pirelli Tyre Co., Ltd. v. United States*, 539 F. Supp. 3d 1257, 1262 (C.I.T. 2021); *see also Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d 1314, 1327 (C.I.T. 2017). Plaintiff Wabtec commenced this appeal on August 14, 2023, and subsequently filed its complaint on September 13, 2023. *See* Summons, ECF No. 1; Complaint, ECF No. 9. Consolidated Plaintiff Strato also commenced its appeal on August 14, 2023, and filed its complaint on September 13, 2023. *See* CIT Ct. No. 23-00158, Summons, ECF No. 1; Complaint, ECF No. 9. Consolidated Plaintiff Strato's appeal was consolidated with this appeal on March 22, 2024. CIT Ct. No. 23-00158, ECF No. 32. Plaintiffs filed their consolidated motion for judgment on the agency record on August 19, 2024. ECF Nos. 45, 46.

The Court's rules provide plaintiffs an opportunity to amend pleadings, including complaints. CIT R. 15(a). If the amendment occurs more than 21 days after the original pleading was filed, amendment may occur with the opposing party's written consent or the court's leave. *Id.* R. 15(a)(2). According to Plaintiffs' declarant Elizabeth Allran, she became aware of the alleged "new design" in June 2023. Mot. for Remand at Exhibit 1. AAR informed McConway of the alleged noncertification of its couplers on October 20, 2023. *See* **Exhibit 1**, **Attachment K**. Notably, AAR's letter to M&T was issued nearly ten months before Plaintiffs filed their consolidated motion for judgment on the agency record. Both before the filing of the complaint and after the filing of the complaint, Plaintiffs were aware of the commercial dispute underlying their allegation of alleged fraud. In order for this matter to be properly before the Court, Plaintiffs should have included it either in their original complaint or amended their complaint prior to briefing to include this allegation.

48

Indeed, Plaintiffs' complaints as filed contest the Commission's determinations made in the facts on the record before it. *See generally* Compl, ECF No. 9. Were Plaintiffs to allege material misstatements of those facts, as it now appears that they are, it would have been necessary for them to amend their complaints. Plaintiffs' failure to amend their complaint in order to raise this issue should result in the Court deciding not to exercise review of this issue at this time.

**C.    The Matter Is Not Ripe for the Court's Review**

Even had the issue of alleged fraud in the Commission's investigation been properly pled, that matter is not ripe for judicial review. This Court has reiterated the longstanding doctrine that, "{t}he party bringing an action must establish that it has standing to bring suit, and the issues raised must be ripe for judicial resolution in order to satisfy the Article III case or controversy requirement." *XYZ Corporation v. United States*, 253 F. Supp. 3d 1257, 1272 (C.I.T. 2017). The plaintiff also has the burden of demonstrating that jurisdiction exists. *See, e.g.*, *Thermacote Welco Co. v. United States*, 27 C.I.T. 32, 35, 246 F. Supp. 2d 1327, 1330 (2003). Additionally, issues that are not the subject of a timely-filed complaint are generally beyond the court's jurisdiction. *See, e.g.*, *Georgetown Steel Corp. v. United States*, 801 F.2d 1308, 1309-13 (Fed. Cir. 1986) (holding that Court of International Trade lacked jurisdiction over action where party failed to file timely appeal).

"Issues are fit for judicial review if the agency action was final and if the issue presented is purely legal." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967) (overturned on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977)). Determining whether an administrative action is ripe for judicial resolution requires evaluation of "both the fitness of the issues for judicial decision and the hardship of the parties of withholding court consideration." *Abbott Laboratories*, 387 U.S. at 149. An issue may not be ripe for review if "further factual development would

'significantly advance {the court's} ability to deal with the legal issues presented." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003).

While the issues alleged in Plaintiffs' complaint are ripe for judicial review and properly before the court, the issue alleged in its motion for remand, which is not included in the pleadings, is not. The issue presented in the motion for remand is not, as *Abbott Laboratories* requires, purely legal. Indeed, whether a commercial dispute affected the underlying investigation is purely a factual matter and not at all a question of law.

Simply put, the Commission has not had an opportunity to evaluate Plaintiffs' claim as Plaintiffs have never submitted it to the agency for review. As discussed further below, Plaintiffs could have filed a changed circumstances review, as has been done for other claims of fraud before an agency, or another request for the Commission to examine this issue. Only after the Commission would issue a determination as to the fraud allegation would this Court have jurisdiction for review of such a determination. Accordingly, should Plaintiffs wish to pursue this (meritless) claim, it would only be proper to first pursue the matter at the agency. This, Plaintiffs have failed to do.

### D.    The Matter Is Not Proper for a Remand

The nature of a remand is an opportunity for the agency to reconsider the facts previously presented to it. Indeed, in this Court in appeals from the Commission, Plaintiffs move for judgment on the <u>agency record</u>. *See* USCIT R. 56.2. On remand, agencies are meant to reconsider the administrative record from the original proceeding in light of the Court's instructions.

Plaintiffs' motion cites *Elkem Metals Co. v. United States*, 193 F. Supp. 2d 1314, 26 C.I.T. 234 (2002), for the proposition that "the {Commission} renders its final determinations in a quasi-adjudicative manner." *See id.* at 239; Mot. for Remand at 8. While this is not untrue, the full background of *Elkem Metals* is instructive. In that case, Plaintiffs challenged the Commission's reconsideration and reversal of affirmative material injury determinations in antidumping and

countervailing duty investigations involving ferrosilicon from various countries. *Elkem Metals*, 193 F. Supp. 2d. at 235. Orders were imposed on ferrosilicon following the Commission's affirmative final determinations in 1993 and 1994. *Id.*

Subsequently, Brazilian ferrosilicon producers petitioned the Commission to institute a changed circumstances review alleging that a "recently disclosed price-fixing conspiracy among some domestic manufacturers, and its consequent distortion of the price data presented to the {Commission} during its original material injury investigations" were changed circumstances warranting Commission review. *Id.* at 235-36. The Commission took up the changed circumstances review and reversed and vacated its final determinations from the original investigations based on adverse inferences against the domestic producers. *Id.* at 236-37. On appeal, the Court found that the Commission had the power to reconsider its final determination and remanded to the Commission on other grounds. *Id.* at 245. It was only after the issue had properly been raised to the agency that the Court subsequently exercised its jurisdiction to review the Commission's determination.

Here, in contrast to *Elkem Metals*, the Plaintiffs have not yet raised the issue of alleged fraud before the Commission. Accordingly, notwithstanding that Plaintiffs should have amended their complaint to include claims related to these allegations of alleged fraud, their claim of alleged fraud is also not properly before the Court, as it has not already been made before the Commission below.

Consequently, the Court should not send this matter to the Commission for consideration in the first place. Rather, Plaintiffs should submit the issue to the agency and then, only after a decision is rendered by the initial finder of fact, could appeal to this Court be potentially appropriate.

## III.    <u>NO FRAUD HAS OCCURRED</u>

While Defendant-Intervenor maintains that Strato's and TTX's fraud allegation and the underlying evidence they present in support thereof are not properly before this Court, to the extent that the Court analyzes them, the evidence confirms that no fraud has occurred.

As discussed below, first, the knowledge regarding updates to the design of a coupler knuckle were known to both Petitioners <u>and</u> Respondents. While Plaintiffs attempt to imply that this was a fraud connected with the Petitioner in this case, the uncontroverted facts demonstrate that this issue affected all North American coupler manufacturers – in effect, McConway, Amsted in the United States, and Amsted's Mexican production. In other words, the facts at issue were known to both the Petitioner and companies in opposition to the trade case.

Moreover, this matter reflects a commercial dispute between – on the one hand, McConway, Amsted, and Amsted's Mexican production operations, and AAR on the other. The allegations of fraud are refuted by AAR's test and inspection results of 30° E-Type knuckles (coded as stock keeping unit E50BEV ("E-Type knuckles")), AAR M-1003 factory certification qualifying McConway to produce the E-Type knuckle, and AAR certifications of E-Type knuckles and couplers meeting the M-211 specifications. This and additional evidence that McConway provides accompanying this response demonstrate that AAR was aware of, had tested, and had approved McConway's E-Type knuckles and E-Type and E/F Type couplers as meeting the M-211 specifications during the Commission's injury investigation. Further, the E-Type knuckles are fully interoperable with other systems in the United States market. Accordingly, McConway requests this Court reject Strato's and TTX's slanderous allegation that McConway perpetrated fraud on the Commission as factually baseless.

### A.    The Design Modification of the E-Type Knuckle Was Known to Both Petitioner and Respondents in the Commission's Investigation

Plaintiffs attempt to insinuate that Petitioner wrongfully concealed information regarding the modified design of the E-Type knuckle in an attempt to gain an advantage in the Commission's investigation. In their papers, Plaintiffs attempt to focus on the Petitioner so as to suggest that it wrongfully withheld this information. The truth of the matter, however, is that all North American knuckle manufacturers had adopted the modified design in the good faith belief that this was fully consistent with AAR specifications.

As this Court is aware, Amsted, a U.S. and a Mexican producer of FRC's, opposed the antidumping investigation and actively participated as a respondent in the Commission's investigation. Even the evidence that Plaintiffs have submitted confirm that Amsted itself had also adopted the modified design and was fully aware that it had done so. Mot. for Remand, ECF Nos. 51, 52, App'x A at 1. While Plaintiffs have engaged in careful but potentially misleading drafting, the fact remains that the fraud allegation involves facts that were known to both sides of the Commission's investigation. It defies credulity to claim that there was a concealment of information when opposing parties were  well aware of all of the relevant facts. Indeed, the fact that neither Petitioner nor Amsted raised the issue during the pendency of the Commission's investigation is supportive of the fact that all parties had a good faith belief that the knuckles at issue met AAR specifications and that there was no relevant issue for the Commission to consider as to this matter.

### B.    Contemporaneous Evidence Shows AAR Had Knowledge and Approved of McConway's E-Type Knuckles as Meeting Relevant Standards

Strato and TTX presented this court a flawed and incomplete history of all North American production of E-Type knuckles. *See generally* Mot. for Remand, ECF Nos. 51, 52. To set the record straight, Defendant-Intervenor provides information regarding [

]. *See* **Exhibit 1**, **Attachment N**.

The M-211 and M-216 specifications are administered by AAR to ensure that knuckles and coupler assemblies are able to resist specified loading and fatigue conditions that will be experienced during use. *See* **Exhibit 1**. McConway, along with [

], which collaborates with AAR to establish and modify the M-211 and M-216 specifications for the North American market. *See id.* Before a facility that seeks to produce M-211- and M-216-approved knuckles and coupler assemblies is approved as a certified facility under the M-1003 standard, it is first necessary for the facility to undergo rigorous onsite inspection and testing as having necessary conditions, equipment, and quality controls. *See id.* AAR administers this inspection and approval process, and McConway's foundry that produces the E-Type knuckle and E-Type couplers has been continuously inspected and approved under the M-1003 standard by AAR. *See id.*

Regarding approvals and certification documentation for M-211 and M-215 specifications, AAR's [

]. *See id.* at **Attachment J**. [                                        ], McConway's E-Type knuckle and E-Type and E/F-Type couplers were annually approved by AAR as meeting the M-

211 and M-216 specifications during the period of investigation. *See id.* at **Attachments C-I**. As such, Plaintiffs' claim "{t}he domestic FRC industry concealed from its customers and from the Commission that its new knuckle design deviated significantly from AAR specifications{,}" is simply not true. Mot. for Remand, ECF Nos. 51, 52, App'x A at 1. Based on AAR's own assessments and inspections, McConway's E-Type knuckles and couplers met the relevant AAR specifications.

Plaintiffs also make troubling statements that such information is "newly emerged{.}" Mot. for Remand, ECF Nos. 51, 52 at 1 and, App'x A at 1. On a quarterly basis, [

]. *See*

**Exhibit 1**, **Attachment N**. This information is widely available and was also available throughout the course of the injury investigation. Significantly, the information details that McConway's E-Type knuckles and couplers met AAR specifications.

Further, McConway provides for the Court's consideration copies of relevant documentation pertaining to AAR certifications, testing results, and/or approvals of McConway's E-Type knuckles and couplers, that were conducted for the time period covered by the Commission's investigation. *Id.* at **Attachments C-I**. For example, in [

]:

[

].

55

*Id.* This demonstrates that AAR, which conducted these onsite audits knew about and approved McConway's E-type knuckles and E-type couplers that are now the subject of Strato's and TTX's spurious allegations. Mot. for Remand, ECF Nos. 51, 52, App'x A at 3-7.

Specifically, this evidence disproves Plaintiffs' claims. Throughout the period of investigation, AAR not only knew that McConway was producing E-Type knuckles and couplers with the geometry that Plaintiffs' claim was "new," but it also annually inspected these products in person, and certified that McConway's products met AAR specifications. *See* **Exhibit 1**, **Attachment C**.

In addition to annual M-211 certification, AAR also certified that McConway's E-type knuckle met M-216 fatigue-resistance specifications. *Id.* Notably, for these inspections and certifications, AAR has been involved in the communication and planning phases as well as the inspection and approval phases. *Id.* Further, it is disingenuous to claim that AAR had no knowledge of these tests, particularly [



]." *Id.* [

]:

[

].

*Id.* AAR knew about McConway's E-Type knuckles and couplers and certified they met the relevant specifications after conducting testing and inspections. As such, McConway's E-Type knuckles and couplers that are the subject of Strato's and TTX's allegations met AAR's M-211 and M-216 specifications during and following the Commission's injury investigation into FRCs. This demonstrates that McConway's products were properly considered domestic like products in the injury investigation because they too "meet or exceed the AAR specifications of M-211 . . . and/or M-215." Views, PR190, CR178 at 7. Because AAR certified McConway's E-Type knuckles and couplers, this Court should reject Strato's and TTX's meritless fraud allegation and decline to send this issue to Commission.

Plaintiffs also have access to and knowledge of the patent for McConway's E-Type knuckle and coupler. Plaintiffs' declarant Erik Gotlund, of TTX Company, states that McConway presented to the industry at a conference its "knuckle design and a complementary new coupler body design, both of which are covered by patent US9,707,980." Mot. for Remand, ECF Nos. 51, 52, App'x A, Exhibit 2 at para. 14. Notably, a second declarant concedes to having knowledge that [

].  *Id.* at Exhibit 4, para. 6. Accordingly, information about the improved design had been publicly available since 2017. And in any event, it defies all logic for Plaintiffs to assert that a party seeking to conceal information would provide that very information in a public setting to the industry it was seeking to conceal that information from. The affidavits submitted by Plaintiffs confirm that McConway was publicly discussing its improved design at industry conferences. But more than that, while Plaintiffs repeatedly claim that the issue was concealed from AAR, this is blatantly contradicted by the

evidence included in their own motion. Indeed, buried in a footnote in Exhibit A, page 14, FN 5 even Plaintiffs concede that [

].”  Simply stated, there was not concealment and Plaintiffs' assertions are meritless.

Similarly, Plaintiffs' related claims regarding a lack of interchangeability are without merit. The E-Type knuckles and couplers that were in production and circulation during the period of investigation were produced by [

]. *See* **Exhibit 1**. Thus, the market was comprised of geometrically compatible and in many cases identical products. Further, McConway's E-Type knuckle compatibility is demonstrated by the fact that [

].

*Id.* at **Attachment B**. These [

]. *Id.* at **Attachments A-B**. Further, using a [

]. *Id.* at **Attachment B**. If the E-Type knuckle [

]. *See* **Exhibit 1**. This also demonstrates that Plaintiffs' contention that "M&T's non-AAR-approved knuckle increases

premature failure of coupler bodies and other FRC components" is factually inaccurate. Mot. for Remand, ECF Nos. 51, 52, App'x A at 9-35.

This information similarly refutes Plaintiffs' statements regarding durability. Plaintiffs claim that "the knuckle increases stress on the coupler body, thereby decreasing fatigue life of the casting and reducing the service life of the coupler body dramatically." Mot. for Remand, ECF Nos. 51, 52, App'x A at 37. However, the [

]. *See*

**Exhibit 1**, **Attachment B**. It is further unconvincing that Plaintiffs claim "[

]." Mot. for Remand, ECF Nos. 51, 52, App'x A at 38. First, the knuckles met all relevant AAR specifications. Second, the knuckles performed better, thus making them safer for longer. In short, Plaintiffs' claim is factually wrong.

But regardless, the question before this Court is not who is right and who is wrong in the commercial dispute. The issue is whether there is clear and convincing evidence that McConway made a representation of fact, that was material and false, and that such statement was made with intent that it should be acted upon by the person in the manner reasonably contemplated – in effect that it knowingly engaged in fraud. Here, McConway (and the other knuckle producers) reasonably believed that the knuckles met AAR standards (which they objectively did) and they made no attempt to conceal this information (and indeed even shared the advantages of the improvements at an industry conference).

Further, and notwithstanding the above, Plaintiffs claim that [

].” Mot. for Remand, ECF Nos. 51, 52, App'x A at 21. This too is misleading because AAR [

]. *See* **Exhibit 1**, **Attachment J**. This is particularly important because the Plaintiffs claims about non-compatibility extend to other parts  [                                                    ]. *Id.*; Mot. for Remand, ECF Nos. 51, 52, App'x A at 21. Further, Plaintiffs' own declarant confirms that [

] of the improved E-Type knuckles that AAR disputes were not approved. Mot. for Remand, ECF Nos. 51, 52, App'x A, Exhibit 4 at para. 14. Thus, AAR itself recognized the interoperability of McConway's E-Type knuckles. This corroborates, as discussed above, that AAR inspected and certified McConway's E-Type knuckles as meeting M-211 standards throughout the period of investigation, which also confirms their interoperability.

Strato's and TTX's allegation is both misleading with respect to its assertions of interoperability and its misrepresentation of the underlying facts of the case. Strato and TTX carelessly state that "{i}n November 2023, the AAR formally notified the domestic industry that the new knuckles—the only knuckles manufactured domestically throughout at least two-thirds of the POI—were not and never had been AAR-approved." Mot. for Remand, ECF Nos. 51, 52, App'x A at 3. This is incorrect on both points. "The parts of couplers that are covered by the investigation include: (1) E coupler bodies, (2) E/F coupler bodies, (3) F coupler bodies, (4) E knuckles, and (5) F knuckles{.}" Views, PR190, CR178 at 7. Accordingly, the design modification was only as to E-Type knuckles, so it did not affect "the only knuckles" manufactured domestically and that were in scope. *Id.*; *see also* **Exhibit 1**. Notably, McConway's best estimates show that on a dollar basis the affected knuckles represented [

]. *Id.* Further, AAR, as discussed herein, certified that the E-Type knuckle met the relevant AAR specifications. *See* **Exhibit 1**, **Attachment C**.

In addition, Strato's and TTX's allegation also omits further material evidence, that they would be reasonably expected to have access to that confirms McConway's E-Type knuckle's broader interoperability in the U.S. market. Specifically, during the time period where they allege "AAR was conducting an investigation" – something that also did not occur in the manner Plaintiffs describe –[

]. *See* **Exhibit 1**, **Attachment N**. Indeed, and as noted in Plaintiff's own submission  [

].

Mot. for Remand, ECF Nos. 51, 52, App'x A, Exhibit 4 at para. 14. If there were any interoperability issues or safety concerns, AAR could have chosen to issue a product recall. AAR's quarterly circular letter is the standard vehicle for such notices to the industry, and it regularly identifies parts subject to AAR review, that are on hold, or which are otherwise subject to limitations on use or trade. *Id.* AAR never issued a circular letter recalling or otherwise identifying structural issues with McConway's E-Type knuckles or couplers, and Strato and TTX, as industry participants, know or had constructive knowledge that AAR never took issue with these products. This confirms that there were no actual compatibility issues with McConway's E-Type knuckles or couplers, much less issues that would warrant consideration by the Commission.

There is obviously a disagreement between the North American producers and AAR regarding the E-Type knuckle. However, as McConway explained to AAR [

], McConway's strong position is that because AAR's engagement with McConway included onsite technical inspections and testing and regular communications confirming the E-Type knuckles and couplers were certified to relevant

61

specifications, the E-Type knuckle and coupler met those AAR specifications. *See* **Exhibit 1,**

**Attachment C**. Even Plaintiffs' declarants confirm that McConway and [          ] have never

conceded that there was ever any violation of AAR procedures. For example, one declarant states

that  [

               ]. Mot. for Remand, ECF Nos. 51, 52, App'x A, Exhibit 3 at para. 7. The same

declarant goes on to detail how [

                ]. *Id.* at para. 10. Another declarant states that [

                ]. *Id.* at Exhibit 4, para. 8. Thus, Plaintiffs'

own declarants confirm McConway has always maintained that its E-Type knuckles meet or

exceed AAR specifications.

    As such, and as discussed above, it is not contested that there is a dispute between

McConway, [                    ], who believe that the E-Type knuckle modification

is a permissible product enhancement as compared to AAR, which believes it constitutes a "design

change."   The issue before the Court is whether this commercial dispute, which arose after the

conclusion of the trade investigation, amounted to a fraud upon the agency. A disagreement is not

fraud. Both Petitioners and Respondents were aware of the modified knuckles. As was AAR. As

stated in the affidavits attached to their own submission and as further demonstrated in the

evidence submitted with this response:

> Every year since the modified geometry E-Type knuckle entered production and
> development, we have undergone AAR certification testing to ensure that our

knuckles meet the M211 product approval requirements, and we have done the same for the M216 fatigue test standards every three years. Because the modified geometry E-Type knuckle regularly underwent and passed relevant inspections, our position in the commercial dispute with AAR is that we maintain that the modified geometry E-Type knuckle had been AAR certified for the entire time it was produced and sold. . . .

In sum, M&T categorically refutes that there was any fraud that occurred, as we were in communication with the AAR regarding this modification, and our E-Type knuckles with the modified geometry were continually inspected and certified by the AAR the entire time they were in production. We maintain that we were entitled to modify the knuckle design, pursuant to the M211 standard. We further maintain that this was a commercial dispute with the AAR arising from information that we provided to them many years ago, and that this was not limited to M&T but also involved all North American manufacturers, including [
                                    ].

**Exhibit 1**. Accordingly, there was no hiding of information from AAR or the Commission, and there was no fraud. Rather, as sworn under penalty of perjury in the attached affidavit, "it is my belief that Strato's fraud allegation was manufactured for the purpose of litigation." *Id.* This is corroborated by the fact Strato and TTX as industry participants, know or have constructive knowledge that AAR did not take issue with these products such as by issuing a recall during or following the Commission's investigation. Given Plaintiffs' knowledge, their fraud allegation appears to be in bad faith.

That their allegation was made in bad faith is corroborated by their drafting tactics that use bracketing of public information as a confidential (ostensibly to prevent domestic industry from being able to see or fully respond to the allegation), misstatements of fact and speculation, slanderous statements that besmirch McConway's character and reputation without any factual support, and even their own sworn declarations made to this Court.

Regarding unjustified bracketing of public information, Plaintiffs claim "{d}omestic FRC producers concealed the fact that they had been making and selling non-AAR-approved knuckles and fits from the freight rail industry for years, [

63

]" and that domestic industry [

]. Mot. for Remand, ECF Nos. 51, 52, App'x A at 35. First, as discussed above, AAR has been informed and been certifying McConway's E-Type knuckles throughout the period covered by the Commission's investigation. *See* **Exhibit 1**, **Attachment C**. Moreover, there is nothing about Plaintiffs' bracketed text which justifies treatment as proprietary or confidential.  Rather, they use bracketing as a prejudicial tactic that precludes domestic industry from having opportunity to fully defend itself. This is particularly compounded by claiming that [

]. Mot. for Remand, ECF Nos. 51, 52, App'x A at 36. Again Plaintiffs rely on this underhanded tactic to make baseless statements while preventing the domestic industry from knowing the full extent of the allegations being made against them.   Plaintiffs' claims are patently false.  The AAR [

]. Mot. for Remand, ECF Nos. 51, 52, App'x A at Exhibit 6.  Rather, this is simply a reputational attack, deployed in a manner to improperly use the rules of this Court to avoid accountability for potentially defamatory misstatements.

Related to Plaintiffs' ongoing difficulty distinguishing between what is public or concealed, it is important to note that contrary to their claims regarding domestic industry's concealment of the E-Type knuckle, they also swear, under oath, that domestic industry presented information about the E-Type knuckle in a public setting.  Specifically, their declarant, Elizabeth Allran, states "BNSF Railway brought this issue to the attention of the CSTCC in June 2023, following a presentation by M&T and Amsted at a National Coal Transportation Association conference." Mot. for Remand, ECF Nos. 51, 52, App'x A at Exhibit 1. Ms. Allran's claims support only the proposition that this knowledge was publicly available. It bears emphasizing that

64

Plaintiffs' claim that there was concealment of information from the AAR and the industry, while at the same time it is conceded that the information was being shared publicly at conferences.

Notably, Ms. Allran also illuminates her own knowledge through her role on the CSTCC. She states, "I have been NS's representative on the Coupling System & Truck Castings Committee ("CSTCC" or "Committee") of the Association of American Railroads ("AAR") for the past ten years." Mot. for Remand, ECF Nos. 51, 52, App'x A at Exhibit 1. This is the same CSTCC to which McConway had, [

]. *See*

**Exhibit 1**, **Attachment C**. This is significant because it means that one of the following is true regarding Ms. Allran's knowledge: (1) she truly learned about the E-Type knuckle in the public setting that she declared – in which case, Plaintiffs contradict their claim that domestic industry concealed such information; or (2) Ms. Allran had knowledge of McConway's E-Type knuckle at an earlier date, as such information was annually provided to her committee. Given that Ms. Allran also declares that [

], it is likely that the second of the above possibilities is the most likely. Mot. for Remand, ECF Nos. 51, 52, App'x A at Exhibit 1. Avoiding speculation, it is significant that regardless of which of these is the case, the basic fact remains that McConway had provided the information Plaintiffs baselessly claim was concealed. *See* **Exhibit 1**, **Attachment C**.

This also raises an important point regarding speculation. Plaintiffs have engaged in unsubstantiated claims for which they actually have no knowledge, actual or constructive. The Court should disregard such conjecture. For example, Plaintiffs claim that:

- "{T}he design changes were so significant that M&T had likely altered or even discarded the original physical toolings used to form the cavity in the metal casting mold for AAR-approved knuckles." Mot. for Remand, ECF Nos. 51, 52, App'x A at 5.

- M&T may have overhauled its tooling for the modified design—by altering or even discarding the original physical tooling used to form the cavity in the metal casting mold for the AAR-approved knuckles—after it initially stopped producing AAR-approved knuckles. Mot. for Remand, ECF Nos. 51, 52, App'x A at 21, and Exhibit 2 para. 23.

- However, based on newly emerged evidence, M&T most likely had zero practical capacity to produce AAR-approved, in-scope knuckles and coupler assemblies over most of the POI because it had likely discarded the tools required to produce AAR-approved knuckles. Mot. for Remand, ECF Nos. 51, 52, App'x A at 44.

McConway does not "discard" its tools in this fashion. *See* **Exhibit 1**. It certainly did not "discard" the tooling at issue here. Plaintiffs' willingness to engage in unsupported and factually incorrect speculation is part of a continuing pattern of behavior before this Court.

Plaintiffs' purported concerns regarding safety and interoperability are also belied by the fact that they explicitly concede that AAR decided all of the companies were allowed to continue to produce and sell the knuckles during the interim period Mot. for Remand, ECF Nos. 51, 52, App'x A, Exhibit 4 (declaring that [

].  While it claimed that [

]).

C.  **Plaintiffs' Motion for Remand Fails to Meet the Clear and Convincing Evidence Standard Required to Send this Issue to the ITC**

Plaintiffs, throughout their Motion for Remand, argue that there is clear and convincing evidence that warrants remand of interchangeability to the Commission. *See generally* Mot. for Remand, ECF Nos. 51, 52. As discussed in the preceding section, Plaintiffs are factually wrong regarding (1) McConway's E-Type knuckles and couplers having met AAR's M-211, M-215, and M-216 specifications, (2) McConway concealing its production of E-Type knuckles and couplers from AAR, industry, and the Commission, and (3) the interchangeability of McConway's E-Type

knuckles and couplers. Historically contemporaneous evidence disproves each of their claims. A

sworn affidavit further refutes Plaintiffs' claims. And the basic fact that this issue affected both

U.S. and Mexican knuckles and that those parties in opposition to the antidumping investigation

were also aware of these facts and did not consider them to be relevant to the Commission's

investigation further undermines Plaintiffs' frivolous allegation. In addition, Plaintiffs' derivative

arguments that tainted interchangeability data necessitates the Commission's reexamination of

domestic like product, cumulation, conditions of competition, price effects, and other findings

based on data from the domestic industry must also fail. Mot. for Remand, ECF Nos. 51, 52, App'x

A at 39-44. Accordingly, sending this issue to the Commission is not warranted because the

Plaintiffs have not met their burden of proof to support their fraud allegation by clear and

convincing evidence.

> The CAFC has held that:

> {W}here a party brings to light clear and convincing new evidence sufficient to make a prima facie case that the agency proceedings under review were tainted by material fraud, the Trade Court abuses its discretion when it declines to order a remand to require the agency to reconsider its decision in light of the new evidence.

*Home Prods. Int'l, Inc. v. United States*, 633 F.3d 1369, 1378 (Fed. Cir. 2011). In *Colorado v.*

*New Mexico*, 467 U.S. 310, 316 (1984), the Supreme Court of the United States ("Supreme Court")

explained the clear and convincing evidence standard.

> Last Term, the Court made clear that Colorado's proof would be judged by a clear-and-convincing-evidence standard. In contrast to the ordinary civil case, which typically is judged by a "preponderance of the evidence" standard, we thought a diversion of interstate water should be allowed only if Colorado could place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are "highly probable."

*See Colorado v. New Mexico*, 467 U.S. at 316 (referencing *C. McCormick, Law of Evidence* § 320,

679 (1954) (internal citations omitted)). The CAFC has held that "{a}lthough not susceptible to

67

precise definition, 'clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact 'an abiding conviction that the truth of {the} factual contentions are "highly probable."'" *Buildex Inc. v. Kason Industries, Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988) (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316, (1984)).

Contemporaneous evidence disproves each of Plaintiffs' claims. An affidavit demonstrating the absence of fraud have also been submitted to the Court. In addition, and as noted above, this was not an issue limited to the Petitioner's E-Type knuckles and couplers, but rather involved all E-Type knuckles and couplers made in North America (of which respondents were aware). There can be no conviction that the truth of their factual contentions are "highly probable," because Plaintiffs' allegation is demonstrably false. As such, Plaintiffs have failed to meet their burden of proof by clear and convincing evidence.

Lastly, and as noted above, respondents in this investigation have made repeated and serious allegations of misconduct that have all been proven to be false. In an attempt to defeat the domestic industry's petition for relief against unfairly priced imports, there were allegations of violation of the administrative protective order. Respondents ultimately acknowledged that there was no factual support for such allegations. These claims were subsequently abandoned. There were also claims of violation of professional ethics, including conflicts of interest. These allegations were made despite a signed waiver of a conflict of interest and a written agreement not to seek disqualification. The claims by the interested party as to that issue also subsequently dismissed those claims. Now, a commercial dispute between the North American producers and AAR has been couched as an act of fraud on the agency. For the reasons discussed above, this claim is meritless. These serious but frivolous claims have real world consequences for the wrongly accused, including significant reputational damage. Accordingly, in addition to rejecting

their fraud allegation and denying their motion for remand, Defendant-Intervenor requests that this Court take whatever action it deems appropriate in order to deter any future weaponization of ethics challenges and abuse of the legal process.

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court affirm the Commission's affirmative determinations for FRCs from China and deny Plaintiffs' motion for remand.

Respectfully submitted,

*/s/ Daniel B. Pickard*
Daniel B. Pickard, Esq.
Claire M. Webster, Esq.

Buchanan Ingersoll & Rooney PC
1700 K Street, NW, Suite 300
Washington, DC 20006
(202) 452-7000
daniel.pickard@bipc.com

*Counsel to Defendant-Intervenor Coalition of Freight Coupler Producers*

Dated: March 17, 2025

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) and (2) of the Standard Chambers Procedures of this Court, that this brief contains no more than 23, 953 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Daniel B. Pickard