Consol. Ct. No. 23-00157                                                    PUBLIC VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

—————————————————————————— x
                                                      :
WABTEC CORPORATION and STRATO INC.,                   :
                                                      :
                   Plaintiff/Consolidated Plaintiff,  : Consol. Court No. 23-00157
                                                      :
                   v.                                 : **PUBLIC VERSION**
                                                      :
UNITED STATES,                                        :
                                                      : Business Proprietary Information
                   Defendant,                         : removed from pages i, 2, 8-15, 19,
           and                                        : 21-23, 27-33, 35-37, Exs. 1-6
                                                      :
COALITION OF FREIGHT COUPLER PRODUCERS,               :
                                                      :
                   Defendant-Intervenor.              :
—————————————————————————— x

## PLAINTIFFS' REPLY IN SUPPORT OF
## STRATO'S MOTION FOR AGENCY RECONSIDERATION AND
## <u>PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

                                         Andrew T. Schutz
                                         Ned H. Marshak
                                         GRUNFELD, DESIDERIO, LEBOWITZ,
                                         SILVERMAN & KLESTADT LLP
                                         1201 New York Ave. NW #650
                                         Washington, D.C. 20005
                                         202.783.6881
                                         aschutz@gdlsk.com

                                         James M. Smith
                                         Sooan (Vivian) Choi
                                         Wanyu Zhang
                                         John Catalfamo
David M. Morrell                         COVINGTON & BURLING LLP
Shelbie M. Rose                          850 10th Street, NW
JONES DAY                                Washington, D.C. 20001
51 Louisiana Avenue, N.W.                202.662.5550
Washington, D.C. 20001                   jmsmith@cov.com
202.879.3636
dmorrell@jonesday.com

Dated: April 21, 2025    *Counsel for Wabtec Corporation*    *Counsel for Strato Inc.*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

REPLY REGARDING MOTION TO REMAND FOR RECONSIDERATION ......................... 2

I.    NEW EVIDENCE OF MATERIAL FRAUD REQUIRES A REMAND FOR
      RECONSIDERATION. ............................................................................... 2

      A.    Procedural Deficiencies Alleged by Defendants Are Baseless............................ 3

            1.    The Court has jurisdiction to decide Strato's motion. ............................. 3

            2.    Strato timely filed the motion to remand. ...................................... 7

      B.    Clear and Convincing Evidence Demonstrates that Domestic Producers
            Tainted the *FRC II* Investigation with Material Fraud. ......................... 8

            1.    The domestic industry concealed information about the modified
                  knuckle design from the AAR, their customers, and the ITC................... 9

            2.    The modified knuckles never received AAR design approval
                  through M-1003, M-211, or M-216 tests. ...................................... 13

            3.    The Coalition's non-AAR-approved knuckles have adversely
                  affected coupler performance and safety. ..................................... 14

REPLY REGARDING MOTION FOR JUDGMENT ON AGENCY RECORD ...................... 16

II.   THE COMMISSION ERRED BY ALLOWING PETITIONER TO
      RELITIGATE THE FINAL DETERMINATION IN *FRC I*. ................................. 16

      A.    The Commission's Refusal to Apply Section 751(b)(4) Was Contrary to
            Law. ........................................................................................ 16

      B.    The Commission Erred in Refusing to Acknowledge and Exercise Its
            Inherent Authority.......................................................................... 17

III.  THE COMMISSION ERRED IN REFUSING TO EXCLUDE [        ]
      FROM THE DOMESTIC INDUSTRY................................................................ 19

      A.    The Commission's Traditional Criteria Required Exclusion of [    ]................. 19

      B.    The Commission's Related-Party Decision Was Factually Flawed. .................. 21

IV.   THE COMMISSION IMPROPERLY CUMULATED IMPORTS SUBJECT TO
      THE TERMINATED INVESTIGATION IN *FRC I*........................................... 24

V.    THE COMMISSION'S FINDING OF MATERIAL INJURY BY REASON OF
      SUBJECT IMPORTS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE
      AND OTHERWISE NOT IN ACCORDANCE WITH LAW. ................................. 25

      A.    The Commission's Entire Injury Analysis is Flawed by its Unexplained
            Departures From, and Selective Reliance on, *FRC I* ............................. 25

      B.    The Commission's Price Effects Analysis Is Unsupported by Substantial
            Evidence and Otherwise Not in Accordance with Law. ........................... 27

  1. The Commission erred in finding that underselling by subject imports caused the domestic industry to lose market share. ...................... 27

  2. The Commission erroneously concluded that subject imports suppressed domestic prices. ....................................................... 28

  3. The Commission failed to consider record evidence showing that non-price factors drive purchasing decisions. ............................. 30

C. The Commission's Causation Analysis, Which Contradicted Its Findings in *FRC I*, Was Arbitrary, Unsupported by Substantial Evidence, and Otherwise Not in Accordance with Law. ............................................. 32

  1. The Commission erroneously attributed to subject imports adverse effects in the replacement channel caused by the domestic industry's prioritization of OEM sales. ...................................... 32

  2. The Commission erroneously discounted the domestic industry's improved condition in 2022 by attributing it to provisional duties in *FRC I*. .................................................................................. 34

  3. The Commission incorrectly minimized the importance of Bedloe as a distinguishing factor between Chinese imports and domestic FRCs. ....................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allied Mineral Prods. v. United States,*
  28 C.I.T. 1861 (2004) ...................................................................................20

*Altx v. United States,*
  167 F. Supp. 2d 1353, 1374 (CIT 2001) ......................................................25

*Asociacion Colombiana de Exportadores de Flores v. United States,*
  704 F. Supp. 1068 (CIT 1988) ......................................................................24

*Cleo v. United States,*
  501 F.3d 1291 (2007) ....................................................................................25

*DAK Americas v. United States,*
  456 F. Supp. 3d 1340 (2020) ........................................................................25

*Elkem Metals Co. v. United States,*
  26 C.I.T. 234 (2002) ...................................................................................6, 7

*Food Mktg. Inst. v. Argus Leader Media,*
  588 U.S. 427 (2019) ......................................................................................16

*George v. McDonough,*
  596 U.S. 740 (2022) ......................................................................................16

*Home Products Int'l v. United States,*
  633 F.3d 1369 (Fed. Cir. 2011) ...........................................................1, 3, 5, 7

*Hopkins v. Lee,*
  19 U.S. 109 (1821) ........................................................................................18

*Mid Continent Nail Corp. v. United States,*
  725 F.3d 1295 (Fed. Cir. 2013) ....................................................................20

*Pirelli Tyre Co., Ltd. v. United States,*
  539 F. Supp. 3d 1257 (CIT 2021) ........................................................4, 5, 6, 8

*San Remo Hotel, L.P. v. City & Cnty. of San Francisco,*
  545 U.S. 323 (2005) ................................................................................18, 19

*SmithKline Beecham Corp. v. Apotex Corp,*
  439 F.3d 1312 (Fed. Cir. 2006) ......................................................................7

*Timken Co. v. United States,*
  321 F. Supp. 2d 1361 (CIT 2004) ..................................................................23, 24

*Tokyo Kikai Seisakusho, Ltd. v. United States,*
  529 F.3d 1352 (Fed. Cir. 2008) ..........................................................................17

*USEC, Inc. v. United States,*
  132 F. Supp. 2d 1 (CIT 2001) ..............................................................................20

**Administrative Materials**

*Certain Freight Rail Coupler Systems and Components from China,*
  Inv. Nos. 701-TA-670 and 731-TA-1570 ..................................................... *passim*

*Certain Freight Rail Couplers and Parts Thereof from China,*
  Inv. Nos. 701-TA-682 and 731-TA-1592 ....................................................... *passim*

*Ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela,*
  Inv. Nos. 303-TA-23, 731-TA-566-570, 731-TA-641, USITC Pub. 3218
  (Aug. 1999) (Reconsideration) .........................................................................6, 7

**Statutes**

19 U.S.C. § 1671d(b) ...............................................................................................16

19 U.S.C. § 1671d(c)(2) ..........................................................................................24

19 U.S.C. § 1673d(b) ...............................................................................................16

19 U.S.C. § 1673d(c)(2) ..........................................................................................24

19 U.S.C. § 1675(b) ..................................................................................................6

19 U.S.C. § 1677(7)(G)(ii)(II) .................................................................................24

19 U.S.C. § 1677(7)(I) .............................................................................................34

19 U.S.C. § 4572, 4572(a) .......................................................................................18

19 U.S.C. § 4574(d)(2)(D)(i) ...................................................................................18

**Regulations**

19 C.F.R. §§ 208.16, 208.16(b) ..........................................................................17, 18

**Other Authorities**

Statement of Administrative Action to the Uruguay Round Agreements Act, H.R.
  Rep. No. 103316, Vol. I (1994) ...........................................................20, 24, 26, 34

Plaintiffs Wabtec Corporation ("Wabtec") and Strato, Inc. ("Strato") submit this Reply in support of Strato's Motion to Remand for Agency Reconsideration and Plaintiffs' Motion for Judgment on the Agency Record.

## INTRODUCTION

Plaintiffs have presented multiple grounds for remand of the International Trade Commission's (the "Commission") affirmative determination in *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 ("*FRC II*").  Before evaluating the merits, however, the Court must first remand for reconsideration in light of new evidence of fraud by the domestic industry: during the period of investigation ("POI"), domestic producers sold knuckles and coupler assemblies that deviated significantly from specifications approved by the Association of American Railroads ("AAR"), but testified throughout the investigation that all FRCs sold were AAR-approved, even as they refused to disclose or seek AAR approval of their modified knuckle design.  The Commission unwittingly relied on the domestic industry's false claims of AAR approval to find that domestically produced couplers were completely interoperable and interchangeable with subject imports, and on that basis found material injury by reason of subject imports.

The Federal Circuit has held that remand for agency reconsideration is *necessary* given clear and convincing new evidence that material fraud tainted the agency proceeding under review.  *Home Products Int'l v. United States*, 633 F.3d 1369, 1381 (Fed. Cir. 2011).  Evidence compiled by Plaintiff Strato in its motion to remand for agency reconsideration, ECF 51 & 51-1, and this reply brief, *see* Part I & Exs. 1-6, makes the required showing.  Given the Federal Circuit's directive, the Court may wish to reserve the merits issues, for purposes of judicial economy, until the Commission has completed its reconsideration.

The new evidence of material fraud is one among many issues, both procedural and substantive, requiring remand.  From the start, the *FRC II* petition aimed to re-litigate the Commission's negative determination in *Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670 and 731-TA-1570 ("*FRC I*").  The Commission's reversal in *FRC II* ignored its statutory obligation and inherent authority to enforce the finality of *FRC I*.  *See* Part II.  The Commission even reversed itself within *FRC I*, abandoning its definition of the domestic industry in the final phase.  *See* Part III.  Meanwhile, the Commission's injury analysis selectively relied on *FRC I* to discount the domestic industry's improvements indicating no injury in *FRC II*; at the same time, the Commission contradicted key findings from *FRC I* without explanation.  *See* Part V.A.  The Commission repeatedly ignored other significant evidence and arguments that undermined its analyses of price effects and causation, and even misapplied statutory guidance.  *See* Parts V.B-C.  Defendants' response briefs fail to rebut these deficiencies.  Plaintiffs thus respectfully request that the Court remand the Commission's determination with instructions.

## REPLY REGARDING MOTION TO REMAND FOR RECONSIDERATION

## I.    NEW EVIDENCE OF MATERIAL FRAUD REQUIRES A REMAND FOR RECONSIDERATION.

The Commission's injury determination rested on a finding that all knuckles sold in the United States during the POI were AAR-approved and thus certified as interoperable.  Months after the vote, the freight rail industry discovered that M&T and Amsted throughout the POI had been marketing non-AAR-approved knuckles disguised as AAR-approved knuckles.  The AAR directed both firms to return to producing only approved designs and began investigating adverse effects caused by the non-approved knuckles.  That inquiry [                              ], in part

because the domestic industry's misrepresentations make it difficult to isolate and trace those effects.

What is clear at this point is that M&T and Amsted deliberately concealed from the AAR and their customers significant changes to major design elements of E-Type knuckles. Information presented in sworn declarations from the AAR itself and from representatives of Class I railroads on its governing committees constitutes "clear and convincing new evidence sufficient to make a prima facie case that the agency proceedings under review were tainted by material fraud." *Home Products Int'l v. United States*, 633 F.3d 1369, 1378 (Fed. Cir. 2011). Before reaching the merits, the Court must protect the integrity of the Commission's proceedings by remanding the case for reconsideration.

### A.    Procedural Deficiencies Alleged by Defendants Are Baseless.

Invoking various procedural claims, Defendants contend that it is inappropriate for the Court even to consider the remand request.  These contentions are without merit, as they ignore prior jurisprudence of this Court and the Federal Circuit.  As detailed in the Motion and below, reconsideration is not only appropriate but necessary because Strato has submitted clear and convincing *prima facie* evidence that material fraud tainted the Commission's determination.

### 1.    The Court has jurisdiction to decide Strato's motion.

The Coalition claims the Court lacks jurisdiction over the Motion because the alleged fraud "was not raised in the complaint" or to the Commission.  CoalitionRespBr at 47.  These arguments ignore binding jurisprudence and would create the jurisdictional problems that Strato avoided by properly filing the Motion.

### a)    The motion addresses issues raised in the Complaint.

The Coalition erroneously claims that the Motion does not address issues raised in Strato's Complaint.  In reality, the Motion focuses on core issues in the Complaint .  Strato

challenged the Commission's final determination in *FRC II*, including, *inter alia*, the Commission's decision to cumulate subject imports, findings on substitutability, analysis of price effects, and causation findings. StratoCompl. at 1, 12-16, 20-21. The Motion explicitly identifies how the fraud tainted the Commission's evaluation of cumulation, price comparisons, substitutability, and other aspects of its injury analysis. PlMotRemand at 11-12.

The Coalition claims that *Pirelli Tyre* requires plaintiffs to allege fraud in the complaint, or at least seek leave for an amended complaint. CoalitionRespBr at 48. But that is not what *Pirelli Tyre* says. Plaintiffs in that case challenged the results of an antidumping administrative review by the Department of Commerce ("Commerce"). The United States—with support of the defendant-intervenor, and over plaintiffs' objections—filed a motion to remand the case to Commerce to determine whether the sole mandatory respondent had reported fraudulent sales prices that could have impacted its zero rate. *Pirelli Tyre Co., Ltd. v. United States*, 539 F. Supp. 3d 1257, 1261 (Ct. Int'l Trade 2021). This Court noted that "{t}he scope of any litigation is confined to the issues raised in a plaintiff's complaint," but held that because plaintiffs claimed eligibility for a separate rate, determining the sole mandatory respondent's calculated rate "could be relevant if Plaintiffs were to succeed on their separate rate claim." *Id.* at 1262. Accordingly, the Court remanded because the United States offered "a compelling justification" that was within the general scope of issues raised in plaintiffs' complaint. *Id.*

The reasoning in *Pirelli Tyre* confirms that the Court can and should rule on the Motion. Strato has provided clear and convincing evidence of the domestic industry's material fraud as to AAR approval, and how that fraud directly undermined the injury determination at issue in this appeal. PlMotRemand at 11-12, App'x A at 41-44. There is a more than sufficient connection between the Complaint and the Motion for the Court to decide whether remand is appropriate.

Accordingly, the Court should reject the Coalition's baseless claim that Strato had an obligation to allege fraud in its Complaint.

### b)      This Court, Not the Commission, Has Jurisdiction Over the Issues Identified in the Motion.

The Coalition's remaining jurisdictional arguments are equally unavailing.  It claims that the Motion is not ripe for review because "the Commission has not had an opportunity to evaluate Plaintiffs' claim as Plaintiffs have never submitted it to the agency," so "Plaintiffs should submit the issue to the agency and then, only after a decision is rendered by the initial finder of fact, could appeal to this Court be potentially appropriate."  CoalitionRespBr at 50-51.

The Coalition's analysis of the jurisdictional issues is exactly backward and ignores Federal Circuit precedent, which this Court has applied.  As the Motion explained, when an agency decision is under appeal, courts must remand for the agency to have jurisdiction to reconsider.  PlMotRemand at 9.  In *Home Products*, the Federal Circuit considered whether to remand a case to Commerce to determine if fraud had tainted the administrative review under appeal.  The Federal Circuit explained that "Commerce may not reopen a case while it is on appeal until the case has been remanded by the Trade Court," because "Commerce lacks jurisdiction to grant a motion to reopen its proceedings while an appeal is pending."  *Home Prods.*, 633 F.3d at 1377.  The Federal Circuit clarified that "when a case is on appeal, our decisions and the decisions of other courts have recognized the appropriateness of a remand to an administrative agency when new and material evidence is presented to the reviewing court and the agency requests a remand for further consideration," or when other parties "request reopening or a remand for the consideration of new and material evidence."  *Id.* at 1377-78.

This Court, in *Pirelli Tyre*, reiterated this reasoning, explaining that "Commerce may not reopen an administrative proceeding while an appeal is pending before this Court until the case

has been remanded." 539 F. Supp. 3d at 1261. Indeed, the Court emphasized that it would abuse

its discretion by declining to remand when faced with clear and convincing evidence of fraud,

because the agency cannot "reopen a proceeding while an appeal is pending." *Id.*

Accordingly, the Commission has no jurisdiction to review a reconsideration request until

this Court remands the case. Strato could not, and therefore did not, seek reconsideration from

the Commission first, as the Commission currently lacks jurisdiction to reconsider.

Curiously, the Coalition next suggests that Strato could have requested a changed

circumstances review, which "has been done for other claims of fraud," or made "another

request" with the Commission to examine the issue, without identifying what that other "request"

might be. CoalitionRespBr at 50. These claims are wrong on the law, especially given that the

Coalition invokes *Ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela*,

Inv. Nos. 303-TA-23, 731-TA-566-570, 731-TA-641, USITC Pub. 3218 (Aug. 1999)

(Reconsideration) at 4-5 ("*Ferrosilicon* Reconsideration"). Remarkably, the Coalition ignores

that in *Ferrosilicon*, the Commission *sua sponte* "suspended the changed circumstances review

and instituted a reconsideration of the original determination" having "determined that

reconsideration was a more appropriate procedure for review of the original determinations." *Id.*

at 6. The Commission's reasoning is clear. Changed circumstances reviews provide the

Commission with the opportunity to assess whether circumstances that change *post hoc* "warrant

a review" of the determination going forward. 19 U.S.C. § 1675(b). Appropriately, Strato

instead requested reconsideration based on fraud that occurred *during the original investigation*

and that directly implicates the Commission's reasoning.

The Coalition correctly describes *Elkem Metals* as "instructive," but highlights a

procedural point unrelated to this case. CoalitionRespBr at 50. The *Ferrosilicon* reconsideration

determination was issued in 1999, over five years after the original injury determinations.
CoalitionRespBr at 50-51; *Ferrosilicon* Reconsideration at 4-6. The final determinations
remained unchallenged until Brazilian producers requested the changed circumstances review,
which the Commission suspended in favor of reconsideration. *Elkem Metals Co. v. United
States*, 193 F. Supp. 2d 1314, 1317 (Ct. Int'l Trade 2002). That situation is very different from
this case: without no pending appeal, the Commission had jurisdiction to hear that request. Here,
the Court must first remand to the agency to enable reconsideration. *Home Prods.*, 633 F.3d at
1377-78. What makes *Elkem Metals* "instructive" is that the Court stated explicitly that the
Commission may reconsider prior determinations "where after-discovered fraud is alleged."
*Elkem Metals*, 193 F. Supp. 2d at 1321.

### 2.    Strato timely filed the motion to remand.

The Commission's arguments fail for similar reasons. Like the Coalition, the
Commission maintains that the Court cannot consider the Motion, because Strato's failure to
raise the fraud in its Rule 56.2 motion forecloses bringing new evidence before the Court in the
Motion to Remand. ITCRespRemand at 4-6. The Commission cites various cases holding that
"arguments not raised in the opening brief are waived." *SmithKline Beecham Corp. v. Apotex
Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006). On that basis, the Commission argues that the
Court must reject Strato's newly submitted evidence of fraud.

The Commission erroneously conflates well-established jurisprudence preventing parties
from submitting new *arguments* after opening briefing on the merits with the new *evidence* that
Strato submitted here in support of its separate Motion to Remand. Strato did not introduce new
arguments as to why the Commission's determination was unsupported by substantial evidence;
it submitted new evidence supporting a remand for agency reconsideration. This distinction is
obvious in *Home Products*, where the Federal Circuit explained that when "a party brings to light

clear and convincing new evidence sufficient to make a prima facie case that the agency

proceedings under review were tainted by material fraud," the Court would abuse its discretion if

"it declines to order a remand to require the agency to reconsider its decision in light of the new

evidence." 633 F.3d at 1378. The Federal Circuit never suggested that this new evidence must

be introduced at any particular point in time. Instead it held that the court must remand for

reconsideration where material fraud tainted the underlying proceedings. As detailed in the

Motion, [                                                              ]; rather than wait for

additional factual evidence to emerge, Strato sought a remand for reconsideration based on the

evidence currently available. PlMotRemand at 6.

Strato thus was not untimely when it filed the Motion. Under the Commission's

approach, parties could not seek reconsideration based on evidence of fraud compiled after

briefing has commenced—like the industry declarations filed in support of the Motion and this

Reply. Such a rule would arbitrarily circumscribe the ability of courts and agencies to guard

against fraud, and would be at odds with precedent. *See Home Prods.*, 633 F.3d at 1378 ("The

Trade Court has considerable discretion as to whether to order a remand in the particular

circumstances of any individual case."); *Pirelli Tyre*, 539 F. Supp. 3d at 1261.

**B.    Clear and Convincing Evidence Demonstrates that Domestic Producers
Tainted the *FRC II* Investigation with Material Fraud.**

Strato presented evidence establishing *prima facie* that the domestic industry fraudulently

marketed non-AAR-approved knuckles and coupler assemblies throughout the POI without

informing their customers, the AAR, or the Commission of significant knuckle design changes.

PlMotRemand at 4-7. In response, the Coalition makes three core claims: (1) that domestic

producers did not conceal the modified knuckles; (2) that the modified knuckles were AAR-

approved; and (3) that the modified knuckles are interoperable with AAR-approved couplers.[1]

As information submitted by the AAR, the Class I railroads, and the Coalition itself makes clear,

these claims are plainly false, and the Commission has erred in crediting them.

The Coalition's basic disregard for the truth is apparent from an illustrative exchange

about the fate of M&T's tooling after its undisclosed design changes. The Motion explained that

the design changes were so significant that M&T had likely altered or discarded the physical

toolings for the AAR-approved knuckles that it stopped producing. PlMotRemand Appendix A

at 20-21. The Coalition then accused Strato of engaging in unsubstantiated "conjecture" and

stated affirmatively that M&T "certainly did not 'discard' the tooling at issue here."

CoalitionRespBr at 65-66. But the Coalition's own evidence demonstrates the opposite. [




]." *Id.* at Ex. 1 Att. O (emphases added). This disregard for basic facts runs

throughout its brief, as explained below.

### 1. The domestic industry concealed information about the modified knuckle design from the AAR, their customers, and the ITC.

The Coalition argues that M&T made no attempt to conceal information about the

modified knuckles from the AAR or the freight rail industry. CoalitionRespBr at 59;

---

[1] The Coalition claims that Plaintiffs prejudicially utilized bracketing to preclude M&T from fully defending itself. CoalitionRespBr at 64. This is incorrect. Plaintiffs bracketed information regarding the AAR's internal deliberations and processes to protect the AAR's confidentiality, as it requires.

ITCRespRemand at 11-12.  This is false.  For example, the Coalition admits that M&T used

modified knuckles to pass M-216 knuckle fatigue tests. CoalitionRespBr at 56.  However, [


], M&T presented [                                              ].  *See* AllranDecl. ¶¶4-8

(**Ex.4**).  M&T's sleight of hand—[                                                    ]

while actually using modified knuckles—is evidence of active concealment.

      M&T's misleading marking of knuckles also constitutes concealment.  M&T marked its

non-AAR-approved knuckles with the same catalog number used for AAR-approved knuckles,

despite the significant changes in design.  RushDecl. ¶6 (**Ex.3**); CoalitionRespBr at 52

(acknowledging that M&T's modified knuckles were "coded as … E50BEV").  If M&T had

submitted its new design for approval, the AAR would have [


] to reflect M&T's significant design deviations, and

also required an "X" marking to indicate that the design was not fully approved.  *See* AllranDecl.

¶12 (**Ex.4**) ([


]); RoyerDecl. ¶10 (**Ex.5**).  Because the

"E50BEV" marking is authorized for use ***only with AAR approval and only for an E-Type***

***knuckle***, AAR auditors had no reason to question the design.  *See* RushDecl. ¶4 (**Ex.3**);

AllranDecl. ¶¶9-11 (**Ex.4**).  Because M&T consistently masked its new design with "E50BEV,"

the Castings Committee [


]."  AllranDecl. ¶11 (**Ex.4**).

      M&T's misleading [                                ] is further evidence of concealment.

Gauges are precision tools that ensure knuckles meet exact dimensional standards, including for

pulling lug angles.  *Id.* at ¶13.  M&T [

]. CoalitionRespBr at Ex. 1 Att. O ([

]).  Each AAR-standard gauge has a designated number.  Any altered gauges

should be assigned new gauge numbers to enable identification.  AllranDecl. ¶¶13-14 (**Ex.4**).

However, M&T identified [

]. [                                    ]

indicated to AAR representatives that the knuckles were manufactured to AAR-approved

dimensions.  Gauges reveal physical differences between an approved design and a casting,

eliminating the need for visual inspections to detect dimensional and geometric changes.  [

]. *Id.* at ¶¶14-16.

AAR rules require vendors to disclose design changes, ***both major and minor***, through a

design approval process.  *See* RushDecl. ¶4 (**Ex.3**); M-211 Specifications at §1.2, App. C (**Ex.1**).

Yet the domestic industry circumvented that process, actively concealing the new knuckle

design.  Even when a vendor believes its product changes are minor, the AAR ultimately decides

whether to waive the design approval process.  *See* AllranDecl. ¶¶ 18-19 (**Ex.4**).  Domestic

producers are familiar with the AAR's approval process. *Id.* at ¶20; CoalitionRespBr at Ex. 1

Att. D ([                                    ]).

When domestic producers circumvent this well-defined process, they inappropriately shift the

burden to the AAR to spot misleading markings and design deviations during tests that are not

focused on design.  *See* RushDecl. ¶9 (**Ex.3**); AllranDecl. ¶¶22-26 (**Ex.4**); RoyerDecl. ¶3 (**Ex.5**).

Strangely, the Coalition argues that there was no fraud or concealment because knowledge of the new knuckle design was shared between M&T and Amsted, and Amsted is "in opposition to {M&T in} the trade case." CoalitionRespBr at 52. Needless to say, Amsted never informed respondents of the design changes. M&T's statement essentially confirms that the only two domestic producers kept their production and marketing of non-AAR-approved knuckles a secret from the rest of the freight rail industry.

The Coalition also claims that there was no fraud because M&T's patent disclosed the new design. CoalitionRespBr at 57. The existence of a patent discloses nothing about actual production operations. Companies frequently file patents for early results of research and development, and many patented results are never commercialized. Moreover, there was no indication in the patent that newly designed knuckles could be—and had been—sold separately, without the matching coupler bodies depicted in the patent. GotlundDecl. ¶11 (**Ex.6**).

Similarly, the Coalition emphasizes that M&T presented the new design at an industry conference. CoalitionRespBr at 59. M&T's presentation, however, took place in summer 2023, *years* after the domestic industry began production. RushDecl. ¶6 (**Ex. 3**); GotlundDecl. ¶8 (**Ex.6**). Vendors routinely communicate design changes to buyers through illustrated drawings, but M&T and Amsted never provided such drawings to their customers. GotlundDecl. ¶¶9-10 (**Ex.6**). If M&T had disclosed the new knuckle design prior to 2023, purchasers [

]. PlMotRemand at Ex. 3 ¶10.

The Coalition asserts that the design change implicated only E-Type knuckles that represented [                                        ] by value. CoalitionRespBr at 60-61 & Ex. 1 ¶7. This [                                        ] knuckles are lighter and cheaper than

coupler bodies. In any event, the broad impact of M&T's fraud cannot be minimized. ***More than [    ] of freight railcars in North America use E-Type knuckles***. GotlundDecl. ¶4 (**Ex.6**). In the freight rail network, F-Type knuckles are used on rotary dump hopper and gondola cars and on specific tank cars carrying hazardous materials. In addition, non-AAR-approved E-Type knuckles were installed in many coupler assemblies, such that ***three of the five pricing products*** on which the domestic industry reported data to the ITC ***were not AAR-approved***. No pricing products use F-Type knuckles. *Id.* at ¶¶4-7.

### 2. The modified knuckles never received AAR design approval through M-1003, M-211, or M-216 tests.

The Coalition claims that because M&T received M-1003, M-211, and M-216 certifications through onsite audits, the AAR "knew about and approved" M&T's modified knuckles and coupler assemblies. CoalitionRespBr at 55-56; *see* ITCRespRemand at 10-11. This claim is false. As the AAR's Senior Vice President for Safety & Operations explains, M&T and Amsted represented that the knuckles tested complied with AAR-approved designs. RushDecl. ¶¶8-10 (**Ex.3**). An uninformed visual inspection or fatigue test does not reveal design changes. These certifications do not approve a new design or authorize AAR marking. For years, the vendors circumvented a well-defined design approval process. *Id.*

Industry witnesses confirm that the M-1003, M-211, and M-216 tests are ***unrelated to product design approval***. M-1003 evaluates general capabilities of the facility where components are produced. It does not evaluate specific components or their designs. The AAR [                                                                  ], a process that is distinct from design approval under M-211 Appendix C. M-216 evaluates knuckle fatigue life. To maintain M-216 certification of a previously approved AAR design, vendors take the fatigue test every three years. AllranDecl. ¶¶27-33 (**Ex.4**); RoyerDecl. ¶¶7-9 (**Ex.5**); GotlundDecl. ¶12 (**Ex.6**).

Claiming that M&T's modified knuckles received design approval through M-1003, M-211, or M-216 is akin to a restaurant claiming it passed a health inspection based on a visit from the local fire department.  All AAR design approvals are issued under Appendix C of the M-211 specifications or under M-215 specifications.  RushDecl. ¶¶4-5 (**Ex.3**); AllranDecl. ¶22 (**Ex.4**) ("Even when the vendor selects the M-215 design approval process, the vendor must meet all the requirements set out in M-211 specifications.").  The process requires multiple submissions, including the application; a request for conditional approval in limited field trials; requests for expanded field trials; distribution and performance reports; and a request for final approval after two years of field trials.  *See* M-211 Specifications at App. C (**Ex.1**).  The Coalition claims that M&T was "in communication with the AAR" about the design change, CoalitionRespBr at 63, but at no point before 2023 did M&T seek AAR approval for the modified design, and the AAR [            ] any required documents before M&T covertly marketed modified knuckles.  RushDecl. ¶8 (**Ex.3**); AllranDecl. ¶¶23-26 (**Ex.4**).

On these central issues, supporting declarations from the AAR itself and from Class I railroads on its governing committees deserve significant weight.  Tellingly, the Coalition attempts to dismiss the AAR by arguing that M&T and Amsted are involved in a "commercial dispute" with the AAR.  CoalitionRespBr at 63.  But the AAR is not a commercial counterparty: it is the freight rail industry's standard-setting organization.  It establishes and enforces interchange standards to ensure interoperability and safety.  *See* RushDecl. ¶¶2, 13 (**Ex.3**).

### 3. The Coalition's non-AAR-approved knuckles have adversely affected coupler performance and safety.

Preliminary results [                    ] have revealed significant performance and safety differences between non-AAR-approved and AAR-approved knuckles.  *See* PlMotRemand Appendix A at 21-35 (showing, for example, the failure rate of coupler bodies

used with non-AAR-approved knuckles could be over *30 times higher* than the failure rate of

coupler bodies used with AAR-approved knuckles).  Evidence of clear differences in

performance and interoperability remains unrebutted by the Coalition.

The Coalition claims the AAR never took issue with its knuckles or had interoperability

or safety concerns.  CoalitionRespBr at 61-63.  This claim is false.  The AAR [

] that the Coalition

exhibited.  CoalitionRespBr at Ex. 1 Att. K ("[

]"); GotlundDecl. ¶¶13-14 (**Ex.6**)

(Castings Committee [

]).  Reports from car repair shops confirmed AAR concerns about coupler

performance and safety.  RushDecl. ¶7 (**Ex.3**).  Further, in November 2023, the AAR directed

domestic producers to ***return immediately*** to producing AAR-approved knuckles.

PlMotRemand Appendix A at 19.

[                                        ] that various tests—internal solidity, mill, static tension, and

mechanical—demonstrate the interoperability and safety of the non-AAR-approved knuckles.

CoalitionRespBr at Appendix A ¶6 (citing Att. A).  But these tests merely evaluate solidity,

chemistry, hardness, and other properties of the steel used to produce components.  None

evaluates geometry, which helps determine whether knuckles are interoperable with other

components in the field.  Gotlund Decl. ¶16 (**Ex.6**); AllranDecl. ¶¶29-33 (**Ex.4**).

*       *       *

Because Plaintiff has presented clear and convincing new evidence sufficient to establish *prima facie* that material fraud tainted the *FRC II* injury determination , the Court must remand the matter for the Commission to reconsider its prior determination.

### REPLY REGARDING MOTION FOR JUDGMENT ON AGENCY RECORD

## II.    THE COMMISSION ERRED BY ALLOWING PETITIONER TO RELITIGATE THE FINAL DETERMINATION IN *FRC I*.

The Commission had the obligation and authority to reach a *negative* determination in *FRC II* in light of Section 751(b)(4) and its inherent authority to enforce the finality of its negative determination in *FRC I*.  Defendants' responses on these issue are meritless.

### A.    The Commission's Refusal to Apply Section 751(b)(4) Was Contrary to Law.

To begin, Defendants say nothing about the text of Section 751(b)(4) itself.  They do not contest that a *negative* final injury determination is "a determination made under section 1671d(b) or 1673d(b)."  Instead, they contend Section 751(b)(4) applies only to "changed circumstances reviews."  ITCRespMJAR at 22; CoalitionRespBr at 11-12.  But that term appears nowhere in the statute, including the chapeau.  Nor can one discover a term of art "by rearranging the text" of a statute (or chapeau) "to create a phrase that does not appear" in it.  *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 438 (2019).  Just as the Supreme Court has held that the phrase "commercial … information {that is} … confidential" is not equivalent to the term of art "confidential commercial information," *id.*, the phrase "Reviews based on changed circumstances" is not equivalent to a "changed circumstances review."

Moreover, a term of art bears on the original meaning of a provision only if it was "transplanted" from an earlier "legal source."  *George v. McDonough*, 596 U.S. 740, 746 (2022).  But Defendants cite no instance of either phrase predating the enactment of the current version of Section 751 in 1994, and Plaintiffs are aware of none either.  Even if *contemporary* sources use

the phrase as a term of art (CoalitionRespBr at 11-13), they have no bearing on the meaning of the phrase *at the time Congress enacted it*.

Finally, Defendants' invocation of the Statement of Administrative Action ("SAA") falls flat. The SAA does not so much as mention the two-year good-cause limitation in Section 751(b)(4), much less suggest it is confined to reviews of affirmative determinations. The plain language thus controls: dissatisfied petitioners cannot force the Commission to review a prior negative determination within two years absent good cause.

### B. The Commission Erred in Refusing to Acknowledge and Exercise Its Inherent Authority.

In addition to the requirements of Section 751(b), the Commission also had the inherent authority to refuse to upend its prior determination in *FRC I* without good cause.

Defendants' central defense is that once Commerce initiated *FRC II*, the Commission's hands were tied because "the Commission has a statutory obligation to conduct its material injury investigation." ITCRespMJAR at 23; CoalitionRespBr at 6-7 (similar). But regardless of whether the Commission had to *conduct* an investigation, the Commission had the authority to reach a *negative determination* to avoid disturbing the finality of its decision in *FRC I*. The Commission notes that inherent authority cannot be used "in a manner that is contrary to statute." ITCRespMJAR at 23. But just as addressing fraud necessarily advances the statute, *see Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1361 (Fed. Cir. 2008), so too does demanding good cause before upsetting determinations deemed "final" under the statute.

The Commission has already exercised this precise authority in implementing the long-haul trucking provisions of the USMCA Implementation Act. The Commission's regulations require a showing of "good cause" before initiating a new investigation into "the same subject matter" as a previous investigation within one year. PlsMJARBr at 23-24 (quoting 19 C.F.R. §

208.16).  Defendants deny the relevance of this regulation because it supposedly implements an "explicit statutory provision."  ITCRespMJAR at 24.  That is false.  This regulation applies to investigations "under section 322 of the Act," 19 C.F.R. § 208.16(b), yet section 322 contains no good-cause limitation, *see* 19 U.S.C. § 4572.  Section 324 contains a good-cause limitation, but it applies only to investigations under Section 324.  *See* 19 U.S.C. § 4574(d)(2)(D)(i).

Plaintiffs' point thus still stands: the Commission used its inherent authority to promulgate a one-year good-cause limitation on reinvestigations into the same subject matter as a previous investigation and did so even though the relevant statute imposes a mandatory obligation on the agency and contains no time-bar on reinvestigations: "{u}pon filing of a petition by an interested party," the Commission "***shall*** promptly initiate an investigation …."  19 U.S.C. § 4572(a) (emphasis added).  Yet, despite nearly identical "shall" language in the Tariff Act, Defendant categorically disclaims any discretion here.  And because Defendant refuses even to acknowledge the discrepancy in its approach to nearly identical statutory language, it has not made any attempt to justify it.  That is the very definition of arbitrary and capricious decision-making, which alone requires remand.

Defendant's dismissive approach to this issue should not obscure the significance of what is at stake.  Finality is not just a matter of convenience; it goes to the heart of the Commission's power to *authoritatively* resolve the questions within its jurisdiction.  The principle of finality "has found its way into every system of jurisprudence, not only from its obvious fitness and propriety, but because without it, an end could never be put to litigation."  *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 336-37 (2005) (quoting *Hopkins v. Lee*, 19 U.S. (6 Wheat.) 109, 114 (1821)).  If tribunals did not have some mechanism to guarantee the conclusiveness of their earlier decisions in later actions, their aid "would not be invoked for the

vindication of rights of person and property." *Id.* at 337 (citation omitted).  Thus, as a necessary corollary to its power to "make a *final* determination" on material injury, the Commission has the power to demand that losing parties present a valid justification before revisiting its prior determinations.  The Commission has already claimed and exercised this precise authority in the context of the USMCA long-haul trucking regulations.  Plaintiffs thus ask the Commission to do only that which it has already (and recently) done in an analogous context.

**III.  THE COMMISSION ERRED IN REFUSING TO EXCLUDE [          ] FROM THE DOMESTIC INDUSTRY.**

 Defendants do not hide their belief that the Commission can apply the related-party provision in a results-orientated way.  Regardless of where its traditional five-factor test leads, Defendants believe the Commission is free to include or exclude related parties based on its tendency to improve the case for injury.  That position cannot stand.

 **A.  The Commission's Traditional Criteria Required Exclusion of [          ].**

 The clearest evidence of the Commission's results-oriented approach is its refusal to apply the five-factor test at all.  Nowhere did the Commission's final determination or its brief walk through those factors, showing which factors point in which direction.  Nor does Defendant dispute that, had the Commission applied the five factors, the inquiry would tilt decisively in favor of *excluding* the related party here, as Plaintiffs' opening brief explained.  *See* PlsMJARBr at 25-26.

 Instead, in the same breath it enumerates the five factors, Defendant disclaims any obligation to use them.  Defendant claims discretion to consider "some or all" of these factors, or to discard them altogether in favor of non-defined "other factors."  ITCRespMJAR at 25-26.  The Court should reject this freewheeling approach, which would merely provide cover for "ad

hoc determinations that provide{} no ascertainable standard" for applying the related-party

provision. *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1305 (Fed. Cir. 2013).

Even setting that aside, Defendant's carte blanche approach fails for another reason.

Defendant claims that Congress wanted to exclude any domestic producer "who is being

shielded from the effects of the subject imports." ITCRespMJAR at 25. So, it says, if a

domestic producer is not shielded from imports, then it should be included in the domestic

industry. *Id.* But the Commission wrenched legislative history from context and turned

Congress's meaning on its head.

The SAA states that the purpose of the related-party provision is to "to reduce any

distortion in industry data caused by the inclusion in the domestic industry of a related producer

who is being shielded from the effects of the subject imports." 1994 U.S.C.C.A.N. 4040, 4190.

This is how this Court has repeatedly described the purpose and intent behind the related-party

provision in light of this legislative history:

> {a}lthough little legislative history behind the related parties provision exists, the
> provision's purpose is to exclude from the industry headcount domestic producers
> substantially benefitting from their relationships with foreign exporters. Congress enacted
> the provision so that domestic producers whose interests in the imports were strong enough
> to cause them to act against the domestic industry would be excluded from the ITC's
> consideration and investigation into material injury or threat thereof.

*Allied Mineral Prods., Inc. v. United States*, 28 C.I.T. 1861, 1864-65 (2004) (quoting

*USEC, Inc. v. United States*, 132 F. Supp. 2d 1, 12 (CIT 2001)). In other words, where a

domestic producer's interests in imports are "strong enough to cause them to act against the

domestic industry," the domestic producer is necessarily "benefitting from" (or "shielded from")

subject imports. *See id.* These various formulations are not freestanding, independent tests, but

flipsides of the same coin: because no rational company would orchestrate imports to injure

itself, Congress's goal was to exclude companies that acquired a sufficiently strong interest in imports to act against the rest of the domestic industry and benefit thereby.

Defendants focus on one side of this coin (the "shield") but ignore the other, which effectively places this Court's formulations of congressional intent into substantive contradiction, as the Commission's findings illustrate.  The Commission found that [          ] was *not* "shielded" from imports (in which case Congress would say [          ] should be *included*) but also accrued an interest in imports "strong enough to cause {it} to act against the domestic industry" (in which case Congress would say it should be *excluded*).  So which is it?  The Commission went with the former, but that results-orientated approach does not resolve the contradiction or the conflict with Congress's clear intent to exclude companies that, like [          ], have a sufficient interest in imports that they act against the domestic industry.

Properly understood, the various formulations of congressional intent and the Commission's traditional five-factor test point in the same direction.  Those factors are designed to tease out whether a related party is working for or against the rest of the domestic industry and how much its presence in the industry would affect the data.  Applying the traditional five factors to its own factual findings, the Commission should have excluded [          ] because it was working against the domestic industry, and exclusion would not distort but preserve the integrity of the data set.  PlsMJARBr at 25-26.  And while Defendant-intervenor mined the record to analyze the five factors itself (CoalitionRespBr at 17-21), post-hoc reasoning cannot sustain an agency decision.

### B.    The Commission's Related-Party Decision Was Factually Flawed.

In addition to the legal defects, the Commission's factual findings are likewise flawed.  They contradict the Commission's prior findings and are unsupported by substantial evidence.

**1.** With Mexico, the Commission's central claim is that "[        ] domestically

produced FRCs were not shielded from competition with its imports from Mexico," but directly

competed with them.  ITCRespMJAR at 29.  For support, Defendant relies on evidence

suggesting at most an [                    ] between the company's imports from Mexico and its

domestic FRC performance indicators.  *Id.* at 29-30.  But a [          ] does not prove

*causation* and thus cannot alone support the Commission's decision.

Worse, the Commission ignored the evidence breaking any causal connection between

[        ] imports from Mexico and its domestic performance.  The record contained extensive

evidence about the *reasons* for [                  ] domestic FRC production over the POI: in

addition to the [                    ], [        ] U.S. Producers QR, CR125 at

22, [        ] optimizes its production of a full suite of railcar products across its [

    ] production facilities, taking into account the location of its customers, [                    ]

in Mexico.  PR151/CR152 at 2-4, 28-31, 56-57;  PR153/CR155 at 13-15.  Since [        ]

competes by bundling a host of railcar components (such as wheels, side frames, bolsters, and

springs), this was critical to maintaining its competitive edge in the broader railcar component

market.  *See* PR151/CR152 at 2; PR153/CR155 at 12-15.  It also meant [                    ]

production across facilities and products.  So even if a U.S. [        ] employee stopped making

*FRCs* over the POI, he was making other railcar components instead.  Indeed, far from reducing

U.S. jobs to compete with imports from Mexico, [


                                                    ].  PR151/CR152 at 19-20, 30, 62-63.

This is consistent with undisputed evidence that [          ] overall production actually

[                                        ].  *Id.*

Defendant denies the relevance of this evidence because it relates to out-of-scope products.  ITCRespMJAR at 33-34.  But it is plainly relevant to causation, because it demonstrates that the reason for the [         ] trends in [          ] domestic *FRC* production was not imports from Mexico, but other factors (e.g., [        ] and bundling subject and nonsubject components).

**2.** The Commission also made contradictory findings involving imports from China.  In *FRC I*, the Commission found that coupler bodies from China did not injure the domestic industry in 2021; in *FRC II*, it treated those same imports in 2021 as evidence that [        ] faced unfair import competition from China.  Views, PR190 at 19-21, CR178 at 20-22.  Defendants say *FRC I* and *FRC II* were "different," but ignore that any differences are immaterial to the Commission's particular finding here: the product (coupler bodies) and year (2021) were both encompassed in *FRC I*.

Another unexplained contradiction is the Commission's decision to credit in *FRC II* the exact same testimony it rejected in *FRC I* concerning the reasons [        ] moved to Mexico.  The Coalition tries to defend the contradiction, but its explanation comes too late: an agency must defend the rationale it gave; it cannot develop a new one on appeal.  Regardless, since the Commission credited evidence in *FRC I* that [              ] moved to Mexico "decades ago" (*FRC I* Views, PR39 at 29-30, CR42 at 38-39), it cannot treat that very move to Mexico as evidence of competition with subject imports in *FRC II* (Views, PR190 at 22, CR178 at 23) without contradiction.

To be clear, agencies can change their mind.  But when they do, they must acknowledge and explain the change.  Defendant-intervenor cites *Timken Co. v. United States*, 321 F. Supp. 2d 1361 (CIT 2004), but that decision does not state otherwise.  It merely held that the Commission

had no obligation to cross-apply factual findings when the prior investigation involved "different subject imports and a different industry altogether." *Id.* at 1372-73. It does not justify the unacknowledged and unexplained contradictions here. *See, e.g.*, *Asociacion Colombiana de Exportadores de Flores v. United States*, 704 F. Supp. 1068, 1071 (CIT 1988) ("That the administrative agency may make varying decisions based on the facts of particular cases does not permit the agency to act arbitrarily.").

## IV.    THE COMMISSION IMPROPERLY CUMULATED IMPORTS SUBJECT TO THE TERMINATED INVESTIGATION IN *FRC I*.

Defendants do not dispute that the Commission cumulated imports that were subject to the terminated investigation in *FRC I*. Instead, Defendants claim that section 1677(7)(G)(ii)(II) does not bar cumulation because *FRC I* and *FRC II* were not filed "on the same day." ITCRespMJAR at 35; CoalitionRespBr at 23-24. This misses the mark. Unlike the provision requiring cumulation, the prohibition on cumulation—section 1677(7)(G)(ii)(II)—contains no same-day requirement. Instead, it prohibits cumulation of imports "from any country with respect to which the investigation has been terminated." Because *FRC I* was "terminated," 19 U.S.C. §§ 1671d(c)(2), 1673d(c)(2), this provision prohibited the Commission from cumulating any imports that were subject to that investigation.

Defendants cite the SAA, but it reinforces what is plain from the text: "imports that are the subject of terminated investigations may not be cumulated." SAA at 849. Because it is undisputed that the Commission cumulated imports that were "the subject of {the} terminated investigation{}" in *FRC I*, the Commission erred in cumulating them in *FRC II*.

## V.    THE COMMISSION'S FINDING OF MATERIAL INJURY BY REASON OF SUBJECT IMPORTS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW.

### A.    The Commission's Entire Injury Analysis is Flawed by its Unexplained Departures From, and Selective Reliance on, *FRC I*

Defendants make no attempt to engage with the unexplained inconsistencies between the Commission's affirmative injury determination in *FRC II* and relevant findings in *FRC I*, except to argue that the Commission "was under no obligation to explain differences" between the two determinations because each investigation is *sui generis*.  PlsMJARBr at 32-35; CoalitionRespBr at 21-22.  However, this Court has found that the Commission has a duty to address or distinguish contrary prior determinations, and that the *sui generis* nature of the Commission's investigations does not conflict with this burden.  *DAK Americas v. United States*, 456 F.Supp.3d 1340, 1354-55 (2020) (observing that in *Cleo v. United States*, 501 F.3d 1291 (2007), the Federal Circuit discussed how the Commission expressly distinguished prior cases involving "significantly different facts" to "justify departure from otherwise similar contrary prior determinations," which "would be unnecessary if the Government bore no duty to address or distinguish prior determinations"). Further, the Commission has an obligation to "address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx v. United States*, 167 F. Supp. 2d 1353, 1374 (CIT 2001).  Given that "consistency has long been a core interest of administrative law," "inconsistent treatment" between determinations is "inherently significant."  *DAK Americas*, 456 F.Supp.3d at 1355.

In the underlying proceeding, the respondents vigorously argued that the Commission's findings in *FRC I* provide a simple explanation of the *FRC II* record: in *FRC I*, the domestic industry's performance declined as OEM demand declined; in *FRC II*, the domestic industry's performance improved as OEM demand increased.  *See, e.g.*, Wabtec Posthearing Br.,

PR153/CR155 at 8. These arguments were not new: the respondents simply reiterated and applied the Commission's very own findings, issued just one year before, regarding the very same industry. Yet neither the Commission nor the Coalition engaged these fundamental points.

Moreover, the Commission itself did not treat the two investigations as distinct and *sui generis*, given its heavy reliance on the pendency of *FRC I* to interpret record data in *FRC II*. *See* PlsMJARBr at 35. For example, Defendants invoke the SAA to justify the Commission's reliance on *FRC I* provisional duties to discount the domestic industry's improvements in 2022. ITCRespMJAR at 37 (citing Views, PR190/CR178 at n.236); CoalitionRespBr at 24-25. The SAA provides that the Commission may presume that a significant change in data following the imposition of provisional duties is related to the pendency of the investigation and may, absent evidence demonstrating otherwise, reduce the weight afforded to the affected data. SAA, H.R. Rep. No. 103316 (1994) at 854. The plain language of the SAA indicates that this presumption applies only to provisional duties imposed in the *same* investigation. *See infra* Part V.C.2. Yet the Commission stretched to apply this presumption to provisional duties imposed in the *prior* investigation—revealing that it was more than willing to rely on *FRC I*.

Furthermore, by discounting the domestic industry's improvements in 2022, the Commission gave more weight to the domestic industry's "injury" in 2020-2021—the period that overlaps exactly with the POI of *FRC I*, where the Commission found couplers imported at that time from China to be non-injurious. PlsMJARBr at 35. Defendants provide no explanation for the contradiction that is inherent in the Commission finding those *exact same couplers* from China to be a cause of injury in *FRC II*.

In these and other respects, the Commission's own reasoning behooved it to explain significant departures from its prior findings in *FRC I* that were raised by the parties. The

Commission utterly failed to meet that basic obligation, offering no such explanation. Meanwhile, Defendants' responses also fail to resolve many other inconsistencies in the Commission's price effects and causation analyses, as detailed in Parts V.B and V.C below. For all of these reasons, the Commission's finding of material injury by reason of subject imports is unsupported by substantial evidence and otherwise not in accordance with law.

**B.    The Commission's Price Effects Analysis Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law.**

       **1.    The Commission erred in finding that underselling by subject imports caused the domestic industry to lose market share.**

Over the POI, the domestic industry's market share increased by [    ] percentage points, in part due to the domestic industry's gains in the OEM channel from 2021 to 2022. Staff Report, PR190/CR163 at C-3, G-11. Yet the Commission dismissed those gains, instead finding that the domestic industry's market share loss in the overall market from 2020 to 2021, together with its market share loss in the *replacement* market from 2021 to 2022, was evidence of subject import underselling causing adverse price effects. Views, PR190 at 42-43, CR178 at 44-45.

The Commission's justifications for its convoluted market share analysis can be hard to follow: (i) any improvements in the domestic industry in 2022 are attributable to *FRC I* provisional duties, so its overall market share gain from 2021 to 2022 can be discounted; but (ii) the benefit of the *FRC I* provisional duties in the *replacement* channel went to Mexico, so the domestic industry's market share loss in the replacement channel from 2021 to 2022 is *not* discounted; and (iii) the replacement market is "larger than the OEM market and represents a more steady source of demand and income for the domestic industry," so the domestic industry's market share gain in the OEM channel deserves less weight, even though it more than offset any losses in the replacement channel. *Id.*; ITCRespMJAR at 37-38.

The Commission's reasoning is internally contradictory and irreconcilable with record evidence in *FRC II* and its prior findings in *FRC I*. If provisional duties were the reason for the domestic industry's overall market share gain in 2022, then one would expect the gain to have occurred in the *replacement* channel, where Chinese imports were heavily concentrated. Views, PR190 at 26, CR178 at 27; *FRC I* Views, PR39 at 14, CR42 at 17. But that is not what the Commission found. Worse, to the extent the gap left by Chinese imports in the replacement channel was filled mostly by Mexican imports, the reason is traceable to the Commission's key finding in *FRC I*: domestic producers have historically prioritized the OEM channel over the replacement channel, and their long-term contracts with OEMs made it difficult for them to pivot to replacement sales. *FRC I* Views, PR39 at 27-28, 31, CR42 at 35-36, 41. The domestic industry's prioritization of the OEM channel remains evident in the *FRC II* record: as new railcar builds increased by 39.1 percent from 2021 to 2022, the domestic industry's market share in the OEM channel increased from [     ] percent in 2021 to [     ] percent in 2022, and the OEM channel accounted for [     ] percent of the domestic industry's U.S. shipments in 2022. Staff Report, PR190/CR163 at C-3, II-4, II-12, G-11; *see also infra* Part V.C. Such evidence demonstrates that changes in the domestic industry's market share continued to be driven by demand trends in the OEM channel, not by subject import prices.

Because the Commission's market share shift analysis was improper for the reasons above, its finding of adverse price effects on that basis is unsupported by substantial evidence.

## 2.    The Commission erroneously concluded that subject imports suppressed domestic prices.

In finding that "subject imports prevented price increases that would have otherwise occurred to a significant degree in 2020 and 2021," Views, PR190 at 46, CR178 at 48, the Commission (i) failed to address record evidence undermining its decision to dismiss the fact that

the domestic industry's COGS-to-net-sales ratio *declined* by [ ] percentage points over the POI, and (ii) flip-flopped without adequate explanation on its findings with respect to the very same business documents reviewed in *FRC I*. Defendants' response briefs fail to rebut these deficiencies.

First, the Commission erred in disregarding the improvement in the domestic industry's COGS-to-net-sales ratio from 2021 to 2022 as being attributable to *FRC I* provisional duties. Plaintiffs pointed to various record data in *FRC II* that undermined this decision, including data showing that domestic prices [        ] starting in 2021, which revealed that the domestic industry managed to [                                    ] *before* provisional duties were imposed in 2022. PlsMJARBr at 39. The key point was that the *timing* of [            ] demonstrated the Commission's error—but this argument was misconstrued by Defendants and left unrebutted. The ITC responds that the [        ] increase in the domestic industry's COGS-to-net-sales ratio from 2020 to 2021 does not support the claim that the domestic industry was able to [                ] in 2021. ITCRespMJAR at 40. The Coalition responds in the context of underselling, not price suppression, and says merely that "an increase in absolute prices does not necessarily demonstrate a lack of injury." CoalitionRespBr at 25. Neither response addresses Plaintiffs' argument that the Commission failed to address significant timing evidence that undermines its decision to dismiss 2022 in its price suppression analysis.

Second, the Commission erred in relying on business documents submitted by the petitioner in *FRC II* that had already been reviewed and rejected in *FRC I* for being "limited in scope and in several instances unclear or incomplete." Views, PR190/CR178 at n.252; *FRC I* Views, PR39 at 25, CR42 at 32. Defendants respond that the Commission's determination adequately explained how these documents became reliable in *FRC II* because they were now "corroborated by the pricing data demonstrating significant underselling" by cumulated subject

PUBLIC VERSION

imports.  ITCRespMJAR at 41; CoalitionRespBr at 29.  However, the Commission spent a full

page of its *FRC I* decision describing how all of these business documents were deficient,

emphasizing that "{t}he context of these data is unclear"; "the quantity under discussion is not

indicated"; and "Petitioner provided no indication as to whether [

] as a result of this alleged subject import price competition."  *FRC I* Views, PR39/CR42 at

n.125.  Such deficiencies cannot be cured merely by adding Mexican imports to the pricing data.

The ITC claims the Commission was free to reach a different conclusion in *FRC II* because there

was a new business document that had not been included in *FRC I*: [

].  ITCRespMJAR at 41 (citing to Pet. Prehearing Br., CR143 at Ex. 2, Att. E).

However, the ITC appears to be mistaken, as the *FRC I* determination describes that very same

document and expressly declines to rely on it.  *FRC I* Views, PR39/CR42 at n.125 (referring to

Exhibit 9 of Petitioner's posthearing brief in *FRC I*).  For these reasons, the Commission's

finding of price suppression remains unsupported by substantial evidence.

> **3.    The Commission failed to consider record evidence showing that non-price factors drive purchasing decisions.**

In finding that evidence of lost sales supports its determination of adverse price effects,

the Commission failed to address significant record evidence undermining its conclusion.

Views, PR190 at 41-42, CR178 at 43.  The Commission's lost sales assessment rested on the

questionnaire response of [        ], the only firm to report any significant quantity of subject

imports purchased instead of domestic product based on price.  *Id.*; Staff Report, PR190/CR163

at Table V-13.  The Commission gave substantial weight to [        ] response, despite record

evidence that [      ] purchased that volume from [        ] pursuant to a long-term contract

that had been in place long before the POI.  Views, PR190/CR178 at n.233.  Not only did this

finding depart from *FRC I*—where the Commission found that long-term contracts were an

important non-price factor driving purchasing decisions in the FRC industry, *see FRC I* Views,

PR 16-17, 28, 34, CR42 at 21-22, 36, 45—but it was also undermined by other record evidence

in *FRC II*, which the Commission's Views and the response briefs failed to address.

      For example, the Commission ignored the fact that importer/purchasers overwhelmingly

reported they did *not* purchase subject imports instead of domestic product on the basis of price,

citing [                                                            ] as non-price reasons for choosing subject

imports.  Staff Report, PR190/CR163 at Table V-13.  The Commission also ignored narrative

responses from large purchasers such as [                                        ] explaining that

domestic producers' supply constraints drove them to purchase subject imports that were

*higher-priced* than domestic FRCs.  *Id.*

      In its response brief, the ITC brushes off this contrary evidence simply because the

information "does not concern the purchasers that corroborated the domestic producers' reports

of lost sales."  ITCRespMJAR at 36.  The ITC's response misses the mark, as evidence need not

concern [      ] to undermine the finding that [        ] purchases constitute lost sales—other

firms consistently citing non-price factors for choosing subject imports is reason to discount

[        ] checkbox response and instead give weight to evidence of [        ] purchasing from

[        ] because of its long-term contract, not price.  Meanwhile, the Coalition claims that the

Commission did address allegations of domestic supply constraints, pointing to its conditions of

competition analysis.  CoalitionRespBr at 27.  However, the Commission's specific error here

was its failure to address the allegations of domestic supply constraints in its lost sales analysis,

as the narratives by [                                                  ] directly implicate the Commission's

lost sales findings.  Thus, the Commission's finding of lost sales, like its finding of adverse price

effects on that basis, is unsupported by substantial evidence.

### C.  The Commission's Causation Analysis, Which Contradicted Its Findings in *FRC I*, Was Arbitrary, Unsupported by Substantial Evidence, and Otherwise Not in Accordance with Law.

#### 1.  The Commission erroneously attributed to subject imports adverse effects in the replacement channel caused by the domestic industry's prioritization of OEM sales.

Even though the domestic industry gained over [    ] percentage points of market share overall and almost [    ] points in the OEM channel, Staff Report, PR190/CR163 at C-3, G-11, the Commission relied on the domestic industry's loss of share in the replacement channel to find injury.  Plaintiffs had emphasized that any loss of market share in the replacement channel was attributable to the domestic industry's strategy to focus on the OEM market—and in particular, to [                                                                          ]—not to competition from subject imports.  PlsMJARBr at 47-51; *see* Amsted Posthearing Br. Q&A, PR151/CR152 at 2-3, 37-38, Ex. 4.  The Commission rejected the respondents' argument that [                                            ], but it did not address the argument that [                                            ] to OEMs, [                                            ].  Moreover, the Commission's characterization of the [                        ] is unsupported by record evidence, as explained below. *See* Views, PR190/CR178 at n.289.

Defendants concede that the domestic industry allocated more [                        ] to the OEM market. ITCRespMJAR at 46-47; CoalitionRespBr at 34.  However, emphasizing that [                                            ] both the OEM and maintenance markets, the Commission arbitrarily dismissed arguments about [                                ].  ITCRespMJAR at 47, 55-56; PlsMJARBr at 48-50.  Whatever its [                                            ] to OEMs.  Amsted Posthearing Br. Q&A, PR151/CR152 at 9 (M&T's Mr. Mautino describing the company's strategy as "{i}n ... a low car build year ... 60/40 OEM to maintenance. In a high car build year, it could be as much as ... 75,

80 percent new car").  That strategy—reflected in its deliberate [

                    ]—drove its loss of share in the replacement market.

    The Coalition has repeatedly misrepresented evidence concerning [                    ].  The

Coalition says "[

                            ]."  CoalitionRespBr at 35.  But its cited evidence shows [

                            ].  Petitioner's Prehearing Brief, PR136/CR143 at Ex. 2 ("[

        ]").  [

        ].  Amsted Posthearing Br., PR151/CR152 at 9.  The Coalition states "[

                                    ]."  CoalitionRespBr at 34.

But record evidence shows that [

            ].  [                    ] at Att. B.  The Coalition alleges that it "[

                            ]," CoalitionRespBr at 35, but its

evidence shows [

                        ].  [                    ] at Att. B.

    The [                                    ], but the Commission ignored it and

chose to rely on [                                ] in finding that [

                        ].  Views, PR190/CR178 at n.289.  The Coalition,

similarly, never addressed [                        ].  CoalitionRespBr at 34.  These omissions

are telling:  the [

                            ].  Amsted Posthearing Br.,

PR151/CR152 at Ex. 4, Att. 1.  The Commission's findings about [

    ], like its assessment of reasons driving the domestic industry's loss of share in the

replacement channel, were not supported by substantial evidence.

2.      **The Commission erroneously discounted the domestic industry's improved condition in 2022 by attributing it to provisional duties in** *FRC I.*

In the underlying proceeding, Plaintiffs explained that the domestic industry improved by virtually every measure over the POI, but the Commission discounted the improvements by attributing them to provisional duties imposed on imports from China that the Commission unanimously found to be non-injurious.  Views, PR190 at 45-47, 50-51, CR178 at 47-48, 50, 54-55.  The Commission's discounting of these improvements was improper.

The Commission may presume that changes in data after the filing of a petition or the imposition of provisional duties in a pending investigation are related to that pending investigation and reduce the weight accorded to those changes.  *See* 19 U.S.C. § 1677(7)(I); SAA at 854.  Both Defendants invoked this rule to justify the Commission's discounting of the domestic industry's improvements in *FRC II*, but on its face the rule does not apply.  Views, PR190/CR178 at n.236; CoalitionRespBr at 30-31.  The SAA does not authorize discounting data changes in one investigation—*FRC II*—based on the imposition of provisional duties ***in another, prior investigation***, especially when the subject imports were unanimously found to be non-injurious.  The Commission treated *FRC I* and *II* as one and the same by invoking the pendency of *FRC I* to discount data in *FRC II*.  Meanwhile, it reached multiple, inconsistent conclusions across the two investigations as to overlapping record evidence. *See supra* Part V.A. The Commission cannot have it both ways.

Even if the rule were applied across two investigations, the SAA does not permit the Commission to discount domestic industry improvements if there is "sufficient evidence" establishing that the improvements "related to factors other than the pendency of the investigation."  SAA at 854.  This is exactly the case here.  Evidence demonstrating that the domestic industry's improvement ***directly reflected*** the significant increase in OEM demand

stands unrebutted.  *See* PlsMJARBr at 45-46 (citing the Commission's *FRC I* finding that the domestic industry's fortunes rose and fell with shifts in OEM demand and *FRC II* data showing domestic industry's U.S. shipments increased by [                    ] as the increase in U.S. demand 2021-22).  The Commission's discounting of the domestic industry's improvements thus contradicts even the SAA provisions on which it inappropriately relies.

Plaintiffs explained that, in the OEM channel, the domestic industry gained [     ] percentage points of market share that cannot be explained by provisional duties.  PlsMJARBr at 43-44.  The Commission's analysis implies that provisional duties on Chinese imports somehow reduced Mexican imports in the OEM market, reducing the presence of subject imports in the OEM market as a whole and allowing the domestic industry to gain market share, but the Commission has identified no evidence to explain how provisional duties *on China* caused a reduction of *Mexican* imports in the OEM market.  ITCRespMJAR at 44.

Plaintiffs also explained that if the Commission were correct that provisional duties caused purchasers to abandon Chinese imports for domestically produced FRCs, then domestic producers should have picked up sales in the replacement channel, where Chinese imports had been concentrated; however, the domestic industry lost market share in that channel. PlsMJARBr at 43.  The Coalition argues that the domestic industry lost replacement market share because provisional duties did not stop Mexican imports from increasing in that channel, CoalitionRespBr at 32, but this does not provide a reason to discount the domestic industry's significant improvements elsewhere.  If anything, the presence of market competition from Mexico in both channels only underscores that the robust, demand-driven improvements of the domestic industry in the overall market were not attributable to provisional duties affecting only imports from China.

The Coalition attempts to provide a *post hoc* justification for the Commission, arguing that the Commission "did not discount the domestic industry's improvement in 2022, but instead explained it as a condition of competition." CoalitionRespBr at 30. This argument plainly misrepresents the Commission's Views. Views, PR190/CR178 at n.240 (stating that "the Commission is affording reduced weight to the domestic industry's market share gain in the overall market in 2022 due to the impact of the FRC I provisional measures"), n.278 (discounting the domestic industry's improvements in its impact analysis).

### 3. The Commission incorrectly minimized the importance of Bedloe as a distinguishing factor between Chinese imports and domestic FRCs.

Plaintiffs have emphasized the Commission's failure to acknowledge that Bedloe technology remained a significant non-price factor distinguishing domestic FRCs from Chinese imports, such that Chinese imports were not injurious. PlsMJARBr at 52-53. In response, the Coalition incorrectly argues that purchaser TTX's preferences are not indicative of industry preferences and that importers/purchasers reported price as an important purchasing factor. CoalitionRespBr at 35-36. Having afforded special weight to TTX's preferences in *FRC I*, the Commission should have done the same in *FRC II*, because TTX was the largest purchaser of FRCs in 2021 and owned the largest freight railcar fleet in North America. *See FRC I* Views, PR39/CR42 at n.76. In addition, record evidence demonstrates that Bedloe stands for superior FRC quality and reliability, TTX Prehearing Br., PR133/CR145 at 28-37, and nearly all purchasers reported quality/consistency as critical purchasing factors and ranked "quality exceeds industry standards" as important, Staff Report, PR190/CR163 at II-21.

The Commission claims that TTX's [        ] purchases of non-Bedloe FRCs in 2022 shows that TTX to some degree viewed non-Bedloe and Bedloe FRCs as substitutable. Views, PR190 at 53, CR178 at 57; ITCRespMJAR at 49. During the POI in *FRC I*, there was [

PUBLIC VERSION

] of non-Bedloe FRCs driven by supply constraints and new car acquisitions, but the Commission nonetheless affirmed Bedloe's importance as a non-price purchasing factor.  In *FRC II*, the Commission dismissed Bedloe while providing no explanation for this reversal.  PlsMJARBr at 53.

*     *     *

For the reasons stated above, the Court should remand the Commission's final determination and direct it to enter a negative determination.  At the very least, the Court should remand the Commission's final determination and direct the Commission to address the multiple legal and factual errors in its decision.

Dated: April 21, 2025                          Respectfully submitted,

                                               */s/ David M. Morrell*
                                               David M. Morrell
                                               Shelbie M. Rose
                                               JONES DAY
                                               51 Louisiana Avenue, N.W.
                                               Washington, D.C. 20001
                                               202.879.3636
                                               dmorrell@jonesday.com

                                               *Counsel for Wabtec Corporation*

                                               */s/ Andrew T. Schutz*
                                               Andrew T. Schutz
                                               Ned H. Marshak
                                               GRUNFELD, DESIDERIO, LEBOWITZ,
                                               SILVERMAN & KLESTADT LLP
                                               1201 New York Ave. NW #650
                                               Washington, D.C. 20005
                                               202.783.6881
                                               aschutz@gdlsk.com

                                               *Counsel for Strato Inc.*

                                               */s/ James M. Smith*
                                               James M. Smith
                                               Sooan (Vivian) Choi
                                               Wanyu Zhang
                                               John Catalfamo
                                               COVINGTON & BURLING LLP
                                               850 10th Street, NW
                                               Washington, D.C. 20001
                                               202.662.5550
                                               jmsmith@cov.com

                                               *Counsel for Strato Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiffs' Reply Brief in Support of Strato's Motion for Agency Reconsideration and Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record, as computed by Covington & Burling LLP's word processing system, is 10,977 words.  In accordance with the Court's Order, dated March 27, 2025, this brief does not exceed 11,000 words.


*/s/ James M. Smith*
James M. Smith


Dated: April 21, 2025

**LIST OF EXHIBITS**

| Ex. No. | Description | Status |
|---------|-------------|--------|
| 1 | Association of American Railroads M-211 Specifications | BPI |
| 2 | Association of American Railroads M-216 Specifications | BPI |
| 3 | Declaration of Michael Rush, Association of American Railroads | BPI |
| 4 | Declaration of Elizabeth Allran, Norfolk Southern Corporation | BPI |
| 5 | Declaration of Zachary Royer, Union Pacific Railroad | BPI |
| 6 | Declaration of Erik Gotlund, TTX Company | BPI |