Slip Op. 25-134

## UNITED STATES COURT OF INTERNATIONAL TRADE

WABTEC CORP.,

      **Plaintiff,**

  **and**

STRATO, INC.,

      **Consolidated Plaintiff,**

  **v.**

UNITED STATES,

      **Defendant,**

  **and**

COALITION OF FREIGHT COUPLER
PRODUCERS,

      **Defendant-Intervenor.**

**Before: Gary S. Katzmann, Judge**
**Consol. Court No. 23-00157**

*PUBLIC VERSION*

## OPINION AND ORDER

[ Strato, Inc.'s motion for remand is denied. The U.S. International Trade Commission's determination is sustained in part and remanded in part. ]

Dated: <u>October 8, 2025</u>

<u>David M. Morrell</u>, Jones Day, of Washington, D.C., argued for Plaintiff Wabtec Corporation. On the brief was <u>Shelbie M. Rose</u>.

<u>James M. Smith</u>, Covington & Burling LLP, of Washington, D.C, argued for Consolidated Plaintiff Strato, Inc. With him on the joint brief were <u>Shara L Aranoff</u>, <u>Sooan (Vivian) Choi</u>, <u>Paula Ortiz Cardona</u>, <u>Wanyu Zhang</u>, and <u>John Catalfamo;</u> and also <u>Andrew T. Schutz</u> and <u>Ned H. Marshak</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C.

<u>Garrett L. Peterson</u> and <u>Michael K. Haldenstein</u>, Attorney-Advisors, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C. argued for Defendant United States. On the briefs were <u>Dominic L. Bianchi</u>, General Counsel, <u>Andrea C. Casson</u>, Assistant General Counsel for Litigation, and <u>Jane C. Dempsey</u>, Attorney-Advisor.

Daniel B. Pickard, Buchanan Ingersoll & Rooney PC, of Washington, D.C., argued for Defendant-Intervenor Coalition of Freight Coupler Producers. Also on the briefs was Claire M. Webster.

Katzmann, Judge: Plaintiff Wabtec Corporation ("Wabtec") and Consolidated Plaintiff Strato, Inc. ("Strato") (collectively "Plaintiffs") challenge the U.S. International Trade Commission's (the "Commission") final determinations in the antidumping and countervailing duty investigations of freight rail couplers ("FRCs"), the components that connect freight train cars, from China and Mexico. See Certain Freight Rail Couplers and Parts Thereof from China, 88 Fed. Reg. 43398 (ITC July 7, 2023), P.R. 189 ("China Determination"); Certain Freight Rail Couplers and Parts Thereof from Mexico, 88 Fed. Reg. 77612 (ITC Nov. 13, 2023) ("Mexico Determination") (collectively "Final Determinations"). As a result of its investigation of cumulated imports of FRCs from China and Mexico from 2020–2022 ("FRC II"), the Commission determined that "an industry in the United States is materially injured by reason of imports of certain [FRCs] and parts thereof" from both China and Mexico. China Determination, 88 Fed. Reg. at 43398; Mexico Determination, 88 Fed. Reg. at 77612.[1]

The Commission had—one year previously—determined that a U.S. industry was not materially injured by imports of FRCs from China from 2019–2021 in a separate investigation ("FRC I"). Freight Rail Coupler Systems and Components from China, 87 Fed. Reg. 41144 (ITC July 11, 2022) ("FRC I Final Determination"). Central to Plaintiffs challenge here is their allegation that the Commission's Final Determinations in FRC II required "the Commission [to]

---

[1] The Commission's final determinations in the China and Mexico investigation became staggered when Commerce reached an earlier final antidumping and countervailing duty determination for China. See Certain Freight Rail Couplers and Parts Thereof From China and Mexico; Scheduling of the Final Phase of Countervailing Duty and Anti-Dumping Duty Investigations, 88 Fed. Reg. 16031, 16032 (ITC Mar. 15, 2023). Because the Commission cumulated imports from China and Mexico for the purpose of its investigation, the two separate determinations follow the same analysis and reach the same result.

throw its previous determination" resulting from FRC I "into the trash and begin again as through the first proceeding had never happened at all."  Pl.'s Mot. for J. on the Agency R. at 1, Aug. 16, 2024, ECF No. 44 ("Pls.' Br.").

Plaintiffs move for judgment on the agency record, asserting that (1) the Commission erred by allowing the Petitioner to relitigate the <u>FRC I Final Determination</u>, (2) the Commission erred in refusing to exclude Amsted Rail Co., Inc. ("Amsted") from the domestic industry, (3) the Commission improperly cumulated imports subject to the terminated investigation in FRC I, (4) the Commission's finding of material injury by reason of subject imports is unsupported by substantial evidence and otherwise not in accordance with law, and (5) a conflict of interest requires remand of the Commission's decision for issuance of a negative injury determination.  <u>See generally</u> Pls.' Br.  Strato additionally moves for remand based on alleged fraud perpetrated by the domestic industry.  <u>See generally</u> Consol. Pl.'s Mot. for Remand to Agency for Reconsideration, January 31, 2025, ECF No. 51 ("Strato's Mot. for Remand").

The court first concludes that Strato does not provide clear and convincing evidence of fraud and denies Strato's motion for remand.  The court then turns to Plaintiffs' motion for judgment on the agency record and concludes that (1) the Commission did not improperly relitigate the <u>FRC I Final Determination</u>, (2) the Commission's refusal to exclude Amsted from the domestic industry is not supported by substantial evidence, (3) the Commission properly cumulated imports from China and Mexico, and (4) Plaintiffs do not have standing to raise the conflict-of-interest issue.  The court sustains the <u>Final Determinations</u> with respect to the cumulation of imports from China and Mexico, and remands the <u>Final Determinations</u> for the Commission's reconsideration or further explanation of its decision not to exclude Amsted from the domestic industry.  Because the Commission's reconsideration of the domestic industry's composition could significantly alter

the Commission's material injury analysis, the court does not here reach Plaintiffs' argument that

the material injury analysis is not supported by substantial evidence or in accordance with law.

## BACKGROUND

### I.    *Legal Background*

### A.    *Antidumping and Countervailing Duties*

To facilitate fair trade, "[t]he Tariff Act of 1930, as amended, permits Commerce to impose

two types of duties on imports that injure domestic industries:" countervailing duties on goods that

receive countervailable subsidies from a foreign government, and antidumping duties on goods

sold in the United States at less than fair value.  Guangdong Wireking Housewares & Hardware

Co. v. United States, 745 F.3d 1194, 1196 (Fed. Cir. 2014).  Commerce initiates a countervailing

or antidumping duty investigation either upon its own authority or upon the filing of a petition by

an interested party.  See 19 U.S.C. §§ 1671a(a)–(b), 1673a(a)–(b).  Within twenty days after the

date on which a petition is filed, Commerce "shall . . . determine whether the petition alleges the

elements necessary for the imposition of a duty under [§§] 1673 [or 1671] of this title and contains

information reasonably available to the petitioner supporting the allegations, and determine if the

petition has been filed by or on behalf of the industry."  Id. §§ 1673a(c)(1)(A), 1671a(c)(1)(A).  If

the petition does not sufficiently allege the elements necessary for the imposition of duties or the

petition was not filed by or on behalf of the industry, Commerce "shall dismiss the petition,

terminate the proceeding, and notify the petitioner in writing of the reasons for the determination."

Id. §§ 1673a(c)(3), 1671a(c)(3).  Where such a petition alleges the elements necessary for the

imposition of antidumping or countervailing duties and where the petition has been filed by or on

behalf of the industry, Commerce "shall initiate an investigation."  Id. §§ 1673a(c)(2), 1671a(c)(2);

see also id. §§ 1673a(b)(1), 1671a(b)(1).

***PUBLIC VERSION***

Within forty-five days after the date on which the petition is filed—unless Commerce dismisses the petition—the Commission is required to separately make a preliminary determination as to whether there is a reasonable indication that "an industry in the United States . . . is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports of the subject merchandise and that imports of the subject merchandise are not negligible." Id. §§ 1673b(a)(1), 1671b(a)(1); see also id. §§ 1673b(a)(2), 1671b(a)(2).

Within 140 days after the date on which Commerce initiates an antidumping investigation—and after an affirmative determination by the Commission as to material injury, threat of material injury, or material retardation—Commerce "shall make a [preliminary] determination . . . of whether there is a reasonable basis to believe or suspect that the merchandise is being sold, or is likely to be sold, at less than fair value." Id. § 1673b(b)(1)(A). Similarly, in a countervailing subsidy investigation, Commerce "shall make a [preliminary] determination . . . of whether there is a reasonable basis to believe or suspect that a countervailable subsidy is being provided with respect to the subject merchandise" within sixty-five days after the date on which Commerce initiates an investigation—and after an affirmative determination by the Commission. Id. § 1671b(b)(1)(A). Commerce is required to make a final determination in both antidumping and countervailing duty investigations within seventy-five days of its preliminary determination, see id. §§ 1673d(a), 1671d(a)(1), though Commerce may postpone making the final determination in an antidumping duty investigation "until not later than the 135th day after the date on which it published notice of its preliminary determination," id. § 1673d(a)(2).

Within the later of 120 days of Commerce's preliminary determination or forty-five days of Commerce's final determination, the Commission is required to make its final determination as

*PUBLIC VERSION*

to material injury, threat of material injury, and material retardation.  See id. §§ 1673d(b)(2), 1671d(b)(2).

      If the determinations of Commerce and the Commission are affirmative, then Commerce "shall issue an antidumping duty order." Id. §§ 1673d(c)(2); 1671d(c)(2).  If either determination is negative, "the investigation shall be terminated." Id.  Commerce thus imposes duties only where both Commerce and the Commission have made affirmative determinations in their respective investigations.

### B.    *Material Injury Determination*

      Pursuant to the Tariff Act, as amended, the Commission determines whether a domestic industry is materially injured, or threatened with material injury, by reason of unfairly subsidized or dumped imports.  See 19 U.S.C. §§ 1671d(b), 1673d(b).  The Commission will issue an affirmative determination if it finds "present material injury or a threat thereof" and makes a "finding of causation." Hynix Semiconductor, Inc. v. United States, 30 CIT 1208, 1210, 431 F. Supp. 2d 1302, 1306 (2006) (internal quotation marks and citation omitted).  The statute provides that " 'material injury' means harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A).  In making a material injury determination, the Commission evaluates "(1) the volume of subject imports; (2) the price effects of subject imports on domestic like products; and (3) the impact of subject imports on the domestic producers of domestic like products." Hynix, 30 CIT at 1210, 431 F. Supp. 2d at 1306 (citing 19 U.S.C. § 1677(7)(B)(i)(I)–(III)); accord GEO Specialty Chems., Inc. v. United States, 33 CIT 125, 127 (Feb. 19, 2009).  The Commission may also consider "such other economic factors as are relevant in the determination." Hynix, 30 CIT at 1210, 431 F. Supp. 2d at 1306 (quoting 19 U.S.C. § 1677(7)(B)(ii)).

### II.      Factual Background

####       A.      *Freight Rail Couplers ("FRCs")*

FRCs "connect two freight cars together by automatically interlocking the knuckles of both FRCs when the freight cars are pushed together, eliminating the need for previously required and potentially dangerous manual input."  Certain Freight Rail Couplers and Parts Thereof from China, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final) at 9, USITC Pub. 5438 (July 2023), P.R. 190, C.R. 178 ("FRC II China Views").  In addition to connecting freight cars, FRCs "reduce shocks when freight cars are in transit or braking."  Id.  Freight cars typically use two FRCs to allow for coupling additional freight cars together on both ends of the car.  Id.  FRCs are composed of two main parts—knuckles and coupler bodies—along with other ancillary parts.  Id.  The image below displays a pair of uncoupled FRCs and a pair of coupled FRCs both including the two primary parts—a pair of coupler bodies (in white) and a pair of knuckles (in blue):



Letter from D. Pickard to G. Raimondo, Sec'y of Com., re: Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China and the United Mexican States: Petitions for the

Imposition of Antidumping and Countervailing Duties at 9 (Sept. 28, 2022), C.R. 1, P.R. 1 ("FRC

II Petitions").  The image below depicts a single knuckle separate from the coupler body:



Id.

There are two primary markets for FRCs.  The first is the Original Equipment Manufacturer

("OEM") channel, in which builders incorporate FRCs into new freight railcars.  See FRC II China

Views at 27.  The second is the replacement channel, in which railcar owners and maintenance

companies replace old FRCs on freight railcars already in service.  See id.

### B.    *2019–2021 Investigation of FRCs from China ("FRC I")*

On September 29, 2021, Defendant-Intervenor the Coalition of Freight Coupler Producers

(the "Coalition") filed petitions for the imposition of antidumping and countervailing duties on

U.S. imports of freight rail coupler systems and components from China.  See Letter from D.

Pickard to G. Raimondo, Sec'y of Com., re: Certain Freight Rail Coupler Systems and

Components Thereof from the People's Republic of China: Petitions for the Imposition of

Antidumping and Countervailing Duties at 1, Case No. A-570-143, Bar Code: 4165365-01 (Sept.

29, 2021) ("FRC I Petitions").  Commerce initiated FRC I covering a period of investigation of

calendar years 2019–2021.  See FRC II China Views at 38 n.208.  At the end of FRC I, the

Commission determined that "an industry in the United States is not materially injured or

threatened with material injury by reason of subject imports of FRCs from China that are sold in

the United States at [less-than-fair-value] and that are subsidized by the government of China."
Freight Rail Coupler Systems and Components from China, Inv. Nos. 701-TA-670, 731-TA-1570
(Final) at 53, USITC Pub. 5331 (July 2022) ("FRC I Views"), PR. 39, C.R. 40; see also FRC I
Final Determination, 87 Fed. Reg. at 41144.

### C.    2020–2022 Investigation of FRCs from China and Mexico ("FRC II")

On September 28, 2022, the Coalition again filed petitions for the imposition of
antidumping and countervailing duties on U.S. imports of freight rail coupler systems and
components, this time covering imports from both China and Mexico.  See FRC II Petitions.
Commerce initiated an investigation covering a period of investigation of calendar years
2020–2022.  See FRC II China Views at 38 n.208.

In its preliminary results, the Commission found that Amsted meets the definition of a
related party because it imported subject merchandise and owned a Mexican producer and exporter
of subject merchandise during the period of investigation.  USITC Views of the Commission
(Preliminary) at 24 (ITC Nov. 25, 2022), P.R. 102, C.R. 96 ("FRC II Preliminary Views").  The
Commission went on to preliminarily determine that appropriate circumstances do not exist to
exclude Amsted from the domestic industry "given that its ratio of subject imports to domestic
production was [[     ]] high throughout the [period of investigation] and its stated reasons for
importing subject merchandise were lowering costs and expanding sales for its largest customers."
Id. at 26.  In its Final Determinations, the Commission again found that Amsted meets the
definition of a related party but determined that appropriate circumstances do not exist to exclude
Amsted from the domestic industry because its "domestic production activities were [not] shielded
from competition with subject imports . . . ."  FRC II China Views at 23.

Turning to material injury, the Commission determined that, during the period of investigation, "an industry in the United States is materially injured by reason of imports of certain freight rail couplers and parts thereof . . . from China found by [Commerce] to be sold in the United States at less than fair value . . . and to be subsidized by the government of China." Id. at 3; see also China Determination, 88 Fed. Reg. at 43398–99. The Commission applied the same analysis to similarly determine that "an industry in the United States is materially injured by reason of imports of certain freight rail couplers and parts thereof from Mexico." Certain Freight Rail Couplers from Mexico and Parts Thereof, Inv. No. 731-TA-1593 (Final) at 3, USITC Pub. 5470 (Nov. 2023) ("FRC II Mexico Views"); see also Mexico Determination, 88 Fed. Reg. at 77612.

At multiple points in its analysis, the Commission distinguished FRC II from FRC I. For example, in its discussion of impact for the purposes of determining material injury, the Commission noted that:

> the Commission's decision in [FRC I] was based on a different record with a different scope, and of course only concerned imports of FRCs (and certain additional components) from China. Specifically, the Commission found that the increase in nonsubject imports from Mexico (subject of the current investigations) explained the domestic industry's market share loss over the [period of investigation].

FRC II China Views at 58.

## PROCEDURAL HISTORY

Wabtec brought this action against the Government on September 13, 2023, to challenge the Commission's final affirmative injury determination in the FRC II antidumping and countervailing duty investigation of certain freight rail couplers and parts thereof from China and Mexico. See Compl., Sept. 13, 2023, ECF No. 9. The Coalition moved to intervene as a Defendant-Intervenor in the instant action under USCIT Rule 24, see Mot. to Intervene, Sept. 18, 2023, ECF No. 18, and the court granted the motion, see Order Granting Mot. to Intervene, Sept.

***PUBLIC VERSION***

18, 2023, ECF No. 19.

On January 31, 2024, Wabtec moved to consolidate this case with <u>Amsted Rail Co. v.</u> <u>United States</u>, No. 23-00268 (CIT filed Jan 31, 2024) and <u>Strato, Inc. v. United States</u>, No. 23-00158 (CIT filed Jan. 31, 2024). <u>See</u> Mot. to Consolidate Cases, Jan. 31, 2024, ECF No. 25. The Government consented to consolidation of <u>Wabtec</u> and <u>Strato</u>, and both the Government and the Coalition opposed consolidation with <u>Amsted Rail</u>. <u>See</u> Gov't Resp. in Opp'n to Mot. to Consolidate Cases, Feb. 21, 2024, ECF No. 28; Def.-Inter.'s Resp. in Opp'n to Mot. to Consolidate Cases, Feb. 21, 2024, ECF No. 27. Wabtec moved to file a reply in support of consolidation. <u>See</u> Mot. for Leave to File Reply, Feb. 26, 2024, ECF No. 30; Reply in Supp. of Mot. to Consolidate, Mar. 22, 2024, ECF No. 31. The court subsequently granted consolidation of <u>Wabtec</u> and <u>Strato</u> and denied consolidation with <u>Amsted Rail</u>. <u>See</u> Order on Consolidation, Mar. 22, 2024, ECF No. 30.

On August 19, 2024, Plaintiff Wabtec and Consolidated-Plaintiff Strato filed a Motion for Judgment on the Agency Record under USCIT Rule 56.2. <u>See</u> Pls.' Br. The Government filed its response brief on December 19, 2024. <u>See</u> Gov't Resp. Br., Dec. 19, 2024, ECF No. 47 ("Gov't Br."). Strato, with Wabtec's support, filed a motion for remand on January 31, 2025. <u>See</u> Strato's Mot. for Remand. On February 21, 2025, the Coalition filed a response to both Plaintiffs' Motion for Judgment on the Agency Record and Strato's Motion for Remand. <u>See</u> Def.-Inter.'s Resp. to Mot. for J. on the Agency R., Feb. 21, 2025, ECF No. 56; <u>see also</u> Def.-Inter.'s Amended Resp., Mar. 17, 2025, ECF No. 64 ("Def-Inter.'s Br."). The Government also filed a response to Strato's Motion for Remand on March 7, 2025. <u>See</u> Gov't Resp. to Mot. for Remand, Mar. 7, 2025, ECF No. 60. Wabtec and Strato filed a joint reply on April 18, 2025. <u>See</u> Pls.' Reply in Supp. of Mot. for Remand and Mot. for J. on the Agency R., Apr. 18, 2025, ECF No. 69 ("Pls.' Reply").

**PUBLIC VERSION**

    With all papers filed, the court held oral argument on both motions on July 2, 2025.  See Order, May 29, 2025, ECF No. 77.  Prior to oral argument, the court issued, and the parties responded to, questions regarding the case.  See Letter re: Qs. for Oral Arg., June 18, 2025, ECF No. 78; Def.-Inter.'s Resp. to Ct.'s Qs. for Oral Arg., June 27, 2025, ECF No. 84; Pls.' Resp. to Ct.'s Qs. for Oral Arg., June 27, 2025, ECF No. 85; Gov't Resp. to Ct.'s Qs. for Oral Arg., June 27, 2025, ECF No. 87.  As directed by the court, the parties filed supplemental briefs following oral argument.  See Def.-Inter.'s Post-Arg. Br., July 21, 2025, ECF No. 92; Gov't Post-Arg. Br., July 21, 2025, ECF No. 94; Pls.' Post-Arg. Br., July 21, 2025, ECF No. 96.

## JURISDICTION AND STANDARD OF REVIEW

    Jurisdiction lies under 28 U.S.C. § 1581(c).  The court will "hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Broadcom Corp. v. Int'l Trade Comm'n, 28 F.4th 240, 249 (Fed. Cir. 2022).

    "The court will find a determination unlawful where [the agency] has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions."  Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996).  The Commission "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co. Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)) (referring to the arbitrary and capricious standard); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citing Amanda Foods (Viet.)

Ltd. v. United States, 33 CIT 1407, 1416, 647 F. Supp. 2d 1368, 1379 (2009)) (requiring the same

of the agency with respect to the substantial evidence standard).  To be supported by substantial

evidence, a determination must account for "whatever in the record fairly detracts from its weight,"

including "contradictory evidence or evidence from which conflicting inferences could be drawn."

Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994)

(quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487–88 (1951)).

## DISCUSSION

### I.    *Strato's Allegation of Fraud Does Not Require Remand*

The court first turns to Strato's motion for remand based on alleged fraud perpetrated by

the domestic industry.  See generally Strato's Mot. for Remand.  Strato argues that remand is

necessary given "newly emerged evidence" that domestic FRC manufacturers produced knuckles

following a new, non-approved design during the period of investigation.  Id. at 1.

The Association of American Railroad ("AAR") is "the standard-setting organization for

North America's railroads."         About AAR, Association of American Railroads,

https://www.aar.org/about-us/ (last visited Sept. 3, 2025).  According to the Commission, "[t]he

main components of FRCs are manufactured in accordance with the [AAR] standards to ensure

FRCs in the United States are interoperable."   FRC II China Views at 9.   On July 18, 2017,

McConway and Torley ("M&T")—a domestic manufacturer of FRCs—obtained a patent for a

knuckle that reflects several modifications to the existing knuckle, including a "chang[e to] the

pulling lug angle of the knuckles by 30 degrees."  Def.-Inter.'s Br. Ex. 2 ¶ 6 ("[[    ]] Declaration");

see generally Strato's Mot. for Remand Ex. 5 ("M&T Patent").  A comparison between the existing

lug design in the image below on the left and the modified design in the image below on the right

demonstrates this changed pulling lug angle, circled in both images.[2]



M&T Patent at 2, 6.

[[     ]] declared that the company has consistently considered the modified knuckle to

represent "a design modification that did not require AAR preapproval." [[     ]] Declaration ¶ 6.

Though M&T did not seek out preapproval of the modified knuckle, id., the AAR undertakes

---

2 The images above demonstrate the existing and modified knuckles paired with the existing
coupler. M&T's Patent also includes a new, complementary coupler body that more closely
matches the modified geometry of the modified knuckle, pictured paired with the modified knuckle
below.



M&T Patent at 5. According to Strato, "[[     ]]." Strato's Mot. for Remand at 17. Strato also
states that "[[     ]]," but [[     ]]. Id. at 17. Because the modified coupler [[     ]] during the period
of review, any claims regarding the incompatibility of the modified coupler with existing knuckles
are not relevant to the court's analysis of whether the domestic industry misrepresented that the
modified knuckles met AAR specifications.

**PUBLIC VERSION**

regular testing to determine whether FRCs and components meet AAR specifications, id. at ¶ 7. During the period of review, the AAR tested the modified knuckles annually to ensure they met the M-211 product approval requirements and once to ensure they met the M-216 fatigue test standards, issuing approvals in each instance. See Def.-Inter.'s Br. Attach. 2, at Exs. C, F ("M-211 Approvals"); id. at Ex. D ("M-216 Approval"). The AAR also conducted an audit of the company's facility in 2020 and subsequently indicated that the company demonstrated compliance with certain AAR specifications.[3] Id. at Ex. E ("Audit Approval"). On October 20, 2023, the AAR sent M&T a letter indicating that it intended to investigate the modified knuckle. See Strato's Mot. for Remand Ex. 6 at 1 ("AAR Letter").[4]

Strato requests remand for the Commission to reconsider its final affirmative injury determination in light of "newly emerged evidence of fraud perpetrated by the domestic industry during the course of underlying investigation." Strato's Mot. for Remand at 1. Strato claims that "[d]omestic producers withheld the material fact that they were producing and selling newly designed, non-AAR-approved knuckles prior to and throughout the [period of investigation]." Id. at 10. The Government and the Coalition respond that Plaintiffs knew about the dispute over the modified knuckle long before Plaintiffs filed their motion for judgement on the agency record such that the request for remand is untimely, see Gov't Resp. to Mot. for Remand at 4–6; Def.-Inter.'s Br. at 49, and that Strato did not provide clear and convincing evidence of fraud, see Gov't Resp. to Mot. for Remand at 9; Def.-Inter.'s Br. at 52. The Coalition also separately argues that the court

---

[3] AAR's [[    ]] audit indicated that M&T's [[    ]] demonstrated compliance with the AAR's [[    ]] specifications. See Def.-Inter.'s Br. Attach. 2, at Ex. E.

[4] Specifically, the AAR stated its [[    ]] See AAR Letter. In the letter, the AAR informed M&T that [[    ]] Id. [[    ]] Id. at 2 (emphasis in original).

does not have jurisdiction because the fraud "has not been submitted to the agency for consideration." Def.-Inter.'s Br. at 47.

"[W]here a party brings to light clear and convincing new evidence sufficient to make a prima facie case that the agency proceedings under review were tainted by material fraud, the [USCIT] abuses its discretion when it declines to order a remand to require the agency to reconsider its decision in light of the new evidence." Home Prods. Int'l, Inc. v. United States, 633 F.3d 1369, 1378 (Fed. Cir. 2011). The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has described "clear and convincing evidence" as "evidence which produces in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions [is] highly probable.' " Buildex Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1463 (Fed. Cir. 1988) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984) (internal quotation marks omitted)). The USCIT has held that the Home Prods. inquiry as to whether the proceedings were tainted by material fraud "is broader, and less exacting, than a determination regarding whether the conduct of a party has met the legal elements of fraud." Tianjin Magnesium Intern. Co. v. United States, 36 CIT 608, 612, 836 F. Supp. 2d 1377, 1381 (2012).

As evidence of the alleged fraud, Strato highlights that domestic producers conveyed that the components were AAR-approved by stamping the knuckles with an AAR mark, assigning the knuckles the same catalogue numbers as AAR-approved knuckles, and indicating that the knuckles were AAR-certified on their public websites. See Strato's Mot. for Remand App. A, at 36 ("Request for Reconsideration"). Additionally, Strato notes a variety of comments from domestic producers during FRC II indicating that the knuckles and coupler fits were AAR-approved. Id. at 39–41. Finally, Strato produces the October 2023 AAR Letter indicating that it intended to investigate the modified knuckle along with several declarations from AAR representatives stating

that they "first learned that M&T and Amsted had been making and selling knuckles with a new design in the U.S. market . . . in June 2023." Strato's Mot. for Remand App. A at Ex. 1 ("Allran Declaration"); see also id. at Ex. 2 ("Gotlund Declaration"); id. at Ex. 3 ("Franz Declaration").

Strato's allegations do not amount to "clear and convincing evidence sufficient to make a prima facie case that the agency proceedings under review were tainted by material fraud." Home Prods., 633 F.3d at 1378. While Strato's evidence suggests the domestic industry frequently communicated that its modified knuckle was AAR-approved, none of Strato's evidence suggests that the domestic industry's communications constituted knowing misrepresentations. Indeed, the Coalition provides compelling evidence that the domestic industry had—and still has—the good faith belief that the modified knuckle was fully consistent with AAR specifications. The Coalition notes that "[M&T's] foundry that produces the E-type knuckles and E-type couplers has been continuously inspected and approved under the M-1003 standard by AAR." Def.-Inter.'s Br. at 54. Additionally, "[M&T's] E-Type knuckle and E-Type and E/F-Type couplers were annually approved by AAR as meeting the M-211 and M-216 specifications during the period of investigation." Id. at 54–55. The domestic industry's comments that the knuckles and coupler fits were AAR-approved are far from misleading—they seem to be accurate.

The AAR's letter indicating its intention to investigate the modified knuckle and the various declarations from AAR representatives reflect an ongoing dispute as to whether the design modification constituted a permissible product enhancement as opposed to a design change that required AAR approval. See AAR Letter; Allran Declaration; Gotlund Declaration; Franz Declaration. However, the existence of this dispute does not constitute clear and convincing evidence that the domestic industry knowingly misled the AAR or the Commission. Strato has not provided any evidence indicating that the domestic industry did not have the good faith belief

that their design modification constituted a permissible product enhancement that did not require new AAR approval.  In fact, a domestic producer at least once indicated to an AAR committee member that it was modifying the knuckle.[5]  <u>See</u> M-216 Approval.  Without clear and convincing evidence that the domestic industry knowingly misrepresented that the modified knuckle met AAR-certification standards, Strato's motion for remand on the basis of fraud must be denied.

## II.    *The Commission Did Not Improperly Relitigate <u>FRC I</u>*

The court now turns to Plaintiffs' motion for judgment on the agency record.  Recall that—upon the Coalition's filing of petitions on September 29, 2021—Commerce initiated FRC I, investigating U.S. imports of freight rail coupler systems and components from China from 2019–2021.  <u>See</u> FRC I Petitions; FRC II China Views at 38 n.208.  In FRC I, the Commission determined that the domestic industry is not materially injured or threatened with material injury by reason of subject imports.  <u>See</u> FRC I Views at 53; <u>FRC I Final Determination</u>, 87 Fed. Reg. at 41144.  Upon the Coalition's filing of new petitions on September 28, 2022, Commerce initiated FRC II, investigating U.S. imports of freight rail coupler systems and components from China and Mexico from 2020–2022.  <u>See</u> FRC II Petitions; FRC II China Views at 38 n.208.  In FRC II, the Commission determined that the domestic industry is materially injured by reason of subject imports.  FRC II China Views at 3; FRC II Mexico Views at 3; <u>see also</u> <u>China Determination</u>, 88 Fed. Reg. at 43399; <u>Mexico Determination</u>, 88 Fed. Reg. at 77612.

Plaintiffs argue that the Commission "erred in . . . failing to acknowledge, much less exercise, its inherent authority to preserve the integrity of its proceedings," by "declining to reexamine [FRC I] without adequate justification."  Pls.' Br. at 18.  Plaintiffs also claim that the Commission improperly refused to apply § 1675(b)(4), which Plaintiffs suggest "requires that a

---

[5] [[    ]]." M-216 Approval.  [[    ]]  <u>Id.</u>  [[    ]]."  <u>Id.</u>

petitioner show 'good cause' before seeking 'review' of any final determination by the Commission, if less than two years have elapsed." Pls.' Br. at 18 (quoting 19 U.S.C. § 1675(b)(4)). Plaintiffs' arguments fail because Commerce—not the Commission—makes the threshold determinations that dictate whether an investigation must be initiated and because § 1675(b)(4) applies only to changed circumstances reviews—not to a new investigation based on different petitions and involving a different scope and period of investigation.

### A.  *FRC II Is Not a "Relitigation" of FRC I*

Plaintiffs mischaracterize FRC II as an improper "relitigat[ion]" of FRC I that would allow for "an endless cycle of reinvestigation whenever [petitioners] are displeased with a prior determination." Pls.' Br. at 18. This characterization incorrectly suggests that FRC I and FRC II are investigations with identical scopes. To the contrary, there are key differences between FRC I and FRC II including different scopes, different subject countries, and different periods of investigation. FRC I covered knuckles, coupler bodies, coupler yokes, and follower blocks imported from China from 2019–2021. See FRC I Views at 6; FRC II China Views at 38 n.208. FRC II, on the other hand, covered knuckles and coupler bodies—but not coupler yokes or follow blocks—imported from China and Mexico from 2020–2022. See FRC II China Views at 9. Some of the merchandise subject to the FRC I investigation was also subject to the FRC II investigation—namely knuckles and coupler blocks imported from China from 2020–2021. Importantly though, FRC II did not include some merchandise that was subject to FRC I—namely coupler yokes and follower blocks and all merchandise from 2019–2020. Additionally, FRC II included some merchandise that was not subject to FRC I—namely imports from Mexico and imports from China from 2021–2022.

This court has long held that the Commission's material injury determinations are "<u>sui</u>

generis, involving a unique combination and interaction of many economic variables." Armstrong Bros. Tool Co. v. United States, 489 F. Supp. 269, 279 (Cust. Ct. 1980); see also Connecticut Steel Corp. v. United States, 18 CIT 313, 318, 852 F. Supp. 1061, 1066 (1994); Timken Co. v. United States, 28 CIT 277, 290, 321 F. Supp. 2d 1361, 1372 (2004); AWP Indus., Inc. v. United States, 35 CIT 774, 790, 783 F. Supp. 1266, 1282 (2011). An investigation of knuckles and coupler bodies imported from China and Mexico from 2020–2022 inevitably shares some overlapping economic variables with an investigation of knuckles, follower bodies, coupler yokes, and follower blocks imported from China from 2019–2021. However, such an investigation also includes distinct economic variables—most obviously those relevant to imports in 2022 and imports from Mexico. These variables—even those common between both investigations—combine and interact in different ways such that the Commission's analysis and conclusion in FRC I "cannot be regarded by the Commission as dispositive of the determination[s] in" FRC II. Armstrong Bros., 489 F. Supp. at 279. Because FRC I and FRC II do not cover identical scopes, countries, and periods of review, FRC II cannot be accurately characterized as a relitigation of FRC I.

### B.    The Commission Has No "Inherent Authority" to Refuse to Initiate an Investigation

Contrary to the Plaintiffs' argument, the Commission has no "inherent authority to . . . refus[e] to reexamine prior determinations without good cause," Pl.'s Br. at 22, because it is Commerce, not the Commission, that initiates an investigation. Recall that within twenty days of the filing of a petition, Commerce must determine whether the petition alleges the elements necessary for the imposition of a duty, whether the petition contains information reasonably available to the petitioner supporting the allegations, and whether the petition has been filed by or on behalf of the industry. 19 U.S.C. §§ 1673a(c)(1), 1671a(c)(1). Where Commerce determines that the petition alleges the necessary elements and that it was filed by or on behalf of the industry,

Commerce "shall initiate an investigation." Id. §§ 1673a(c)(2), 1671a(c)(2); see also id. §§ 1673a(b)(1), 1671a(b)(1). Once Commerce initiates an investigation, the Commission must produce its preliminary determinations within forty-five days of the petition. Id. §§ 1673b(a), 1671b(a). The Commission has no power to decline to initiate an investigation, as Plaintiffs allege. Where Commerce initiates an investigation, the Commission is required to separately determine whether there is a reasonable indication that "an industry in the United States . . . is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports of the subject merchandise and that imports of the subject merchandise are not negligible." Id. §§ 1673b(a)(1), 1671b(a)(1); see also id. §§ 1673b(a)(2), 1671b(a)(2).

### C.    Section 1675(b)(4) Applies Only to Changed Circumstance Reviews

Plaintiffs separately argue that "Petitioner was required to establish—and the Commission was required to find—'good cause' before forcing another investigation into FRCs from China." Pls.' Br. at 20. Plaintiffs point to § 1675(b)(4), which states that "[i]n the absence of good cause shown . . . the Commission may not review a [final injury determination] . . . less than [twenty-four] months after the date of publication of notice of that determination or suspension."

The court's "job is to interpret [statutory] words consistent with their 'ordinary meaning.' " Wisconsin Central Ltd. v. United States, 585 U.S. 274, 277 (2018) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)). As the Government notes, § 1675(b) is titled "[r]eviews based on changed circumstances." FRC II is not a review based on changed circumstances, and it is a stretch to suggest that a provision within a subsection titled "[r]eviews based on changed circumstances" applies to anything but reviews based on changed circumstances. Id.

Plaintiffs highlight that two other paragraphs in the subsection are explicitly limited to review "under this subsection."  Pls.' Br. at 29 (citing 19 U.S.C. § 1675(b)(2)–(3)).  According to Plaintiffs, § 1675(b)(4) applies to reviews of any final Commerce and Commission determinations because it does not contain the same reference to review "under this subsection."  Id.  "[W]e do not usually pick a conceivable-but-convoluted interpretation over the ordinary one."  Stanley v. City of Sanford, Fla., 606 U.S. __, __, 145 S. Ct. 2058, 2065–66 (2025).  The fact that paragraphs (2) and (3) explicitly refer to reviews "under this subsection," does not obviate the fact that paragraph (4) also clearly falls within the same subsection covering "[r]eviews based on changed circumstances."  19 U.S.C. § 1675(b).  There is no reason to assume it applies to anything other than changed circumstance reviews, as the chapeau and structure of the subsection make clear.

Even ignoring the title of the subsection, the text of § 1675(b)(4) provides an instance where Commerce may not "review" a determination.  Id. § 1675(b)(4).  As discussed above, FRC II is not a review of FRC I given the multitude of differences between the investigations.  As a result, § 1675(b)(4) does not require the Commission to find good cause before making a determination in FRC II.

### III.    *The Commission's Determination that Appropriate Circumstances Do Not Exist to Exclude Amsted from the Domestic Industry Is Not Supported by Substantial Evidence*

Plaintiffs next argue that the Commission erred in including Amsted within the domestic industry.  Pls.' Br. at 24.  The domestic industry consists of the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A).  The statute allows the Commission to exclude from the domestic industry producers that are related to an exporter or importer of subject merchandise or which are

Case 1:23-cv-00157-GSK    Document 108    Filed 10/17/25    Page 23 of 35

Consol. Court No. 23-00157                                                    Page 23
**PUBLIC VERSION**

themselves importers in certain circumstances.  See id. § 1677(4)(B); see also Torrington Co. v.

United States, 16 CIT 220, 224, 790 F. Supp. 1161, 1168 (1992), aff'd, 991 F.2d 809 (Fed. Cir.

1993); Sandvik AB v. United States, 13 CIT 738, 748–49, 721 F. Supp. 1322, 1331–32, (1989),

aff'd, 904 F.2d 46 (Fed. Cir. 1990); Empire Plow Co. v. United States, 11 CIT 847, 852, 675 F.

Supp. 1348, 1352–53 (1987).

    This court has repeatedly upheld the Commission's consideration of five factors in deciding

whether appropriate circumstances exist to exclude a related party:

> (1) the percentage of domestic production attributable to the importing producer;
> (2) the reason the U.S. producer has decided to import the product subject to
> investigation (whether the firm benefits from unfair trade practice or to enable them
> to continue production and compete in the domestic market); (3) whether inclusion
> or exclusion of the importing producer will skew the data for the rest of the industry;
> (4) the ratio of import shipments to U.S. production for the importing producer; and
> (5) whether the primary interest of the importing producer lies in domestic
> production or importation.

Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n, 39 CIT 1105, 1121–22, 100

F. Supp. 3d 1314, 1329 (2015), aff'd, 879 F.3d 1377 (Fed. Cir. 2018) (quoting Allied Mineral

Prods., Inc. v. United States, 28 CIT 1861, 1865 (2004)); see also Torrington Co., 16 CIT at 224,

790 F. Supp. at 1168.  "The most significant factor . . . in making the 'appropriate circumstances'

determination is whether the domestic producer accrued a substantial benefit from its importation

of the subject merchandise." Allied Mineral, 28 CIT at 1864 (citing Empire Plow, 11 CIT at 853,

675 F. Supp. at 1353); see also Changzhou Trina, 39 CIT at 1121, 100 F. Supp. 3d at 1329.  "[T]he

[related parties] provision's purpose is to exclude from the industry headcount domestic producers

substantially benefitting from their relationships with foreign exporters."  USEC, Inc. v. United

States, 25 CIT 49, 61, 132 F. Supp. 2d 1, 12 (2001), aff'd, 34 Fed. App. 725 (Fed. Cir. 2002).  "This

provision was enacted 'so that domestic producers whose interests in the imports were strong

enough to cause them to act against the domestic industry would be excluded from the

[Commission's] consideration and investigation into material injury or threat thereof.' "

Changzhou Trina, 29 CIT at 1117–18, 100 F. Supp. 3d at 1326 (quoting USEC, 25 CIT at 61, 132

F. Supp. 2d at 12).

Though the Commission considered that traditional five factors in determining that

exclusion is not appropriate, multiple of its conclusions are not supported by substantial evidence.

The Commission's determination that "appropriate circumstances do not exist to exclude Amsted

from the domestic industry as a related party," relied entirely on two underlying findings that were

not supported by substantial evidence: (1) that Amsted's reason for importation is to compete with

domestic production and (2) that Amsted's exclusion would skew the domestic industry data.

Additionally, the Commission failed to appropriately weigh the final three factors—all of which

seem to support Amsted's exclusion.

### A.    *The Commission Did Not Articulate a Rational Connection Between Amsted's Domestic Production Performance and Its Determination Not to Exclude Amsted*

The Commission did not "articulate a . . . rational connection between the facts found and

the choice made." State Farm, 463 U.S. at 43 (internal quotation marks omitted) (referring to the

arbitrary and capricious standard); see also Bestpak, 716 F.3d at 1378 (requiring the same of the

agency with respect to the substantial evidence standard). Specifically, the Commission failed to

provide a rational connection between the facts of Amsted's domestic production performance and

its determination that "Amsted's domestic production was not shielded from competition with

subject imports during the [period of investigation]." FRC II China Views at 19.

On the second factor—Amsted's reason for importation—the Commission concluded that

Amsted imported FRCs to "substitut[e] [FRCs] from Mexico for its domestic production of the

same FRC products." Id. at 20. The Commission cites to [[    ]] unit values for sales of imported

**PUBLIC VERSION**

subject merchandise in comparison to sales of the same domestically produced products and Amsted's domestic production decline during the period of investigation.  See id. at 20–21.  None of the statistics that the Commission cites to—including [[    ]] unit values for imported subject merchandise, [[    ]] capacity utilization, a decline in shipments and market share, a higher operating income to net sales ratio, and an increased cost of goods sold to net sales ratio—connect directly to the Commission's determination that Amsted was not shielded from competition with subject merchandise from Mexico.  Indeed, these statistics could all support Amsted's own statement that its primary interest during the period of investigation was in importation.  Amsted reported that its subject imports from Mexico complemented the domestically produced FRCs and thus did not compete with them in the U.S. market.  See, e.g., Amsted's Post Hearing Br. at 4 (May 25, 2023), P.R. 151, C.R. 152.  Amsted also reported that it had no lost sales or revenue due to subject imports from Mexico and that it was not materially injured by subject imports.  See Amsted's U.S. Producers' Questionnaire at 41–43 (Apr. 5, 2023) C.R. 125.[6]  Additionally, as two dissenting commissioners noted, Amsted "is a principal respondent [[    ]]" regarding material injury caused by subject imports from Mexico.  Separate Views of Chairman David S. Johanson and Commissioner Amy A. Karpel on Related Parties at 5 (July 7, 2023) P.R. 190, C.R. 180 ("Separate Views").  The Commission did not recognize, let alone account for Amsted's statements regarding a lack of any injury to its domestic production.

Several other facts detract from the weight of the statistics the Commission cites to support its conclusions that Amsted was not shielded from competition from subject imports and that Amsted did not benefit from subject imports.  For example, during the period of investigation,

---

[6] Amsted also stated that it [[    ]].  Amsted's Resp. to U.S. Producers' Questionnaire at 41–43 (Apr. 5, 2023) C.R. 125.

Amsted's domestic FRC production took place at a single facility of the seventeen it maintains across the United States.  See Amsted's Resp. to U.S. Producers' Questionnaire at 43 (Apr. 5, 2023) C.R. 125.[7]  This supports Amsted's own assertion that its domestic production complemented its imports from its Mexican facility by, for example, bundling its FRCs with other rail products which are the bulk of its production, especially in the United States.  See Amsted's Post-Hearing Br. at 4 (May 25, 2023), P.R. 151, C.R. 152.  The Commission did not adequately account for facts suggesting that Amsted benefitted from the import of subject merchandise from Mexico.

### B.    *The Commission's Conclusion that Amsted's Exclusion Would Skew the Data Is Unsupported by Substantial Evidence*

The Commission does not explain how exclusion of a minority of domestic production would skew—not merely reduce—the domestic industry data.  On the third factor—the skewing of data—the Commission concluded that the exclusion of Amsted "would skew the data for the domestic industry."  FRC II China Views at 23.  The Commission found that "excluding Amsted would have the effect of masking declines in the domestic industry's market share, financial performance, and employment," and "would . . . mask the available capacity for FRC production in the United States."  Id. at 23.  The Commission's analysis on this factor suggests that the exclusion of any producer from the domestic industry would skew the data.  Exclusion of data is not synonymous with skewing data.  Exclusion of Amsted would still leave the majority of domestic production accounted for in the Commission's analysis.  See Separate Views at 4–5. While excluding some domestic production from the investigation would certainly remove the capacity and other financial data related to that production, it would not inevitably skew the

---

[7] Even at that single domestic facility, FRCs accounted for a [[    ]] of the facility's overall production.  See id. at 12.  Most subject imports from Mexico in 2022 were [[    ]], which [[    ]]. See Separate Views at 3 (citing Amsted's Importer Questionnaire at II-14(d) (Apr. 5, 2023), C.R. 122 ).

**PUBLIC VERSION**

remaining data.  In fact, Amsted's exclusion would leave a domestic industry comprised of the only domestic manufacturer that is claiming material injury by subject imports.  The exclusion of Amsted does not clearly result in skewed domestic industry data as the Commission seems to imply.  See FRC II China Views at 23.  The Commission provided no reasoning or substantial evidence supporting its conclusion that Amsted's exclusion would skew the domestic industry data.

### C.    The Commission Failed to Account for Evidence Supporting Amsted's Exclusion

The Commission failed to "take into account whatever in the record fairly detracts from its weight." Universal Camera, 340 U.S. at 488.  The Commission noted facts related to the remaining three factors—Amsted's relatively small share of the domestic industry, Amsted's high ratio of subject imports to U.S. production, and Amsted's primary interest—but failed to weigh the impact of these factors.  See FRC II China Views at 17.  While Amsted's reason for importation—and specifically "whether the domestic producer accrued a substantial benefit from its importation of the subject merchandise," Allied Mineral, 28 CIT at 1864—is the most substantial factor to the Commission's determination, the Commission must properly account for evidence that supports exclusion beyond merely suggesting that it is "not dispositive."  FRC II China Views at 18.  Though no single factor among the five traditional factors the Commission considers in determining whether appropriate circumstances exist to exclude a producer is dispositive, the Commission must still account for whatever in the record fairly detracts from the weight of evidence supporting Amsted's inclusion in the domestic industry—including facts relevant to the remaining three factors.

On the first factor—Amsted's share of domestic production—the Commission noted that

Amsted accounted for a minority[8] of domestic production during the period of investigation.  Id. at 17.  However, the Commission did not indicate whether this percentage of domestic production supported exclusion or not and instead focused on the fact that "Amsted is one of two remaining domestic producers."  Id.  The relevance of the number of domestic producers to the Commission's determination on exclusion is not immediately clear from the Commission's explanation.  While the Commission notes the number of domestic producers when discussing Amsted's share of domestic production, it went on to use the fact as support for the conclusion that exclusion of "one of two remaining domestic producers" would "mask declines in the industry's performance."  Id. at 23.  Though the Commission's reasoning for determining that Amsted's exclusion would skew the domestic industry data is itself not supported by substantial evidence, as outlined above, the fact that exclusion of a producer would leave only one remaining producer has nothing to do with that producer's share of domestic production—the first factor.[9]  The Commission's analysis does not clearly indicate whether or why this factor might support or detract from its ultimate determination not to exclude Amsted.

On the fourth and fifth factors—Amsted's ratio of subject imports to U.S. production and Amsted's primary interest, respectively—the Commission acknowledged that both factors support exclusion but concluded that "that alone is not dispositive in the Commission's related party analysis when the record shows the related party is not shielded from subject import competition and its exclusion from the industry would mask the effects of subject imports on the industry."  Id.

---

[8] Amsted accounted for between [[    ]] percent and [[    ]] percent of domestic industry production during the period of investigation.  See FRC II China Views at 23.

[9] As two dissenting commissioners note, "exclusion of Amsted from the definition of the domestic industry still leaves nearly [[    ]] percent of domestic production accounted for in the Commission's analysis in 2022 (and more than [[    ]] percent in 2020 and 2021)."  Separate Views at 4–5.

at 18.    While "[t]he most significant factor . . . in making the appropriate circumstances determination is whether the domestic producer accrued a substantial benefit from its importation of the subject merchandise," Allied Mineral, 28 CIT at 1864, it is not the only significant factor in making a determination, see Changzhou Trina, 39 CIT at 1121–22, 100 F. Supp. 3d at 1329 (listing other factors).    Amsted's ratio of subject imports to U.S. production was high throughout the period of investigation.    See FRC II China Views at 18, see also Separate Views at 6.[10]    Additionally, Amsted stated that its reason for importing subject merchandise is to lower costs and that "its purchase of the Mexican facility is to serve its largest rail customers that had shifted their production to Mexico."    Id. at 18 (citing Amsted's Post-hearing Br. at 5; USITC Commission Hearing Tr. at 118 (May 19, 2023), P.R. 144 ("Amsted purchased this facility out of bankruptcy in 2005.    Some of the most significant OEM customers moved their production of railcars to Mexico.")).

Both factors seem to independently support exclusion and provide important context for the Commission's analysis of the second factor: Amsted's reason for importation.    With such a high ratio of subject imports to U.S. production and Amsted's stated interest in lowering costs across its operations and expanding sales to Mexican customers, it is hard to understand how Amsted's reason for importation was to compete with domestic production.    While Amsted's domestic FRC production accounted for a [[    ]] of its domestic production and a minority of total domestic FRC production during the period of review, see FRC II China Views at 23, Amsted's FRC production in Mexico accounted for the vast majority of total subject import production from

---

[10] Amsted's ratio of subject imports to U.S. production ranged from [[    ]] percent to [[    ]] percent during the period of investigation. See FRC II China Views at 17.

Mexico, see id. at 19 n.83.[11]  These facts detract from the Commission's determination that Amsted's reason for importation was to compete with domestic production of FRCs rather than complement domestic production.  Despite this, the Commission failed to account for either factor beyond acknowledging the high ratio of subject imports to U.S. production and Amsted's stated primary interest and noting that neither was dispositive.  That a fact is not dispositive does not mean it need not be accounted for.

The Commission's decision not to exclude Amsted from the domestic industry was based almost entirely on its conclusions regarding Amsted's reason for importation—that Amsted was not shielded from competition with subject imports and did not benefit from its importation of subject imports from Mexico.  See FRC II China Vies at 19.  The Commission relied on facts related to Amsted's domestic production performance including [[     ]] unit values for imported subject merchandise, [[    ]] capacity utilization, a decline in shipments and market share, a higher operating income to net sales ratio, and an increased cost of goods sold to net sales ratio.  Id. at 23.  However, the Commission provided no rational connection between these facts and any competition or lack of benefit from subject imports.  These facts could also be consistent with Amsted's own stated reason for importation—to complement production across its facilities.  Additionally, the Commission seemed to rely heavily on its conclusion that exclusion would skew the domestic industry data.  However, the Commission failed to provide a rational explanation for why exclusion of a minority of domestic production would result in skewed domestic industry data.  The removal of some data does not, on its own, skew the remaining data.  Finally, the Commission failed to properly account for the final three factors—Amsted's share of domestic

---

[11] Amsted is the only known producer of FRCs in Mexico and accounted for [[     ]] percent of subject imports from Mexico in 2022.

production, Amsted's ratio of subject imports to U.S. production, and Amsted's primary interest—

each of which seem to support Amsted's exclusion.  Because the Commission's analysis of each

factor was unsupported by substantial evidence, the court remands the Commission's final

determination to reconsider or further explain whether appropriate circumstances exist to exclude

Amsted from the domestic industry.

> ### IV.    The Commission's Cumulation of Imports Is Supported by Substantial Evidence and in Accordance with Law

Plaintiffs next argue that the Commission erred in cumulating imports from China and

Mexico.  Pls.' Br. at 31.  In conducting its material-injury analysis, "the Commission may

cumulatively assess the volume and effect of imports" from multiple source countries—as long as

those imports satisfy certain threshold criteria.  19 U.S.C. § 1675a(a)(7).  The imports must be (1)

"likely to compete with each other and with domestic like products in the domestic market" and

(2) not be "likely to have no discernible adverse impact on the domestic industry."  Id.  Section

1675a does not delineate any factors that the Commission must consider in determining whether

to cumulate a county's imports.  See Nucor Corp. v. United States, 601 F.3d 1291, 1295 (Fed. Cir.

2010); Neenah Foundry Co. v. United States, 25 CIT 702, 709, 155 F. Supp. 2d 766, 772 (2001).

The Commission accordingly enjoys "wide latitude" in identifying relevant factors for cumulation.

Allegheny Ludlum Corp. v. United States, 30 CIT 1995, 2002, 475 F. Supp. 2d 1370, 1380 (2006).

At the same time, however, the Commission's discretion "must be predicated upon a judgment

anchored in the language and spirit of the relevant statutes and regulations."  Freeport Mins. Co.

v. United States, 776 F.2d 1029, 1032 (Fed. Cir. 1985).

The statute provides several exceptions when the Commission is prohibited from

cumulatively assessing the volume and effect of imports including those "from any country with

respect to which the investigation has been terminated."  19 U.S.C. § 1677(7)(G)(ii)(II).  Plaintiffs

cite to this exception, arguing that the Commission improperly cumulated imports from China and Mexico because "all subject imports from China for the years 2020 and 2021 were the subject of the terminated investigation in FRC I." Pls.' Br. at 31. Plaintiffs argue that "the relevant question is whether the <u>imports</u> to be cumulated were subject to a terminated investigation, which is indisputably the case here." <u>Id.</u> (emphasis in original). However, the statute does not prohibit cumulation of imports subject to any terminated investigation, it prohibits cumulation of imports specifically "from any country with respect to which <u>the investigation</u> has been terminated." 19 U.S.C. § 1677(7)(G)(ii)(II) (emphasis added).

The term "the investigation" cannot refer to a previous negative determination, as imports subject to such an investigation do not meet the threshold criteria for cumulation—namely that the "investigations were initiated . . . on the same day." <u>Id.</u> § 1677(7)(G)(i)(II). The simplest reading of the statute is that "the investigation" refers to the present investigation. Specifically, the statute refers to termination with respect to a country in the present investigation. This interpretation is consistent with the Statement of Administrative Action ("SAA"), which notes that "[t]his exception . . . implements the requirement of the [WTO] Agreements that negligible or <u>de minimis</u> imports not be cumulated." <u>Statement of Administrative Action accompanying the Uruguay Round Agreements Act</u>, H.R. Doc. No. 103-316, vol. I (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040, 1483 ("SAA").[12] The FRC II investigation had not been terminated with respect to either China or Mexico, and thus the exception for "imports . . . from any country with respect to which the investigation has been terminated," does not apply. Because the exception does not apply, the

---

[12] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

Commission's determination to cumulate imports from China and Mexico is supported by substantial evidence and in accordance with law.

### V.     *The Court Will Not Address the Commission's Material Injury Determination at this Time*

Recall that in making a material injury determination, the Commission evaluates "(1) the volume of subject imports; (2) the price effects of subject imports on domestic like products; and (3) the impact of subject imports on the domestic producers of domestic like products." Hynix, 30 CIT at 1210, 431 F. Supp. 2d at 1306 (citing 19 U.S.C. § 1677(7)(B)(I)(I)–(III)).

Given that Amsted was the second largest domestic producer,[13] the court will not consider the Commission's material injury determination until the Commission redetermines or further explains whether appropriate circumstances exist to exclude Amsted from the domestic industry on remand.

### VI.     *Plaintiffs Lack Standing to Raise Amsted's Conflict-of-Interest Allegation*

Plaintiffs allege that a conflict of interest requires remand of the Commission's determination. See Pls.' Br. at 54. According to Plaintiffs, a conflict of interest exists because Amsted, who was represented by the Coalition's counsel (the "Attorney") and Law Firm to initiate FRC I, later withdrew from the Coalition and now has interests adverse to the Coalition in FRC II. Id. Plaintiffs allege that the Commission improperly denied Amsted's request to disqualify the Attorney and Law Firm from further participation in FRC II based on this conflict. Id.

Plaintiffs' allegation addresses a conflict of interest originally raised by Amsted in the underlying investigation. See Letter from Amsted to K. Hiner, re: Action Request to Disqualify Petitioner's Counsel (Oct. 14, 2022), P.R. 36, C.R. 31. "The plaintiff, as the party invoking federal

---

[13] Amsted accounted for between [[    ]] and [[    ]] percent of domestic production during the period of investigation. See FRC II China Views at 17.

jurisdiction, bears the burden of establishing the[] elements [of standing]." Spokeo, Inc. v. Robins,

578 U.S. 330, 338 (2016).  Plaintiffs' claim falls short of establishing any injury in fact that is

fairly traceable and likely to be redressed by a favorable decision.  See Lujan v. Defs. of Wildlife,

504 U.S. 555, 560–61 (1992).  It is not clear that Plaintiffs here have suffered an injury based on

Amsted's alleged conflict.  While Amsted did challenge the Commission's determination not to

disqualify the Attorney, see Memo. in Supp. of Mot. for J. on the Agency R. at 34–50, Amsted Rail

Co. v. United States, No. 23-00268 (Ct. Int'l Trade Sept. 6, 2024), ECF No. 45, Amsted has since

dismissed that claim, see Consent Mot. to Amend Compl., Amsted Rail, No. 23-00268 (Ct. Int'l

Trade Feb. 7, 2025), ECF No. 51.  The court will not address Amsted's now dismissed conflict

allegation here, especially as neither Wabtec nor Strato allege any particularized injury in fact

resulting from the alleged conflict.

## CONCLUSION

For the reasons above, the court holds that (1) Strato's allegation of fraud does not provide

clear and convincing evidence necessary to require remand, (2) the Commission was not required

to refuse to initiate or find good cause to initiate FRC II, (3) the Commission's refusal to exclude

Amsted from the domestic industry is not supported by substantial evidence, (4) the Commission's

cumulation of imports from China and Mexico is supported by substantial evidence and in

accordance with law, and (5) Plaintiffs do not have standing to raise the conflict-of-interest issue.

As a result, the court denies Strato's Motion for Remand on the basis of fraud, sustains the Final

Determination with respect to the cumulation of imports from China and Mexico, and remands the

Final Determination for the Commission's reconsideration or further explanation of its decision

not to exclude Amsted from the domestic industry.  The court does not reach the Commission's

material injury analysis.  The court does not compel a result on remand.  It is hereby:

**ORDERED** that Strato's Motion for Remand, Feb. 1, 2025, ECF No. 52, is **DENIED**, and it is further

**ORDERED** that upon consideration of Plaintiffs' Motion for Judgment on the Agency Record, Aug. 19, 2024, ECF No. 45, the U.S. International Trade Commission is instructed to reconsider whether appropriate circumstances exist to exclude Amsted from the domestic industry, and it is further

**ORDERED** that the Commission shall file its remand redetermination with the court within ninety days of the date of this opinion.  The timeline for filings and comments regarding the remand redetermination shall proceed according to USCIT Rule 56.2(h).

**SO ORDERED.**

*/s/  Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated:  October 8, 2025
            New York, New York