**Contains Business Proprietary Information**

**Views of the Commission on Remand**

By decision and order dated October 8, 2025, the U.S. Court of International Trade affirmed in part and remanded in part the Commission's affirmative injury determinations in *Certain Freight Rail Couplers and Parts Thereof ("FRCs") from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) (the "*Leading Views*").[1]  Upon consideration of the remand order and based on the evidence in the record of these investigations, we again determine that an industry in the United States is materially injured by reason of imports of FRCs from China that are sold in the United States at less than fair value ("LTFV"), and that are subsidized by the government of China.[2]

---

[1] *Wabtec Corp. v. United States*, Consol. Court No. 23-157, Slip Op. 25-134 (Ct. Int'l Trade October 8, 2025) ("Slip Op. 25-134").  Although the antidumping and countervailing duty petitions regarding FRCs from China and Mexico were filed on the same day, September 28, 2022, the investigation schedules became staggered when Commerce did not postpone the final determination for its antidumping and countervailing duty investigations regarding FRCs from China, while it did postpone the final determination for its antidumping duty investigation regarding FRCs from Mexico. This necessitated earlier Commission determinations in the final phase of the antidumping and countervailing duty investigations regarding FRCs from China (the "leading investigations") than in the final phase of the antidumping duty investigation on FRCs from Mexico (the "trailing investigation").  As discussed in section I below, the separate appeal of the Commission's determination in the trailing investigation has been stayed pending resolution of this appeal.

In the original determinations, Commissioners Rhonda K. Schmidtlein, Jason E. Kearns, and Amy A. Karpel found that an industry in the United States was materially injured by reason of subject imports, Chairman David S. Johanson determined that an industry in the United States was not materially injured or threatened with material injury by reason of subject imports, and Commissioner Randolph J. Stayin did not participate.  *Leading Views* at 3.  Commissioner Amy A. Karpel, however, did not join the majority's definition of domestic industry and instead issued separate views, along with Commissioner David S. Johanson, excluding U.S. producer Amsted from the definition of domestic industry under the related parties provision.  *See Separate Views of Chairman David S. Johanson and Commissioner Amy A. Karpel on Related Parties*, EDIS Doc. 799943 (July 7, 2023).

[2] Chair Karpel again determines on remand that an industry in the United States is materially injured by reason of subject imports of FRCs from China.  She adopts and incorporates the Commission's original determination finding that the domestic industry is materially injured by reason of subject imports, and the separate views on related parties that she and Commissioner Johanson joined in the original determination.  See Certain Freight Rail Couplers and Parts Thereof from China, Inv. Nos. 701-Continued...

**Contains Business Proprietary Information**

**Views of Commissioner Jason E. Kearns on Remand**

I again determine on remand that an industry in the United States is materially injured by reason of imports of FRCs from China. I have considered the record as a whole in light of the Court's remand instructions and continue to find that appropriate circumstances do not exist to exclude Amsted from the domestic industry. Accordingly, although the Court indicated that I may reconsider my injury analysis in complying with its remand instructions, I find it unnecessary to do so. I adopt my original findings, analysis, and conclusions from the *Leading Views* in their entirety. In accordance with the Court's remand instructions, I further explain below why appropriate circumstances do not exist to exclude Amsted from the domestic industry.

I.    **Background**

In July 2023, the Commission determined in the leading determinations that a domestic industry was materially injured by reason of the subject imports from China found by Commerce to be sold in the United States at LTFV and that were subsidized by the government of China.[3] Subsequently, in November 2023, the Commission determined in the trailing

---

TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) at 61-64 (separate views on related parties); EDIS Doc. 799943 (confidential version).

    Commissioner David S. Johanson dissents on remand based on the record, again determining that an industry in the United States is not materially injured or threatened with material injury by reason of subject imports of FRCs from China. He adopts and incorporates the separate views on related parties that he and Chair Karpel joined in the original and his dissenting views in the original. *See Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) at 61-64 (separate views on related parties) and 66-84 (dissenting views); EDIS Docs. 799942 and 799943 (confidential versions).

    [3] *Leading Views* at 2 and 64.

**Contains Business Proprietary Information**

investigation that the domestic industry was materially injured by reason of subject imports

from Mexico found by Commerce to be sold in the United States at LTFV.[4]

Wabtec Corp. and Strato, Inc., U.S. importers of subject merchandise from China, each

appealed the Commission's final affirmative determinations with respect to China on August

14, 2023, and Amsted Rail Company Inc. ("Amsted"), a U.S. producer of FRCs and U.S. importer

of subject merchandise, and ASF-K de Mexico S. de R.L. de C.V., a Mexican producer of subject

merchandise, jointly appealed the Commission's final affirmative determinations with respect

to Mexico on December 15, 2023.[5]  The Court consolidated the appeals concerning the

Commission's final affirmative determinations with respect to China but declined to consolidate

those appeals with the appeal of the Commission's final affirmative determinations with

respect to Mexico,[6] which has since been stayed pending the final disposition of this

consolidated appeal.[7]  On October 8, 2025, the Court issued an opinion and order, affirming in

part and remanding in part the Commission's determinations with respect to China.[8]  It found

that the changed circumstances provisions of the statute did not apply to the investigations,

and the Commission properly conducted the investigations notwithstanding its negative

determination one year earlier in *Freight Rail Coupler Systems and Components from China*, Inv.

Nos. 701-TA-670 and 731-TA-1570 (Final), USITC Pub. 5331 (July 2022).[9]  The Court upheld the

---

[4] *Certain Freight Rail Couplers from Mexico and Parts Thereof*, Inv. No. 731-TA-1593 (Final), USITC Pub. 5470 (November 2023) (the "*Trailing Views*") at 3 and 6.  In the Trailing Views, the Commission adopted its findings and analyses from the Leading Views with respect to issues concerning the domestic like product, domestic industry, cumulation, conditions of competition, and injury.  *Id.*

[5] *Wabtec Corp. v. United States*, Court No. 23-157; *Strato, Inc. v. United States*, Court No. 23-158; *Amsted Rail Company, Inc. v. United States*, Court No. 23-268.

[6] *Wabtec Corp. v. United States*, Consol. Court No. 23-157, ECF 30.

[7] *Amsted Rail Company, Inc. v. United States*, Court No. 23-268, ECF 55.

[8] *See generally* Slip Op. 25-134.

[9] Slip Op. 25-134 at 19-23 and 35-36.

**Contains Business Proprietary Information**

Commission's decision to cumulate subject imports from China with subject imports from Mexico, and it held that Plaintiffs did not have standing to raise a conflict of interest allegation with respect to Petitioner's counsel.[10]  It also denied Plaintiffs' separate motion requesting that the Court remand the investigations to the Commission to reconsider its determinations based on allegations of material fraud by the domestic industry.[11]

The Court, however, remanded the Commission's determinations on the basis that the Commission's finding that appropriate circumstances did not exist to exclude domestic producer Amsted from the definition of the domestic industry pursuant to the related parties provision was not supported by substantial evidence.[12]  Specifically, the Court found that the Commission "relied entirely on two underlying findings" not supported by substantial evidence: "(1) that Amsted's reason for importation is to compete with domestic production and (2) that Amsted's exclusion would skew the domestic industry data."[13]  The Court also found that the Commission failed to appropriately weigh three of the five factors the Commission typically considers in its related party analysis – the firm's share of domestic production, the firm's ratio of subject imports to domestic production, and whether a firm's primary interest is in domestic production or importation – all of which the Court viewed as supporting Amsted's exclusion.[14]

---

[10] Slip Op. 25-134 at 32-36.
[11] Slip Op. 25-134 at 14-19 and 36.
[12] Slip Op. 25-134 at 24-32 and 36.
[13] Slip Op. 25-134 at 24-27.
[14] Slip Op. 25-134 at 27-31.

**Contains Business Proprietary Information**

In light of the above, the Court instructed the Commission to reconsider or further explain its decision not to exclude Amsted from the domestic industry.[15]

On December 10, 2025, the Commission published a notice of remand proceedings, inviting parties to file comments on how best to comply with the Court's remand instructions.[16] Both Petitioner, the Coalition of Freight Rail Producers, and Respondents, Strato and Wabtec, filed comments on January 2, 2026.[17]

## II.    Party Arguments

*Petitioner*.  Petitioner argues that the record supports the Commission's finding that appropriate circumstances do not exist to exclude Amsted from the domestic industry.[18]  It suggests that the Court incorrectly considered Amsted's operations as a whole, *i.e.*, a multi-national corporation with many products, when determining whether substantial evidence supported the Commission's finding that Amsted was not shielded from the effects of, nor benefited from, subject imports.  Petitioner argues that the Court's consideration should have instead been limited to Amsted's operations involved in the production of the domestic like product (*i.e.*, FRCs), for which the record shows no shielding or benefit from subject imports.[19]

---

[15] Slip Op. 25-134 at 36.  The Court deferred ruling on the remaining challenges to the Commission's material injury determinations until the Commission has issued its remand determinations.  *Id*. at 33.

[16] *Certain Freight Rail Couplers and Parts Thereof from China; Notice of Remand Proceedings*, 90 FR 57215 (Dec. 10, 2025).

[17] Petitioner's Confidential Remand Comments, EDIS Doc. 867788 (Jan. 2, 2026) ("Petitioners' Comments"); Respondents' Confidential Remand Comments, EDIS Doc. 867796 (Jan. 2, 2026) ("Respondents' Comments").  The Coalition of Freight Rail Producers consists of McConway & Torley LLC ("M&T"), a U.S. producer of FRCs, and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW" or "Steelworkers"), which represents Amsted's employees that manufacture FRCs in the United States at its Granite City, Illinois plant.  *Leading Views* at 4.

[18] Petitioners' Comments at 1.

[19] Petitioners' Comments at 2.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**Contains Business Proprietary Information**

Further, it emphasizes that Amsted's U.S. workers participated in the investigations as a petitioning party under the representation of the Steelworkers and testified to the declines in Amsted's domestic FRCs operations due to subject import competition and the prioritization of FRCs production in Mexico over the United States.[20]  Petitioner contends that Amsted's [ ▮ ] ratio of subject imports to domestic production confirms that Amsted was prioritizing its Mexican FRCs operation over its domestic FRCs operation.[21]

In addressing the Court's comment concerning the skewing of industry data by a minority producer, Petitioner argues that Amsted's exclusion from the domestic industry both diminishes the industry's lost market share to subject imports and weakens the Commission's price suppression finding.[22]

*Respondents*.  Respondents argue that that Commission should find that appropriate circumstances exist to exclude Amsted from the domestic industry.  They agree with the Court's conclusion that Amsted appeared to benefit from subject imports by bundling the imported FRCs with out-of-scope rail products that comprised the bulk of its domestic production.[23]  Respondents also agree with the Court's conclusion that the Commission failed to explain why "exclusion of a minority of domestic production would skew—not merely reduce—the domestic industry data."[24]  Relying on the *Separate Views*, they contend that the domestic industry data cannot be skewed by Amsted's exclusion since the majority of domestic industry data will remain and Amsted was not injured by subject imports, as evidenced by it opposing

---

[20] Petitioners' Comments at 5-7.
[21] Petitioners' Comments at 8-9.
[22] Petitioners' Comments at 7-8.
[23] Respondents' Comments at 3.
[24] Respondents' Comments at 3-4 (*quoting* Slip Op. 25-124 at 28).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**Contains Business Proprietary Information**

the petitions with respect to Mexico and actively participating as a respondent that contested

such injury during the investigations.[25]  Respondents also claim that Amsted's exclusion from

the domestic industry cannot mask injury since the firm's decision to move production from the

United States to Mexico predated the period of investigation.[26]

Finally, Respondents argue that Amsted's [ ███████████████████ ],

including its [ ███ ] capacity utilization and [ ████ ] financial performance, is consistent with its

claim that Amsted's primary interest is in importation, thereby supporting Amsted's exclusion

from the domestic industry.[27]

### III.    Analysis

It is inappropriate to exclude Amsted from the domestic industry in these investigations

because its domestic FRCs facility, in Granite City, Illinois, was not benefiting or shielded from

subject imports during the period of investigation.  To the contrary, because Amsted's subject

imports from Mexico *substantially harmed* its domestic FRC workers and FRC operations in

Granite City, its exclusion would inappropriately mask injury to the domestic industry.

That Amsted's exclusion would mask injury is clear, for example, from a look at market

share shifts, a key metric in these investigations as in every antidumping and countervailing

duty ("AD/CVD") investigation.  If Amsted is included in the domestic industry, we see that

pervasive underselling by cumulated subject imports led to those imports taking [ ███████

███ ] percentage points of market share from the industry from 2020 to 2021, a clear indication

---

[25] Respondents' Comments at 4.
[26] Respondents' Comments at 5.
[27] Respondents' Comments at 4.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Contains Business Proprietary Information**

of material injury by reason of subject imports.[28]  On the other hand, if Amsted were excluded, the data would be nonsensical, and injury would be masked: subject imports and the domestic industry *both gain market share, at no one's expense*, as nonsubject imports were nil and Amsted's declining sales of domestically produced FRCs would be ignored.[29]

Further, from 2020 to 2021, [ ██ ] jobs were lost at Amsted's Granite City facility as Amsted's imports from Mexico gained market share at the expense of its domestic FRCs operation.  Those job losses amount to [ ██ ] percent of the domestic industry's production related workers ("PRWs") in 2020.  In fact, Amsted went from employing [ ██ ] FRC workers in 2020 to just [ ██ ] in 2021, as Amsted's imports from Mexico gained market share at the expense of its domestic FRC operations in Granite City.[30]  Exclusion would essentially erase those job losses from the record.

Job losses like that matter in any AD/CVD investigation.  But in these investigations, those Amsted jobs were held by workers represented by the Steelworkers, a labor organization of the type that Congress granted standing to petition for relief (independent of the domestic producer that employs its members) and that in fact did petition for relief in this

---

[28] Confidential Report, INV-VV-048, EDIS Doc. 797851 (June 5, 2023) ("CR") at Table C-1; Public Report ("PR") at Table C-1; *Confidential Leading Views*, EDIS Doc. 799941 (July 7, 2023) at 44.  The 2020 to 2021 period is critical in these investigations.  In its original determinations, the Commission focused its material injury analysis on the 2020-2021 period, the first two years of the period of investigation, because in 2022 subject imports from China declined significantly as a result of the imposition of provisional duties in earlier antidumping and countervailing duty investigations of freight railer coupler systems and components from China ("*FRC I*") that year.  *Leading Views* at 43 n.240, 44, 45 n.249, 50-51, and 53.  Incidentally, the Commission ultimately reached negative determinations in *FRC I* because it found that the injury to the domestic industry – *which included Amsted* – was not the result of subject imports from China but more likely the result of imported FRCs from Mexico.  *Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670 and 731-TA-1570 (Final), USITC Pub. 5331 (July 2022) at 29, 31, and 34-35.

[29] *See* CR/PR at Table C-2.

[30] *Compare* CR/PR at Table C-1 *with* Table C-2.

**Contains Business Proprietary Information**

case.[31]  Excluding Amsted would therefore mean ignoring the job losses of a petitioner in these investigations.

Those job losses – and their connection to Amsted's subject imports from Mexico – were described by a Steelworker official during the hearing:

> I am extremely concerned about the welfare and livelihoods of our USW members in Granite City. …I was also troubled to discover that … it was Amsted's Mexican operations that were the lowest priced product in the United States, even underselling the Chinese couplers.  I am particularly disappointed that Amsted is now defending … its Mexican operations{.} [32]

Another Steelworker, himself a Granite City employee and the President of his local union, also testified about jobs moving from Granite City to Mexico: "Amsted has told us the reason why production is down {in Granite City} in part is because they've moved much of their production to Mexico{.} … We only now make parts in Granite City that Amsted is unable to make in Mexico."[33]

Thus, to put it mildly, Amsted's domestic FRCs operation was not benefitting or shielded from Amsted's imports of FRCs from Mexico.  *And indeed Amsted has not argued otherwise.* Instead, Amsted claims those FRC imports are "complementary" or beneficial because they enable Amsted to produce *other products -- products outside the scope of these investigations* – in the United States.  But the Commission's related parties analysis, like its material injury analysis, focuses exclusively on the production of the domestic like product, FRCs.[34]

---

[31] *See* 19 U.S.C. §§ 1671a(b)(1), 1673a(b)(1), 1677(9)(D).

[32] Hearing Transcript, EDIS Doc. 797533 (May 31, 2023) at 30-31.

[33] Petitioners' Prehearing Brief, EDIS Doc. 796242 (May 11, 2023) at Exhibit 6 (*FRC I* Conference Transcript at 33).

[34] *See* 19 U.S.C. § 1677(4)(B)(i) (providing that "producers of the domestic like product" that qualify as related parties "may, in appropriate circumstances, be excluded from the industry").

**Contains Business Proprietary Information**

Congress gave the Commission the *discretion* to exclude a domestic producer that was *benefitting or shielded* from imports, as discussed in the following section.[35]  Respondents, on the other hand, attempt to turn the statute on its head: they seek Amsted's exclusion because exclusion would mask injury caused by subject imports.  Congress certainly did not *require* the Commission to exclude a related party in a case like this one.  To the contrary, it enacted the related parties provision to *prevent* the masking of injury to a domestic industry, not to *require* it.

    a.  **Legal Standards**

This section describes several core principles that can be gleaned from the statute, its legislative history, and the Commission's longstanding approach to analyzing related parties issues.  A further description of the law and the Commission's approach over the years is included as an appendix to these Views.[36]

By statute, Congress has granted the Commission broad discretion to exclude a domestic producer from the industry if appropriate circumstances exist, as when that producer is benefitting or shielded from subject imports such that its inclusion would mask injury by

---

[35] *See Leading Views* at 14, 18-19.

[36] Other members of the Commission may or may not agree with the approach that I describe below, and my own thinking may evolve further over time.  Commissioners are not required to apply the same analytical methodologies in their decision-making, particularly in an area in which the Commission is afforded wide discretion by the statute.  No methodology for determining "appropriate circumstances" is specified in the statute.  Given the Commission's discretion in this area, as emphasized in the Statement of Administrative Action ("SAA") for the Uruguay Round Agreements Act, Commissioners need not employ the same methodology as long as it is consistent with the statute.  *See Nucor v. United States.* 594 F.Supp.2d 1320, 1346-47 (Ct Int'l Trade 2008) (approving of different methodologies for discretionary cumulation in sunset review).  *See also U.S. Steel Group v. United States,* 96 F.3d 1352, 1362 (Fed.Cir.1996) ("So long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious, the Commission may perform its duties in the way it believes most suitable.").

**Contains Business Proprietary Information**

reason of unfairly traded imports.[37]  The court has repeatedly recognized the centrality of that

overarching principle, most recently in this case.[38]

Several points follow from that core purpose as well as from the legislative history and

the Commission's longstanding approach:

- Inclusion is the default.[39]  The statutory framework takes as its starting point that a producer is part of the domestic industry, but the Commission may exclude it in appropriate circumstances.  More often than not, the Commission decides not to do so.

- Congress gave the Commission broad discretion, and approved its longstanding approach of excluding a producer when inclusion would mask injury.[40]

- The Commission has generally avoided a mechanical, rote, or sclerotic checklist application of the factors.  The five factors the Commission considers are heuristic, a way to scaffold the overall analysis, not an exhaustive formula for reaching a determination;[41] some factors are more important than others, and the application depends on the facts and circumstances of each *sui generis* investigation.

---

[37] 19 U.S.C. § 1677(4)(B)(i); *see also* SAA, H.R. Rep. 316, 103d Cong., 2d Sess., vol. 1 (1994) at 858 (explaining that "{b}oth Commerce and the Commission will have discretion in applying the related party provision to determine whether a producer is related and whether appropriate circumstances exist for excluding such a related producer from the domestic industry" and that the purpose of the related parties provision is "to reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports"); S. Rep. No. 96-249 at 83 (1979) ("where a U.S. producer is related to a foreign exporter and the foreign exporter directs his exports to the United States so as not to compete with his related U.S. producer, this should be a case where the ITC would not consider the related U.S. producer to be a part of the domestic industry").

[38] Slip Op. 25-134 at 25, *quoting USEC, Inc. v. United States* (The related parties "provision's purpose is to exclude from the industry headcount domestic producer substantially benefitting from their relationships with foreign exporters."); *see also Empire Plow Co. v. United States*, 11 CIT 847, 853, 675 F. Supp. 1348, 1353-54 (1987) ("The {U.S. Senate report for the Trade Agreements Act of 1979} displays an intent to exclude from the industry headcount domestic producers which, due to a relationship with the foreign producer, benefit from the foreign exporter{.}").

[39] *Leading Views* at 17.

[40] SAA at 858 (Commission utilizes related parties provision to reduce distortion in industry data).

[41] When it lists the five factors, the Commission states that these are the "primary" factors that the Commission "has examined" in past cases, and that the factors the Commission considers "include" these five.  *See, e.g., Leading Views* at 14 n.54.

**Contains Business Proprietary Information**

- The analysis is, appropriately, impact- or result-oriented: would inclusion mask injury caused by subject imports, or not?[42]  It is important not to lose sight of that forest by focusing too closely on the trees of the individual factors.

**b.  The Commission's Five Factors**

The five factors, as recited by the Court in this case but reordered below to better reflect their general sequence in my analysis, are: (1) "the percentage of domestic production attributable to the importing producer" (referred to below as "the first factor"); (2) "the ratio of import shipments to U.S. production for the importing producer" ("the second factor"); (3) "the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from unfair trade practice or to enable them to continue production and compete in the domestic market" ("the third factor"); (4) "whether inclusion or exclusion of the importing producer will skew the data for the rest of the industry" (the "fourth factor"); and (5) "whether the primary interest of the importing producer lies in domestic production or importation" ("the fifth factor").[43]  Below, I discuss my approach to analyzing each of these factors in considering whether appropriate circumstances exist to exclude a related party.

The first two factors address a *threshold* question, aiding in determining whether to delve deeper into the thorny issue of whether "appropriate circumstances" exist to exclude (*i.e.*, whether the firm is benefiting or shielded from imports in a way that would mask injury). Under the first factor, a very small producer is unlikely to be excluded because its data don't

---

[42] That is not to say, however, that the Commission should make its related party determination with a view to creating the data set that shows the most injury to the domestic industry.  Any injury must still be tied to subject imports.

[43] Slip. Op. 25-134 at 24; *see also Changzhou Trina Solar Energy Co. v. USITC*, 100 F. Supp.3d 1314, 1326-31 (Ct. Int'l. Trade 2015); see *also Torrington Co. v. United States*, 790 F. Supp. 1161, 1168, *aff'd without opinion*, 991 F.2d 809 (Fed. Cir. 1993).

**Contains Business Proprietary Information**

move the needle for the industry as a whole, even if that small producer is benefiting or

shielded from subject imports.[44]

Similarly, under the second factor, an importing producer with a very low ratio of import

shipments to U.S. production is unlikely to be excluded because those imports are unlikely to

have a meaningful impact on that producer's domestic production data.[45]  But a high ratio

should not be dispositive and does not dictate exclusion; it simply ensures that the threshold is

crossed and a further analysis is warranted.[46]

---

[44] *See, e.g., Certain Cut-to-Length Steel Plate from the Czech Republic, France, India, Indonesia, Italy, Japan, Korea, and Macedonia*, Inv. Nos. 701-TA-387-392 and 731-TA-815-822 (Preliminary), USITC Pub. 3181 (Apr. 1999) at 10-11; *Seamless Refined Copper Pipe and Tube from China and Mexico*, Inv. Nos. 731-TA-1174-1175 (Final), USITC Pub. 4193 (Nov. 2010) at 13-14; *Live Cattle from Canada*, Inv. No. 731-TA-812, USITC Pub. 3255(Nov. 1999) at 6.

At the opposite end of the spectrum, the Commission has recognized that a very large producer, such as one that produces most of the total industry's output, generally should not be excluded from the domestic industry because the large producer's experience cannot be divorced from the industry as a whole; in those circumstances, one often must take the "industry" as it finds it, and the firm's experience is considered representative of the industry's.  *See Empire Plow*, 11 CIT at 853, 675 F. Supp. at 1354; *Torrington Co.  v. United States*, 16 CIT 220, 224-25, 790 F. Supp. 1161, 1168 (1992), *aff'd without opinion*, 991 F.2d 809 (Fed. Cir. 1993).  The Commission will not exclude a related U.S. producer when it is the sole U.S. producer of the domestic like product, making the total number of U.S. producers in an industry a determinative factor for the related party analysis in some cases.  *See, e.g., 1-Hydroxyethylidene-1, 1-Diphosphonic Acid (HEDP) from China and India,* Inv. Nos. 731-TA-1146-1147 (Final), USITC Pub. 4072 (April 2009) at 6 ("We also note that, where the sole domestic producer is also a related party . . . the Commission previously has found that appropriate circumstances do not exist to exclude the producer under the related party provision."); *Tetrahydrofurfuryl Alcohol from China*, Inv. No. 731-TA-1046 (Preliminary), USITC Pub. 3620 (August 2003) at n. 20 ("As it has been the sole domestic producer throughout the POI, however, appropriate circumstances do not exist to exclude it from the domestic industry.").

[45] *See, e.g.*, *Ceramic Tile from India*, Inv. No. 701-TA-720 (Final), USITC Pub. 5630 (June 2025) at 7*; Disposable Aluminum Containers, Pans, Trays, and Lids from China*, Inv. Nos. 701-TA-727 and 731-TA-1695 (Final), USITC Pub. 5611 (Apr. 2025) at 8; *Polyvinyl Alcohol from Germany and Japan*, Inv. Nos. 731-TA-1015-1016 (Final), USITC Pub. 3604 (June 2003) at 8.

[46] *See, e.g., DRAMs and DRAM Modules from Korea*, Inv. No. 701-TA-431 (Final), USITC Pub. 3616 (August 2003) at 13 (finding domestic producer's ratio of subject imports to domestic production supported its exclusion from the domestic industry, but nevertheless finding that appropriate circumstances did not exist to do so based on other factors); *Canned Pineapple Fruit from Thailand,* Inv. No. 731-TA-706 (Prelim.), USITC Pub. 2798 (July 1994) at I-11 (finding that although the related party Continued...

**Contains Business Proprietary Information**

After crossing those two thresholds, the remaining factors require a deeper analysis.

Under the third factor, if the firm is benefiting or shielded from unfairly traded subject imports

(as it might under the scenarios of an "imported semi-finished product," a "long-production

run," "regional segregation," or "market segregation" described in the following section), it is a

key indication that the firm may need to be excluded from the industry data.[47]  This factor most

clearly reflects the overarching object and purpose of the statutory provision, as described

above, which is why this Court has recognized in the past and repeated again in this case that it

is "{t}he most significant factor{.}"[48]

Under the fourth factor, if inclusion "will skew the data for the rest of the industry" that

may be tantamount to a determination that inclusion would mask injury.  There is an important

---

appeared to be both a significant importer and domestic producer, the lack of any distortion of the industry's data by including it in the industry meant that appropriate circumstances did not exist to exclude it from the industry); *Certain Iron Mechanical Transfer Drive Components and from Canada and China,* Inv. No. 701-TA-550 and 731-TA-1304, USITC Pub. 4587 at 25 (December 2015) ("Although the firm's ratio of imports to domestic production is high, its poor financial performance does not suggest that it benefitted from its importing activities.").

[47] There is a risk when this factor is applied in a manner that takes at face value how the producer has articulated "the reason" it imports, and that reason can be described in different ways. Indeed, at least from a firm's multinational corporate perspective, a producer that decides to rely more on low-cost, unfairly traded imports likely benefits from the trade practice which may enable the firm to continue to produce and compete in the domestic market.

[48] Slip Op. 25-134 at 29, *citing Allied Mineral Prods., Inc. v. United States*, 28 CIT 1861, 1864 (2004); *see also Empire Plow Co. v. United States*, 11 CIT 847, 853, 675 F. Supp. 1348, 1353-54 (1987) ("The {U.S. Senate report for the Trade Agreements Act of 1979} displays an intent to exclude from the industry headcount domestic producers which, due to a relationship with the foreign producer, benefit from the foreign exporter{.}").  Thus, if it is clear that a related domestic producer's domestic operations are not benefiting from imports, inclusion cannot mask injury, and the related parties inquiry can end there.  But it is not always possible to discern whether a related party is materially benefiting from its imports. The Commission collects data on domestic production and domestic sales separately from the data it collects on imports.  Thus, absent certain circumstances such as those described below (*i.e.*, the semi-finished product scenario, the long-production-run scenario, the regional segregation scenario, or the market segregation scenario), one cannot simply assume that in all cases the subject imports of a domestic producer are necessarily "benefiting" the domestic producer.

**Contains Business Proprietary Information**

link between this factor and the fourth factor: the industry data can be skewed by the inclusion of a firm that is benefiting or shielded from subject imports.

Under the fifth factor, to determine a firm's "primary interest," the Commission may recall its analysis under the second factor (the ratio of the domestic producer's U.S. shipments to subject imports) to determine how dependent on imports the firm is, and the Commission often then considers under this factor whether the firm is a petitioner or at least supports the petition, or instead opposes the petition. Firms that are primarily interested in importing subject merchandise are unlikely to support a petition, and the Commission is able to conclude their primary interest lies in importation. But under that interpretation it is not clear how the "primary interest" consideration connects to the ultimate question, whether inclusion would mask injury, particularly when the Commission can definitively assess the first four factors of the analysis. It may therefore simply serve as more of a conclusion than a factor.[49] [50]

    **c.  Six Scenarios**

---

[49] This factor may help the Commission determine how to assess a firm's responses to the Commission's qualitative questions. For example, whereas domestic producers generally are likely to report a high degree of substitutability between subject imports and the domestic product, a domestic producer that imports – and whose primary interest lies in importation – is more likely to respond in its questionnaire that imports and the domestic product a lower degree of substitutability. In both cases, the Commission should be aware of whether the statement is for or against the firm's primary interest.

[50] There may be other ways to view this factor so as to make it more useful in the overall analysis. For example, this factor may help gauge the producer's commitment to subject imports, *i.e.*, whether it was a temporary relationship unrelated to the cost advantages of importing unfairly traded imports (*e.g.*, to fill an emergency need caused by a fire, hurricane, or other domestic production disruption or temporary constraint), or a permanent one. Viewed that way, the primary interest factor may help determine whether the firm is benefiting from unfairly traded imports or instead is simply filling a need that is not masking injury. Additionally, it may be most insightful for a related party analysis when a record contains minimal information about a related domestic producer's relationship with subject imports, *e.g.*, whether it was shielded or benefited from subject imports. The primary interest factor could be a useful proxy in that situation, as a conclusive determination that a domestic producer's primary interest is in domestic production would indicate that inclusion in the domestic industry would not mask injury.

**Contains Business Proprietary Information**

While emphasizing the context of this dynamic approach and that the each case is *sui generis*, in the interest of clarifying what to me has been a murky area of the material injury analysis, I outline below six scenarios to illustrate how I may consider whether inclusion of a related party in the domestic industry could mask injury.

First, if a domestic producer imports unfinished and unfairly low-priced subject merchandise and finishes that merchandise in a U.S. manufacturing facility, converting it into the domestic like product, it is likely its profits will be higher than the rest of the industry's due to the low-cost subject imports.  This is the "imported semi-finished product scenario."[51]

Second, the same result could follow if a domestic producer decides that, rather than interrupting long production runs on its equipment as it moves from producing one kind of the domestic like product to another, it would be more efficient and cost-effective to produce one kind without interruption in the United States and import the other (the "long-production run scenario").

Third, if a domestic producer and its related foreign exporter decide that the foreign subject merchandise will be imported to serve one region of the United States and not compete against the domestic producer in another U.S. region, the domestic producer's performance may be better than the industry as a whole, as that producer is "shielded from" the imports (the "regional segregation scenario").

---

[51] *See, e.g., Allied Mineral Prods., Inc. v. United States*, 28 CIT 1861, 1864-66 (2004).

**Contains Business Proprietary Information**

Fourth, and similar to the third, market segregation can occur when the domestic producer is selling sufficiently different products than those it is importing from subject sources (the "market segregation scenario").[52]

In all of those four scenarios, exclusion of the producer from the industry would appear to be appropriate.  Conversely, as described below, there are two scenarios in which exclusion would appear inappropriate.

In the fifth scenario, suppose a firm is a longstanding importer of subject merchandise but recently began to produce product domestically to replace those imports.  In that "onshoring scenario," the firm may not be "benefiting" from the unfairly traded subject imports; instead, it is working to supplant them with domestic production, and inclusion of the firm in the domestic industry therefore may not mask injury due to unfairly traded subject imports.

Finally, the "survivor bias scenario" is particularly pertinent to these remand determinations and therefore worth a closer focus.  Suppose a domestic producer begins the period of investigation producing in the United States all of the product it sells in the U.S. market, but by the end of the period it shifts to importing low-cost subject merchandise it manufactures in a foreign country.  While the *multinational* as a whole is benefitting from subject imports (*i.e.*, its costs are lower, its profits are higher, its shareholders are happier), *the domestic arm* of the operation is of course far worse off, as it has shuttered its production and laid off its employees.  In that scenario, the opposite of a "benefit" occurs to the related

---

[52] *See Calcium Aluminate Cement and Cement Clinker from France*, Inv. 731-TA-645 (Final) USITC Pub. 2772 (Apr. 1994) (domestic producer only produced ordinary cement while the related subject exporter only exported cement clinker to the United States).

**Contains Business Proprietary Information**

domestic producer; exclusion would mask injury, as the related producer's U.S. market share would have shifted to the related subject imports, and the surviving domestic producers, separated from that relationship, may not have faced similar market share loss.

This was the case most recently in *Aluminum Lithographic Printing Plates from China and Japan*.[53] The domestic producer, Fujifilm Manufacturing USA, ceased domestic production during the period of investigation at its facility in Greenwood, South Carolina. Its ratio of subject imports by its affiliated U.S. importer, FNAC, to its domestic production increased dramatically early in the period of investigation as its domestic production was increasingly replaced by subject imports until it ceased domestic production. It stated that it increased imports to replace the supply from its Greenwood facility that it closed as part of corporate strategy to reallocate production globally. The Commission unanimously decided appropriate circumstances did not exist to exclude the related part from the domestic industry:

> {T}he record indicates that Fujifilm Manufacturing USA's domestic production was not shielded from competition with subject imports during the POI and that its exclusion would skew the domestic industry data. As Fujifilm Manufacturing USA's production and shipments declined, the volume of cumulated subject imports … increased substantially, gaining in market share{.} … Further, the record indicates that FNAC's imports of subject merchandise were of the same products that were domestically produced by Fujifilm Manufacturing USA, indicating that these subject imports competed directly with Fujifilm's own domestically produced ALPs. Excluding Fujifilm Manufacturing USA from the domestic industry would mask declines in the domestic industry's market share, output, and financial performance during the POI{.} …
>
> Fujifilm argues that its decision to offshore production was made before the POI. Even if that were the case, the Commission has previously declined to exclude from the domestic industry a related domestic producer that made a decision prior to the Commission's POI to offshore production of the merchandise at issue to a subject country when it has found that excluding that producer from the domestic industry would mask declines in the domestic industry's performance. Simply put, where a

---

[53] *Aluminum Lithographic Printing Plates from China and Japan,* Inv. Nos. 701-TA-694 and 731-TA-1641-1642 (Final), USITC Pub. 5559 at 10-13 (Nov. 2024).

**Contains Business Proprietary Information**

domestic producer replaces domestic production with imports, excluding that producer from the domestic industry would skew the data in terms of the domestic industry's performance.[54]

### d. Application of the Statute and Factors to These Investigations

This case is akin to the survivor bias scenario, as Amsted moved production from the United States to Mexico in 2005 and its subject imports from Mexico, which it produced at lower costs, supplanted domestic production during the POI.[55]  In light of this and other record evidence, under the object and purpose of the statute, appropriate circumstances do not exist to exclude Amsted from the domestic industry.  An analysis under the five factors supports that finding, as described below.

### i. First Factor: Percentage of Domestic Production

---

[54] *Aluminum Lithographic Printing Plates from China and Japan*, USITC Pub. 5559 at 10-13; s*ee also Certain Large Residential Washers from Korea and Mexico*, Inv. Nos. 701-TA-488 and 731-TA-1199-1200 (Final), USITC Pub. 4378 at 12-13 (Feb. 2013), *aff'd sub nom. LG Elecs., 38 CIT at 1569, 26 F. Supp. 3d at 1346* (holding that the ITC reasonably found that appropriate circumstances did not exist to exclude Electrolux from the domestic industry where Electrolux was not shielded from subject import competition and its exclusion would distort the data)*; Gas-Powered Pressure Washers from Vietnam*, Inv. Nos. 731-TA-1598 (Final), USITC Pub. 5465 at 16-19 (Oct. 2023) (finding that appropriate circumstances did not exist to exclude a producer from the domestic industry, notwithstanding its substantial imports of subject merchandise, where it was not shielded from subject import competition and imported subject merchandise to lower costs in the face of low-priced subject imports, and its exclusion "would have the effect of masking subject imports' impact on the domestic industry's {trade and financial indicators}."); *Steel Wire Garment Hangers from China*, Inv. No. 731-TA-1123, USITC Pub. No. 4034 at 9  n.39 (September 2008) ("Commissioners Williamson and Pinkert . . . emphasized that both United Wire and Laidlaw were significant producers of the domestic like product during the period of investigation and concluded, given the facts on the record, that excluding them would mask the effects of the subject imports on the domestic industry as a whole."); *Portable Electric Typewriters from Singapore*, Inv. No. 731-TA-515, USITC Pub. No. 2388 at 13 n.42 (June 1991) ("Acting Chairman Brunsdale and Commissioner Rohr note that the principal reason for exclusion of related parties is to avoid distortion of the data. In the particular circumstances of this preliminary investigation, there is a distinct possibility that exclusion would distort the relevant data even more than including it.").

[55] The only material difference between this case and the classic survivor bias scenario is that the supplanting of Amsted's domestic production with subject imports from Mexico did not result in the shuttering of its Granite City FRC operations.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**Contains Business Proprietary Information**

As stated above, assessing the percentage of domestic production attributable to the importing producer helps determine whether the producer is so small that inclusion is inconsequential (and further analysis is unnecessary) or so large that its inclusion is unavoidable.  In this case, Amsted's percentage of domestic production is large enough that its inclusion or exclusion would be consequential: [ ■ ] percent in 2020, [ ■ ] percent in 2021, and [ ■ ] percent in 2022.[56]  Accordingly, further analysis of whether appropriate circumstances exist for its exclusion is warranted.[57]

### ii.  Second Factor: Ratio of Subject Imports to Domestic Production

As stated above, determining the ratio of subject import shipments to U.S. production can help the Commission determine whether the producer's subject imports are likely to have a meaningful impact on its domestic production and financial data.  If the ratio is fairly small, there is likely no need to delve deeper into the thorny issue of whether the firm was benefiting or shielded from imports in a way that could mask injury to the domestic industry.  In these investigations, Amsted's import ratio is [ ■■■■■■■■■ ]: [ ■■ ] percent in 2020, [ ■■ ] percent in 2021, and [ ■■ ] percent in 2022.[58]  The fact that Amsted imports [ ■ ] of FRCs from Mexico relative to its domestic production simply means that further analysis of whether its domestic operations benefited from the imports, or are somehow shielded from them, is warranted.

---

[56] *Leading Views* at 16 n.67; *Confidential Leading Views* at 17 n.67.

[57] Also, Amsted is not so large that inclusion is unavoidable because, as demonstrated below, it is possible to divorce its experience from the industry as a whole.

[58] *Leading Views* at 16; *Confidential Leading Views* at 17.  Amsted's imports of subject merchandise from Mexico were [ ■■■■■ ] pounds in 2020, [ ■■■■■ ] pounds in 2021, and [ ■■■■■ ] pounds in 2022; its U.S. production was [ ■■■■ ] pounds in 2020, [ ■■■ ] pounds in 2021, and [ ■■■■ ] pounds in 2022.  CR/PR at Table III-11.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**Contains Business Proprietary Information**

### iii.  Third Factor: Domestic Producer Benefitting from Imports

#### 1.  Amsted's Imports *Harmed* Granite City

The record shows that Amsted's domestic FRCs operations were harmed by subject

imports, rather than benefiting or being shielded from them, particularly from 2020 to 2021:[59]

- Granite City Lost Market Share to Amsted's Subject Imports.  Amsted's commercial shipments of domestically produced FRCs fell [███████] from [███████] pounds in 2020 to just [███████] pounds in 2021, while shipments of its subject imports from Mexico declined [███████████] from [███████] pounds to [███████] pounds.[60]  These trends bely Amsted's claim that Granite City did not lose any sales to subject imports from Mexico.  And many of those FRC products that Amsted was importing from Mexico were the very same that Amsted had produced, or could produce, in Granite City.[61]

- Lost Jobs.  As those imports gained market share, [██] FRC jobs were lost in Granite City from 2020 to 2021.

- Declining Operating Margins.  As its subject imports from Mexico gained market share, Granite City's operating [███] to net sales ratio worsened from [███████] percent in 2020 to [███████] percent in 2021.[62]

- Declining Production and Capacity Utilization.  As its imports gained market share, production of FRCs in Granite City was cut [███████████████] pounds in

---

[59] Consistent with the *Leading Views*, I focus my analysis on the 2020-21 period due to the impacts of the *FRC I* provisional duties on subject imports from China in 2022.

[60] CR/PR at IV-11.

[61] Observing that the majority of subject imports from Mexico were knuckles in 2022, a product produced in [███████████] by Amsted in the United States, the Court suggested that FRC products not produced in the United States by Amsted were being imported from Mexico. Slip Op. 25-134 at 27 n.10.  In fact, the record showed that there was substantial overlap in coupler bodies and coupler fit/assemblies imported from Mexico and produced in the United States by Amsted.  Indeed, the majority of subject imports from Mexico consisted of products produced in the United States by Amsted.  *See* CR/PR at Tables G-1 and G-5; *also compare* Amsted's U.S. Producer Questionnaire Response, EDIS Doc. 793835 (April 5, 2023) at IV-26 *with* Amsted's U.S. Importer Questionnaire Response, EDIS Doc. 793832 (April 5, 2023) (showing overlap in nine of top ten largest U.S. customers). Also, Amsted sold at least [███████] pounds of domestically produced knuckles in 2020, before it decided to rely entirely on subject imports from Mexico beginning in the first quarter of 2021 and until the last quarter of 2022.  *Compare Amsted's U.S. Producer Questionnaire Response at IV-2b with Amsted's U.S. Importer Questionnaire Response at III-2b* (specifically pricing product 3).

[62] CR/PR at Table VI-3.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Contains Business Proprietary Information**

2020 to [        ] pounds in 2021.[63]  This led to a decline in capacity utilization from [                    ] percent to [        ] percent.[64]

- Declining U.S. Assets.  The value of assets at Granite City fell from $[            ] in 2020 to $[          ] in 2021, about a [      ] percent drop, as its assets [                        ].  As Respondent Strato admitted in a post-hearing brief, Amsted's decline in domestic net assets during the period of investigation "is evidence of {Amsted's} intent to further [        ] its production of FRC in the United States," as Amsted imported far more FRCs from Mexico.[65]

Further, and very importantly, Amsted has admitted that it uses its Mexican operations to "lower costs" compared to its Granite City operation.[66]

The testimony of the President of the Steelworkers Local in Amsted's Illinois facility, himself a Granite City worker, further confirms that Amsted's subject imports from Mexico harmed workers in Granite City:

In a couple of years we went from almost having a thousand to barely 300 {jobs}.  … Amsted says that it relocated the bulk of their production from Granite City to Mexico so they can compete with Chinese imports.  Amsted opened its Mexican facility since I started working at Amsted years ago, but we did not see a significant job loss at the plant facility until around three years ago {in 2019}{.} … According to Amsted, the Mexico facility is operating at full capacity and Granite City is only there to supplement it.  We are told regularly that we are surviving off of Mexico's leftovers.  If you would like to know the last time that I was told this, I know the exact date – it was this month on Tuesday, April 12th.  I specifically was told on that day, yet again, that the Mexico shop was operating at full capacity, and that we at the Illinois facility {were} only getting what they could not produce.[67]

---

[63] CR/PR at Table III-6.  Amsted's production of Mexican FRCs remained fairly constant over this period, from [            ] pounds in 2020 to [            ] pounds in 2021.  *Id*. at Table VII-11.  Throughout the period of investigation, [      ] of that Mexican production was exported to Amsted in the United States.  Amsted's Foreign Producer Questionnaire Response, EDIS Doc. EDIS Doc. 794626 (April 20, 2023) at II-9.

[64] *Leading Views* at 20; *Confidential Leading Views* at 21.

[65] Strato's Posthearing Brief, EDIS Doc. EDIS Doc. 797260 (May 25, 2023) at 5-6; CR/PR at Table IV-9.

[66] *Leading Views* at 17; *Confidential Leading Views* at 18; Preliminary Staff Report, INV-UU-108, EDIS Doc. 783843 (Nov. 4, 2022) at III-11.

[67] Petition Volume I, EDIS Doc. 781165 (Sept. 2022) at Exhibit I-48 (*FRC I* Hearing Transcript at 38-39).

**Contains Business Proprietary Information**

The connection between Amsted's subject imports from Mexico and Granite City's

declining operations during the period of investigation is also clear from other evidence on the

record, as was noted in the *Leading Views*:

> An amended supply agreement between [ ███████████ ] serves as further
> evidence that [ ██████ ] domestic production operations did not benefit from its
> subject imports from Mexico during the POI.  In March 2022, after provisional duties
> were imposed on FRCs from China, [ █████████ ] amended a supply
> agreement to include purchases of knuckles by [ ████████ ].  *The agreement*
> *provided that the knuckles could be supplied from either of [*
> ████████ *].*  [ ██████ ] ended up purchasing roughly [ ████ ] pounds of
> knuckles from [ ██████ ] in 2022.  The available data indicates that *the majority of the*
> [ ████████ ] *pounds of knuckles came from [* ████████████ *], at the direct*
> *expense of its U.S. facility.*[68]

Thus, compared to other investigations, the evidence here is more than substantial that

Amsted's domestic operations were not benefiting or shielded from subject imports.[69]

### 2. Amsted's Claimed Benefits Are Contrary to the Record

The Court states that the Commission did not adequately account for Amsted's self-

serving statements to the contrary – *i.e.*, Amsted "report{ing} that its subject imports from

Mexico complemented the domestically produced FRCs and thus did not compete with them in

the U.S. market" and "that it was not materially injured by subject imports".  The Court further

notes that Amsted reported losing no sales or revenue due to subject imports from Mexico, and

---

[68] *Leading Views* at 21: *Confidential Leading Views* at 22.

[69] The Court of International Trade affirmed as reasonable the Commission's reliance on
financial data to determine whether a related party benefited by importing subject merchandise in
*Allied Mineral Prods., Inc.,* 28 CIT 1861 at 1866 ("The Commission's analysis of Great Lakes' financial
results served to substantiate its finding that Great Lakes accrued a substantial benefit from its
importation of the subject merchandise.").  *See also Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade
Comm'n*, 100 F. Supp. 3d 1314, 1327 (2015); aff'd, 879 F.3d 1377 (Fed. Cir. 2018) ("The ITC thus
determined that, based on Motech's financial performance during the POI (*i.e.,* whether the company
benefitted from its importing activities), its capital expenditures, and research and development
expenses, that it was not 'appropriate to exclude Motech from the domestic industry as a related
party.'").

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

## Contains Business Proprietary Information

that Amsted's "domestic FRC production took place at a single facility of the seventeen it

maintains across the United States. … This supports {Amsted's} own assertion that its domestic

production complemented its imports from its Mexican facility by, for example, *bundling its*

*FRCs with other rail products* which are the bulk of its production, especially in the United

States."[70]

Having considered the evidence highlighted by the Court, I have two responses.  First

and foremost, my consideration of whether Amsted benefited from its subject imports is

focused solely on its operations producing the *domestic like product*, consistent with the

statute and focus of the Commission's material injury analysis,[71] not on whether subject

imports benefited its operations producing "*other*" products outside the scope of investigation,

such as "other rail products" that are bundled with FRCs.[72]  Amsted has stated that Mexican

production of FRCs benefits Amsted domestically by enabling Amsted to focus on producing

---

[70] Slip Op. 25-134 at 26-27 (emphasis added).  The Court also notes in its analysis under this factor that Amsted has reported its "primary interest" lies in importation.  *Id*.  That of course is a factor separate from this one, and it is addressed below.

[71] Consequently, the focus is also limited to the benefit or harm to the domestic production operations of a domestic producer that is a multinational company, like Amsted.  To be sure, considering its multinational operations as a whole, Amsted may not have been harmed by subject imports from its own Mexican manufacturing facility.  Indeed, those imports cost less to produce in Mexico than in the United States, which of course strengthens the bottom line, and helped the company compete against subject imports from China.  But the test is not whether the *multinational corporation* has benefited from imports or not; the test is whether the *domestic producer* has benefited.

[72] The Court stated that Amsted "reported that its subject imports from Mexico complemented *the domestically produced FRCs* and thus did not compete with them in the United States."  Slip Op. 25-134 at 26 (emphasis added).  However, Amsted reported that its production of FRCs in Mexico complemented its production of *other rail products*, not FRCs, in the United States.  Amsted Posthearing Brief at 56-57 ("Although more FRCs may be produced in its Mexican facility, that production is complementary to the production of the *other rail products* that Amsted produces in its Granite City facility.") (emphasis added).  Amsted stated that [ ▮ ] percent of its 2022 domestically produced FRCs sales and [ ▮ ] percent of its 2022 imported FRCs sales were bundled with other products. CR/PR at II-25.

**Contains Business Proprietary Information**

*products other than FRCs* in the United States, and the Court criticized the Commission for not adequately accounting for that benefit.[73]  But the Commission's related parties analysis, like its material injury analysis, is appropriately and necessarily focused on production of the domestic like product, not on the production of other products outside of the scope of the investigation.[74]

Second, to the extent that Amsted denies that its subject imports from Mexico injured its domestic FRC operations and employees (as opposed to claiming that its FRC imports benefitted its domestic production of "other" products by complementing them), Amsted's assertions are simply not credible.  As explained above, the record data make clear that Amsted's subject imports from Mexico *harmed* Amsted's Granite City facility, with the Steelworkers testimony corroborating those data.  Amsted's subject imports came at the expense of its sales of domestically produced FRCs, as subject imports gained market share at

---

[73] Slip Op. 25-134 at 27.

[74] The statute provides for the Commission to consider the effects of subject imports on operations producing the domestic like product in the United States.  *See* 19 U.S.C. §1677(7)(B)(i)(II) and (III).  It does not assess the effects of imports on overall operations of a firm, such as those producing other products.  *Color Television Receivers from China*, Inv. No. 731-TA-1034 (Final), USITC Pub. 3695 at 18 n.105 (May 2004) (noting the focus is on U.S. production operations, even if the firm is a multinational corporation); *Outboard Engines from Japan*, Inv. No. 731-TA-1069 (Preliminary), USITC Pub. 3673 at 24 n.165 (March 2004) (noting that consistent with the statute, the Commission was only examining financial data pertaining to operations producing the like product and "not the overall operations of its parent company"); *General Motors Corp. v. United States*, 827 F. Supp. 774, 780 (Ct. Int'l Trade 1993) (the statute "clearly provides" that effects of dumped imports be assessed to production of the like product, in that case minivans, not other types of vehicles produced by the corporations comprising the U.S. minivan industry).  *See also Large Residential Washers from China*, Inv. No. 731-TA-1306 (Final), USITC Pub. 4666 at 36 (January 2017) (finding respondent argument that domestic industry's losses on washers compensated by profits on dryers not responsive to statutory inquiry).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Contains Business Proprietary Information**

the expense of Amsted's domestic production of the very same sub-products within the scope

of these investigations.[75]  One does not need Amsted to admit lost sales to see them.

Furthermore, in addition to not benefitting or being shielded from its own subject

imports from Mexico, Amsted's domestic operations also faced competition from subject

imports from China.  Indeed, Amsted reported that Granite City [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛ ], consistent with record evidence showing that shipments of coupler

bodies from China took market share from Amsted in the component market (replacement

channel) in 2021.[76]  This harm from subject imports from China to the domestic industry would

be masked if Amsted were excluded from the industry,[77] providing an independent basis for

finding that appropriate circumstances do not exist to exclude Amsted because it was not

shielded from subject import competition.

Finally, while Amsted reports that it [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ], the record shows that [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ].[78]  This disconnect between Amsted's statements

and the data further calls into question Amsted's arguments concerning the extent to which its

subject imports from Mexico complemented its domestic FRC operations.

---

[75] While this type of very specific competitive overlap is not necessary to establish that the firm was not benefiting or shielded from its imports, in this case, it does make that conclusion particularly clear.

[76] *Leading Views* at 21; CR/PR at V-22.

[77] *Leading Views* at 19-20; *Confidential Leading Views* at 20-21.

[78] CR/PR at Table VII-8; Preliminary Staff Report at Tables III-9 and VII-11.  Also, while Amsted states that by importing FRCs, the firm can produce more "other" rail products in the United States (which, as explained above, is not relevant to our analysis), FRCs are an [⬛⬛⬛⬛⬛⬛⬛⬛⬛ ] of the overall production of Amsted's domestic *and Mexican* facilities.  CR/PR at Tables III-8 and VII-12.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**Contains Business Proprietary Information**

Thus, the record indicates that, rather than complementing its *domestic production of the domestic like product, FRCs,* with subject imports from Mexico, Amsted chose to import FRCs from Mexico at the expense of domestic FRC production at its Granite City facility.

### iv.  Fourth Factor: Skewing the Industry Data

When the Commission considers whether a related party's inclusion in the domestic industry would "skew the data," it is getting at the overarching objective of the related parties provision: a related party's data should be excluded from the domestic industry data if its domestic operations were benefiting or shielded from unfairly traded subject imports such that its inclusion would mask material injury by reason of subject imports.

### 1.  Excluding Amsted Would Mask Injury to the Domestic Industry

Consistent with my finding above that Amsted's domestic FRC operations were not benefiting or shielded from subject imports from Mexico or China, I find that excluding Amsted from the domestic industry would actually result in the masking of injury, running contrary to the intent of the statute:

- Market Share Loss.  If Amsted is included, the domestic industry *loses* [ ▉ ] percentage points of market share to subject imports from 2020 to 2021.[79]  If it is excluded, the domestic industry *gains* [ ▉ ] percentage points of market share from 2020 to 2021, and subject imports also gain [ ▉ ] percentage points of market share, as the market share losses caused by Amsted's declining U.S. shipments are ignored in the analysis.[80]

- Lost Jobs.  If Amsted is included, [ ▉ ] U.S. jobs are lost.[81]  If it is excluded, [ ▉ ] jobs are lost (at the other remaining domestic producer, M&T), and the remaining [ ▉ ] job losses are ignored.[82]

---

[79] CR/PR at Table C-1.
[80] CR/PR at Table C-2.
[81] CR/PR at Table C-1.
[82] CR/PR at Table C-2.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**Contains Business Proprietary Information**

- <u>Production, Shipment, and Sales Declines.</u>  If included, from 2020 to 2021, the domestic industry's production declines by [ ▮ ] percent; its U.S. shipments decline by [ ▮ ] percent; and its net sales decline by [ ▮ ] percent.[83]  If Amsted is excluded, from 2020 to 2021, the domestic industry's production declines by [ ▮ ] percent; its U.S. shipments decline by [ ▮ ] percent; and its net sales decline by [ ▮ ] percent.[84]

- <u>Increasing Operating [ ▮▮▮ ].</u>  If Amsted is included, from 2020 to 2021, the industry's operating [ ▮ ] increases from [ ▮ ] percent to [ ▮ ] percent.[85]  If Amsted is ignored, the industry's operating [ ▮ ] increases from [ ▮ ] percent to [ ▮ ] percent over the same period.[86]

- [ ▮▮▮▮▮ ] Capacity Utilization.  If Amsted is included, the industry's capacity utilization drops from [ ▮ ] percent in 2020 to [ ▮▮▮ ] percent in 2021.[87]  If ignored, it goes from [ ▮ ] percent to [ ▮▮▮ ] percent over the same period.[88]

- <u>Declining U.S. Assets.</u>  If included, we see a [ ▮ ] percentage point decline in the value of the domestic industry's net assets from 2020 to 2021.[89]  If ignored, we see a [ ▮ ] percentage point decline over the same period.[90]  Again, in a posthearing brief, Strato stated that this [ ▮▮ ] is evidence of Amsted's intent to further [ ▮▮▮ ] production of FRCs in the United States.

In short, Amsted's exclusion from the domestic industry would eliminate data showing the adverse impact of subject imports on its domestic FRC operations, similar to a survivor bias fact pattern, thereby masking injury to the domestic industry.[91]

> **2.** **That M&T Accounted for [ ▮▮▮▮ ] of Domestic Production Does Not Mean that Excluding Amsted Would Not Skew Industry Data**

---

[83] CR/PR at Table C-1.
[84] CR/PR at Table C-2.
[85] CR/PR at Table C-1.
[86] CR/PR at Table C-2.
[87] CR/PR at Table C-1.
[88] CR/PR at Table C-2.
[89] CR/PR at Table C-1.
[90] CR/PR at Table C-2.
[91] This is consistent with the Commission's determination in *FRC I*.  As discussed above, under a different period of investigation and a similar but somewhat different product scope, the Commission indicated that injury to the domestic industry, which *included Amsted*, was due not to subject imports from China, but more likely to imports from Mexico.

**Contains Business Proprietary Information**

Two issues raised in the Court's opinion concerning whether Amsted's exclusion would skew domestic industry data require responses.  First, the Court stated that "{e}xclusion of {Amsted} would still leave the majority of domestic production accounted for in the Commission's analysis."[92]  Similarly, Respondents have argued that this factor addresses whether exclusion would leave the remaining data of the industry "representative."[93]  But the question of representativeness is better addressed under the first factor, which examines the size of the related party in relation to the industry as a whole.  Asking whether the data would be skewed if a producer is excluded is not tantamount to asking whether enough data from other producers would remain.  As stated above, the analysis here is to determine whether *inclusion* of a related domestic producer would skew domestic industry data in a way that would mask injury to the industry caused by unfairly traded imports.

Second, the Court states, approvingly, that Amsted's "exclusion would leave a domestic industry comprised of the only domestic producer that is claiming material injury by subject imports."[94]  But, again, the workers at Amsted's Granite City facility are also claiming material injury by subject imports, including subject imports from Amsted's Mexican facility.  Those workers should not be ignored, particularly given that they are a statutorily-recognized petitioner in these proceedings.[95]  It would be a mistake to limit domestic industry data to those domestic producers that are claiming material injury by reason of subject imports while ignoring multinational corporations who deny that their U.S. affiliates are injured by subject

---

[92] Slip Op. 25-134 at 28.
[93] Respondents' Comments at 3-4 (*quoting* Slip Op. 25-124 at 28).
[94] Slip Op. 25-134 at 28.
[95] But, even if they did not petition for relief, U.S. workers should never be ignored, even if they work for a multinational that favors its own imports and opposes relief.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

## Contains Business Proprietary Information

imports but profit by offshoring production to subject countries at the expense of those affiliates.[96]

### v. Fifth Factor: Amsted's Primary Interest

Without question, the primary interest of Amsted as a whole (*i.e.*, the multinational corporation) but specifically with respect to FRCs lies in importation, as Amsted emphasizes: In every year of the POI, it imported at least [          ] FRCs than it produced domestically, and admits that it did so because FRCs are cheaper to produce in Mexico.[97] According to Steelworkers testimony, Amsted in recent years decided the best way to compete against cheap imports from China was to import even cheaper imports from Mexico itself, and consistent with that view, the Commission made negative determinations in *FRC I* in part because competition from imported FRCs from Mexico was found to be more impactful than competition from subject imports from China.  It is unsurprising that Amsted [         ] the petitions with respect to Mexico here (given that [         ] subject imports from Mexico ([     ] percent) are Amsted's, and those imports are a multiple of Amsted's domestic production).[98]

And while a firm with a primary interest in importation generally should be excluded in other circumstances, that is hardly so under the facts of this case.[99]  Doing so would ignore the

---

[96] Furthermore, as already mentioned, Amsted claimed [                              ].CR/PR at V-22.  *See* Amsted's U.S. Producer Questionnaire at V-27 and V-28 (noting "[                                        ]).

[97] At the same time, it has a primary interest in domestic production of a broader range of products beyond the scope of these investigations, as it has testified.  *Leading Views* at 17.

[98] *Leading Views* at 16 and 18 n.83; *Confidential Leading Views* at 17 and 19 n.83.

[99] *See Certain Large Residential Washers from Korea and Mexico*, Inv. Nos. 701-TA-488 and 731-TA-1199-1200 (Final), USITC Pub. 4378 at 12-13 (Feb. 2013) (After Electrolux had shifted production from the United States to Mexico during the period of investigation, the Commission found "{t}hat Continued...

**Contains Business Proprietary Information**

substantial injury the Granite City facility and its workers experienced, particularly from 2020 to 2021, before provisional measures were put in place on imports from China in *FRC I*, as discussed above.

*     *     *

In sum, I find that appropriate circumstances do not exist to exclude Amsted from the domestic industry in these investigations. The first two factors indicate that Amsted is large enough to impact the overall industry data, and it imported large volumes of subject imports from Mexico relative to its domestic production, warranting a consideration of whether its domestic FRC operations were benefiting or shielded from subject imports. The determinative factors in these investigations are the third and fourth ones. Specifically, Amsted's Granite City facility was not benefiting nor shielded from its subject imports from Mexico and was instead harmed by those imports, as well as by subject imports from China. For this reason, excluding Amsted from the domestic industry would run contrary to the intent of the statute by masking injury to the domestic industry that was caused by subject imports, including domestic industry market share and employment losses. Factor five tells us that Amsted's primary interest is in importation, but that only corroborates what the Steelworkers witness who represents the workers at Granite City told us: Amsted has decided to prioritize production of FRCs in Mexico,

---

Electrolux's current interest is not in domestic production is an insufficient basis by itself to warrant its exclusion" because "{t}here is no evidence that Electrolux's domestic production activities benefitted from its subject imports or were otherwise shielded from subject import competition" and "{e}xclusion of Electrolux from the domestic industry would have a significant effect on domestic industry data and trends, particularly with respect to employment and capacity."), *aff'd sub nom. LG Elecs., Inc. v. U.S. Int'l Trade Comm'n*, 38 CIT 1562, 1569, 26 F. Supp. 3d 1338, 1346 (2014).

     A related U.S. producer's primary interest can be particularly informative in cases where the Commission is not considering a survivor bias fact pattern, with a primary interest in importation in such a scenario indicating shielding or benefiting.

**Contains Business Proprietary Information**

at the expense of its operations and workers in Granite City. It therefore would be

inappropriate to exclude Amsted (*i.e.*, its Granite City facility) from the domestic industry data.

Congress did not intend for the Commission to exclude a related party from the domestic

industry where it decided to replace domestic production with lower cost subject imports to

the detriment of its domestic production operations.[100]

Accordingly, consistent with our definition of the domestic like product, I again define a

single domestic industry consisting of all U.S. producer of FRCs.


**Appendix to Views of Commissioner Jason E. Kearns on Remand**

**BACKGROUND ON LEGISLATIVE HISTORY AND COMMISSION PRACTICE**

The Trade Agreements Act of 1979 included the first statutory version of the related

parties provision:

> When some producers are related to the exporters or importers, or are themselves
> importers of the allegedly subsidized or dumped merchandise, the term "industry" may
> be applied in appropriate circumstances by excluding such producers from those
> included in the industry.[101]

Reports from both the House and Senate accompanying this legislation were clear that the

1979 Act's definition of industry "preserves present {Commission} practice" and "respects

current {Commission} practice."[102]

---

[100] The importance of the related parties issue to this case, and the abundant evidence
concerning the issue, is atypical. In some cases, there may be limited evidence concerning whether a
related party is benefiting or shielded from its subject imports in a way that would mask injury. In such
cases it may be necessary to rely more on the other factors.

[101] Pub. L. No. 96-39, § 101, 93 Stat. 144, 177 (July 26, 1979) (1979 Act).

[102] H. Rep. 96-317 at 73 (1979); *see also* S. Rep. 96-249 at 83 (1979).

**Contains Business Proprietary Information**

Accordingly, an examination of the Commission's practice in defining the domestic industry under the Antidumping Act of 1921, the predecessor legislation for material injury analysis, is pertinent in understanding Congress' intent in the 1979 Act.   The Antidumping Act of 1921's provision for an injury analysis was that "...the Commission shall determine...whether *an industry* in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States."[103] The Commission interpreted the lack of further definition for "industry," as well as the use of the indefinite article "an", as providing significant discretion in how the Commission defined an industry.  Thus, the Commission would consider whether to include U.S. producers' captive production for internal consumption within its definition of industry, or whether to define regional industries specific to geographic portions of the United States, notwithstanding that the 1921 Act provided no explicit authority for either approach.[104]

This discretion in defining "an industry" extended to excluding U.S. producers from the domestic industry that imported subject merchandise in certain instances. In *Titanium Sponge from the U.S.S.R.*, the Commission noted that one of three U.S. producers undertook "production on a small scale" and preferred instead "to use substantial quantities of imports, including USSR sponge," and the Commission defined the industry to be the other two U.S. producers that did not import sponge.[105] The concurring views of Commissioner Clubb

---

[103] 19 U.S.C. § 160(a) (1976) (1921 Act) (emphasis added).

[104] *See, e.g., Hot-Rolled Carbon Steel Wire Rods from France*, Inv. No. AA1921-30, TC Pub. 99 (1963) at 6-7 (discussing integrated U.S. producers' of wire rod's captive production and explaining that finding of no injury was true whether data were included or not); *Portland Hydraulic Cement from Canada*, Inv. No. AA1921-184, USITC Pub. 918 (1978) at 3-4 (defining regional industry of producers in the "northeast" regional market).

[105] *Titanium Sponge from the U.S.S.R.*, Inv. No. AA1921-51, TC Pub. 255 (1968) at 5.

**Contains Business Proprietary Information**

elaborated on the meaning of "industry" under the 1921 Act. Commissioner Clubb explained

that "{t}he scope of the term 'industry' is flexible and depends heavily upon the inquiry being

made" and should be defined to reflect "that group of economic interests which might be

destroyed by unabated dumping."[106] Concerning U.S. producers that might benefit from

imports of subject merchandise, Commissioner Clubb explained:

> It does not matter that other related commercial interests are *not affected, or that some are actually benefitted*. Congress obviously realized that in dumping cases, as in other unfair trade cases, the buyer of the unfairly priced goods benefits in the short run, but *it does not require that this factor be weighed against the injury to the domestic competitor*.[107] (emphases added)

This passage supports that related party exclusions under the 1921 Act were to ensure that

domestic producers that benefit from subject imports would not weigh against injury

experienced by other domestic producers, and their exclusion from U.S. industry data was a

method to accomplish this balancing.

Thus, while the 1979 Act "delineate{d} important concepts with respect to the definition

and treatment of the term 'industry,'" these delineations "respect{ed}" and  "preserv{ed}"

Commission practice under the 1921 Act.[108]  With respect to related parties, this practice was

not to allow a U.S. producer that benefitted from subject imports to weigh against domestic

competitors suffering injury from subject imports.  In the case of *Titanium Sponge*, this benefit

was direct: the firm at issue benefitted from access to low-priced subject imports and had little

---

[106] *Titanium Sponge*, TC Pub. 255 at 12 and 16.

[107] *Titanium Sponge*, TC Pub. 255 at 16a-16b.  Note that this is similar to the "shielded from" and "benefitted from" analysis we see in the Commission's more recent approach.

[108] H. Rep. 96-317 at 73 (1979); *see also* S. Rep. 96-249 at 83 (1979).

**Contains Business Proprietary Information**

domestic production.  The Senate report accompanying the 1979 Act gives another example with less direct benefit: "where a U.S. producer is related to a foreign exporter and the foreign producer directs his exports to the United States so as not to compete with his related U.S. producer."[109]  The benefit would presumably be one of efficiencies for the U.S. producer to focus on only certain products, and that these products faced less import competition – *i.e.*, they were "shielded from" import competition.  These varied illustrations, as well as statements of support for Commission practice, indicate that Congress was not concerned with one specific scenario, but rather that related party exclusions should be approached broadly in light of the unique facts of each case. Indeed, in not defining "appropriate circumstances" and using the discretionary "may" for related party exclusions, the statute's language itself affirms that Congress intended to maintain the Commission's "large measure of latitude" in how it applied such exclusions.[110]

In the years that followed the 1979 Act's passage, two trends are worth noting in the first cases applying the statute's related parties provision. First, cases emphasized the fact-specific nature of the decision on whether to exclude firms.[111] Even as the Commission began to recognize recurring fact patterns in its related party analysis, the Commission was clear that previous cases were not precedent, but rather were "merely illustrative" and that "each case

---

[109] S. Rep. 96-249 at 83 (1979).

[110] *Melamine in Crystal Form from Austria and Italy*, Inv. Nos. 731-TA-13-14, USITC Pub. 1065 (May 1980) at 10-11 (additional views of Commissioner Stern, stating that the 1979 Act "does imply a large measure of latitude for the Commission in its application. And the legislative history underscores this broad latitude by specially mentioning the Commission's 'discretion'").

[111] *See, e.g.*, *Certain Iron-Metal Castings from India*, Inv. No. 303-TA-13, USITC Pub. 1098 (September 1980) at 19 (describing related party exclusion as "discretionary and there should be made on a case-by-case basis"); *Melamine in Crystal Form from Austria and Italy*, USITC Pub. 1065 at 10-11 (related party provision "impl{ies} a large measure of latitude for the Commission in its application").

**Contains Business Proprietary Information**

has its own details which merit individual consideration."[112] Second, the decision on whether to exclude firms often hinged on the actual impact of the firm's data on the Commission's injury analysis. Hence, exclusion was not appropriate for firms that accounted for a large portion of domestic production and whose exclusion would "severely distort our perception of the domestic industry."[113] Exclusion could conversely be appropriate if "inclusion would decrease the impact of the alleged dumping on the domestic industry."[114] These cases illustrate a flexible, case-specific approach with a focus on a firm's impact on the Commission data for the domestic industry.

These early related party cases tended to focus on just one or two factors, but these factors began to coalesce into the five-factor test.[115] In *Rock Salt from Canada*, the Commission canvassed its application of the related parties provision in the preceding years and identified many factors that it had considered, including "the reasons the domestic producers have chosen to import," "the percentage of domestic production attributable to the related producers," whether "the primary interests of the respondents lie in domestic production," and considerations of how firms inclusion would affect the overall industry data.[116] Yet even while beginning to enunciate what would become the five-factor test, the case was nonetheless clear

---

[112] *Motorcycle Batteries from Taiwan*, Inv. No. 731-TA-42, USTIC Pub. 1157 (June 1981) at 6-7.

[113] *Melamine in Crystal Form from Austria and Italy*, USITC Pub. 1065 at 10-11.

[114] *Snow-Grooming Vehicles, Parts Thereof and Accessories Therefor From the Federal Republic of Germany*, Inv. No. 731-TA-36, USITC Pub. 1117 (Dec. 1980) at 13 (concurring views of Commissioner Stern elaborating on majority decision to exclude related party from domestic industry).

[115] The earliest cases also tended to represent the views of just Commissioner Paula Stern, who appears to have pioneered much of the Commission's related party analysis under the 1979 Act. Her approach, and the factors identified by her, would be adopted by the Commission in *Rock Salt from Canada*, Inv. No. 731-TA-239 (Final), USITC Pub. 1798 (January 1986).

[116] *Rock Salt from Canada*, USITC Pub. 1798 at 11-13. The only factor of the five-factor test missing from the opinion is that of the ratio of imports shipments to U.S. production.

**Contains Business Proprietary Information**

that the "principal consideration is whether there is a nexus between a domestic producer and

the allegedly LTFV imports which, if not accounted for, may result in inaccurate assessment of

material injury or threat of such injury."[117]  Thus, these factors have been applied dynamically

to determine whether a related party's impact on the injury assessment in that particular case

warranted exclusion.[118]

  The Commission has long recognized that the survivor bias scenario is a unique issue to

analyze in the context of an injury analysis.[119] For instance, where a domestic producer ceased

operation during the period of investigation and was unable to provide data, the Commission

recognized that "survivor bias" had "distorted the observed trends in the industry," and the

Commission relied on alternative data to try to account for these distortions in its injury

---

[117] *Rock Salt from Canada*, USITC Pub. 1798 at 10.

[118] For instance, the Commission in *Rock Salt* noted that two related producers accounted "for a significant share of domestic production" and their exclusion would "impair the accuracy" of the Commission's injury analysis, but the Commission was clear that this was not determinative and that it "must proceed beyond a superficial weighing of the amount of domestic production." *Rock Salt from Canada*, USITC Pub. 1798 at 13.

[119] For instance, in a safeguards investigation on *Birch Plywood Door Skins*, the domestic producer had ceased all production prior to filing the petition for relief, and respondents argued that the firm lacked standing to initiate an investigation given this lack of production. The Commission did not accept this argument and initiated the investigations. *Birch Plywood Door Skins*, Inv. No. TA-201-1, USITC Pub. 743 (October 1975) at 1-2. The separate views of Vice Chairmen Minchew elaborated that while at a technical level the safeguards statute could be interpreted as respondents advocated, the Commissioner believed this to be contrary to the purposes of the statute for trade relief:

    Does this statute contemplate that an injured industry which has been
    forced out of production but which still maintains a production
    capability be denied access to import relief, while an industry which has
    not been injured to the extent of closure may still avail itself of such
    relief? I think not.

*Birch Plywood Door Skins*, USITC Pub. 743 at 25. While I recognize this case involves a different statutory scheme, I find this logic relevant to material injury determinations under the antidumping and countervailing duty laws.

**Contains Business Proprietary Information**

analysis.[120]  The concept also applied to not exclude a related party that shifted from being a

domestic producer to primarily or exclusively an importer of subject merchandise during the

POI, because its exclusion would result in "survivor bias" by "skewing the data and potentially

masking the effects of subject imports."[121]  Thus, even if a U.S. producer's current primary

interest is not in domestic production, that alone is not dispositive in the Commission's related

party analysis when the record shows the related party is not benefiting or shielded from

subject import competition.[122]

        The Commission's statutory discretion with respect to whether to exclude a firm has

remained unchanged since the 1979 Act. The Uruguay Round Agreements Act further defined

the types of control relationships that entailed related party status, but it did not otherwise

alter the statute's discretionary language on whether the Commission "may" in "appropriate

circumstances" exclude a related party from the industry.[123] Indeed, Senate and House reports

accompanying the Act indicated the Commission would continue to "have discretion in applying

---

[120] *Certain Aluminum Plate from South Africa*, Inv. No. 731-TA-1056, USITC Pub. 3734 (November 2004) at 35 (relying on alternative sales data provided by another U.S. producer).

[121] *Organic Soybean Meal from India*, Inv. Nos. 701-TA-667 and 731-TA-1559 (Final), USITC Pub. 5321 (May 2022) at 10, n.34.

[122] *See, e.g., Large Residential Washers from Korea and Mexico*, Inv. Nos. 701-TA-488 and 731-TA-1199-1200 (Final) USITC Pub. 4378 (Feb. 2013) at 12-13 ("that {firm's} current interest is not in domestic production is an insufficient basis by itself to warrant exclusion as a related party in these investigations"); *LG Electronics, Inc. v. U.S. Intern. Trade Comm'n*, 26 F. Supp. 3d 1338, 1344-47 (Ct. Int'l Trade 2014) (affirming Commission decision not to exclude domestic producer, over respondents' objection, when the firm did not appear to benefit from subject imports and exclusion would mask declines in domestic industry during the POI); *see also See Certain Tissue Paper from China,* Inv. No. 731-TA-1070B (Final), USITC Pub. 3758 (Mar. 2005) at 11-12 ("{E}xclusion may not be warranted simply because a large producer (that was also a related party) has shifted to become a substantial importer of such merchandise during the period of investigation.  A significant factor is whether the firm's domestic production operations significantly benefitted financially from its relationship to subject imports or from its import activities. Such benefits create the sort of data distorting effect that the exercise of discretion to exclude under the related party provision seeks to overcome.").

[123] Pub. L. No. 103-465, § 222, 108 Stat. 4809, 4869 (1994) (codified at 19 U.S.C. § 1677(4)(B)).

**Contains Business Proprietary Information**

the related party provision and whether appropriate circumstances exist for excluding such a

related producer."[124]

---

[124] H. 103-826 at 65 (1994). A Senate report also indicated that the primary change to the provision was "to conform the definition of 'related parties'" with international agreements. S. Rep. 103-412 at 53 (1994).