**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

---

| | |
|---|---|
| WABTEC CORPORATION and STRATO INC., | : |
|        Plaintiff/Consolidated Plaintiff, | : : : |
| v. | : : |
| UNITED STATES, | : : |
|        Defendant, | : : |
| and | : : |
| COALITION OF FREIGHT COUPLER PRODUCERS, | : : : |
|        Defendant-Intervenor. | : : |

Consol. Court No. 23-00157

**PUBLIC VERSION**

---

**PLAINTIFFS' RULE 56.2(H) COMMENTS ON**
**THE INTERNATIONAL TRADE COMMISSION'S REMAND DETERMINATION**

C. Kevin Marshall
Henry J. Dickman
Shelbie M. Rose
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3939
ckmarshall@jonesday.com

*Counsel for Wabtec Corporation*

Andrew T. Schutz
Ned H. Marshak
GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Avenue, N.W., #650
Washington, D.C. 20005
1.202.783.6881
aschutz@gdlsk.com

James M. Smith
Sooan (Vivian) Choi
Wanyu Zhang
John Catalfamo
COVINGTON & BURLING LLP
850 10th Street, N.W.
Washington, D.C. 20001
1.202.662.5550
jmsmith@cov.com

Dated: March 13, 2026

*Counsel for Strato Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES .............................................................................................. iii

INTRODUCTION ............................................................................................................... 1

STANDARD OF REVIEW ................................................................................................ 2

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 5

I.    Commissioner Kearns's Reasoning Is Inconsistent with the Court's Order. ......... 5

   A.   Commissioner Kearns Again Failed to Weigh Factors (1), (4), and (5). ........... 6

   B.   Commissioner Kearns's Analysis of Factor (2) Violates This Court's Directives. ............. 9

   C.   Commissioner Kearns's Claims of Data "Skew" Are Unsupported by Substantial
        Evidence. ........................................................................................................... 14

II.   The Court Should Remand to the Commission to Issue a New Material Injury
      Determination Based on a Lawful Definition of the Domestic Industry. ............ 16

   A.   Because Commissioner Kearns's Domestic Industry Findings Are Inconsistent with this
        Court's Order, Remand Is Appropriate. ........................................................... 17

   B.   The Commission's Affirmative Determination on Remand Rests on Distinct Records and
        Findings, Each of Which Must Independently Survive Scrutiny. ..................... 18

      1.   Commissioner Kearns's Injury Findings Are Ripe for Review, But Not Supported by
           Substantial Evidence. .................................................................................... 19

      2.   Chair Karpel's Separate Injury Findings Require Additional Briefing and Likewise Are
           Not Supported by Substantial Evidence. ....................................................... 21

   CONCLUSION .............................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

**Page**

### Cases

*Allied Min. Prods., Inc. v. United States,*
  28 C.I.T. 1861 (2004) ................................................................................. 12

*Anderson v. U.S. Sec'y of Agric.,*
  469 F. Supp. 2d 1300 (CIT 2006) ............................................................... 11

*Angus Chem. Co. v. United States,*
  140 F.3d 1478 (Fed. Cir. 1998) .................................................................... 2

*Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n,*
  100 F. Supp. 3d 1314 (CIT 2015) ............................................................... 12

*Corus Grp. PLC v. Int'l Trade Comm'n,*
  352 F.3d 1351 (Fed. Cir. 2003) ............................................................... 2, 3

*Fujifilm N. Am. Corp. v. United States,*
  2026 WL 464687 (CIT Feb. 18, 2026) ....................................................... 16

*NSK Corp. v. United States,*
  637 F. Supp. 2d 1311 (CIT 2009) ............................................................... 11

*NTN Bearing Corp. of Am. v. United States,*
  757 F. Supp. 1425 (CIT 1991) .................................................................... 12

*Qingdao Taifa Grp. Co. v. United States,*
  710 F. Supp. 2d 1352 (CIT 2010) ............................................................... 11

*Rhone-Poulenc, Inc. v. United States,*
  927 F. Supp. 451 (CIT 1996) ........................................................................ 2

*SKF USA Inc. v. United States,*
  263 F.3d 1369 (Fed. Cir. 2001) .................................................................. 20

*Sullivan v. Hudson,*
  490 U.S. 877 (1989) ..................................................................................... 11

*USEC, Inc. v. United States,*
  132 F. Supp. 2d 1 (CIT 2001) ..................................................................... 12

### Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................ 2

19 U.S.C. § 1677(4)(B) ..................................................................................... 5

19 U.S.C. §§ 1671a(c)(4)(A) ........................................................................... 12

19 U.S.C. §§ 1671a(c)(4)(B)(i) ........................................................................ 12

19 U.S.C. §§ 1673a(c)(4)(A) ........................................................................... 12

19 U.S.C. §§ 1673a(c)(4)(B)(i) ........................................................................ 12

iii

PUBLIC VERSION

## Other Authorities

*Trade Agreements Act of 1979*,
  S. Rep. No. 96-249 (1979) ........................................................................................ 16

## Federal Register Notices

*Aluminum Lithographic Printing Plates from China and Japan*,
  Inv. Nos. 701-TA-694 and 731-TA-1641-1642 (Final), USITC Pub. 5559 (Nov. 2024).... 15, 16

PUBLIC VERSION

Plaintiffs Wabtec Corporation ("Wabtec") and Strato, Inc. ("Strato"), U.S. importers of subject merchandise, submit these comments in opposition to the U.S. International Trade Commission's remand determination in *Certain Freight Rail Couplers and Parts Thereof from China*, USITC Inv. Nos. 701-TA-682 and 731-TA-1592 ("Remand Views"), ECF117/ECF118.

## INTRODUCTION

By a 2-1 vote, the Commission has again determined that the domestic industry is materially injured by imports of freight rail couplers ("FRCs") and components from China and Mexico. But the deciding vote, Commissioner Kearns, reached that determination based on the view that Amsted belonged in the domestic industry—even though the majority of the Commission (Chair Karpel and Commissioner Johanson) determined that Amsted does *not* belong in the domestic industry.

Commissioner Kearns's inclusion of Amsted in the domestic industry is incompatible with the reasoning of this Court. The last time around, the Court determined that the Commission had incorrectly applied *all five factors* of the established test for excluding related parties, and it all but indicated that Amsted did not belong in the domestic industry. Yet Commissioner Kearns responded by "{re-}adopt{ing} my original findings, analysis, and conclusions … *in their entirety*." Remand Views at 2. And his analysis of each factor evaded the Court's reasoning at best, or deliberately rejected it at worst.

At minimum, these errors require remand. Because Commissioner Kearns's bottom-line injury determination rests on Amsted's inclusion in the domestic industry, his vote is necessarily unsupported by substantial evidence and contrary to law. And because his vote was necessary to an affirmative determination by the Commission, that determination must be vacated.

Even if Commissioner Kearns's inclusion of Amsted in the domestic industry somehow passed muster, there is no basis for this Court to uphold the Commission's injury determination.

1

As Plaintiffs have explained in prior briefing, the record does not support a finding that the domestic industry, defined to include Amsted, was materially injured by subject imports. *See infra* § II.B.1. Further, Chair Karpel—whose vote was also necessary to the Commission's bottom-line determination and therefore must independently survive judicial scrutiny—found material injury to a domestic industry that excludes Amsted. There has been no opportunity to brief that issue, and Plaintiffs request an opportunity to do so before the Court rules on this theory. In all events, as Commissioner Johanson has persuasively articulated, there is plainly no basis to find material injury to an M&T-only domestic industry. *See* Dissenting Views of Chairman David S. Johanson ("Dissent"), PR190 at 66-84, CR179 at 3-22; *see infra* § II.B.2. Whether the Court disagrees with Commissioner Kearns's reasoning, Chair Karpel's reasoning, or both, the bottom line is that the Commission has put forth no reasoned basis for finding material injury.

## STANDARD OF REVIEW

The Court must hold unlawful and set aside Commission determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Under this standard, "{t}he court will find a determination unlawful where {the agency} has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." Slip op. 25-134 ("Slip op."), ECF98/ECF108 at 13 (quoting *Rhone-Poulenc, Inc. v. United States*, 927 F. Supp. 451, 454 (CIT 1996)).

"{I}n reviewing a Commission determination, each of the various separate opinions making up the majority decision is subject to judicial scrutiny under the applicable statutory standard." *Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1363 (Fed. Cir. 2003). "If any opinion necessary to the majority … fails to satisfy the statutory standard, the decision must be set aside." *Id.*; *see also Angus Chem. Co. v. United States*, 140 F.3d 1478, 1485-86 (Fed. Cir. 1998)

PUBLIC VERSION

(reviewing each commissioner's opinion separately). Because Commissioner Kearns's opinion is necessary to the majority, it is independently subject to judicial scrutiny, and if it comes up short, the Commission's determination must be set aside. *Corus Grp.*, 353 F.3d at 1363.

## BACKGROUND

When the Commission issued its original final determination, its four participating members divided evenly on whether Amsted belonged in the domestic industry—Commissioners Kearns and Schmidtlein concluded that it did so belong, and now-Chair Karpel and now-Commissioner Johanson concluded that it did not. Remand Views at 1 n.1; *see* Separate Views of Chairman David S. Johanson and Commissioner Amy A. Karpel on Related Parties ("Johanson/Karpel Views"), PR190/CR180. But because Chair Karpel concluded that there was material injury even without Amsted's inclusion, the Commission voted in favor of material injury 3-1. Views of the Commission (July 2023) ("Leading Views"), PR190/CR178 at 3; Johanson/Karpel Views, PR190 at 65 n.31, CR180 at 6 n.31.

At the time of remand, however, Commissioner Schmidtlein was no longer a member of the Commission. Thus, a 2-1 *majority of the Commission* (Karpel and Johanson) now concludes that *Amsted does not belong* in the domestic industry. Remand Views at 1 n.1. For Commissioner Johanson, Amsted's exclusion compelled a negative determination of injury. *Id.* at 1-2 n.2. Chair Karpel again found material injury notwithstanding Amsted's exclusion. *Id.* Commissioner Kearns broke this 1-1 tie by finding material injury. *Id.* at 2. But he did so based on the premise that *Amsted does belong* in the domestic industry.[1]

---

[1] Commissioner Kearns was clear that his bottom-line vote rested on his including Amsted in the domestic industry. Commissioner Kearns stated he "continue{s} to find that appropriate circumstances do not exist to exclude Amsted from the domestic industry," and "{a}ccordingly, although the Court indicated that I may reconsider my injury analysis in complying with its remand instructions, I find it unnecessary to do so." Remand Views 2. Furthermore, the Commission's

Therefore, the deciding vote in favor of an affirmative determination rests on a factual premise that a majority of the Commission has rejected. Indeed, on *each factor* of the test for excluding "related parties" from the domestic industry, Commissioner Kearns's analysis contradicts that of the majority:

| Factor | Commission Majority | Commissioner Kearns |
|--------|--------------------|--------------------|
| 1 | "We disagree that exclusion would skew the data," in part because "exclusion of [      ] from the definition of the domestic industry still leaves nearly [  ] percent of domestic production accounted for in the Commission's analysis in 2022 (and more than [ ] percent in 2020 and 2021)." Johanson/Karpel Views, PR190 at 64, CR180 at 4-5. | "In this case, Amsted's percentage of domestic production is large enough that its inclusion or exclusion would be consequential.… Accordingly, further analysis of whether appropriate circumstances exist for its exclusion is warranted." Remand Views at 20. |
| 2 | "{T}he information of record indicates that [      ] has benefitted from its ownership of the [      ] producer and its imports of FRCs from that producer." Johanson/Karpel Views, PR190 at 63, CR180 at 3. | "The record shows that Amsted's domestic FRCs operations were harmed by subject imports, rather than benefiting or being shielded from them…." Remand Views at 21. |
| 3 | "We also disagree with Petitioner's argument that excluding [      ] from the domestic industry would introduce 'survivor bias' and mask the injury to the domestic industry during the POI." Johanson/Karpel Views, PR190 at 64, CR180 at 5. | "I find that excluding Amsted from the domestic industry would actually result in the masking of injury, running contrary to the intent of the statute." Remand Views at 27. |
| 4 | "Given [      ] ratio of subject imports to domestic production throughout the POI (between [      ] percent), and its stated reasons for importing subject merchandise (lowering costs and expanding sales for its largest customers), Chairman Johanson and Commissioner Karpel find that [      ] primary interest is in the importation of subject merchandise." | "The fact that Amsted imports [      ] of FRCs from Mexico relative to its domestic production simply means that further analysis of whether its domestic operations benefited from the imports, or are somehow shielded from them, is warranted." Remand Views at 20. |

_____

original material-injury determination (which Commissioner Kearns joined) rested on key findings that do not hold for a domestic industry that excludes Amsted. *See infra* § II.B.2.

| | | |
|---|---|---|
| | Johanson/Karpel Views, PR190 at 62, CR180 at 2. | |
| 5 | "[        ] primary interest appears to lie in importation." Johanson/Karpel Views, PR190 at 65, CR180 at 6. | "Without question, the primary interest of Amsted as a whole (*i.e.*, the multinational corporation) but specifically with respect to FRCs lies in importation. … And while a firm with a primary interest in importation generally should be excluded in other circumstances, that is hardly so under the facts of this case." Remand Views at 30. |

## ARGUMENT

**I.    Commissioner Kearns's Reasoning Is Inconsistent with the Court's Order.**

The Tariff Act "allows the Commission to exclude from the domestic industry producers that are related to an exporter or importer of subject merchandise or which are themselves importers in certain circumstances." Slip op. at 24; *see* 19 U.S.C. § 1677(4)(B). As all agree, there are five factors that "decid{e} whether appropriate circumstances exist to exclude a related party:

> (1) the percentage of domestic production attributable to the importing producer; (2) the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from unfair trade practice or to enable them to continue production and compete in the domestic market); (3) whether inclusion or exclusion of the importing producer will skew the data for the rest of the industry; (4) the ratio of import shipments to U.S. production for the importing producer; and (5) whether the primary interest of the importing producer lies in domestic production or importation."

Slip op. at 24 (collecting cases). This Court held that "the Commission's analysis of *each factor* was unsupported by substantial evidence." *Id.* at 32 (emphasis added). But Commissioner Kearns insisted that *all five factors* still supported Amsted's inclusion in the domestic industry, stating: "I adopt my original findings, analysis, and conclusions from the *Leading Views* in their entirety." Remand Views at 2. His views indeed recapitulate the very reasoning this Court rejected. The Court should correspondingly reject that reasoning again.

Commissioner Kearns "reordered" the Court's five factors to "reflect their general sequences in {his} analysis." Remand Views at 12. The following chart shows his reordering:

| Court Factor # | Cmr. Kearns Factor # |
|---|---|
| 1 | 1 |
| 2 | 3 |
| 3 | 4 |
| 4 | 2 |
| 5 | 5 |

*Id.* In the analysis below, Plaintiffs will refer to the factors according to the Court's ordering.

### A.   Commissioner Kearns Again Failed to Weigh Factors (1), (4), and (5).

This Court held that the Commission "failed to appropriately weigh … three factors" of the five-part test—specifically, factors (1), (4), and (5). Slip op. at 25. Indeed, the Court recognized that "*all of {these factors} seem to support {Amsted's} exclusion*." *Id.* (emphasis added). Commissioner Kearns, however, continued to underweight all three of these factors. *See* Remand Views at 31 ("The determinative factors in these investigations are the {second} and {third} ones.").

Start with factor (5): "whether *the primary interest* of the importing producer lies in domestic production or importation." Slip op. at 24 (emphasis added). The Commission previously "acknowledged that {this} factor{} support{s} exclusion," but found it "not dispositive." *Id.* at 30. This Court, however, held that this factor "seem{s} to independently support exclusion" and explained that even if "a fact is not dispositive," that "does not mean it need not be accounted for." *Id.* at 31.

On remand, Commissioner Kearns took essentially the same approach as before. He admitted that "{w}ithout question, the primary interest of Amsted as a whole … but specifically with respect to FRCs lies in importation." Remand Views at 30. And he acknowledged that "a firm

with a primary interest in importation generally should be excluded in other circumstances." *Id.* Those two concessions should have been conclusive. But instead, he held that was "hardly so under the facts of this case" because it "would ignore the substantial injury" to Amsted's sole domestic FRC *facility* in Granite City, Illinois, and the workers there. *Id.* at 30-31. He provided no citation for that *sui generis* conclusion, which misunderstands the fifth factor: It actually looks to "the primary interest of the *importing producer*," not a particular facility of the importing producer. Slip op. at 24 (emphasis added). Thus, when this Court analyzed factor (5), it emphasized "{Amsted's} stated interest in lowering costs *across its operations* and expanding sales to Mexican customers"—reasoning that presupposes a focus on whether Amsted's interest *as a whole* lies in importation. *Id.* at 31 (emphasis added). So there is no principled basis for concluding that factor (5) favors including Amsted in the domestic industry.

Commissioner Kearns's analysis also neutered factors (1) and (4) in several ways. In his view, these factors just "address a *threshold* question, aiding in determining whether to delve deeper into the thorny issue of whether 'appropriate circumstances' exist to exclude." Remand Views at 12 (emphasis in original). On factor (1) (the importing producer's *share of domestic production*), Commissioner Kearns found that "Amsted's percentage of domestic production is large enough that its inclusion or exclusion would be consequential," and "{a}ccordingly, further analysis of whether appropriate circumstances exist for its exclusion is warranted." Remand Views at 20. Likewise on factor (4) (the importing producer's *imports relative to its domestic production*), Commissioner Kearns recited Amsted's import ratio in 2020, 2021, and 2022, and concluded that "{t}he fact that Amsted imports [      ] of FRCs from Mexico relative to its domestic production simply means that further analysis of whether its domestic operations benefited from the imports, or are somehow shielded from them, is warranted." *Id.* He thereafter ignored those factors.

7

Commissioner Kearns cited no support for treating factors (1) and (4) as "threshold questions"—indeed, he admitted his approach was both novel and provisional. *Id.* at 10 n.36 ("Other members of the Commission may or may not agree with the approach that I describe below, and my own thinking may evolve further over time."). And this unprecedented approach caused him to effectively sweep these factors under the rug. He reduced them to supposed triggers for review under *other factors*, and then those other factors did all the work, these two having (again) fallen away into irrelevance. *See id.* at 31 ("The determinative factors in these investigations are the {second} and {third} ones."). What he did not do was *weigh* either of them. This "fail{ure} to weigh the impact of" factors (1) and (4) repeats an error the Court already identified. Slip op. at 28-29.

Even if it were meaningful for factors (1) and (4) to be just "threshold questions," Commissioner Kearns still did not adequately evaluate them on their own terms as instructed by the Court. On factor (1), the Court criticized the Commission for "not clearly indicat{ing} whether or why this factor might support or detract from its ultimate determination not to exclude {Amsted}." *Id.* at 30. Commissioner Kearns committed the same error on remand, finding that "domestic production is large enough that its inclusion or exclusion would be consequential." Remand Views at 20. To say a choice is "consequential" says nothing about which way it should go. This nothing-ism again does not indicate whether Amsted should be excluded or not.

On factor (4), the Court observed that "{Amsted's} ratio of subject imports to U.S. production was high throughout the period of investigation" and that this "seem{s} to independently support exclusion." Slip op. at 30-31. "With such a high ratio of subject imports to U.S. production," the Court held, "it is hard to understand how {Amsted's} reason for importation was to compete with domestic production," which "detract{s} from the Commission's

determination" to the contrary. *Id.* at 31. Commissioner Kearns breezed past this: He acknowledged that "Amsted's import ratio is [                                    ]," but then concluded only that "further analysis … is warranted." Remand Views at 20. That is insufficient. Slip op. at 31 (Commission merely "acknowledging the high ratio of subject imports to U.S. production" does not satisfy the fourth factor).

In sum, this Court held that "the Commission failed to properly account for the final three factors—{Amsted's} share of domestic production, {Amsted's} ratio of subject imports to U.S. production, and {Amsted's} primary interest—each of which seem to support {Amsted's} exclusion." Slip op. at 32. That remains true. Commissioner Kearns's analysis of these factors on remand is more of the same.

### B.    Commissioner Kearns's Analysis of Factor (2) Violates This Court's Directives.

Factor (2) looks to "*the reason the U.S. producer has decided to import the product* subject to investigation." Slip op. at 24 (emphasis added). The Commission previously concluded that "{Amsted's} reason for importation is *to compete* with domestic production," but the Court found this conclusion unsupported by substantial evidence because it "did not adequately account for facts suggesting that {Amsted} *benefitted from* the import of subject merchandise from Mexico." *Id.* at 25, 27 (emphases added). Indeed, the Court found the evidence of Amsted's benefitting from importation so strong that it was "hard to understand how {Amsted's} reason for importation was to compete with domestic production." *Id.* at 31. Commissioner Kearns nonetheless clung to his original view, and he did so with reasoning that contravenes the Court's remand instructions.

**1.**    To begin, this Court put substantial weight on Amsted's own statements about its reasons for importation. Amsted explained that "its reason for importing subject merchandise is to lower costs and that 'its purchase of the Mexican facility is to serve its largest rail customers that

had shifted their production to Mexico.'" *Id.* at 30. Indeed, Amsted's Mexican operation "is 'literally across the street' from one OEM's production facility in Mexico." Amsted Posthearing Br., PR151/CR152 at 5. While Amsted's shift to Mexico reduced its domestic FRC production, the Court emphasized that "{Amsted's} domestic FRC production took place at a single facility of the seventeen it maintains across the United States." Slip op. at 27. "This supports {Amsted's} own assertion that its domestic production complemented its imports from its Mexican facility by, for example, bundling its FRCs with other rail products which are the bulk of its production, especially in the United States." *Id.*

Commissioner Kearns acknowledged that "the Court criticized the Commission for not adequately accounting for" the fact that "Mexican production of FRCs benefits Amsted domestically by enabling Amsted to focus on producing *products other than FRCs* in the United States." Remand Views at 24-25 (emphasis in original). Nonetheless, he rejected the Court's instructions, explaining that "my consideration of whether Amsted benefited from its subject imports is focused solely on its operations producing the *domestic like product*, … not on whether subject imports benefited its operations producing '*other*' products outside the scope of investigation, such as 'other rail products' that are bundled with FRCs." *Id.* at 24 (emphasis in original, internal footnotes omitted). He claimed that this approach was "consistent with the statute and focus of the Commission's material injury analysis." *Id.* He thus found that factor (2) favored inclusion because "the record indicates that, rather than complementing its *domestic production of the domestic like product, FRCs*, with subject imports from Mexico, Amsted chose to import FRCs from Mexico at the expense of domestic FRC production at its Granite City facility." *Id.* at 27 (emphasis in original). That reasoning should be rejected on multiple grounds.

PUBLIC VERSION

*First*, "{t}he ITC act{s} contrary to law when it fail{s} to genuinely comply with the court's remand instructions" and instead "dedicates … its remand analysis to vociferously disagree with the court's holding." *NSK Corp. v. United States*, 637 F. Supp. 2d 1311, 1319 (CIT 2009); *see Qingdao Taifa Grp. Co. v. United States*, 710 F. Supp. 2d 1352, 1357 (CIT 2010) (remanding where "Commerce {} did not comply with the court's remand instructions"); *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989) ("Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review."). If the Commission believes that the Court's analysis is wrong, "the proper and prudent course would have been to move for reconsideration or rehearing." *Anderson v. U.S. Sec'y of Agric.*, 469 F. Supp. 2d 1300, 1301 (CIT 2006).[2]

Here, the Court ordered the Commission to "account for facts suggesting that {Amsted} benefitted from the import of subject merchandise from Mexico," and, given the facts the Court relied on, the directive clearly required the Commission to consider benefits to Amsted's domestic operations as a whole. Slip op. at 27. Commissioner Kearns expressly acknowledged that directive but then openly disregarded it. Remand Views 24-25. In doing so, he overstepped his limits.

*Second*, in any event, there is no legal support for the view that Amsted can be excluded only if its production of the *domestic like product* (FRCs) at a particular domestic facility (Granite City) benefitted from imports. Commissioner Kearns contended that because the Commission's *material-injury* analysis is tailored to the domestic like product, the *related-party* analysis must have the same focus. Remand Views at 24. But he cited nothing, and that inference does not follow. After all, Commerce also determines whether appropriate circumstances exist to exclude related

---

[2] Of course, that avenue was not available in this case given that a majority of the Commission *agrees* that Amsted should be excluded. Yet that hardly gave Commissioner Kearns license to fight the Court's order.

parties, *e.g.*, *NTN Bearing Corp. of Am. v. United States*, 757 F. Supp. 1425, 1430 n.5 (CIT 1991), so there is no reason why the Commission's material-injury analysis would control this issue generally. Further, this Court's precedent says "{t}he most significant factor considered by the Commission in" determining whether to exclude a related party is simply "whether *the domestic producer* accrued a substantial benefit from its importation of the subject merchandise"—not whether its production of the *domestic like product* benefitted, or whether a particular domestic *facility* benefitted. *Allied Min. Prods., Inc. v. United States*, 28 C.I.T. 1861, 1864 (2004) (emphasis added). This Court here likewise described the second factor as looking to the reasons of "the U.S. producer" and "the firm," not just one of the producing firm's products or outposts. Slip op. at 24. So Commissioner Kearns is grafting on yet another new requirement, much as he chose to reframe the first and fourth factors in his own way. *See* Remand Views at 10 n.36 ("Other members of the Commission may or may not agree with the approach that I describe below….").

*Third*, such a rule would make no sense. "The related parties provision's purpose is to exclude from the industry headcount domestic producers substantially benefitting from their relationships with foreign exporters," slip op. at 25 (brackets omitted) (quoting *USEC, Inc. v. United States*, 132 F. Supp. 2d 1, 12 (CIT 2001)), because domestic producers with "strong enough" "interests in the imports" could "act against the domestic industry," *id.* (quoting *Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 100 F. Supp. 3d 1314, 1326 (CIT 2015)).[3] If a domestic producer is *generally* benefitting from subject imports, then the incentive to "act against

---

[3] For instance, a related party whose overall interest favors importation could kill an AD/CVD petition were it included in the domestic industry. *See* 19 U.S.C. §§ 1671a(c)(4)(A), 1673a(c)(4)(A) (requiring that "the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product" and "more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition"); *but see id.* §§ 1671a(c)(4)(B)(i), 1673a(c)(4)(B)(i) (excluding related parties from this determination).

the domestic industry" is present. Here, for instance, all agree that Amsted as a whole benefits from the importation of subject merchandise, *see* Remand Views at 30, so it has no incentive to support the domestic industry in these investigations—regardless of whether its *domestic FRC production* or *Granite City facility* benefits from subject imports.

      **2.**     In any event, Commissioner Kearns's view that Amsted's Granite City plant was harmed by FRC imports is not supported by substantial evidence. *See* Remand Views at 25 ("{T}o the extent that Amsted denies that its subject imports from Mexico injured its domestic FRC operations and employees (as opposed to claiming that its FRC imports benefitted its domestic production of 'other' products by complementing them), Amsted's assertions are simply not credible."). As Amsted explained, it "does not view [                    ] solely as an FRC facility." Amsted Posthearing Br., PR151/CR152 at 2. "Instead, it views it as a casting facility for a suite of rail products that it sells as a bundle to its customers in North America," including "side frames and bolsters, brake systems, end-of-car systems (including FRCs), pellet car systems, wheels, roller bearings, springs, energy management systems, seals, graphite products, and transit rail offerings." *Id.* Thus, "{t}he workers at Amsted's Mexican facility … are not in competition with the workers at its [                    ] for the production of FRCs. To the contrary, the goal is to produce a suite of products and maximize production at its [                    ] and {Mexican} facilities in order sell a bundle of rail products to its customers." *Id.* at 2-3. Further, "FRCs account for a [                    ] of the [                    ] facility's overall production," Johanson/Karpel Views, PR190 at 63, CR180 at 4, so changes in domestic FRC production would not have substantially impacted the overall operations of the Granite City facility. Finally, Amsted [                    ] both its FRC capacity utilization and overall capacity utilization at Granite City over the course of [      ], which underscores that its Mexican

13

operations complemented operations at Granite City. Amsted Posthearing Br., PR151/CR152 at 29-30.

Commissioner Kearns on remand failed to grapple with these facts about *the facility*. Instead, further narrowing his focus, he looked simply at *FRC* production there, defining away the facility's overall flourishing. *See* Remand Views at 25 (finding that "Amsted's subject imports from Mexico *harmed* Amsted's Granite City facility" because "Amsted's subject imports came at the expense of its sales of domestically produced FRCs" (emphasis in original)).

In sum, this Court identified numerous "facts suggesting that {Amsted} benefitted from the import of subject merchandise from Mexico," going so far as to say "it is hard to understand how {Amsted's} reason for importation was to compete with domestic production." Slip op. at 27, 31. Commissioner Kearns treated those facts as irrelevant and, in so doing, flouted the Court's remand instructions.

### C. Commissioner Kearns's Claims of Data "Skew" Are Unsupported by Substantial Evidence.

On factor (3), the Commission previously found that "'excluding {Amsted} would have the effect of masking declines in the domestic industry's market share, financial performance, and employment,'" as well as "'the available capacity for FRC production in the United States.'" Slip op. at 28. The Court rejected this analysis because it "suggests that the exclusion of <u>any</u> producer from the domestic industry would skew the data." *Id.* (emphasis in original).

Here too, Commissioner Kearns essentially regurgitated the Commission's prior, defunct analysis. He claimed that Amsted's exclusion "masks" market-share loss, lost jobs, financial performance, capacity, and U.S. assets—the very data points the Commission previously considered. Remand Views at 27-28; *see* Leading Views, PR190 at 21-22, CR178 at 23. This Court rejected that outcome-driven analysis precisely. Slip op. at 28. "Exclusion of data is not

synonymous with skewing data," the Court explained, which was lost on Commissioner Kearns. *Id.*

This Court also held that "{e}xclusion of {Amsted} would still leave the majority of domestic production accounted for in the Commission's analysis"—which means "it would not inevitably skew the remaining data." *Id.* Commissioner Kearns responded that this issue "is better addressed under the first factor, which examines the size of the related party in relation to the industry as a whole." Remand Views at 29. But he had robbed the first factor of any force, *see supra* § I.A, so this is no answer anyway.

Commissioner Kearns also chided the Court for "stat{ing}, approvingly, that Amsted's 'exclusion would leave a domestic industry comprised of the only domestic producer that is claiming material injury by subject imports.'" Remand Views at 29 (quoting slip op. at 28). The Court's reasoning, he stated, ignores "the workers at Amsted's Granite City facility {who} are also claiming material injury by subject imports." *Id.* But factor (3) looks to whether Amsted's exclusion "will skew the data *for the rest of the industry*"—that is, for M&T. Slip op. at 24 (emphasis added). And Commissioner Kearns made no finding to suggest that Amsted's exclusion would skew the data as to M&T.

Finally, Commissioner Kearns compared this case favorably to the Commission's decision in *Aluminum Lithographic Printing Plates from China and Japan*, Inv. Nos. 701-TA-694 and 731-TA-1641-1642 (Final), USITC Pub. 5559 (Nov. 2024). There, Fujifilm Manufacturing USA ceased domestic production during the POI, while its affiliate FNAC imported subject merchandise from Japan and China. *Id.* at 9-11. The Commission determined that "{e}xcluding Fujifilm Manufacturing USA from the domestic industry would mask declines in the domestic industry's market share, output, and financial performance during the POI as subject import volume and

15

PUBLIC VERSION

market share increased." *Id.* at 12. Commissioner Kearns viewed this case as "akin" to that one. Remand Views at 18-19.

Putting aside that a Commission determination in another case cannot trump a judicial holding in the same case, *Aluminum Lithographic* has now been *vacated* by this Court. *See Fujifilm N. Am. Corp. v. United States*, 2026 WL 464687, at *5 (CIT Feb. 18, 2026). And critically, the Court directed the Commission to "address on remand how the instant facts are an 'appropriate' case for excluding a related party in light of the example provided in the legislative history." *Id.* That history, the Court explained, states that "{t}he Commission will not consider a related U.S. producer to be a part of the domestic industry 'where a U.S. producer is related to a foreign exporter and the foreign exporter directs his exports to the United States so as not to compete with his related U.S. producer.'" *Id.* at *4 (quoting S. Rep. No. 96-249, at 83 (1979)). The Court found that example "to be very similar to the facts in this case." *Id.* at *5. So even assuming Commissioner Kearns is right that this case is "akin" to the *Aluminum Lithographic*, that only strengthens the case for excluding Amsted. Remand Views at 18-19.

*    *    *

This Court all but held that Amsted did not belong in the domestic industry. A majority of the Commission agrees. But Commissioner Kearns bucked all and openly reinstated his prior analysis, which erroneously led him to make an affirmative finding of material injury. The Court should hold that his determination is unlawful.

## II.    The Court Should Remand to the Commission to Issue a New Material Injury Determination Based on a Lawful Definition of the Domestic Industry.

The Court now has before it three different views reaching three different conclusions regarding the domestic industry and whether subject imports materially injured the domestic industry. In this setting, as explained below, the Court should remand for a determination of

16

whether the domestic industry—properly defined to exclude Amsted—is materially injured by subject imports. In the alternative, to the extent the Court is inclined to address findings of material injury under *both* definitions of the domestic industry prior to a second remand, then additional briefing by the parties is required to address the many respects in which Chair Karpel's separate findings are unsupported by substantial evidence and contrary to law.

### A.    Because Commissioner Kearns's Domestic Industry Findings Are Inconsistent with this Court's Order, Remand Is Appropriate.

As explained in Part I, Commissioner Kearns failed to follow the Court's instructions with regard to the five factors for excluding related parties, and his claim of "skew" in the data is unsupported by substantial evidence and contrary to law. This alone requires a second remand.

Because the domestic industry definition is a threshold issue, one the Court has determined must be resolved before analysis of the material injury determination, the Court should once again remand without considering the merits of the Commission's injury determination. Slip op. at 34. If the Court remands, the Commission would then have a necessary opportunity to determine whether the domestic industry—properly defined to exclude Amsted—suffered material injury by reason of subject imports.

To this point, only Chair Karpel has expressed support for a finding of material injury based on a domestic industry that excludes Amsted. And at this stage, Chair Karpel's position merely reflects the separate views of a single Commissioner, not the views of the Commission. On a second remand, that position may not secure majority support—indeed, Commissioner Johanson has found *no* material injury to a domestic industry that excludes Amsted. Remand is therefore necessary to resolve that uncertainty.

**B.      The Commission's Affirmative Determination on Remand Rests on Distinct Records and Findings, Each of Which Must Independently Survive Scrutiny.**

Plaintiffs believe a second remand is essential to enable the Commission to address material injury based on a proper definition of the domestic industry. However, if the Court for some reason deems it appropriate to address merits issues in advance of a second remand—*e.g.*, because Commissioner Kearns's remand views on the domestic industry somehow manage to pass muster under the applicable standard of review—then each of the Commission's two votes in support of an affirmative injury determination on the first remand must independently be supported by substantial evidence and not contrary to law.

Two of the three sitting Commissioners reached an affirmative injury determination, but did so on different records. Commissioner Kearns found injury based on a record that includes Amsted, while Chair Karpel did so on a record that excludes Amsted. The Court must evaluate each set of findings separately, and the Commission's ultimate, affirmative determination may be sustained only if the Court finds that both Commissioner Kearns's and Chair Karpel's injury findings are supported by substantial evidence and otherwise in accordance with law.

Before the Court can properly evaluate Chair Karpel's injury determination, additional briefing is necessary. The parties have not previously had occasion or opportunity to address the Court on whether a record that *excludes* Amsted contains substantial evidence capable of supporting an affirmative injury determination. For that reason, Chair Karpel's separate views— which never represented the views of the Commission—are not ripe for review. Plaintiffs therefore request an opportunity to brief the Court fully on that issue prior to its evaluation.

In any event, as previewed below, an affirmative injury determination is not supported by substantial evidence regardless of whether Amsted is included in the domestic industry.

PUBLIC VERSION

### 1. Commissioner Kearns's Injury Findings Are Ripe for Review, But Not Supported by Substantial Evidence.

On remand, Commissioner Kearns adopted the injury analysis set forth in the Commission's original majority views. Remand Views at 2. The parties have briefed the Court on how that determination is not supported by substantial evidence and otherwise contrary to law. *See* Pls. Mot. for J. on the Agency R. ("Pls. MJAR"), ECF44/ECF46 at 32-54; Pls. Reply Br., ECF69/ECF70 at 25-37; Pls. Resp. to Oral Arg. Qs., ECF85/ECF86 at 12-18. Accordingly, the Court has before it full briefing on the injury findings of Commissioner Kearns. If it reaches the merits at this stage, the Court should conclude that Commissioner Kearns's injury findings are not supported by record evidence and not in accordance with law.

The record that includes Amsted's data demonstrates that the domestic industry was not injured at all, much less injured by reason of subject imports. Over the POI, the domestic industry defined to include Amsted *gained* [    ] percentage points of market share as subject imports increasingly *oversold* the domestic like product—hardly the mark of an injured industry. Staff Report, PR190/CR163 at C-3. Yet the Commission improperly discounted the domestic industry's overall market share gain and disregarded its [     ] gains within the OEM channel. In so doing, the Commission ignored contrary record evidence, created internal inconsistencies, and contradicted its own findings in *FRC I*.

As detailed in Plaintiffs' briefs, neither of the Commission's explanations for finding material injury—(1) the domestic industry's loss of market share between 2020 and 2021, which it regained in 2022 supposedly because of provisional duties from *FRC I*, and (2) the domestic industry's loss of market share in the replacement channel alone over the POI—can plausibly support an affirmative injury determination. *See* Pls. MJAR, ECF44/ECF46 at 32-54; Pls. Reply Br., ECF69/ECF70 at 25-37; Pls. Resp. to Oral Arg. Qs., ECF85/ECF86 at 12-18.

First, attributing improvements of the domestic industry in 2022 to provisional duties from *FRC I* contradicts both the law and record evidence. *See* Pls. Reply Br. at 26-29, 34-36; Pls. MJAR at 34-39, 42-46. Notably, if provisional duties on Chinese imports from *FRC I* were the reason for the domestic industry's market share gain in 2022, then one would expect the gain to have occurred in the replacement channel, where Chinese imports were heavily concentrated. Yet record data showed that the domestic industry *lost* [    ] percentage points of market share in the replacement channel between 2021 and 2022. *See* Pls. MJAR at 37, 43-44; Pls. Reply Br. at 28, 35.

Second, in finding injury based on the domestic industry's loss of market share in the replacement channel, the Commission ignored evidence showing that this [       ] loss was attributable to the domestic industry concentrating its efforts on the OEM channel where demand was surging—and in particular to [

]. Pls. MJAR at 48-49; Pls. Reply Br. at 32-33; Pls. Resp. to Oral Arg. Qs. At 13-14. This shift did not reflect competition from subject imports in the distinct replacement channel, which the domestic industry deemed to be a lower priority than the OEM channel.

Moreover, throughout its analysis, the Commission failed to reconcile multiple contradictions with its findings in *FRC I*, which is itself arbitrary and capricious. *See* Pls. MJAR at 32-36, 45-48, 50-53; *see also SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{I}t is well-established that an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (citation modified)). The Commission additionally failed to address record evidence demonstrating that non-price factors, including the use of Bedloe technology exclusively in subject imports from China, drove purchasing decisions. Pls. MJAR at 51-54; Pls. Reply Br. at 36-37. For these and other reasons set out in Plaintiffs' briefing, Commissioner Kearns's injury determination cannot be sustained.

### 2. Chair Karpel's Separate Injury Findings Require Additional Briefing and Likewise Are Not Supported by Substantial Evidence.

The majority in the original determination never reached the question of material injury to M&T alone. Nor did this Court in the remand order. *See* slip op. at 4 (acknowledging "the Commission's reconsideration of the domestic industry's composition could significantly alter the Commission's material injury analysis"). Accordingly, the parties have had no opportunity to brief the Court on whether Chair Karpel's separate injury findings (which excluded Amsted data) are supported by substantial evidence and otherwise in accordance with law. Plaintiffs thus respectfully request an opportunity to brief the Court on Chair Karpel's views before the Court addresses material injury in a forthcoming opinion.

As a preview of that briefing, it is clear that Chair Karpel's injury determination is not supported by substantial evidence. M&T experienced [          ] improvement in its production of FRCs, practical FRC capacity, capacity utilization, and U.S. shipments of FRCs over the POI. Amsted Prehearing Br., PR134/CR148 at 31-32. The unit values of M&T's U.S. shipments and net sales increased; no purchaser reported any reduction in M&T's prices to compete with subject imports; and M&T's COGS-to-net-sales ratio improved over the POI. *Id.* at 32-33. Overall, M&T [     ] market share in the replacement channel from 2020 to 2021. Staff Report, PR190/CR163 at G-15. These are not the hallmarks of an injured domestic industry.

Chair Karpel's injury findings rest on the [                    ] in M&T's share in the replacement channel from 2021 to 2022—its *sole* [                ] in either channel over the POI. Leading Views, PR190 at 43-44 n.243, CR178 at 45-46, n.243. However, that [

] is not attributable to subject imports. Rather, it was a direct result of M&T's strategic decision to prioritize OEM customers as new railcar demand surged from 2021 to 2022. Dissent, PR190 at 71-72, CR179 at 8-9. During that period, M&T's former owner, Trinity, outperformed the market,

increasing its share of new railcar orders by 15.6 percentage points. Amsted Prehearing Br., PR134/CR148 at 8-9. This had a direct and substantial impact on M&T, given [

]. Dissent, PR190 at 71 & n.39, CR179 at 8-9 & n.39; *see also* Amsted Prehearing Br., PR134/CR148 at 7-10. Thus, "any loss of share in the replacement channel by the domestic industry was attributable to the industry's strategic decisions as to how to deploy its capacity." Dissent, PR190 at 72, CR179 at 9.

Chair Karpel's injury findings also fail to address the obvious explanation for the precise amount of the [        ] in M&T's replacement channel sales—[

]. "One purchaser [                        ], accounted for [                        ] of this decline" because it [                                                                    ] from 2021 to 2022." Dissent, PR190 at 70, CR179 at 7. "[      ] shift in supply was necessitated by [

]." *Id*; *see also* Pls. MJAR at 48-49; Pls. Reply Br. at 32-33; Pls. Resp. to Oral Arg. Qs. at 13-14. That fact, along with the other circumstances surrounding their dispute, confirms that "the decision to end the relationship was [      ] and is not reasonably attributable to subject imports." Dissent, PR190 at 70, CR179 at 8.

M&T also faced additional headwinds in the replacement channel. The domestic industry does not produce FRCs with Bedloe technology, which means it had a significant "disadvantage in competing for the business of" one of the largest U.S. purchasers of FRCs during the POI, "which has a strong preference for FRCs with Bedloe technology and believes [

]." Dissent, PR190 at 72, CR179 at 10; *see* Pls. MJAR at 51-54; Pls. Reply Br. at 36-37. M&T also could not compete based on bundling, which places it at a competitive disadvantage in the replacement channel. Dissent, PR190 at 72, CR179 at 10. Four

purchasers, [     ] from the replacement channel, indicated that a supplier's ability to bundle FRCs with other railcar components increases the likelihood that their firm will purchase that supplier's products. *Id.*

Finally, M&T's loss in market share in the replacement channel between 2021 and 2022 was not attributable to underselling. "{S}ubject imports undersold the domestic industry ([     ]) in a greater share of instances and quantity of Pricing Products 3-5 (i.e., the FRC components primarily sold to the replacement market) in 2021 than in 2022." Amsted Posthearing Br., PR151/CR152, Q&A at 13-14. "Despite this, the domestic industry increased its replacement market share in 2021 (when subject import underselling was greater), and decreased its share in 2022 (when subject import underselling was lesser)." *Id.*; Dissent, PR190 at 70, CR179 at 7.

In conclusion, as additional briefing will make clear, substantial evidence does not and cannot support a finding that the domestic industry defined as M&T was materially injured by reason of subject imports during the POI.

## CONCLUSION

For these reasons and those set forth in their prior briefing, Plaintiffs request that the Court find the Commission's affirmative final determinations on remand are arbitrary and capricious, unsupported by substantial evidence, and not in accordance with law. Plaintiffs further request that the Court remand with instructions to the Commission to reconsider its determinations consistent with the Court's opinion.

Respectfully submitted,

/s/ C. Kevin Marshall

C. Kevin Marshall
Henry J. Dickman
Shelbie M. Rose
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3939
ckmarshall@jonesday.com

*Counsel for Wabtec Corporation*

/s/ Andrew T. Schutz

Andrew T. Schutz
Ned H. Marshak
GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Avenue, N.W., #650
Washington, D.C. 20005
1.202.783.6881
aschutz@gdlsk.com

/s/ James M. Smith

James M. Smith
Sooan (Vivian) Choi
Wanyu Zhang
John Catalfamo
COVINGTON & BURLING LLP
850 10th Street, N.W.
Washington, D.C. 20001
1.202.662.5550
jmsmith@cov.com

*Counsel for Strato Inc.*

Dated: March 13, 2026

24

**PUBLIC VERSION**

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that the foregoing document contains 7,261 words, exclusive of the table of contents, table of authorities, and certifications of counsel, and therefore complies with the maximum 10,000 word count limitation set forth in Rule 2(B)(1)(b) of the Standard Chambers Procedures of the U.S. Court of International Trade.

<u><em>/s/ Andrew T. Schutz</em></u>
Andrew T. Schutz

<em>Counsel for Strato, Inc.</em>

Dated: March 13, 2026

25