PUBLIC VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **WABTEC CORPORATION and STRATO INC.,**<br><br>　　　　　　**Plaintiff/Consolidated Plaintiff**<br><br>　　**v.**<br><br>**UNITED STATES,**<br><br>　　　　　　**Defendant,**<br><br>　　**and**<br><br>**COALITION OF FREIGHT COUPLER PRODUCERS,**<br>　　　　　　**Defendant-Intervenor.** | Before: Hon. Gary S. Katzmann, Judge<br><br>Court No. 23-00157 |

## COMMENTS IN SUPPORT OF THE FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Daniel B. Pickard
Claire M. Webster

Buchanan Ingersoll & Rooney PC
1700 K Street, NW
Washington, DC 20006
(202) 452-7000

*Counsel to Coalition of Freight
Coupler Producers*

Dated: March 16, 2026

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................... 1

ARGUMENT............................................................................................................................. 1

    I.    The Percentage of Domestic Production Attributable to the Importing Producer..... 3

    II.    The Ratio of Import Shipments to U.S. Production for the Importing Producer....... 3

    III.    The Reason the U.S. Producer Has Decided to Import the Product Subject to Investigation ..................................................................................................................... 4

    IV.    Whether Inclusion or Exclusion of the Importing Producer Will Skew the Data for the Rest of the Industry ..................................................................................................... 6

    V.    Whether the Primary Interest of the Importing Producer Lies in Domestic Production or Importation................................................................................................... 7

CONCLUSION ......................................................................................................................... 8

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Changzhou Trina Solar Energy Co. v. U.S. International Trade Commission*,
  39 CIT 1105, 100 F. Supp. 3d 1314, *aff'd* 879 F.3d 1377 (Fed. Cir. 2018) ...............................2

## INTRODUCTION

Defendant-Intervenor the Coalition of Freight Coupler Producers ("CFCP") hereby submits these Comments in support of the Views of the Commission on Remand ("Remand Views"), filed with the Court on February 11, 2026. ECF Nos. 117/118. In its Opinion, the Court found that the Commission's determination that appropriate circumstances did not exist to exclude Amsted from the domestic industry was not supported by substantial evidence. *See* ECF Nos. 98/108, Slip Op. 25-134 at 22-31. On remand, the Commission fully explained its determination that appropriate circumstances did not exist to exclude Amsted from the domestic industry and provided the additional analysis that the Court requested in its Opinion. CFCP agrees with the Commission's Remand Views and submits that the Court should affirm the Remand Views for the reasons discussed below.

## ARGUMENT

The Remand Views respond to the Court's Order, which found that "the Commission failed to provide a rational connection between the facts of Amsted's domestic production performance and its determination that 'Amsted's domestic production was not shielded from competition with subject imports during the {period of investigation},'" ECF Nos. 98/108 at 26, and that "The Commission did not recognize, let alone account for Amsted's statements regarding a lack of injury to its domestic production," *Id.* at 27. The Court further found that "the Commission's decision not to exclude Amsted from the domestic industry was based almost entirely on its conclusions regarding Amsted's reason for importation – that Amsted was not shielded from competition with subject imports and did not benefit from its importation of subject imports from Mexico." *Id.* at 30.

The Commission considers five factors in deciding whether appropriate circumstances exist to exclude a related party:

> The percentage of domestic production attributable to the importing producer; (2) the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from unfair trade practice or to enable them to continue production and compete in the domestic market); (3) whether inclusion or exclusion of the importing producer will skew the data for the rest of the industry; (4) the ratio of import shipments to U.S. production for the importing producer; and (5) whether the primary interest of the importing producer lies in domestic production or importation.

*Changzhou Trina Solar Energy Co. v. U.S. International Trade Commission*, 39 CIT 1105, 1121-22, 100 F. Supp. 3d 1314, 1329, *aff'd* 879 F.3d 1377 (Fed. Cir. 2018) (quoting *Allied Mineral Prods., Inc. v. United States*, 28 CIT 1861, 1865 (2004)). The Remand Views reordered these factors for purposes of the Commission's analysis, stating that the first two factors as reordered – the percentage of domestic production attributable to the importing producer and the ratio of import shipments to U.S. production for the importing producer address the threshold question. ECF Nos. 117/118 at 12. For example, as to the first factor, a very small producer is unlikely to be excluded because its data would not "move the needle for the industry as a whole" and that, as to the second factor, an importing producer with a low ratio of import shipments to U.S. production is "unlikely to be excluded because those imports do not have a meaningful impact on that producer's domestic production data," but that "a high ratio should not be dispositive and does not dictate exclusion." *Id.* at 12-13. Once the two threshold questions are answered, then one would proceed to addressing the three remaining factors: the reason for importation, whether exclusion of the importing producer would skew the data for the rest of the industry, and whether the importing producer's primary interest lies in domestic production or importation. *Id.* at 14-15.

2

These comments follow the traditional five-factor test as the Commission reordered it in its Remand Views.

## I.    The Percentage of Domestic Production Attributable to the Importing Producer

The Court found that "the Commission did not indicate whether {Amsted's minority} of domestic production supported exclusion or not and instead focused on the fact that 'Amsted is one of two remaining domestic producers'" ECF Nos. 98/108 at 28 (quoting Leading Views at 17). On remand, the Commission elucidated that, "{A}ssessing the percentage of domestic production attributable to the importing producer helps determine whether the producer is so small that inclusion is inconsequential (and further analysis is unnecessary) or so large that its inclusion is unavoidable." ECF Nos. 117/118 at 20. The Commission found that Amsted's percentage of domestic production is "large enough that its inclusion or exclusion would be consequential {so} further analysis of whether appropriate circumstances exist for its exclusion is warranted." *Id.* Accordingly, the Commission explained why Amsted's percentage of domestic production supported further analysis of whether exclusion is warranted.

## II.    The Ratio of Import Shipments to U.S. Production for the Importing Producer

The Court found that "the Commission failed to account for {this} factor beyond acknowledging the high ratio of subject imports to U.S. production . . . and noting that {it was not} dispositive." ECF Nos. 98/108 at 30. On remand, the Commission noted that "determining the ratio of subject import shipments to U.S. production can help the Commission determine whether the producer's subject imports are likely to have a meaningful impact on its domestic production and financial data. If the ratio is fairly small, there is likely no need to delve deeper into the thorny issue of whether the firm was benefiting or shielded from imports in a way that could mask injury to the domestic industry." ECF Nos. 117/118 at 20. The Commission noted that, that Amsted's

import ratio was "[                                    ]: [          ] percent in 2020, [            ] percent in 2021, and [            ] percent in 2022 . . . simply means that further analysis of whether its domestic operations benefited from the imports, or are somehow shielded from them, is warranted." *Id.* This explanation is responsive to the Court's finding that the Commission had previously failed to go further than acknowledge Amsted's [         ] ratio of subject imports to U.S. production by situating it in the context of the remaining three factors.

## III.    The Reason the U.S. Producer Has Decided to Import the Product Subject to Investigation

In its Opinion, the Court found that the Commission had not addressed evidence that detracted from the Commission's conclusion that Amsted did not benefit from subject imports and cited to the fact that Amsted's domestic freight rail coupler ("FRC") production "took place at a single facility of the seventeen it maintains across the United States," and that this supported "Amsted's own assertion that its domestic production complemented its imports from its Mexican facility." ECF Nos. 98/108 at 25-26.

The Commission addressed this and other evidence on remand, responding to the question of whether domestic production operations received a benefit/were shielded from import competition. The Remand Views pointed to evidence showing that Amsted's domestic FRC operations were harmed by subject imports during the period of investigation ("POI"). The Commission pointed to five relevant factors:

- Amsted's U.S. FRC production facility in Granite City, Illinois, lost market share to Amsted's subject imports. Amsted's U.S. production operations compete head-to-head with its imports from Mexico. This is demonstrated by the fact that Amsted's commercial shipments of domestically produced FRCs declined [            ] from 2020 to 2021, while shipments of its Mexican imports only declined [            ] over the same period. ECF Nos. 117/118 at 21.

4

- Due to Mexican import market share gain, [        ] FRC jobs were lost at Granite City. *Id.*

- When subject imports from Mexico were gaining market share, Granite City's operating [      ] to net sales ratio worsened. *Id.*

- As subject imports from Mexico gained market share, FRC production in Granite City was cut [           ]. *Id.*

- The value of assets at Granite City fell by about [       ] percent from 2020 to 2021. *Id.* at 22.

The record includes even further evidence that Amsted's subject imports from Mexico harmed its U.S. production operations, including that its commercial shipments [

                          ], CR122 at II-8, and its gross profit [

                          ], *Id.* at III-9a. Similarly, Amsted's operating

income and net income [                                                    ].

*Id.* To put a fine point on it, Amsted lost [

                                    ]. *Id.* These metrics

demonstrate that Amsted was not shielded from competition with subject imports, as its

[                                        ] over the three-year period, which came at the cost

of its import operations.

The Commission additionally emphasized the record evidence that the workers at Granite City are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), which is one of the two members of the petitioning coalition. Amsted's workers were not shielded from the effects of subject imports, and its workers were told that the reason for importation was to leverage its lower priced imports from Mexico. Ms. Roxanne Brown, International Vice President of the USW, testified to the injury suffered by Amsted's workers as a result of import competition and

referred to the difference between Amsted's domestic injury and its stated position on the underlying investigation as a "cognitive dissonance." PR160 at 85. Ms. Brown further testified:

> {T}hat's why we felt it was really important for us to be here, to show that even though that domestic manufacturer seems not to have the same commitment that we do and that these other facilities do, we're still going to do our part to make sure that, as much as possible, there is a positive determination from this.

*Id.* In the predecessor investigation, and such evidence was added to the record in the current investigation, a union worker from Amsted's domestic production facility testified that, "The Mexico facility is operating at full capacity and {the domestic facility} is only there to supplement it. We are told regularly that we are surviving off of Mexico's leftovers." PR1, CR1 at Exhibit I-48 (FRC I Hearing Tr. at 39). These facts demonstrate that Amsted's Mexican and domestic facilities do not "complement" each other, but rather that Amsted was prioritizing its Mexican import operations, demonstrating that the U.S. production operation (the appropriate entity for consideration) and its workers were not shielded from import competition.

The Commission further notes that, "in addition to not benefitting or being shielded from its own subject imports from Mexico, Amsted's domestic operations also faced competition from subject imports from China," so the harm from subject imports from China would be masked if Amsted were excluded. ECF Nos. 117/118 at 26. Accordingly, the Commission addressed the record evidence that Amsted was indeed harmed and not benefitted or shielded from subject imports and found that the evidence is "more than substantial that Amsted's domestic operations were not benefiting or shielded from subject imports." *Id.* at 23.

## IV.     Whether Inclusion or Exclusion of the Importing Producer Will Skew the Data for the Rest of the Industry

The Court found that the Commission did not explain how "exclusion of a minority of domestic production would skew – not merely reduce – the domestic industry data," and that,

6

"While excluding some domestic production from the investigation would certainly remove the capacity and other financial data related to that production, it would not inevitably skew the remaining data. In fact, Amsted's exclusion would leave a domestic industry comprised of the only domestic manufacturer that is claiming material injury by subject imports." ECF Nos. 98/108 at 26-27.

As an initial matter, and as noted above, the workers at Amsted's Granite City facility are part of the petitioning coalition that claimed material injury due to subject imports. *See* ECF Nos. 117/118 at 29. The Remand Views point to record evidence of Amsted's market share loss; lost jobs; production, shipment, and sales declines; increasing operating [          ]; [

] capacity utilization; and declining U.S. assets in support of the Commission's conclusion that exclusion of Amsted would skew the data for the rest of the industry.  *See* ECF Nos. 117/118 at 27-28. Further, the Commission properly frames the inquiry as "whether *inclusion* of a related domestic producer would skew domestic industry data in a way that would mask injury to the industry caused by unfairly traded subject imports," rather than whether exclusion would "leave the remaining data of the industry 'representative.'" *Id.*

V.    **Whether the Primary Interest of the Importing Producer Lies in Domestic Production or Importation**

The Court found that "the Commission failed to account for {this} factor beyond acknowledging . . . Amsted's stated primary interest and noting that {it was not} dispositive." ECF Nos. 98/108 at 30.  In response, on remand, the Commission found that the primary interest of Amsted was in importation, as it imported [                    ] FRCs than it produced domestically. ECF Nos. 117/118 at 30. Notwithstanding that Amsted acknowledged at the Commission hearing that its primary interest was in domestic production, PR160 at 162-63, the

Commission found that Amsted "decided that the best way to compete against cheap imports from China was to import even cheaper imports from Mexico itself . . . ." ECF Nos. 117/118 at 30. The Commission acknowledged that, if a firm has a primary interest in importation, it could generally be excluded in other circumstances, but doing so in this case would be inappropriate and would ignore the injury to Amsted's Granity City facility and its workers. *Id.* at 30-31.

## CONCLUSION

For the foregoing reasons, the Coalition of Freight Coupler Producers respectfully requests that the Court affirm the Commission's Remand Views.

Respectfully submitted,
*/s/ Daniel B. Pickard*
Daniel B. Pickard, Esq.
Claire M. Webster, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
*Counsel to the Coalition of Freight Coupler Producers*

8