*PUBLIC VERSION*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE GARY S. KATZMANN

Court No. 23-00157

**WABTEC CORPORATION,**

*Plaintiff*,

**and**

**STRATO, INC,**

*Consolidated Plaintiffs*,

**v.**

**UNITED STATES,**

*Defendant*,

**and**

**COALITION OF FREIGHT COUPLER PRODUCERS,**

*Defendant-Intervenors*.

## DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S PUBLIC RESPONSE IN SUPPORT OF THE COMMISSION'S REMAND DETERMINATIONS

GARRETT L. PETERSON
MICHAEL K. HALDENSTEIN
Attorney-Advisors
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3241
Facsimile: (202) 205-3111
garrett.peterson@usitc.gov

Telephone: (202) 205-3041
michael.haldenstein@usitc.gov

MARGARET D. MACDONALD
General Counsel
Telephone:  (202) 205-2561
margaret.macdonald@usitc.gov

KARL VON SCHRILTZ
Assistant General Counsel for Litigation
Telephone:  (202) 205-3096
karl.von-schriltz@usitc.gov

**DATED:  April 13, 2026**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................. iv

I.      STANDARD OF REVIEW...................................................................................2

II.     BACKGROUND ...................................................................................................4

III.    ARGUMENT.........................................................................................................6

      a.      Congress Has Committed the Determination of Whether There Are
            Appropriate Circumstances to Exclude a Related Party to the
            Discretion of the Commission ....................................................................6

      b.      Plaintiffs Have Failed to Establish that Commission Kearns's
            Methodology of Analyzing Whether Appropriate Circumstances
            Existed to Exclude Amsted from the Domestic Industry Was
            Unreasonable....................................................................................7

      c.      Commissioner Kearns's Definition of the Domestic Industry Was
            Supported by Substantial Evidence .........................................................14

      d.      Plaintiffs Have Failed to Establish that Commissioner Kearns Did
            Not Comply with the Court's Remand Instructions.................................16

      e.      Commissioner Kearns Complied with the Court's Remand
            Instructions in Explaining His Finding that Amsted Was Not
            Shielded from Subject Import Competition and Did Not Benefit
            from Them ....................................................................................17

      f.      Commissioner Kearns Complied with the Court's Remand
            Instructions in Explaining How He Weighed the Factors in his
            Related Party Analysis .............................................................................19

            i.      Commissioner Kearns Complied with the Court's
                    Instructions to Account for Amsted's Stated Reasons for
                    Importing Subject Merchandise..................................................22

            ii.     Commissioner Kearns Complied with the Court's
                    Instructions to Account for Amsted's Statements Regarding
                    a Purported Lack of Harm to Its Domestic Production.............23

            iii.    Commissioner Kearns Complied with the Court's Remand
                    Instructions in Explaining that Amsted's Exclusion from
                    the Domestic Industry Would Skew the Data in a Manner
                    that Would Mask Injury by Subject Imports.............................24

**TABLE OF CONTENTS (cont'd)**

g.     The Court Should Deny Plaintiffs' Request for New Briefing on Chair Karpel's Material Injury Findings, which They Had the Opportunity to Challenge ......................................................................28

     i.     Plaintiffs' Rule 56.2 Opening Brief Did Not Address Chair Karpel's Separate Analysis and Their Claims Are Therefore Waived ...............................................................................28

     ii.     Plaintiffs Have No Excuse for Not Previously Briefing the Matter Because They Knew Chair Karpel's Vote Was Required for Affirmative Determinations ...................................................29

     iii.     The Remand Proceeding Does Not Revive Plaintiffs' Claims Challenging Chair Karpel's Injury Analysis .................................30

IV.     **CONCLUSION** ...............................................................................................**32**

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Allied Mineral Prods., Inc. v. United States*,
    28 CIT 1861 (2004) ...............................................................................................10, 11, 20

*Altx, Inc. v. United States*,
    370 F.3d 1108 (Fed. Cir. 2004)..................................................................................3

*AWP Indus., Inc. v. United States*,
    35 CIT 774, 783 F. Supp. 2d 1266 (2011) ...............................................................24

*Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*,
    100 F. Supp. 3d 1314 (Ct. Int'l Trade 2015); *aff'd*,
    879 F.3d 1377 (Fed. Cir. 2018)................................................................................11

*Chemours Co. FC, LLC v. United States*,
    492 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ............................................................2

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966)..................................................................................................2, 3

*Empire Plow Co. v. United States*,
    11 CIT 847, 675 F. Supp. 1348 (1987).........................................................7, 12, 20

*Fujifilm N. Am. Corp. v. United States*,
    Slip Op. 26-17, ___ F. Supp. 3d ___, 2026 WL 464687 (Ct. Int'l Trade
    Feb. 18, 2026) ...............................................................................................26, 27, 28

*Goss Graphics Sys., Inc. v. United States*,
    22 CIT 983, 33 F. Supp. 2d 1082 (1998), *aff'd*,
    216 F.3d 1357 (Fed. Cir. 2000)..................................................................................3

*Grupo Industrial Camesa v. United States*,
    85 F.3d 1577 (Fed. Cir. 1996)....................................................................................2

*Hitachi Metals, Ltd. v. United States*,
    949 F.3d 710 (Fed. Cir. 2020)....................................................................................3

*JMC Steel Grp. v. United States*,
    70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ...........................................................4, 7

*Mosaic Co. v. United States*,
    744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ...........................................................31

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)...............................................................................3, 4

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                                                    **Page(s)**

*Nucor Corp. v. United States*,
  32 CIT 1380, 594 F. Supp. 2d 1320 (2008) ............................................................................7, 8

*Saha Thai Steel Pipe Public Co., Ltd. v. United States*,
  592 F. Supp. 3d 1299 (Ct. Int'l Trade 2022), *rev'd on other grounds*,
  101 F.4th 1310 (Fed. Cir. 2024) .............................................................................................30

*Shandong TTCA Biochem. Co., Ltd. v. United States*,
  35 CIT 545, 774 F. Supp. 2d 1317 (2011) .................................................................................4

*Siemens Energy, Inc. v. United States*,
  806 F.3d 1367 (Fed. Cir. 2015)..................................................................................................2

*SmithKline Beecham Corp. v. Apotex Corp.*,
  439 F.3d 1312 (Fed. Cir. 2006)...........................................................................................29, 32

*Torrington Co. v. United States*,
  16 CIT 220, 790 F. Supp. 1161 (1992), *aff'd without opinion*,
  991 F.2d 809 (Fed. Cir. 1993)....................................................................................................7

*U.S. Steel Grp. v. United States*,
  96 F.3d 1352 (Fed. Cir. 1996)......................................................................3, 7, 8, 18, 24

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)...............................................................................................................2, 3

*Vivint v. Alarm.com Inc.*
  856 F. App'x 300 (Fed. Cir. 2021) .....................................................................................30, 32

*Yantai Xinke Steel Structure Co., Ltd. v. United States*,
  38 CIT 478 (2014) ....................................................................................................................31

**USITC Publications**

*Aluminum Lithographic Printing Plates from China and Japan*,
  Inv. Nos. 701-TA-694 and 731-TA-1641-1642 (Final), USITC Pub. 5559
  (Nov. 2024)..........................................................................................................................26, 27

*Brake Rotors from China*,
  Inv. No. 731-TA-744 (Final), USITC Pub. 3035 (Apr. 1997)..........................................11, 12

*Chassis and Subassemblies from Mexico, Thailand, and Vietnam*,
  Inv. Nos. 701-TA-755–756 and 731-TA-1734–1736 (Preliminary),
  USITC Pub. 5612 (Apr. 2025)..................................................................................................12

## **TABLE OF AUTHORITIES (cont'd)**

**USITC Publications (cont'd)**                                            **Page(s)**

*Color Television Receivers from Korea and Taiwan*,
  Inv. No. 731-TA-134-135 (Final), USITC Pub. 1514 (Apr. 1984) ..........................................12

*Rock Salt from Canada*,
  Inv. No. 731-TA-239 (Final), USITC Pub. 1798 (Jan. 1986)....................................................11

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................................................2

19 U.S.C. § 1671a(c)(4)(B)......................................................................................................13

19 U.S.C. § 1673a(c)(4)(B)......................................................................................................13

19 U.S.C. § 1677(4)(A).............................................................................................................9

19 U.S.C. § 1677(4)(B)(i) ....................................................................................................6, 13

19 U.S.C. § 1677(4)(B)(ii)......................................................................................................13

19 U.S.C. § 1677(7)(B)(III) .................................................................................................9, 10

28 U.S.C. § 2639(a)(1)..............................................................................................................2

**Other Authorities**

Statement of Administrative Action to the Uruguay Round Agreements Act,
  H.R. Rep. 103-316, vol. I (1994)  ............................................................................6, 7, 13, 14

S. Rep. No. 96-249 (1979)........................................................................................................27

Defendant U.S. International Trade Commission ("Commission") hereby opposes Plaintiff's challenges to the Commission's affirmative remand determinations in *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final) (Remand), ECF No. 117, CR184R (hereinafter "*Remand Views*") (public version at ECF No. 118, PR205R), as well as all remaining challenges to findings in the Commission's original determinations, *Certain Freight Rail Couplers and Parts Thereof from China,* Inv. Nos. 701-TA-682 and 731-TA-1592 (Final), USITC Pub. No. 5438 (July 2023), ECF No. 22-1, PR190 ("*Leading Views*") (confidential *Leading Views* at ECF No. 21-1, CR178).  Because the Commission's remand determinations are supported by substantial evidence, in accordance with law, and fully complied with the Court's remand instructions, the Court should affirm them.

Plaintiffs' challenges to the Commission's determination are unavailing.  Plaintiffs do not – and cannot – argue that the Commission's finding that appropriate circumstances did not exist to exclude Amsted from the domestic industry was not in accordance with the statute, which affords the Commission broad discretion to assess whether to exclude a domestic producer from the domestic industry as a related party.  Plaintiffs have also failed to establish that the methodology that the Commission used to analyze whether to exclude Amsted was unreasonable or arbitrary and capricious.  Plaintiffs likewise have failed to show that the Commission's analysis was unsupported by substantial evidence or did not fully comply with the Court's remand instructions.

Plaintiffs also incorrectly argue that they should be afforded another opportunity to brief material injury because they have not previously had an opportunity to address Chair Karpel's injury analysis, which was based on a different definition of the domestic industry than Commissioner Kearns's injury analysis.  They also include a summary of additional injury

arguments that are wholly unrelated to the *Remand Views*. As explained herein, Plaintiffs have waived their claims concerning Chair Karpel's injury analysis by failing to argue them in their opening brief. Accordingly, we respectfully request that this Court affirm the Commission's determinations without a second round of briefing concerning material injury.

## I.    STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court must uphold the Commission's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Chemours Co. FC, LLC v. United States*, 492 F. Supp. 3d 1333, 1335 (Ct. Int'l Trade 2021). The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determination to demonstrate otherwise. 28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Even if "individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Siemens Energy, Inc. v. United States,* 806 F.3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo*, 383 U.S. at 620); *see also Grupo Industrial Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is

2

unsupported by substantial evidence.") (citing *Consolo*, 383 U.S. at 619-20). Indeed, the Federal Circuit has explained, "in the hierarchy of the four most common standards of review, substantial evidence is the second most deferential, and can be translated roughly to mean, 'is {the determination} unreasonable?'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citation omitted). Thus, under the substantial evidence standard, a court may not, "even as to matters not requiring expertise … displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera*, 340 U.S. at 488. Rather, a court '"must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion.'" *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

The Commission is the trier of fact in injury investigations. As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel*, 458 F.3d at 1350. Accordingly, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000). As the Federal Circuit has made clear, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder – here the majority of the Presidentially-

3

appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Nippon Steel,* 458 F.3d at 1359.

"When evaluating challenges to the ITC's choice of methodology," the Court has explained, "the court will affirm the chosen methodology as long as it is reasonable." *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1316-17 & n.4 (Ct. Int'l Trade 2015) (*citing Shandong TTCA Biochem. Co., Ltd. v. United States*, 35 CIT 545, 556, 774 F. Supp. 2d 1317, 1327 (2011)).

## II.     BACKGROUND

In July 2023, the Commission, including Chair Karpel, Commissioner Kearns, and Commissioner Schmidtlein, determined that an industry in the United States was materially injured by reason of LTFV and subsidized FRCs from China.  Then-Chairman Johanson dissented and reached negative final determinations. *Leading Views* at 3.

In the *Leading Views*, the Commission was divided with respect to whether appropriate circumstances existed to exclude Amsted from the domestic industry under the related parties provision.  Commissioners Kearns and Schmidtlein, representing a majority of the Commissioners voting in the affirmative, determined that appropriate circumstances did not exist to exclude Amsted, while Chair Karpel and Commissioner Johanson determined to exclude Amsted. *Leading Views* at 16 n.66, 22; *see also Remand Views* at 1 n.1.  While Commissioners Johanson and Kearns and Chair Karpel remain with the Commission, Commissioner Schmidtlein departed the agency on February 1, 2025.

Plaintiffs appealed the Commission's final affirmative determinations with respect to China on August 14, 2023.  *Wabtec Corp. v. United States*, Court No. 23-157 ("Court No. 23-157"); *Strato, Inc. v. United States*, Court No. 23-158 ("Court No. 23-158").  Wabtec and Strato

4

filed their respective complaints with the Court on September 13, 2023.  Court No. 23-157, ECF

Nos. 9-10; Court No. 23-158, ECF No. 9.  On March 22, 2024, this Court consolidated Court No.

23-158 with Court No. 23-157.  *See* Order in Court No. 23-158, ECF No. 32 (unless otherwise

noted, all "ECF No." citations hereafter refer to Court No. 23-157).  On August 16, 2024, Strato

and Wabtec filed a joint Rule 56.2 Motion for Judgement on the Agency Record, ECF Nos. 44-

45 ("Rule 56.2 motion").

On October 8, 2025, the Court issued an opinion granting in part and denying in part

Plaintiffs' Rule 56.2 motion for judgment on the agency record.  *Wabtec v. United States*,

Confidential Slip Op. 25-134, Court No. 22-00157, ECF No. 98 ("Slip Op.").  Specifically, the

Court affirmed the Commission's determination to cumulate subject imports from China and

Mexico, denied Strato's motion for remand for reconsideration based on material fraud, and

rejected several other claims raised by Strato, but remanded the Commission's related parties

analysis.  In doing so, the Court found that the Commission did not adequately explain its

findings with respect to several factors.  These factors included whether the related party was

shielded from subject imports, whether it benefited from importing subject merchandise, the

reason it imported subject merchandise, whether the firm's exclusion would skew data for the

domestic industry, the related party's apparent primary interest in importing, and other evidence

the Court believed supported the firm's exclusion from the domestic industry.  The Court

deferred ruling on Plaintiffs' challenges to the Commission's affirmative material injury

determinations.  Slip Op. at 14-33.

On February 11, 2026, the Commission filed its *Remand Views* with the Court.  The

remaining three Commissioners, Chair Karpel, Commissioner Johanson, and Commissioner

Kearns, each fully adopted their findings in the *Leading Views*, though Commissioner Kearns –

the only remaining Commissioner that included Amsted in the domestic industry and voted in the affirmative – also provided a further explanation of his decision not to exclude Amsted from the domestic industry, which was the sole subject of the Court's remand instructions. *Remand Views* at 1-2 n.1, 2-39. Moreover, contrary to Plaintiffs' claims, Commissioner Kearns did not indicate that his affirmative vote depended on his definition of the domestic industry. *See, e.g.*, Plaintiffs' Resp. at 3 n.1. ("Commissioner Kearns was clear that his bottom-line vote rested on his including Amsted in the domestic industry.").

On March 13, 2026, Plaintiffs filed a joint response in opposition to the Commission's *Remand Views*. Plaintiffs' Remand Response, ECF Nos. 124-125 ("Plaintiffs' Resp."). Defendant-Intervenor also filed a response on March 13, 2026, but in support of the Commission's *Remand Views*. Defendant-Intervenor's Remand Response, ECF Nos. 123 and 126-127.

### III.    ARGUMENT

#### a.  Congress Has Committed the Determination of Whether There Are Appropriate Circumstances to Exclude a Related Party to the Discretion of the Commission

The applicable statute makes clear that whether to exclude a domestic producer from the domestic industry is left to the discretion of the Commission based on whether it finds that there are appropriate circumstances to do so. "If a producer of a domestic like product and an exporter or importer of the subject merchandise are related parties, or if a producer of the domestic like product is also an importer of the subject merchandise, the producer *may*, in appropriate circumstances, be excluded from the industry." 19 U.S.C. § 1677(4)(B)(i) (emphasis added). Congress emphasized the discretionary nature of exclusion under the related parties provision in the SAA, explaining that the Commission along with Commerce "will have discretion to apply

this provision."  Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. I (1994) at 858 ("SAA").  As in the case of cumulation in five-year reviews, the statute through the use of the term "may," rather than "shall," indicates that even in appropriate circumstances, the exclusion of a domestic producer pursuant to the related parties provision is not mandatory.  *See Nucor Corp. v. United States*, 32 CIT 1380, 1402, 594 F. Supp. 2d 1320, 1346 (2008) ("The language is unambiguous: though the cumulation requirements may be met, the Commission may nevertheless decline to cumulate as a proper exercise of its power of agency discretion.").

Indeed, reviewing courts have recognized that Congress has committed the appropriateness of exclusion of a related party domestic producer to the Commission's discretion. *See e.g.*, *Empire Plow Co. v. United States*, 11 CIT 847, 852, 675 F. Supp. 1348, 1352 (1987) ("It is clearly within the ITC's discretion to apply the related parties provision in its analysis of the facts of the case."); *Torrington Co. v. United States*, 16 CIT 220, 224-25, 790 F. Supp. 1161, 1168 (1992) ("The decision whether to exclude parties who import or are related to exporters of the subject merchandise from consideration of the domestic industry is within the discretion of the Commission."), *aff'd without opinion*, 991 F.2d 809 (Fed. Cir. 1993).

Plaintiffs have not shown that Commissioner Kearns exercised his discretion unreasonably or that his finding that there were not appropriate circumstances to exclude Amsted was unsupported by substantial evidence.

   **b.  Plaintiffs Have Failed to Establish that Commission Kearns's Methodology of Analyzing Whether Appropriate Circumstances Existed to Exclude Amsted from the Domestic Industry Was Unreasonable**

Given the broad discretion afforded the Commission under the statute, this Court should affirm Commissioner Kearns's methodology so long as it is reasonable.  *See, e.g.*, *JMC Steel Grp.*, 70 F. Supp. 3d at 1316-17 & n.4.  As the Federal Circuit has made clear, "as long as the

Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious, the Commission may perform its duties in the way it believes most suitable." *U.S. Steel Grp.*, 96 F.3d at 1362. Here, consistent with this Court's remand instructions, Commissioner Kearns in the *Remand Views* relied upon the five factors that the Commission typically considers, thoroughly explaining that he uses the five factors as a holistic framework for considering whether appropriate circumstances existed to exclude Amsted from the domestic industry rather than as a tabulation of the number of factors supporting inclusion versus the number supporting exclusion (*e.g.*, three factors support exclusion while two factors support inclusion, so the firm must be excluded). *Remand Views* at 12-15. Commissioner Kearns further explained his consideration of each of the five factors in general terms and as applied to the facts of these investigations. *Remand Views* at 19-30. He did not describe his approach as "novel" or "provisional" as Plaintiffs claim. Plaintiffs' Resp. at 8. Plaintiffs have failed to establish that Commissioner Kearns's methodology was in any way unreasonable or arbitrary and capricious. Rather, Plaintiffs ask this Court to disregard the broad discretion afforded to Commissioners under the statute and to unlawfully reweigh of the evidence, substituting their preferred conclusion for the lawful and reasonable one Commissioner Kearns reached in exercising his discretion under the statute.

First, Plaintiffs elevate form over substance in making much of the fact that Commissioner Kearns considered the five factors in a different order than the Court outlined in its opinion. Plaintiffs' Resp. at 6. The fact that Commissioner Kearns thoroughly addressed each factor but did so in a different sequence in no way establishes that his methodology was unreasonable. *See Nucor*, 32 CIT at 1402, 594 F. Supp. 2d at 1346 ("{T}he statute does not mandate any particular sequence of analysis.").

8

In the same vein, Plaintiffs' attacks on Commissioner Kearns's treatment of the factors concerning Amsted's percentage of domestic production and the ratio of its imports to its domestic production as "threshold" questions fails to establish that his methodology was unreasonable. Plaintiffs' Resp. at 7-8. That Commissioner Kearns considered these factors first and characterized them as threshold issues in no way renders his analysis unreasonable. Indeed, Commissioner Kearns provided examples of previous investigations in which the two factors were *de facto* threshold issues in the Commission's related party analysis. *See Remand Views* at 13 nn.44-46 (collecting investigations). Thus, Commissioner Kearns's approach is consistent with the Commission's approach in other investigations in which it has found either that a domestic producer was too small for its inclusion or exclusion to affect industry data or that the volume of the domestic producer's subject imports was not large enough to confer a benefit. Such an approach is reasonable, and Plaintiffs have not shown otherwise.

Equally unavailing is Plaintiffs' argument that Commissioner Kearns erred in focusing his analysis on Amsted's domestic operations in analyzing whether it benefited or was shielded from subject imports during the period of investigation. Plaintiffs' Resp. at 6-13. As Commissioner Kearns explained, his analysis focused on Amsted's domestic operations consistent with the statute's definition of the domestic industry as producers as a whole of the domestic like product and the Commission's exclusive focus on production of the domestic like product in analyzing material injury. *Remand Views* at 9. Under the statute, the domestic industry is defined with reference to the domestic like product, as "the producers as a whole of a domestic like product." 19 U.S.C. § 1677(4)(A). The Commission's material injury determination, in turn, evaluates "the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the

9

United States." 19 U.S.C. § 1677(7)(B)(III). The statute thus limits the definition of domestic producers to their operations producing the domestic like product and, accordingly, the Commission limits its data collection from domestic producers to data on their production of the domestic like product. Commissioner Kearns therefore appropriately focused his related parties analysis on Amsted's domestic operations producing the domestic like product, not its broader operations producing products other than the domestic like product at issue. Because such an approach to defining the domestic industry and addressing whether appropriate circumstances exist to exclude a domestic producer is entirely consistent with the statutory scheme, Commissioner Kearns's methodology was a reasonable exercise of his discretion under the statute.

Plaintiffs fail to establish otherwise. Specifically, Plaintiffs' argument that "there is no legal support" for Commissioner Kearns's methodology, Plaintiffs' Resp. at 11-12, overlooks not only the broad discretion afforded the Commission under the related parties provision, but also the fact that the Commission's statutorily-mandated material injury analysis focuses on domestic producers' operations producing the domestic like product. Plaintiffs fail to identify a single case in which the Commission considered production data or other information concerning products other than the domestic like product in its related parties analysis. *Id.* at 9-14. In contrast, as Commissioner Kearns observed, this Court has affirmed as reasonable the Commission's reliance on financial data for production of the domestic like product to determine whether a related party benefited by importing subject merchandise. In fact, the case relied upon by Plaintiffs to support their position, *Allied Mineral Products, Inc. v. United States*, 28 CIT 1861 (2004), actually supports Commissioner Kearns's approach. Plaintiffs' Resp. at 12 (citing *Allied Mineral*). In *Allied Mineral*, this Court found that the Commission had reasonably considered a related party's

10

financial results from its production of the domestic like product in assessing whether appropriate circumstances existed for the firm's exclusion.  28 CIT at 1866 ("The Commission's analysis of Great Lakes' financial results served to substantiate its finding that Great Lakes accrued a substantial benefit from its importation of the subject merchandise."); *see also Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 100 F. Supp. 3d 1314, 1327 (Ct. Int'l Trade 2015); *aff'd*, 879 F.3d 1377 (Fed. Cir. 2018) ("The ITC thus determined that, based on Motech's financial performance during the POI (*i.e.,* whether the company benefitted from its importing activities), its capital expenditures, and research and development expenses, that it was not 'appropriate to exclude Motech from the domestic industry as a related party.'").  The Commission's consideration of the financial performance of domestic producers' operations producing the like product in these cases is thus consistent with assessing any potential benefits of importing in the context of a producer's domestic like product operations.

Indeed, consistent with the statute, the Commission has long considered whether a related party has benefitted from importing subject merchandise by considering whether any benefit had accrued to the producer's domestic production operations for the domestic like product, not the producer's overall operations.  For example, in one of the Commission's early applications of the related parties provision, it declined to exclude a domestic producer because it found that the producer's financial data for its domestic operations for the domestic like product could not be affected by its imports because "as a practical matter, each company's accounting and financial records regarding domestic operations are kept separately from its foreign operations within its overall financial and accounting records thereby avoiding any commingling of books or records."  *Rock Salt from Canada*, Inv. No. 731-TA-239 (Final), USITC Pub. 1798 (Jan. 1986) at 12.  In *Brake Rotors from China*, Inv. No. 731-TA-744 (Final), USITC Pub. 3035 (Apr. 1997),

the Commission found that appropriate circumstances did not exist to exclude two firms because their "importation activities did not cause their financial performance on their *domestic production* to benefit … ." *Id.* at 14 (emphasis added). More recently, the Commission found no link between a related party's higher profit margins than the industry average and any benefit that the firm's subject imports may have conferred on its domestic production operations. *Chassis and Subassemblies from Mexico, Thailand, and Vietnam,* Inv. Nos. 701-TA-755–756 and 731-TA-1734–1736 (Preliminary), USITC Pub. 5612 (Apr. 2025) at 19 ("While {the producer's} margins were {better than those} of the industry in 2022 and 2023, there is no information on record that links this to any benefit that {the producer's} *domestic production operations* may have received … .") (emphasis added).

In another early decision, the Commission explained that the purpose of the related parties provision was to prevent related parties from distorting domestic industry data by making the industry appear less injured, thereby masking injury by reason of subject imports:

> The overriding concern, however, is whether the Commission's *injury analysis will be distorted*. A related domestic firm may benefit both from the economic advantage gained by the LTFV imports and/or may be shielded from competition from those imports. Therefore, to include such a protected firm may make the entire industry appear healthier than it might actually be in the face of competition from LTFV imports.

*Color Television Receivers from Korea and Taiwan*, Inv. No. 731-TA-134-135 (Final), USITC Pub. 1514 (Apr. 1984) at 9-10 (emphasis added). *See also Empire Plow*, 11 CIT at 853, 675 F. Supp. at 1354 ("The ITC is also concerned about excluding companies which account for a significant share of the domestic production and which exclusion would result in impairing the *accuracy of the ITC determination*.") (emphasis added). Commissioner Kearns's focus on whether Amsted's importation benefited or shielded its domestic operations as they pertain to the

12

domestic like product is thus reasonable and consistent with the Commission's longstanding approach.

Further, Plaintiffs' reliance on Commerce's past related party analyses is inapposite and in no way establishes that Commissioner Kearns's methodology was unreasonable.  Plaintiffs' Resp. at 11-12.  The statutory provisions applying to Commerce, 19 U.S.C. §§ 1671a(c)(4)(B) and 1673a(c)(4)(B), rely on the same related party definition in 19 U.S.C. § 1677(4)(B)(ii), but serve a very different purpose than the related parties provision applicable to the Commission, 19 U.S.C. § 1677(4)(B)(i).  As Congress explained in the SAA, each agency has the discretion to apply the related parties provision for their own distinct purposes:

> Commerce and the Commission utilize section 771(4)(B) for different purposes:  Commerce to eliminate any conflicts of interest that may distort its consideration of the level of industry support for an antidumping or countervailing duty petition, and the Commission to reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports. For this reason, each agency will have discretion to apply this provision to accomplish these different purposes, even where this may lead to somewhat different results in individual cases.

SAA at 858.  Thus, the Commission's analysis of related parties focuses on eliminating distortions to industry data caused by the inclusion of related parties that are shielded from subject import competition while Commerce's analysis of related parties focuses on eliminating conflicts of interest in determining industry support for a petition.  Because Commissioner Kearns's related parties analysis appropriately focused on whether Amsted's inclusion in the domestic industry would distort domestic industry data by masking injury to the domestic industry, *Remand Views* at 7-10, his methodology was reasonable, regardless of how Commerce would have approached the issue.

Nor does the fact that other Commissioners approach this analysis differently or arrive at different conclusions establish that Commissioner Kearns's approach was unreasonable or arbitrary and capricious. As Commissioner Kearns explained in the *Remand Views*, "{o}ther members of the Commission may or may not agree with the approach that I describe below, and my own thinking may evolve further over time." *Remand Views* at 10 n.36. Commissioner Kearns further explained that the five factors were devised by past Commissioners, and while they can be informative in analyzing related parties issues, as demonstrated in the *Remand Views*, they must be considered in the context of the object and purpose of the statute as expressed in the SAA and other legislative history. *Remand Views* at 10-11, *see also id.* at 32-39 (Appendix to Views). Accordingly, given the statute's broad grant of discretion to the Commission and absence of enumerated factors, nothing requires individual Commissioners to conduct the same analysis and give the same weight to factors and evidence in determining whether appropriate circumstances exist to exclude a domestic producer from the domestic industry pursuant to the related parties provision. That Plaintiffs would have preferred Commissioner Kearns to have reached a different result fails to establish that his methodology was unreasonable or arbitrary and capricious.

    c.  **Commissioner Kearns's Definition of the Domestic Industry Was Supported by Substantial Evidence**

In accordance with the Court's remand instructions, Commissioner Kearns further explained his determination that appropriate circumstances did not exist to exclude Amsted from the domestic industry, addressing the factors highlighted by the Court. Commissioner Kearns first considered Amsted's share of total domestic production and its ratio of subject imports to domestic production, his two threshold questions for determining whether appropriate circumstances exist to exclude a domestic producer pursuant to the related parties provision. He

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

found that both threshold questions indicated further consideration of whether appropriate circumstances existed to exclude Amsted was necessary, as both Amsted's share of total domestic production and its ratio of subject imports to domestic production were large enough to influence the aggregated domestic industry data. *Remand Views* at 19-20.

Commissioner Kearns proceeded to consider whether Amsted was shielded or benefiting from subject imports. Observing declines in Amsted domestic FRCs operations from 2020 to 2021, including lost market share (to subject imports from Mexico) and lost jobs, and declines in its operating margin, production, capacity utilization, and U.S. assets, as well as Amsted's acknowledgement that it uses subject imports from Mexico to lower costs in the U.S. market, he determined that Amsted was not shielded or benefiting from subject imports. *Remand Views* at 21-22. Indeed, he found that the record showed that Amsted's domestic FRCs operations were harmed by subject imports from Mexico, as well as subject imports from China – an independent basis for not excluding Amsted from the domestic industry. *Remand Views* at 21-23, 25-26; *Leading Views* at 19-22. In his view, rather than subject imports from Mexico complementing Amsted's domestic FRCs production, Amsted imported FRCs from Mexico at the expense of its domestic FRCs production, to complement its other rail products. Subject imports from Mexico gained market share at the expense of Amsted's domestic FRCs production of the very same sub-products within the scope of these investigations, and "[ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ]." *Remand Views* at 25-27.

Commissioner Kearns also explained that excluding Amsted from the domestic industry would skew domestic industry data in a manner that would mask injury, akin to a survivor bias fact pattern, and run counter to the statutory intent. *Remand Views* at 14 n.48, 27-30.

15

Specifically, Commissioner Kearns explained that Amsted's exclusion from the domestic industry would have the effect of disregarding evidence of material injury to the domestic industry caused by subject imports, including market share and job losses for a company whose workers are represented by the Steelworkers Union in these investigations. *Remand Views* at 27-29.

Finally, Commissioner Kearns addressed the final factor, whether Amsted's primary interest was in importation or domestic production. He acknowledges that Amsted as whole, including its multi-national and domestic FRC operations, was undoubtedly more interested in importation given the lower cost of producing FRCs in Mexico. However, because Amsted's domestic FRC operations were not shielded or benefiting from subject imports, but rather harmed by them, excluding Amsted based on its importation of subject FRCs from Mexico would mean disregarding certain indicators of injury to the domestic industry caused by subject imports. *Remand Views* at 30-31.

Because Commissioner Kearns's related parties analysis was supported by substantial evidence, the Court should affirm it.

### d. Plaintiffs Have Failed to Establish that Commissioner Kearns Did Not Comply with the Court's Remand Instructions

In the *Remand Views*, Commissioner Kearns complied with and thoroughly addressed the Court's remand instructions to reconsider whether appropriate circumstances existed to exclude Amsted in accordance with the Court's opinion. *See* Slip Op. at 24-32. Plaintiffs' arguments to the contrary are without merit.

16

**e.  Commissioner Kearns Complied with the Court's Remand Instructions in Explaining His Finding that Amsted Was Not Shielded from Subject Import Competition and Did Not Benefit from Them**

Commissioner Kearns fully complied with the Court's remand instructions to articulate a rational connection between Amsted's domestic production performance and his finding that Amsted was not shielded from subject import competition.  Slip Op. at 25-26.  Specifically, the Court held that the Commission relied upon unit values for subject imported merchandise, capacity utilization, a decline in shipments and market share, a higher operating income to net sales ratio, and an increased cost of goods sold to net sales ratio but did not directly connect these data to its determination that Amsted was not shielded from competition with subject imports.  Slip Op. at 26.  In the *Remand Views*, Commissioner Kearns discussed in detail how Amsted's domestic FRCs operations were harmed by subject imports, rather than benefiting or being shielded from them, particularly from 2020 to 2021, citing among other things declines in its market share and domestic production, as discussed above.  *Remand Views* at 7-10, 21-22, 25-26.  In particular, Commissioner Kearns emphasized Amsted's job losses, noting that the statute specifically provides for U.S. labor unions to petition for relief from import injury, as the Steelworkers union did here.  *Remand Views* at 8-9, 22.

Plaintiffs' challenges to these findings are unavailing.  First, to the extent that Plaintiffs' arguments rest on the fact that Commissioner Kearns's analysis focused on Amsted's domestic FRCs operations, his analysis in this regard was lawful and reasonable, and Plaintiffs have failed to establish otherwise, as discussed above.

Equally without merit are Plaintiffs' invitations for this Court to reweigh the evidence.  Indeed, Plaintiffs mischaracterize the Court's opinion as having already reweighed the evidence.  *See, e.g.*, Plaintiffs' Resp. at 9 ("{T}his Court put substantial weight on Amsted's own statements

17

PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REDACTED

. . . .").  As discussed above, it is the role of the Commission as the trier of fact in injury investigations, rather than the Court, to determine the "weight to be assigned a particular piece of evidence."  *See U.S. Steel Grp.*, 96 F.3d at 1357-58.  Contrary to Plaintiffs' assertions, this Court did not, and cannot, assign any particular weight to certain evidence in its remand opinion.  That Plaintiffs would prefer Commissioner Kearns to have assigned greater weight to other factors, Amsted's statements, or Amsted's increased capacity and production in 2022 does not establish that his analysis was unreasonable or unsupported by substantial evidence.  Plaintiffs' Resp. at 5-14.  As discussed below, Commissioner Kearns fully addressed Amsted's statements and explained how he considered all the factors but afforded substantial weight to the fact that Amsted's domestic operations did not benefit and were not shielded from subject imports.  Similarly, with respect to Plaintiffs' claim that there was a [                    ] in the firm's capacity utilization in 2022 (Plaintiffs' Resp. at 13-14), the Commission reasonably assigned greater weight to the earlier part of the period of investigation, explaining that the improvement in the domestic industry's performance that year, including Asmted's performance, was primarily driven by the imposition of provisional duties on FRCs from China that led to a decline in subject imports from China.  *See Leading Views* at 44-45 & n.240, 47 n.249, 50-51, 53; *Remand Views* at 8 n.28, 21 n.59 ("Consistent with the *Leading Views*, I focus my analysis on the 2020-21 period due to the impacts of the FRC I provisional duties on subject imports from China in 2022."); Commission's Resp. to R. 56.2 Mot., ECF No. 47 at 37-40, 42-46 (same pages available in public version at ECF No. 48).

Plaintiffs also overlook that subject imports were not limited to imports of FRCs from Mexico, and as discussed above, Commissioner Kearns found that Amsted's competition with subject imports from China was an independent basis for not excluding Amsted from the

18

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

domestic industry. *Remand Views* at 26. Indeed, Plaintiffs do not dispute that Amsted was not

shielded from subject imports from China. The record shows that both China and Mexico were

substantial sources of imports during the POI, and subject imports from China exceeded subject

imports from Mexico in 2021 when the domestic industry suffered declines in its condition

before the *FRC I* provisional duties came into effect in 2022. *See* Confidential Staff Report at

Tables IV-2 and C-1 (CR163). Given that Amsted reported [        ] to subject imports

from China and [        ] from 2020 to 2021 as subject imports from China increased

their share of the U.S. market, Commissioner Kearns's finding that Amsted was not shielded

from subject imports from China is supported by uncontested evidence. *Leading Views* at 20-21;

*Remand Views* at 26. Thus, Plaintiffs have failed to establish that Commissioner Kearns's

finding that Amsted's FRCs operations were harmed by subject imports, rather than shielded or

otherwise benefiting from them, was unreasonable or inconsistent with the Court's remand

instructions.

f. **Commissioner Kearns Complied with the Court's Remand Instructions in Explaining How He Weighed the Factors in his Related Party Analysis**

Consistent with this Court's remand instructions, in the *Remand Views*, Commissioner

Kearns thoroughly explained his consideration of each of the five factors in general terms and as

applied to the facts of these investigations, as discussed above. *Remand Views* at 19-31.

Plaintiffs contend that Commissioner Kearns continued to improperly weigh three factors: the

percentage of domestic production attributable to the importing producer; the ratio of import

shipments to U.S. production for the importing producer; and whether the primary interest of the

importing producer lies in domestic production or importation. Plaintiffs' Resp. at 6-7.

However, as discussed below, Commissioner Kearns considered and weighed each of these

19

factors.  That Plaintiffs would prefer he weigh them differently does not establish that his analysis was unreasonable.

Commissioner Kearns explained that he views the related domestic producer's share of total U.S. production and its ratio of subject imports to domestic production as threshold questions to be addressed as the first and second factors in his framework.  *Remand Views* at 12-13.  Considering these factors as threshold issues necessarily involves assigning some weight to them because only if they are satisfied does the related parties analysis continue.  *Remand Views* at 19-20.  Here, Commissioner Kearns reasonably analyzed Amsted's relative size in the domestic industry, explaining that it "{was} not so small that inclusion is inconsequential (and further analysis is unnecessary) or so large that its inclusion is unavoidable."  *Remand Views* at 20.  With respect to the ratio of subject imports to domestic production, Commissioner Kearns explained that he views a high ratio as indicating that the producer may have benefited from subject imports, and therefore further investigation of the issue is necessary.  *Remand Views* at 13 & n.46. He also explained that a high ratio is not necessarily dispositive because the Commission typically considers all factors.  *Remand Views* at 13-14 n.46 (citing investigations in which a high ratio was not dispositive).  Commission Kearns then proceeded to explain why he affords substantial weight to the third factor regarding whether a firm is benefitting or shielded from unfairly traded imports, explaining his view that this factor "most clearly reflects the overarching object and purpose of the statutory provision" and has often been recognized by the court, including in this Court's remand opinion, as "the most significant factor."  *Remand Views* at 14 (citing Slip Op. at 29, *Allied Mineral Prods.*, 28 CIT at 1864, and *Empire Plow Co.*, 11 CIT at 852-54, 675 F. Supp. at 1353-54).  That Plaintiffs would prefer Commissioner Kearns to weigh these factors differently in no way establishes error.

20

Plaintiffs further accuse Commissioner Kearns of "nothing-ism" because he did not indicate whether Amsted's share of domestic production supported excluding the firm from the domestic industry.  Plaintiffs' Resp. at 8.  Commissioner Kearns reasonably found that Amsted's relative size in the domestic industry did not mandate its default inclusion in the industry.  As he explained, it was not "so small that inclusion is inconsequential (and further analysis is unnecessary) or so large that its inclusion is unavoidable."  *Remand Views* at 20.  Again, that Plaintiffs would prefer a different outcome does not establish error.

Regarding whether Amsted's primary interest was in domestic production or importation, Plaintiffs maintain that it was in importation, and therefore a factor favoring exclusion.  Plaintiffs again rely on their view that this factor "looks to 'the primary interest of the importing producer,'" meaning the U.S. producer's overall global operations, rather than its production operations involving the domestic like product.  Plaintiffs' Resp. at 6-7 (emphasis removed).  As discussed above, Commissioner Kearns's focus on Amsted's domestic FRCs operations was lawful and reasonable.  Moreover, Commissioner Kearns acknowledged that Amsted as a whole, including its multi-national and domestic FRC operations, was primarily interested in the importation of FRCs.  However, based on evidence that Amsted's domestic operations had been harmed by subject imports as reflected in market share and employment losses, as well as several other indicators, he found that Amsted's FRCs production operations in the United States did not benefit from its subject imports from Mexico and were not shielded from subject imports from China and Mexico.  *Remand Views* at 20-21; *Leading Views* at 19-22.  As Commissioner Kearns also explained, Amsted's primary interest in importation reflected its prioritization of its FRC production operations in Mexico at the expense of Amsted's only facility producing FRCs in the United States — its Granite City facility.  *Remand Views* at 31-32.  Thus, he explained that

21

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

Amsted's primary interest in importation did not support excluding Amsted from the definition of the domestic industry under the circumstances of these investigations.  *Remand Views* at 31-32.  Plaintiffs' preference that Commissioner Kearns rely on a different analysis and weigh the evidence according to their preferences does not establish error.

Thus, contrary to Plaintiffs' arguments, Commissioner Kearns reasonably explained his weighing of the percentage of domestic production attributable to the importing producer, the ratio of import shipments to U.S. production for the importing producer, and whether the primary interest of the importing producer lies in domestic production or importation was unreasonable, in accordance with the Court's remand instructions.

### i. Commissioner Kearns Complied with the Court's Instructions to Account for Amsted's Stated Reasons for Importing Subject Merchandise

Contrary to Plaintiffs' assertions, Plaintiffs' Resp. at 7, 11, Commissioner Kearns's analysis complied with the Court's remand instructions in accounting for Amsted's stated reasons for importing subject merchandise and producing FRCs in Mexico, including that such imports complemented its domestic production of other rail products and lowered the cost of producing FRCs, and that it produced FRCs in Mexico to serve customers located in Mexico.  *Remand Views* at 23-27.  While acknowledging that Amsted produced FRCs in Mexico and imported them to lower the costs of producing FRCs, Commissioner Kearns found that Amsted's subject imports from Mexico had increasingly supplanted its domestic production of FRCs.  *Remand Views* at 19, 22 & n.66, 31-32.

Commissioner Kearns also addressed Amsted's claim that [ ████████████████ ████████████████████████████████████ ].  He found that while the Mexican facility shipped to customers in Mexico, the record also showed that "[ ████████████

22

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

████████████████████████████████████████████████████

████████████████████████ ].” *Remand Views* at 26.  As Commissioner

Kearns explained, this disconnect between Amsted's stated reasons for producing FRCs in

Mexico and the record data further undermined any argument that subject imports from Mexico

complemented its domestic FRC production rather than other rail products.  *Remand Views* at 26.

### ii. Commissioner Kearns Complied with the Court's Instructions to Account for Amsted's Statements Regarding a Purported Lack of Harm to Its Domestic Production

Commissioner Kearns also fully complied with the Court's remand instructions in

accounting for Amsted's statements regarding the alleged lack of injury to its domestic FRCs

production from subject imports.  *Remand Views* at 23-27.  In doing so, Commissioner Kearns

addressed the specific evidence underlying the Court's concerns regarding this issue.  First, he

reiterated that his analysis focused on Amsted's operations producing the domestic like product,

which, as discussed above, was a lawful and reasonable exercise of his discretion under the

statute.  *Remand Views* at 23-25.  For this reason, he explained, Amsted's statement that subject

imports from Mexico benefitted its domestic production of products other than FRCs was not

relevant.

Commissioner Kearns next explained why he found Amsted's assertion that its domestic

production had not been injured by subject imports not credible and contrary to the record

evidence.  *Remand Views* at 23-27.  As he explained, the record showed that subject imports from

Mexico harmed Amsted's Granite City facility by increasing their market share at the expense of

the facility's production of the same FRC sub-products, as corroborated by the Steelworkers'

testimony.  *Remand Views* at 25.  The record also showed that Amsted's domestic operations

faced competition from subject imports from China, causing those operations to lose revenues

and market share.  *Remand Views* at 26.  Plaintiffs challenge these findings as unsupported by substantial evidence but base their argument entirely on other statements by Amsted that support their preferred outcome.  Plaintiffs' Resp. at 13.  In finding these statements to be "self-serving" and "not credible," however, Commissioner Kearns was acting well within his authority to determine the weight assigned to particular evidence on the record.  *See, e.g.*, *U.S. Steel Grp.*, 96 F.3d at 1357 ("Certain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of {the Commission's} evaluative process.").  *See also AWP Indus., Inc. v. United States*, 35 CIT 774, 794, 783 F. Supp. 2d 1266, 1285 (2011) ("{I}t is the Commission's duty to evaluate the record evidence and determine the credibility of the submitted evidence, . . . even where testimony comes from an interested party.") (citations omitted).  That Plaintiffs would prefer that Commissioner Kearns weigh these statements differently to support their theory of the case in no way establishes that Commissioner Kearns acted unreasonably in finding them to not credible in light of other record evidence indicating that Amsted had been harmed by subject imports.

Thus, Plaintiffs have failed to show that Commissioner Kearns's weighing of Amsted's statements regarding a purported lack of injury was unreasonable or failed to comply with the Court's remand instructions.

### iii.  Commissioner Kearns Complied with the Court's Remand Instructions in Explaining that Amsted's Exclusion from the Domestic Industry Would Skew the Data in a Manner that Would Mask Injury by Subject Imports

Commissioner Kearns further explained how Amsted's exclusion from the domestic industry would skew domestic industry data in light of the Court's concerns, *see Remand Views* at 27-30, notwithstanding Plaintiffs' arguments to the contrary.  Plaintiffs' Resp. at 14-16. Commissioner Kearns explained that Amsted's exclusion from the domestic industry would

24

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

eliminate data showing the adverse impact of subject imports on its domestic FRCs operations, thereby "masking injury" to the domestic industry. *Remand Views* at 27-30. He also identified the specific data that would be skewed if Amsted were excluded. *Remand Views* at 27-28. He explained that Amsted's exclusion from the domestic industry would make the industry appear less injured in terms of the industry's market share loss; job losses; declines in production, shipments, and sales; declines in operating income; [ █████████ ] low capacity utilization; and declines in assets. *Remand Views* at 27-28.

Commissioner Kearns then explained that the fact that a majority of the industry would remain if Amsted were excluded does not mean that excluding it does not skew industry data. First, as he explained, "Amsted's percentage of domestic production is large enough that its inclusion or exclusion would be consequential." *Remand Views* at 20. Second, Amsted's exclusion from the domestic industry would eliminate data showing the adverse impact of subject imports on its domestic FRC operations and mask injury. *Remand Views* at 28. Thus, contrary to Plaintiffs' arguments, Commissioner Kearns fully explained and reasonably concluded that Amsted's exclusion from the domestic industry would skew the data in a manner that masked injury to the domestic industry from subject imports.

Equally unavailing is Plaintiffs' claim that excluding Amsted would leave the only producer that claimed to be injured. Plaintiffs' Resp. at 15. As Commissioner Kearns pointed out, Plaintiffs acknowledge that the union representing Amsted's workers, the Steelworkers Union, was a petitioner and claimed injury from subject imports, and that Amsted, in fact, reported [ ████████████████████ ]. *See Remand Views* at 9, 26; *Leading Views* at 21; Plaintiffs' Resp. at 15.

25

Plaintiffs additionally fault Commissioner Kearns for making "no finding to suggest that Amsted's exclusion would skew the data as to M&T." Plaintiffs' Resp. at 15. It is not entirely clear what Plaintiffs are arguing here because Amsted's data do not affect M&T's data and Commissioner Kearns compared data for the industry defined both ways in finding that Amsted's exclusion would skew industry data by masking injury. He specifically compared industry data with Amsted's data included to industry data including only M&T, with Amsted's data excluded. *See Remand Views* at 27-28 (comparing Table C-1 data with Table C-2 data for market share loss, lost jobs, production, shipments, sales, operating income, capacity utilization, U.S. assets). Thus, contrary to Plaintiffs' argument, Commissioner Kearns detailed how industry data would be skewed with Amsted's data excluded and how that would mask injury.

Finally, Plaintiffs challenge Commissioner Kearns's discussion of *Aluminum Lithographic Printing Plates from China and Japan*, Inv. Nos. 701-TA-694 and 731-TA-1641-1642 (Final), USITC Pub. 5559 at 10-13 (Nov. 2024), in which he addressed some similarities between the two investigations. *Remand Views* at 18-19. Specifically, Plaintiffs point to the court's recent decision remanding the Commission's related parties analysis in *Aluminum Lithographic Plates* in *Fujifilm North America Corp. v. United States*, Court No. 1:24-cv-251, Slip Op. 26-17, ___ F. Supp. 3d. ___, 2026 WL 464687 (Ct. Int'l Trade Feb. 18, 2026) ("*Fujifilm Slip Op.*" or "*Fujifilm*"), as support for excluding Amsted from the domestic industry in this case. This argument does not withstand scrutiny. As an initial matter, the court's remand in that case partly involved the threshold issue of whether the domestic producer at issue even qualified as a related party under the statute, which is not at issue in this case. *Fujifulm* Slip Op. at 11-13.

The *Fujifilm* court also remanded the case for the Commission to explain whether the facts were similar to or different from the example of a related party that should be excluded

26

from the domestic industry provided in the legislative history, "where a U.S. producer is related to a foreign exporter and the foreign exporter directs his exports to the United States so as not to compete with his related U.S. producer" – an issue that Commissioner Kearns squarely addressed in his remand views for this case. *Id*. at 10 (quoting S. Rep. No. 96-249, at 83 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 469). Specifically, Commissioner Kearns quoted this very legislative history, *Remand Views* at 11 n.37, 35; *see also Leading Views* at 18-19, and explained that Amsted's Mexican production operations did not direct its exports to the United States so as not to compete with Amsted's domestic FRC production operations. To the contrary, as Commissioner Kearns explained, "Amsted's subject imports came at the expense of its sales of domestically produced FRCs, as subject imports gained market share at the expense of Amsted's domestic production of the very same sub-products within the scope of these investigations." *Remand Views* at 25-26; *see also id.* at 21 n.61 (noting that "the majority of subject imports from Mexico consisted of products produced in the United States by Amsted"); *Leading Views* at 22. He found that the performance of Amsted's domestic FRCs operations declined from 2020 to 2021, in terms of market share, operating income margins, production, capacity utilization, and U.S. assets, as those operations lost market share to subject imports from Mexico. *Remand Views* at 21-22. As the President of the Steelworker's local for Amsted's Granite City facility testified at the Commission's hearing for the earlier investigations of FRCs from China, "we went from almost having a thousand to barely 300 {jobs} . . . . Amsted says that it relocated the bulk of their production from Granite City to Mexico so they can compete with Chinese imports . . . but we did not see a significant job loss at the plant facility until around three years ago {in 2019}." *Remand Views* at 22 (quoting Petition Vol. I at Exh. I-48 (CR1/PR1) (*FRC I* H'rg Tr. at 38-39)). Based on all this evidence, Commissioner Kearns found that "Amsted's subject imports

from Mexico harmed Amsted's Granite City facility," where FRCs were produced, "with the Steelworkers testimony corroborating those data." *Remand Views* at 25. Thus, Commissioner Kearns reasonably found that Amsted's subject imports from Mexico had replaced, not complemented, its domestic production of FRCs, unlike the example provided in the legislative history highlighted by the court in *Fujifilm*, supporting his conclusion that appropriate circumstances did not exist to exclude Amsted from the domestic industry.

### g. The Court Should Deny Plaintiffs' Request for New Briefing on Chair Karpel's Material Injury Findings, which They Had the Opportunity to Challenge

Plaintiffs claim that they have not previously had the occasion or opportunity to challenge Chair Karpel's injury analysis. Plaintiffs' Resp. at 2, 18, 20, 21. This is not true as Plaintiffs had the opportunity to do so in their joint opening brief. Plaintiffs included separate counts alleging multiple errors in Chair Karpel's analysis in their complaints filed in September 2023, and they detailed her separate findings. Wabtec's Compl., Ct. No. 23-157, ECF No. 10 at ¶¶ 47, 69-73 (count seven); Strato's Compl., Ct. No. 23-158, ECF No. 9, ¶¶ 59, 81-85 (count seven). Plaintiffs therefore recognized the significance of Chair Karpel's separate findings notwithstanding that they were not necessary for the Commission's affirmative injury determinations because Commissioner Kearns's and Schmidtlein's joint views constituted the Views of the Commission.

### i. Plaintiffs' Rule 56.2 Opening Brief Did Not Address Chair Karpel's Separate Analysis and Their Claims Are Therefore Waived

Plaintiffs filed their joint Rule 56.2 opening brief on August 16, 2024, and did not argue therein that Chair Karpel's separate injury analysis was flawed in any way, as alleged in their complaints. Because Plaintiffs did not pursue the claims detailed in their complaints pertaining to Chair Karpel's injury analysis, those claims are waived. As held by the Federal Circuit,

28

"{o}ur law is well established that arguments not raised in the opening brief are waived." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir 2006). Because these claims were waived, the Court should deny Plaintiffs' request for additional briefing concerning Chair Karpel's injury analysis.

ii.   **Plaintiffs Have No Excuse for Not Previously Briefing the Matter Because They Knew Chair Karpel's Vote Was Required for Affirmative Determinations**

Even if Plaintiffs could somehow be excused for not challenging Chair Karpel's injury analysis in their opening brief, they had two additional opportunities to do so after learning of Commissioner Schmidtlein's departure from the Commission. On January 16, 2025, the Commission issued a news release announcing that Commissioner Schmidtlein was leaving the Commission. At that point, Plaintiffs knew that Chair Karpel's separate injury analysis and affirmative vote were potentially outcome determinative as they had anticipated in their complaints.

On January 31, 2025, Plaintiff Strato filed a motion for an immediate remand to the Commission for reconsideration of the original investigations based on alleged new evidence of material fraud by the domestic producers. ECF No. 51. The Commission and Defendant-Intervenor filed oppositions to Strato's motion. ECF No. 56 (Feb. 21, 2025); ECF No. 60 (Mar. 7, 2025). On April 18, 2025, Plaintiffs filed a reply brief in support of their Rule 56.2 motion and their motion for remand for reconsideration. ECF No. 69. In neither of Plaintiffs' filings on January 31, 2025 and April 18, 2025 – both after Commissioner Schmidtlein's announced departure – did Plaintiffs raise any challenge to Chair Karpel's injury analysis.

This timeline shows that in addition to waiving the claims in their opening brief, Plaintiffs could have sought to argue their claims challenging Chair Karpel's injury analysis

29

when her vote became potentially outcome determinative before briefing was complete but declined to do so.

### iii.    The Remand Proceeding Does Not Revive Plaintiffs' Claims Challenging Chair Karpel's Injury Analysis

On October 8, 2025, the Court remanded the Commission's determinations for it to reconsider or further explain its decision not to exclude Amsted from the domestic industry pursuant to the related parties provision.  Slip Op. at 36.  The Court also affirmed the Commission's determinations in several respects, but the Court deferred ruling on material injury to the domestic industry because the composition of the industry was subject to change on remand.  Slip Op. at 4, 34.  On remand, however, none of the Commissioners changed their views on domestic industry or injury.  In accordance with the Court's remand instructions, Commissioner Kearns provided further explanation of his decision not to exclude Amsted from the domestic industry.

Plaintiffs acknowledge that their claims challenging Chair Karpel's injury analysis are unrelated to the remand, so they would need the Court's permission for additional briefing on the claims.  The Court's remand of the Commission's related parties analysis does not excuse their waiver of the issue in their multiple filings from August 2024 to April 2025.  "Failing to raise an argument in a previous proceeding thus forfeits the argument after the matter has been remanded and is back on appeal."  *Saha Thai Steel Pipe Public Co., Ltd. v. United States*, 592 F. Supp. 3d 1299, 1306 (Ct. Int'l Trade 2022), *rev'd on other grounds*, 101 F.4th 1310 (Fed. Cir. 2024).  *See also Vivint v. Alarm.com Inc.*, 856 F. App'x 300, 304 (Fed. Cir. 2021) ("Vivint failed to raise an Appointments Clause challenge in its *first appeal*, in which it contested the Board's findings of invalidity . . . {but raising} an Appointments Clause challenge in its *second appeal*, in which it disputed the Board's decisions on remand, does not revive its already forfeited challenge.")

30

(emphasis original); *Yantai Xinke Steel Structure Co., Ltd. v. United States*, 38 CIT 478, 489-90 (2014) ("{P}laintiff waived its claim that Commerce used the wrong type of steel for the steel input by failing to raise it before the court prior to the remand. {As such,} the court's instructions necessarily did not direct the Department to reconsider its selection of the input itself."). These cases make clear that the Court's remand of the Commission's related parties analysis in no way revived Plaintiffs' claims challenging Chair Karpel's injury analysis.

Furthermore, Plaintiffs' request for additional briefing on their claims challenging Chair Karpel's injury analysis is unreasonable at this stage of litigation when the case was fully briefed last April and submitted to the Court for decision. For example, in *Mosaic Company v. United States*, 744 F. Supp. 3d 1367, 1377-78 (Ct. Int'l Trade 2025), plaintiff failed to raise cost of production arguments in its Rule 56.2 motion prior to remand, and the court deemed the argument waived when plaintiff attempted to raise the claim after remand. It noted that "{a}llowing {plaintiff} to present the argument at this stage of the litigation will require additional proceedings upon remand, consuming time and expense that could have been avoided." *Id.* at 1377. The court's reasoning in *Mosaic* applies equally to Plaintiffs' request in this case.

Plaintiffs' request for additional briefing is especially unjustified in this case because a year has passed since briefing on Plaintiffs' challenge to the Commission's injury analysis was completed. Had the Court addressed all issues in its decision of October 2025, it might have dispensed with Plaintiffs' injury claims without ever hearing any arguments concerning Chair Karpel's injury analysis. It is only because the Court deferred ruling on material injury that Plaintiffs have an opportunity to request additional briefing on Chair Karpel's injury analysis. The Court's deferred ruling on material injury to preserve judicial resources should not become

an opportunity for Plaintiffs to pursue their waived claim and burden the Court and parties with additional briefing.

In sum, Plaintiffs included claims challenging Chair Karpel's injury analysis in their complaints filed September 2023, neglected to argue those claims in their opening brief filed August 16, 2024, knew by January 16, 2025, that Schmidtlein was leaving making Chair Karpel's injury analysis outcome-determinative, filed two subsequent briefs on the merits without raising any challenge to Chair Karpel's analysis, and now seek to revive the claims through a remand proceeding that does not touch Karpel's analysis. Under Federal Circuit precedent, Plaintiffs have waived their claims concerning Chair Karpel's injury analysis and the vote-count shift Plaintiffs rely on to justify revival of the claims was fully known to them before their last brief was filed in April 2025. *SmithKline Beecham Corp.,* 439 F.3d at 1319; *Vivint*, 856 F. A'ppx at 304. For all these reasons, the Court should deny Plaintiffs' request for additional briefing.

## IV.    CONCLUSION

Because the Commission's affirmative remand determinations are supported by substantial evidence and in accordance with law, the Court should affirm them.

Respectfully submitted,

MARGARET D. MACDONALD
General Counsel

/s/ Karl von Schriltz
KARL VON SCHRILTZ
Assistant General Counsel for Litigation

/s/ Garrett L Peterson
GARRETT L. PETERSON
MICHAEL K. HALDENSTEIN
Attorney-Advisors
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3241
garrett.peterson@usitc.gov

*Counsel for Defendant*
*U.S. International Trade Commission*

Dated: April 13, 2026

33

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S**

**CONFIDENTIAL RESPONSE IN SUPPORT OF THE COMMISSION'S REMAND**

**DETERMINATIONS** contains 9,589 words, according to the word-count function of the word

processing system used to prepare this brief (Microsoft Word 2010).


Dated: April 13, 2026                    */s/ Garrett L. Peterson*
                                         Garrett L. Peterson
                                         Attorney-Advisor
                                         Office of the General Counsel
                                         U.S. International Trade Commission
                                         500 E Street, SW
                                         Washington, DC 20436
                                         Telephone: (202) 205-3241
                                         Facsimile: (202) 205-3111
                                         garrett.peterson@usitc.gov

                                         *Counsel for Defendant*
                                         *U.S. International Trade Commission*


34

## CERTIFICATE OF SERVICE

Pursuant to CIT Administrative Order 25-01 and Rule 5(b)(2)(E) of the Rules of the

Court of International Trade, I, Garrett L. Peterson, certify that a true and correct copy of the

foregoing **DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S**

**PUBLIC RESPONSE IN SUPPORT OF THE COMMISSION'S REMAND DETERMINATIONS**

was served on counsel of record by filing it within the Court's CM.ECF system.


Dated: April 13, 2026                    */s/ Garrett L. Peterson*
                                         Garrett L. Peterson
                                         Attorney-Advisor
                                         Office of the General Counsel
                                         U.S. International Trade Commission
                                         500 E Street, SW
                                         Washington, DC 20436
                                         Telephone: (202) 205-3241
                                         Facsimile: (202) 205-3111
                                         garrett.peterson@usitc.gov

                                         *Counsel for Defendant*
                                         *U.S. International Trade Commission*