*PUBLIC VERSION*

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  THE HONORABLE GARY S. KATZMANN

Court No. 23-00157

**WABTEC CORPORATION,**

*Plaintiff*,

**and**

**STRATO, INC.,**

*Consolidated Plaintiffs*,

**v.**

**UNITED STATES,**

*Defendant*,

**and**

**COALITION OF FREIGHT COUPLER PRODUCERS,**

*Defendant-Intervenors.*

## UNITED STATES INTERNATIONAL TRADE COMMISSION'S
### NONCONFIDENTIAL WRITTEN RESPONSES TO THE COURT'S QUESTIONS

GARRETT L. PETERSON
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone: (202) 205-3241
Facsimile: (202) 205-3111
garrett.peterson@usitc.gov

MICHAEL K. HALDENSTEIN
Attorney-Advisor
Telephone: (202) 205-3041
michael.haldenstein@usitc.gov

KARL VON SCHRILTZ
Assistant General Counsel for Litigation
Telephone: (202) 205-3096
Karl.von-Schriltz@usitc.gov

**DATED:  June 4, 2026**

The Commission welcomes the opportunity to respond to the Court's questions concerning the Commission's remand determination.

**1.** ***How should the fact that two of three Commissioners conclude on remand that Amsted should be excluded from the domestic industry impact our analysis here?  See Pls.' Cmts. at 1 ("the majority of the Commission . . . determined that Amsted does not belong in the domestic industry." (emphasis in original)).***

That two of three Commissioners found appropriate circumstances to exclude Amsted from the definition of the domestic industry does not affect the Court's review of the Commission's determinations.  The standard of review is set forth in the statute providing for judicial review of the Commission's final determinations, 19 U.S.C. § 1516a(b)(1)(B)(i).  Regardless of the number of Commissioners making a particular finding or determination, the Court's review is whether it is supported by substantial evidence and otherwise in accordance with law.  In *Siemens Energy Corp. v. United States*, 992 F. Supp. 2d 1315, 1322 n.5 (Ct. Int'l Trade 2014), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015), the court reviewed the Commission's affirmative determination based on two Commissioners' affirmative determinations of material injury and one Commissioner's affirmative determination of threat of material injury.  The court rejected an argument that it should defer to the 4-2 majority of Commissioners that had found no material injury and the 5-1 majority that had not found threat of material injury.  The court explained,

> {T}he standard of review provided in 19 U.S.C. § 1516a(b)(1)(B)(i) does not suggest any distinction when reviewing a determination by a divided Commission.  Indeed, cases reviewing a determination by a divided Commission have applied the same 'substantial evidence' standard of review as used in cases with more uniform voting patterns.

*Id.* at 1328.  In short, there is no basis in this statutory framework for adopting a variable standard of review based upon the voting pattern of the Commission.  That two Commissioners

found appropriate circumstances to exclude Amsted should have no bearing on the Court's

review of whether Commissioner Kearns reasonably found that appropriate circumstances did

not exist for Amsted's exclusion.  *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir.

1996) ("{E}ach commissioner is free to attach different weight to factual information bearing on,

and determinate of, the many statutory tests; and . . . commissioners may ultimately reach

different factual conclusions on the same record.").

**2.**     ***What support is there for Commissioner Kearns's position that "{t}he first two factors address a threshold question, aiding in determining whether to delve deeper into the thorny issue of whether 'appropriate circumstances' exist to exclude."  Remand Results at 12 (emphasis in original).***

Commissioner Kearns relied on his statutory discretion and explained that his approach is

consistent with the Commission's approach in previous investigations in which the Commission

treated the two factors as *de facto* threshold factors.  *See* Confidential Remand Views at 13

nn.44-46 (CR184R) (Dkt. 117) ("*Remand Views*") (collecting investigations).  For example, the

Commission has not engaged in further analysis when the producer is so small that exclusion of

its data does not affect the overall data for the industry, or when the producer's imports are *de*

*minimis* and not likely to have benefited the domestic producer.  *Remand Views* at 13 n.44-45.

In *LG Electronics*, the Court approved of the Commission's reasoning that "the size of

the producer may matter to the agency in determining whether excluding it would distort the data

regardless of any benefit it received."  *LG Elecs., Inc. v. U.S. Int'l Trade Comm'n*, 26 F. Supp. 3d

1338, 1345-46 (Ct. Int'l Trade 2014).  In other words, as Commissioner Kearns recognized, the

producer may be so small that its inclusion or exclusion from the industry simply does not matter

so no further analysis is necessary.  *Remand Views* at 12-13 ("{A} very small producer is

unlikely to be excluded because its data don't move the needle for the industry as a whole, even

if that small producer is benefiting or shielded from subject imports.").  Similarly, the

3

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Commission has recognized the common-sense notion that when the volume of subject merchandise imported by a domestic producer is very small, it is unlikely to have provided much benefit to the domestic producer. *See Wire Decking from China,* Inv. No. 701-TA-466, 701-TA-466, and 731-TA-1162 (Final), USITC Pub. 4172 at 7 (July 2010) ("However, its importations were fairly small relative to its domestic production, suggesting that any benefit from its imports was minimal."); *see also Remand Views* at 13 n.45 (collecting investigations).

**2a.     *Please respond to Plaintiffs' suggestion that Commissioner Kearns' treatment of these factors as threshold questions caused him to "ignore{} those factors" and "sweep those factors under the rug," rather than "weigh either of them." Pls.' Cmts. at 7–8 (emphasis in original).***

Far from ignoring these factors, Commissioner Kearns treated them as threshold factors that were potentially decisive in his analysis. Considering these factors as threshold issues necessarily involves assigning some weight to them because only if they are satisfied does the related parties analysis continue. *See Remand Views* at 19-20. Commissioner Kearns reasonably analyzed Amsted's relative size in the domestic industry, explaining that it was not "so small that inclusion is inconsequential (and further analysis is unnecessary) or so large that its inclusion is unavoidable." *Remand Views* at 20. After considering Amsted's ratio of subject imports to domestic production during the POI, Commissioner Kearns recognized that the ratio was [   ] and warranted further analysis of whether its domestic operations benefited from the imports or were somehow shielded from them. *Remand Views* at 20. Neither Amsted's size nor its ratio of subject imports to production could definitively answer those questions.

Fundamentally, Plaintiffs disagree with how Commissioner Kearns considered the factors and the weight he assigned to them and ask the Court to reweigh the evidence. Commissioner Kearns explained that Amsted's high ratio of subject imports to domestic production, as well as its primary interest in importation, was outweighed by evidence under the third and fourth

4

factors indicating that Amsted's domestic production had in fact been injured by subject imports, not shielded from subject import competition.  Thus, excluding Amsted from the domestic industry would skew industry data and mask injury by eliminating data showing the adverse impact of subject imports on Amsted.  *See Remand Views* at 19-31.  In this way, Commissioner Kearns's related parties analysis was similar to the Commission's related parties analysis affirmed by the court in *LG Electronics*, 26 F. Supp. 3d at 1344-47, as discussed in response to question 8 below.  The Court should likewise affirm Commissioner Kearns's analysis here.

3.      *Plaintiffs argue that "there is no legal support for the view that Amsted can be excluded only if its production of the domestic like product (FRCs) at a particular domestic facility (Granite City) benefited from imports." Pls.' Cmts. at 11 (emphasis in original).  What support is there for Commissioner Kearns' position that "the Commission's related parties analysis, like its material injury analysis, focuses exclusively on the production of the domestic like product, FRCs"? Remand Results at 9.*

The issue in this case is whether the Commission is required to ignore declines in U.S. production and employment of the domestic like product, and other forms of injury, when a multinational corporation moves production out of the United States to then import those dumped foreign made goods into the United States.  The related parties provision provides that the "producer" that may be excluded from the domestic industry "in appropriate circumstances" is "a producer of a domestic like product," thereby focusing the Commission's analysis of whether appropriate circumstances exist on a related party's production of the domestic like product.  19 U.S.C. § 1677(4)(B).  This focus is also consistent with the purpose of the related parties provision, which is "to reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports."  SAA at 858.  Given the statutory definition of "industry" as "producers as a whole of a domestic like product," 19 U.S.C. § 1677(4)(A), the "distortion in industry data" that the related

parties provision seeks to reduce is the distortion caused when "a producer of a domestic like product" is "shielded from the effects of the subject imports." SAA at 858. As we discussed in our previous submission, consistent with the statute, the Commission has long considered whether a related party has benefitted from importing subject merchandise by considering whether any benefit had accrued to the producer's domestic production operations for the domestic like product, not the producer's overall operations. *See* ITC Confidential Response in Support of Remand Determinations at 11-12 (Dkt. 128) ("*Commission's Confidential Response*") (quoting 1980s investigations).

**3a.** ***Please respond to Plaintiffs' argument that Commissioner Kearns "misunderstands the fifth factor," and that "{i}t actually looks to 'the primary interest of the importing producer,' not a particular facility of the importing producer." Pls.' Cmts. at 7 (emphasis in original) (quoting Wabtec Corp. v. United States, 49 CIT _, _ , 805 F. Supp. 3d 1326, 1343 (2025) ("Remand Opinion").***

Commissioner Kearns recognized that "{wi}thout question, the primary interest of Amsted as a whole (*i.e.,* the multinational corporation) but specifically with respect to FRCs lies in importation . . . ." *Remand Views* at 30. He then explained, however, that this factor was not determinative:

> {W}hile a firm with a primary interest in importation generally should be excluded in other circumstances, that is hardly so under the facts of this case. Doing so would ignore the substantial injury the Granite City facility and its workers experienced, particularly from 2020 to 2021, before provisional measures were put in place on imports from China in FRC I.

*Remand Views* at 30-31. Commissioner Kearns reasonably focused on the Granite City facility, as Amsted's <u>only facility</u> producing the domestic like product, in explaining that Amsted's exclusion would mask injury to that facility, and thus the domestic industry, caused by subject imports. *See* Confidential Staff Report at Table III-1 (CR163) (listing Granite City facility).

6

**3b.**    ***Please respond to Plaintiffs' contention that "{i}f a domestic producer is generally benefitting from subject imports, then the incentive is to 'act against the domestic industry' is present." Pls.' Cmts. at 12-13 (emphasis in original) (quoting Remand Opinion, 805 F. Supp. 3d at 1344).***

Contrary to the premise of Plaintiffs' contention, Commissioner Kearns explained at length that "Amsted's domestic FRCs operations were harmed by subject imports, rather than benefiting or being shielded from them." *See Remand Views* at 21-23. For this reason, even if Amsted's subject imports benefited its overall operations at the expense of its domestic FRCs operations, arguably creating an incentive to act against the domestic industry by importing subject merchandise at injurious volumes and prices, such circumstances would not support excluding Amsted's domestic FRCs operations from the domestic industry. As Commissioner Kearns explained, excluding Amsted from the domestic industry would "eliminate data showing the adverse impact of subject imports on its domestic FRC operations," including the impact of not only Amsted's subject imports from Mexico but also subject imports from China. *Remand Views* at 26-28. Plaintiffs specifically acknowledge that a related party's incentive to "act against the domestic industry" is more relevant to Commerce, Pls.' Cmts. at 12 n.3 (Dkt. 124), which may exclude a related party from the domestic industry for purposes of calculating industry support for a petition if the party's interest in importation creates an incentive to oppose the petition. *See Commission's Confidential Response* at 13 (quoting the SAA and discussing differences in the two agencies' use of the related parties provision).

**4.**    ***Did Commissioner Kearns sufficiently "account for facts suggesting that Amsted benefitted from the import of subject merchandise from Mexico"? Pls.' Cmts. at 11 (quoting Remand Opinion, 805 F. Supp. 3d at 1345).***

Yes. Commissioner Kearns explained that his analysis focused on Amsted's operations producing the domestic like product, which, as discussed above, was a lawful and reasonable exercise of his discretion under the statute. *Remand Views* at 23-25. Commissioner Kearns's

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

analysis also complied with the Court's remand instructions by accounting for Amsted's stated reasons for importing subject merchandise and producing FRCs in Mexico, including that such imports complemented its domestic production of other rail products and lowered the cost of producing FRCs, and that it produced FRCs in Mexico to serve customers located in Mexico. *Remand Views* at 23-27. While acknowledging that Amsted produced FRCs in Mexico and imported them to lower costs for the firm's overall operations, Commissioner Kearns found that Amsted's subject imports from Mexico had increasingly supplanted its domestic production of FRCs. *Remand Views* at 19, 22 & n.66, 31-32. He also pointed out that "[ ███████████ ██████████████████████████████████████████████████████ ████████████████████████████ ]," belying one of Amsted's alleged reasons for moving to Mexico. *Remand Views* at 25-27.

Commissioner Kearns also discussed in detail how Amsted's domestic FRCs operations were harmed by subject imports, rather than benefiting or being shielded from them, particularly from 2020 to 2021, citing, among other indicators, declines in its market share, domestic production, and employment. *Remand Views* at 7-10, 21-22, 25-26.

5.    ***Plaintiffs note that "FRCs account for a [ ████████████████ ] of the [ ████ ████ ] facility's overall production." Pls.' Cmts. at 13 (quoting Separate Views of Chairman David S. Johanson and Commissioner Amy A. Karpel on Related Parties at 63 (July 7, 2023) P.R. 190, C.R. 180 ("Separate Views")). Is there evidence supporting a connection between the job losses at Amsted's [ ██████████ ] facility and changes in domestic FRC production?***

Yes. Commissioner Kearns discussed the job losses and other negative effects specific to Amsted's FRC production. *Remand Views* at 8, 21-23. Thus, the job losses reported by Amsted and cited by Commissioner Kearns are for <u>FRC operations only</u>, not all rail products.

Commissioner Kearns specifically noted that from 2020 to 2021, [ ██ ] jobs were lost at Amsted's Granite City facility as Amsted's imports from Mexico gained market share at the

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

expense of its domestic FRCs operations. *Compare* Staff Report at Table C-1 *with* Table C-2 (CR163) (Amsted reported [   ] PRWs in 2020 but only [   ] PRWs in 2021). As subject imports' market share increased from [   ] percent in 2020 to [   ] percent in 2021, Amsted' market share declined from [   ] percent in 2020 to [   ] percent in 2021. Staff Report at Tables IV-11 & C-2 (CR163).

Commissioner Kearns explained that "{a}s {Amsted's} imports gained market share, production of FRCs in Granite City was cut [   ] pounds in 2020 to [   ] pounds in 2021. This led to a decline in capacity utilization from [   ] percent to [   ] percent." *Remand Views* at 21-22 (footnotes omitted). Commissioner Kearns also relied on the hearing testimony of Amsted workers that Amsted shifted production to Mexico to reduce costs and better compete with imports of FRCs from China, resulting in job losses at Granite City. *Remand Views* at 22.

Commissioner Kearns also addressed the limited portion of Granite City's overall production consisting of FRC production. He observed that "while Amsted states that by importing FRCs, the firm can produce more 'other' rail products in the United States . . . FRCs are an [   ] of the overall production of Amsted's domestic *and Mexican* facilities." *Remand Views* at 26 n.78 (citing Staff Report at Tables III-8 & VII-12 (CR163)). Thus, Amsted's explanation that it was prioritizing other rail products in the United States while prioritizing FRC production in Mexico conflicted with evidence that other rail products were no more prioritized in the United States than in Mexico.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**6.** ***How should we reconcile the fact that [ ▮ ] FRC jobs were lost at Amsted's Granite City facility from 2020 to 2021, Remand Results at 8, with the fact that FRC and overall capacity utilization at Granite City [ ▮▮▮▮▮▮▮▮ ] over the course of [ ▮ ], Amsted's Post Hearing Br. at 29- 30 (May 25, 2023), P.R. 151, C.R. 152?***

As explained in response to question 5, [ ▮ ] FRC jobs were lost at Granite City from 2020 to 2021 on Amsted's operations producing the domestic like product, not its overall operations. Amsted explained that it [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ]. Amsted's U.S. Producer Questionnaire at II-2c (CR125). Thus, Amsted's improved performance in 2022 is consistent with Commissioner Kearns's conclusion that Amsted was harmed by subject imports from 2020 to 2021, not shielded from their effects.

Amsted also explained that the increase in its capacity utilization for its overall operations was due to increased railcar builds in 2022. Amsted's Posthearing Brief at Answers to Questions at 30 (CR152). While increased railcar builds in 2022 also may have affected FRC demand and explain some of Amsted's increased production and shipments of FRCs, it cannot account for the increase in Amsted's market share from [ ▮ ] percent in 2021 to [ ▮ ] percent in 2022 as subject imports from China exited the market. Staff Report at Tables III-6 & IV-11 (CR163). Further, as discussed above, Amsted attributed [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ].

**7.** ***Plaintiffs argue that the court's finding that "{e}xclusion of data is not synonymous with skewing data," Remand Opinion, 805 F. Supp. 3d at 1345, "was lost on Commissioner Kearns," Pls.' Cmts. at 15. Please describe how Commissioner Kearns's analysis of skew on remand does not "suggest{} that the exclusion of any producer from the domestic industry would skew the data." Remand Opinion, 805 F. Supp. 3d at 1345 (emphasis in original).***

Commissioner Kearns explained that Amsted's exclusion from the domestic industry would eliminate data showing the adverse impact of subject imports on its domestic FRCs

10

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

operations, thereby distorting industry data and "masking injury" to the domestic industry from 2020 to 2021.  *Remand Views* at 27-30.  As he specifically detailed, if Amsted is included in the industry, [ ▮ ] U.S. jobs are lost; if it is excluded, only [ ▮ ] jobs are lost.  If Amsted is included in the industry, the domestic industry *loses* [ ▮ ] percentage points of market share to subject imports; if Amsted is excluded, all sources nonsensically gain market share.  Commissioner Kearns also reviewed other distortions in industry data that would mask injury to the industry when Amsted is excluded from the industry, including smaller operating losses, smaller declines in production, shipments and sales, and higher capacity utilization.  *Remand Views* at 27-28 (emphasis original).  "In short," he found, "Amsted's exclusion from the domestic industry would eliminate data showing the adverse impact of subject imports on its domestic FRC operations" and mask injury.  *Remand Views* at 28.

Moreover, contrary to Plaintiffs' assertions, Commissioner Kearns's analysis does not suggest that the exclusion of any producer would skew data.  While it is always true that exclusion of a domestic producer results in a smaller domestic industry, it may be the case that *trends* in industry data are unchanged (*i.e.* not distorted) when a domestic producer with trends in its data very similar to the industry average is excluded from the domestic industry.

**8.    *What authorities best support your overall argument?***

Commissioner Kearns's decision not to exclude Amsted from the domestic industry was a reasonable exercise of his discretion, much like the Commission's related parties analysis upheld in *LG Electronics*, 26 F. Supp. 3d at 1344-47.  In that case, the court affirmed the Commission's decision not to exclude Electrolux, a related party that had transferred domestic production to Mexico during the POI, over respondents' objection.  *Id.*  As in this case, the Commission discounted the fact that Electrolux no longer had a primary interest in domestic production

because there was no evidence that Electrolux's domestic production activities had benefitted from its subject imports or were otherwise shielded from subject import competition. *Id.* at 1346. The court explained that the "Commission also discussed Electrolux's ratio of imports to U.S. production, explaining that the increasing ratio of imports combined with increased operating losses was evidence that Electrolux did not receive a benefit from subject imports." *Id.* Likewise, Commissioner Kearns found that Amsted's jobs, operating income margins, production, and capacity utilization worsened as its subject imports from Mexico gained market share, indicating that Amsted's FRC production operations did not benefit from the imports. *Remand Views* at 21-23.

This analysis is also consistent with the analysis affirmed by the court in *Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 100 F. Supp. 3d 1314, 1327 (Ct. Int'l Trade 2015); *aff'd*, 879 F.3d 1377 (Fed. Cir. 2018) ("The ITC thus determined that, based on Motech's financial performance during the POI (*i.e.*, whether the company benefitted from its importing activities), its capital expenditures, and research and development expenses, that it was not appropriate to exclude Motech from the domestic industry as a related party."). Commissioner Kearns's related parties analysis here was similar to the analyses affirmed by the court in *LG Electronics* and *Changzhou Trina* and should likewise be affirmed.

**9.    *Are there any recent or pending Supreme Court, Federal Circuit, or USCIT cases that may affect the court's analysis?***

On February 18, 2026, the court issued an opinion and order remanding the Commission's related parties analysis in *Fujifilm North America Corp. v. United States*, Court No. 24-00251, Slip. Op. 26-17 (Ct. Int'l Trade Feb. 18, 2026). That case is of no clear relevance to this one, however, as we discussed in our response to *Plaintiffs' Comments. See Commission's Confidential Response* at 26-28.

12

Respectfully submitted,

Karl Von Schriltz
Assistant General Counsel for Litigation

*/s/  Garrett L. Peterson*
Garrett L. Peterson
Michael K. Haldenstein
Attorney-Advisors
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3241
garrett.peterson@usitc.gov

*Attorneys for Defendant*
*United States International Trade Commission*

Dated: June 4, 2026

**ADDENDUM**

Counsel for the Commission are available to appear for oral argument on any of the days proposed by the Court, although we do not believe that oral argument is necessary for the resolution of this case.

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**UNITED STATES INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL**

**WRITTEN RESPONSES TO THE COURT'S QUESTIONS** contains 3,000 words, not

including the Court's questions, according to the word-count function of the word processing

system used to prepare this brief (Microsoft Word 2010).


Dated: June 4, 2026

*/s/  Garrett L. Peterson*
Garrett L. Peterson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3241
garrett.peterson@usitc.gov

*Attorney for Defendant*
*United States International Trade Commission*

15

## CERTIFICATE OF SERVICE

Pursuant to CIT Administrative Order 25-01 and Rule 5(b)(2)(E) of the Rules of the

Court of International Trade, I, Garrett L. Peterson, certify that a true and correct copy of the

foregoing **UNITED STATES INTERNATIONAL TRADE COMMISSION'S**

**NONCONFIDENTIAL WRITTEN RESPONSES TO THE COURT'S QUESTIONS** was

served on the following counsel by filing it via CM/ECF:

Claire M. Webster, Esq.
Buchanan Ingersoll & Rooney PC
1700 K Street, NW, Suite 300
Washington, DC 20006-3807
(202) 452-7900
Email: claire.webster@bipc.com

C. Kevin Marshall, Esq.
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Phone: (202) 879-3939
Email: ckmarshall@jonesday.com

Andrew Thomas Schutz, Esq.
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW, Suite 650
Washington, DC 20005
Phone: (202) 661-7795
Email: aschutz@gdlsk.com

Dated: June 4, 2026

*/s/ Garrett L. Peterson*
Garrett L. Peterson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3241
Facsimile: (202) 205-3111
garrett.peterson@usitc.gov

*Counsel for Defendant*
*U.S. International Trade Commission*