## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| WABTEC CORPORATION and STRATO INC., <br><br> Plaintiff/Consolidated Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> COALITION OF FREIGHT COUPLER PRODUCTS, <br><br> Defendant-Intervenor. | Consol. Court No. 23-00157 <br><br> <u>**PUBLIC VERSION**</u> <br><br><br> Business Proprietary Information removed on pages 9-10 |

## <u>RESPONSES TO QUESTIONS FROM THE COURT ON REMAND DETERMINATION</u>

1.     **You suggest that "the majority of the Commission … determined that Amsted does <u>not</u> belong in the domestic industry," and focus on "Commissioner Kearns's bottom-line injury determination rest{ing} on Amsted's inclusion in the domestic industry." Pls.' Rule 56.2(h) Cmts. on the Int'l Trade Comm'n's Remand Determination at 1, Mar. 13, 2026, ECF No. 124 ("Pls.' Cmts."). Are you suggesting that we disregard Commissioner Schmidtlein's vote to exclude Amsted and find material injury in the original determination?**

<u>**RESPONSE:**</u> At this stage, the Court simply "reviews" the Commission's "remand determinations for compliance with the court's remand order." *Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 1274, 587 F.Supp.2d 1303, 1306 (2008). But Commissioner Schmidtlein did not participate in the remand. Commissioner Schmidtlein left the Commission on February 1, 2025—after the Commission reached its original injury determination, but before the Court's opinion instructing the Commission "to reconsider whether appropriate circumstances exist to exclude {Amsted} from the domestic industry." *Wabtec Corp. v. United States* ("*FRC*"), 805 F.Supp.3d 1326, 1350 (CIT 2025).

1

The Court's exclusive focus now is whether the Commission's remand determination is supported by substantial evidence, in accordance with law, and consistent with the Court's instructions in its opinion and order. And that requires grappling with the Commission's three-way split on remand. As Plaintiffs explained in their Remand Comments, the three Commissioners participating on remand reached three different conclusions: (1) Commissioner Kearns determined that Amsted should be included in the domestic industry definition, and that the record supported a material injury finding; (2) Chair Karpel determined that Amsted should be excluded from the domestic industry definition, and that the record supported a material injury finding; and (3) Commissioner Johanson concluded that Amsted should be excluded from the domestic industry, but that the record did not support a material injury finding. Pls.'Cmts.3. Given this split, "the deciding vote in favor of an affirmative determination rests on a factual premise that a majority of the Commission has rejected." *Id.* at 4. Commissioner Schmidtlein's participation in the original proceedings has no bearing on that issue.

2.      **The Government states that you previously "recognized the significance of Chair Karpel's separate findings notwithstanding that they were not necessary for the Commission's affirmative injury determinations because Commissioner Kearns's and Schmidtlein's joint views constituted the Views of the Commission." Def. U.S. Int'l Trade Comm'n's Confidential Resp. in Supp. of the Comm'n's Remand Determinations at 28, Apr. 13, 2026, ECF No. 128 ("Gov't Resp."). Could you have challenged Chair Karpel's injury analysis in your joint opening brief as the Government suggests? See id.**

        **RESPONSE:** No. When Plaintiffs filed their Opening Brief, Chair Karpel's separate views were not part of the majority views of the Commission and were therefore not ripe for judicial review. At that time, a Commission majority had *both* found material injury *and* defined the domestic industry to include Amsted. *See, e.g.*, *FRC* 1343-48 (describing the decision including Amsted in the domestic industry as "*the Commission's*" decision). Chair Karpel, joined by

Commissioner Johanson, "*dissented* from the majority finding on related parties." Gov't Resp. MJAR 11 & n.4 (ECF No. 47) (emphasis added).

Plaintiffs challenged the majority decision—but they had neither reason nor means to challenge Chair Karpel's dissent. As this Court has previously explained, it "does not review the views of dissenting Commissioners as an alternative to the majority's findings," though it "may find dissenting views as means of illuminating flaws in the majority's analysis." *Cleveland-Cliffs Inc. v. United States*, 693 F.Supp.3d 1341, 1358 & n.12 (CIT 2024).

Things changed on remand. With Commissioner Schmidtlein's departure, the Commission was left without a majority; three Commissioners reached three distinct conclusions about the definition of the domestic industry and whether that domestic industry was materially injured by reason of subject imports. Only then did Chair Karpel's views become central to the Court's review. That is why Plaintiffs requested an opportunity for additional briefing on Chair Karpel's separate views, while also summarizing why those views are unsupported by substantial evidence. Pls.'Cmts. 21-23. As with pre- and post-argument submissions requested by the Court, Plaintiffs believe that full briefing on Chair Karpel's separate injury analysis would facilitate the Court's review.

    a. **The Government suggests that Plaintiffs "had two additional opportunities to {challenge Chair Karpel's injury analysis} after learning of Commissioner Schmidtlein's departure from the Commission": Strato's motion for an immediate remand for reconsideration of the original investigations filed on January 31, 2025, and Plaintiffs' reply brief in support of the Rule 56.2 motion and motion for remand for reconsideration filed on April 18, 2025. Gov't Resp. at 29. Could you have sought to challenge Chair Karpel's injury analysis then?**

**RESPONSE:** As explained above, Chair Karpel's separate views excluding Amsted from the domestic industry were not part of the majority's injury determination at issue in the original appeal that Strato moved to remand. Plaintiffs thus had no reason to challenge Chair Karpel's

3

separate injury analysis then. Furthermore, the motion to remand had nothing to do with the definition of the domestic industry; it concerned newly discovered evidence that called into question the integrity of the Commission's original investigation. That motion was not an appropriate pleading to mention, let alone challenge, Chair Karpel's separate views—as the Commission would no doubt have argued in opposing any such challenge. And the reply brief concerned (1) the original injury determination, as set forth in the majority views, and (2) newly discovered evidence that the original investigation had been tainted by misconduct—neither of which called for analysis of Chair Karpel's separate views.

3.      **Given the "broad discretion {Commerce has} to assess whether to exclude a domestic producer from the domestic industry," Gov't Resp. at 1; <u>see also</u> Statement of Admin. Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, at 858 (1994) at 858, <u>as reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4190; <u>JMC Steel Grp. v. United States</u>, 39 CIT 649, 657–658 & n.4, 70 F.Supp.3d 1309, 1316–17 & n.4 (2015), are Commissioner Kears' application of the five factors—specifically his treatment of two factors as threshold factors and his focus exclusively on FRCs—unsupported by substantial evidence or not in accordance with law?**

**<u>RESPONSE</u>:** The Court instructed the Commission to give independent weight to *all five factors* the Commission has "traditional{ly}" used in its analyses that this Court has "repeatedly upheld," including addressing those factors that "seem{ed} to support Amsted's exclusion." *FRC* 1343-44, 1346. The Commission lacks discretion to substitute its own view of the law for the Court's.[1] *NSK Corp. v. United States*, 33 CIT 1185, 1193, 637 F.Supp.2d 1311, 1320 (2009). Yet Commissioner Kearns continues to disregard the Court's instructions. *See* Pls.'Cmts.6-16.

*First*, Commissioner Kearns' decision to focus "on production of the domestic like product, not on the production of other products outside the scope of the investigation," flies in the face of

---

[1] Though the question refers to *Commerce*, that agency's discretion at the "initiation determination" to exclude certain domestic producers does not negate the *Commission's* independent responsibility to determine whether related parties should be excluded at the material-injury stage. *See, e.g.,* SAA, H.R. Doc. No. 103-316, at 858. 1994 U.S.C.C.A.N. 4040, 4190.

this Court's instructions on how to determine substantial benefit. Remand Views 25. The Court held that a decision not to exclude lacked substantial evidence unless it grappled with the benefit to Amsted from "bundling {imported} FRCs with other rail products which are the bulk of its production … in the United States." *FRC* 1345. Only by ignoring this directive could Commissioner Kearns conclude that Amsted's domestic operations were harmed by the subject imports. Remand Views 23.

*Second*, ignoring Amsted's bundling strategy enabled Commissioner Kearns to give the back of the hand to another factor this Court thought "independently support exclusion." *FRC* 1347. He acknowledged that, "{w}ithout question, the primary interest of Amsted as a whole … lies in importation" and that this "generally should" warrant "exclu{sion} in other circumstances." Remand Results 30. That should have been the end of the matter. Instead, he brushed off this factor on the theory that Amsted's domestic FRC production had suffered from Amsted's imports. *Id*. at 30-31.

*Third*, Commissioner Kearns loaded the dice by treating two of the traditional factors this Court thought "support{s} Amsted's exclusion," *FRC* 1344, as mere "threshold" questions unlocking the others, Remand Views 12. He "did not indicate whether {Amsted's} percentage of domestic production supported exclusion or not," *FRC* 1344, merely noting that "inclusion or exclusion would be consequential," Remand Views 20. And though this Court treated Amsted's ratio of subject imports to U.S. production as weighty enough "to independently support exclusion," *FRC* 1347, Commissioner Kearns reduced the factor to "simply mean{ing} further analysis … is warranted," Remand Views 20.

Commissioner Kearns did not give a reasoned basis for so discounting these factors and taking an admittedly novel approach—a ground for remand independent of his disregard of this

Court's instructions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (requiring adequate explanation for departures from agency practice). And his choice had downstream consequences. Information relevant to these factors is "important context" that should have informed his analysis of the others. *FRC 1347*. For example, the ratio of a company's imports to its domestic production bears directly on where its primary interest lies. *See id.*; Separate Views 4. Treating these factors as a key unlocking *other factors*, which then did all the work, hardly takes them into account at all.

**4.     The Government argues that Commissioner Kearns' approach "to defining the domestic industry … is entirely consistent with the statutory scheme." Gov't Resp. at 10. Please describe how Commissioner Kearns' position that "the Commission's related parties analysis, like its material injury analysis, focuses exclusively on the production of the domestic like product, FRCs," is unsupported by substantial evidence or not in accordance with law. <u>Views of the Commission on Remand</u> at 9 (ITC), Feb. 11, 2026, ECF No. 117 ("<u>Remand Results</u>").**

**<u>RESPONSE</u>:** Facts involving out-of-scope products bear on at least two of the five factors in the related-party analysis.

*First*, Factor 2—the reason Amsted has decided to import FRCs—requires the Commission to examine the commercial realities that explain the company's decision. Even in a material-injury analysis, the non-attribution test looks broadly to relevant "economic factors." 19 U.S.C. § 1677(7)(B)(ii). The Commission must consider factors such as non-subject products to ensure it is not misattributing injury. *See* SAA 851-52. Here, no assessment of Amsted's reason to import could ignore that Amsted uses its Mexican and domestic facilities to produce complementary products so it can offer bundled rail products to customers. *FRC* 1345; Amsted Posthearing Br., PR151/CR152, 2-3.

*Second*, Factor 5—whether Amsted's primary interest lies in importation—also implicates out-of-scope products. As this Court held, determining the benefit to Amsted from its subject

imports—and thus the risk it would act against the domestic industry—requires understanding how subject imports factored into Amsted's domestic operations as a whole. For example, that the majority of Amsted's domestic operations produced "other rail products," which were "bundl{ed}" with imported FRCs, indicated that the imports did not "materially injure{}" Amsted. *FRC* 1344-45.

Commissioner Kearns' contrary conclusion fails on its own terms. He first contended that, because the Commission's material-injury analysis is tailored to the domestic like product, the related-party analysis must have the same focus. Remand Views 24. But Congress knew how to focus the material-injury inquiry on the harms to production of "a domestic like product" "by reason of imports of the subject merchandise," 19 U.S.C. §§ 1673b(a)(1), 1677(4)(A), and declined to do so with regard to the related-party analysis. That question instead turns on corporate operations as a whole. *See* § 1677(4)(B) (related party status turns on "direct{} or indirect{} control" of a producer or importer). This makes sense: A domestic producer's integration into a broader operation, not simply its like-product production, determines its "interests" and whether they are to "act against the domestic industry." *Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 100 F.Supp.3d 1314, 1326 (CIT 2015). The substantial-benefit analysis should and traditionally does track this statutory focus: The Commission asks whether the producer's relationship reveals an interest in imports adverse to the domestic industry. It does not make sense for the Commission to zoom in on the domestic like product and blind itself to the interests at work.

That is why this Court consistently asks, "whether the *domestic producer* substantially benefits from the relation to the subject imports," not whether the *domestic like product* does. *Empire Plow Co. v. United States*, 11 CIT 847, 852, 675 F.Supp.1348, 1353 (1987) (emphasis added); *see also Changzhou*, 100 F.Supp.3d at 1329 (examining "the benefit *the company* received"

(emphasis added)); *Allied Mineral Prods., Inc. v. United States*, 28 CIT 1861, 1871 (2004) (company obtained a substantial benefit by importing subject merchandise for use in its refining operations); *Fujifilm N. Am. Corp. v. United States*, 821 F.Supp.3d 1373, 1378 (CIT 2026) (remanding for consideration whether an "orderly withdrawal of U.S. production to be replaced by subject imports" substantially benefitted company). A company may substantially benefit when it "replace{s}" or supplements domestic production of the like good with "subject imports," and focusing on the like good alone will miss that benefit. *Id*.

None of its own determinations that the Government cites (at 11-12) suggests otherwise. In each, the Commission simply concluded that a domestic producer's imports did not substantially benefit that producer vis-à-vis other domestic producers. *See Brake Rotors from China*, Inv. No. 731-TA-744 (Final) USITC Pub. 3035, pp. 14-15 (Apr. 1997) ("{I}mportation activities did not cause {the companies'} financial performance on their domestic production to benefit vis a vis the domestic rotor producers that did not import subject rotors from China."); *Rock Salt from Canada*, Inv. No. 731-TA-239 (Final), USITC Pub. 1798, pp. 12-13 (Jan. 1986) (similar); *Chassis and Subassemblies from Mexico, Thailand, and Vietnam*, Inv. Nos. 701-TA-755-756 and 731-TA-1734-1736 (Preliminary), USITC Pub. 5612 (Apr. 2025) at 19 (similar). The determinations certainly do not purport to license the Commission to blind itself to the benefit a company's *entire* domestic operation receives.

5.     **Is "{t}his case akin to the survivor bias scenario" described by the Commission, <u>Remand Results</u> at 19, where "a domestic producer replaces domestic production with imports, {such that} excluding the producer from the domestic industry would skew the data in terms of the domestic industry's performance"? <u>Id.</u> at 18–19.**

<u>RESPONSE</u>: No. As Commissioner Johanson and Chair Karpel (a majority) concluded, Amsted "did not move production to Mexico … due to subject import competition," but rather for other business purposes: It could better serve "its largest rail customers that had shifted their own

8

production to Mexico." Separate Views 5-6; *see FRC* 1347. As the Court recently explained, this scenario is "very similar" to "the example provided in the legislative history … of an appropriate case in which a related party *should be excluded*." *Fujifilm*, 821 F.Supp.3d at 1379 (emphasis added). A company that makes a "management decision" to "better align supply with demand" by engaging in the "orderly withdrawal of U.S. production" and "replace{ment} by subject imports" substantially benefits from imports and should be excluded. *Id.* at 1378-79.

*Excluding* a company will always *affect* the data, but to simply label any impact as *skewing* is arbitrary rather than reasoned, inviting results-oriented decision-making. *See* FRC 1348. It does not *skew* the data to exclude a producer under *the circumstances in which Congress contemplated exclusion. Fujifilm*, 821 F.Supp.3d at 1379. Rather, excluding a company that benefits from subject imports would, in this case, "leave a domestic industry comprised of the only domestic manufacturer that is claiming material injury by subject imports." *FRC 1345*. That is a necessary *correction*, not a distortion.

6.      **How should we reconcile the fact that FRC and overall capacity utilization at Granite City [[                                  ]] over the course of [[      ]], see Amsted's Post Hearing Br. at 29–30 (May 25, 2023), P.R. 151, C.R. 152, with the fact that "[[    ]] FRC jobs were lost in {Amsted's} Granite City {facility} from 2020 to 2021," Remand Results at 21?**

        **RESPONSE:** That capacity utilization at Granite City [                                    ] while FRC jobs [                    ] from 2020 to 2021 is neutral as to the Commission's exclusion of Amsted under the majority's five factor analysis.

        In 2022, Amsted's capacity utilization [                                        ], while M&T's [                    ]. Final Staff Report ("FSR")  at III-6, Table III-6. Moreover, while both M&T and Amsted [        ] between 2020 and 2021, both companies experienced an [

] from 2020 to 2022 and [

]. FSR at III-15, Table III-13; H-4 at Table H-4.

The fluctuations in capacity utilization and employment reflected cyclical business conditions, exacerbated by "the COVID-19 pandemic and resulting economic shock," then increased demand in 2022. FSR at II-10. The Staff reported that "Questionnaire responses and outside data often show demand for FRC's as depressed in 2020 to 2021 and then increasing in 2022." FSR at II-11. Moreover, increased demand in 2022 was "attributable, at least in part, to a [      ] increase in [                                        ]. FSR at III-10 n.8.

As a result, both M&T and Amsted experienced [              ] in production between 2020 and 2021, then even [                  ] in 2022, with overall production for both companies [                  ]. FSR at III-6, Table II-6. These facts—which are not relevant to the domestic-industry definition—also do not support an affirmative determination of material injury, whether Amsted is excluded or not.

7.    **How should we consider the testimony from Amsted's workers? <u>See Remand Results</u> at 22, 25, 30; Gov't Resp. at 23, 28.**

<u>RESPONSE</u>: Commissioner Kearns and the Government refer to testimony before the Commission in *FRC I*—not in *FRC II*, the present investigation. As the POI of *FRC I* ended in 2021, this testimony came before the domestic industry's turnaround in 2022, reflected only in the record of *FRC II*. Indeed, at the May 18, 2023 Hearing in *FRC II*, Amsted's union representative did not echo the testimony of her predecessor. Rather, she acknowledged that "Amsted is hiring more production workers at the Granite City facility," and that "Amsted's actions appear to demonstrate that its interests are greater in their import operations than in their U.S. production." Brown Testimony, Tr. at 31-32 (May 18, 2023). These statements support Amsted's *exclusion* from the domestic industry, contrary to Commissioner Kearns's determination to include

Amsted. *See USEC, Inc. v. United States*, 25 CIT 49, 61, 132 F.Supp.2d 1, 12 (2001) ("{T}he {related parties} provision's purpose is to exclude from the industry headcount domestic producers substantially benefitting from their relationships with foreign exporters."); *Changzhou Trina,* 39 CIT at 1117–18, 100 F.Supp.3d at 1326 ("This provision was enacted 'so that domestic producers whose interests in the imports were strong enough to cause them to act against the domestic industry would be excluded….'") (quoting *USEC,* 25 CIT at 61, 132 F.Supp.2d at 12).

8.      **What authorities best support your overall argument?**

        **RESPONSE:** *Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 39 CIT 1105, 100 F.Supp.3d 1314 (2015); *Allied Mineral Prods., Inc. v. United States,* 28 CIT 1861 (2004);  and *NSK Corp. v. United States*, 33 CIT 1185, 637 F.Supp.2d 1311 (2009).

9.      **Are there any recent or pending Supreme Court, Federal Circuit, or USCIT cases that may affect the court's analysis?**

        **RESPONSE:** *Fujifilm N. Am. Corp. v. United States*, 821 F.Supp.3d 1373 (CIT 2026).

Dated: June 4, 2026

Respectfully submitted,

*/s/ C. Kevin Marshall*
C. Kevin Marshall
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
202.879.3851
ckmarshall@jonesday.com

*Counsel for Wabtec Corporation*

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Ned H. Marshak
GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave. NW #650
Washington, D.C. 20005
202.783.6881
aschutz@gdlsk.com

*Counsel for Strato Inc.*

*/s/ James M. Smith*
James M. Smith
Sooan (Vivian) Choi
Wanyu Zhang
John Catalfamo
COVINGTON & BURLING LLP
850 10th Street, NW
Washington, D.C. 20001
202.662.5550
jmsmith@cov.com

*Counsel for Strato Inc.*

**Consol. Ct. No. 23–00157**                                      **PUBLIC VERSION**

## Addendum To Submission

The court may decide to hold oral argument upon review of the parties' submissions. Accordingly, the court would also like each party to indicate in an addendum to its submission:

1. Whether counsel will be available to appear for oral argument in New York City on any of June 23, 24, or 25; and

2. Whether oral argument would aid the court's resolution of this case.

**RESPONSE:** As the Plaintiffs explain in their Comments on Remand, the Court should vacate and remand for the Commission to determine whether the domestic industry, properly defined to exclude Amsted, is materially injured by subject imports; after such a determination and party comments on it, the Court may wish to receive oral argument. And if the Court is not inclined to vacate and remand as Plaintiffs argued in their Comments on Remand, then, as they also explain in their Comments, further briefing is warranted on Chair Karpel's finding of material injury to a domestic industry that excludes Amsted; after such briefing, oral argument may be warranted. Subject to these observations, Plaintiffs are available and happy to provide oral argument on any of the dates the Court identified.

15263113_1